**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**(ALBANY DIVISION)**

KYLE BOURGAULT, in his official capacity as Sheriff of Rensselaer County, New York;

PATRICK R. ENGLE, in his official capacity as Sheriff of St. Lawrence County, New York;

ROBERT E. MILBY, in his official capacity as Sheriff of Wayne County, New York;

FREDERICK A. AKSHAR, in his official capacity as Sheriff of Broome County, New York;

TODD M. HOOD, in his official capacity as Sheriff of Madison County, New York;

ERIC A. BUTLER, in his official capacity as Sheriff of Cattaraugus County, New York;

PAUL ARTETA, in his official capacity as Sheriff of Orange County, New York,

PETER R. BARNETT, in his official capacity as Sheriff of Jefferson County, New York,

JEFFREY R. BROWN, in his official capacity as Sheriff of Saratoga County, New York;

MICHAEL CARPINELLI, in his official capacity as Sheriff of Lewis County, New York;

JAY D. COOK, in his official capacity as Sheriff of Franklin County, New York;

CRAIG S. DUMOND, in his official capacity as Sheriff of Delaware County, New York;

RICHARD C. GIARDINO, in his official capacity as Sheriff of Fulton County, New York;

DON HILTON, in his official capacity as Sheriff of Oswego County, New York;

BRIAN SCHENCK, in his official capacity as Sheriff of Cayuga County, New York;

Plaintiffs,

Civil Action No. 1:26-cv-1637 (MAD/ML)

Related Cases:
No. 1:26-cv-1360 (MAD/ML);
No. 1:26-cv-1281 (MAD/ML)

v.

KATHY HOCHUL, in her official capacity as Governor of the State of New York,

LETITIA A. JAMES, in her official capacity as Attorney General of the State of New York, and

THE STATE OF NEW YORK,

Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Sheriffs Kyle Bourgault, Patrick Engle, Robert Milby, Frederick Akshar, Todd Hood, Eric Butler, Paul Arteta, Peter Barnett, Jeffrey Brown, Michael Carpinelli, Jay Cook, Craig DuMond, Richard Giardino, Don Hilton, and Brian Schenck ("Plaintiffs"), in their official capacities, bring this action against New York Governor Kathy Hochul, New York Attorney General Letitia James, and the State of New York ("Defendants") for declaratory and injunctive relief, alleging as follows:

**INTRODUCTION**

1. Congress has established a comprehensive framework of immigration enforcement that encourages voluntary partnerships between federal authorities and state and local law-enforcement agencies. Through statutes like 8 U.S.C. §§ 1357(g), § 1103(a), and § 1231(g), Congress empowered the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), and the U.S. Marshals Service ("USMS") to enter into written agreements under which local officers and local jails assist in the identification, detention, and removal of aliens who are present in the United States in violation of federal law.

2. New York's county sheriffs are independently elected constitutional officers under Article XIII, § 13 of the New York Constitution. They are not subordinates or agents of the Governor or the Attorney General. Under the New York Constitution's guarantees of Home Rule (Article IX)

and Separation of Powers, and under the independent status of their office, they possess the authority to make their own judgments about whether and how to participate in the cooperative framework Congress created.

3. Exercising their independent judgment, Plaintiffs have entered into a variety of formal cooperative agreements with federal immigration authorities. These agreements include Section 287(g) Memoranda of Agreement ("MOA"), USMS Intergovernmental Agreements ("IGA") that authorize ICE as a user, and dedicated ICE Intergovernmental Service Agreements ("IGSA"). Through these arrangements, Plaintiffs have identified and processed removable aliens who pose risks to public safety in their communities and have provided housing for federal detainees. As a result of their willing cooperation with immigration enforcement, Plaintiffs have received federal funding that facilitates those partnerships—including through the State Criminal Alien Assistance Program ("SCAAP") and Operation Stonegarden grants.

4. These partnerships are now under attack. On May 27, 2026, Governor Kathy Hochul signed Chapter 55 of the Laws of 2026, enacting into law the Public Protection and General Government budget bill (S9005-C / A10005-C). Part LL of that bill enacted a suite of provisions that entrench New York as a sanctuary jurisdiction for criminal aliens. Two of those provisions, which are the subject of this action, include the "Local Cops, Local Crimes Act" (codified at Executive Law § 170-K) and the enabling act for the Office of Immigrant Trust ("OIT") (codified at Executive Law § 63-E). Together, those statutes dismantle the cooperative arrangements Plaintiffs have lawfully chosen to maintain.

5. Executive Law § 170-K prohibits local law-enforcement agencies and local correctional facilities from entering into, remaining in, or extending 287(g) agreements or contracts to house individuals for civil immigration violations. It declares existing agreements "not consistent with

state law" and "void and unenforceable," and it requires that 287(g) agreements be terminated by August 25, 2026. For agreements to house or detain individuals for federal immigration violations, the statute requires agencies to exercise any applicable termination provision within three months after August 25, 2026. Those housing agreements will thus become void and unenforceable on November 25, 2026.

6. Meanwhile, Executive Law § 63-E establishes OIT within the Department of Law, under the direction and control of the Attorney General. OIT is armed with sweeping investigative, subpoena, inspection, and civil-enforcement powers designed to police compliance with § 170-K and to second-guess the independent judgments of elected sheriffs concerning federal cooperation with immigration enforcement.

7. Together, these provisions do more than express a policy preference. They nullify the ability of independently elected constitutional officers to enter into contracts authorized by federal law. In doing so, they subject those officers' core law-enforcement judgments to centralized state oversight and control.

8. The resulting harm is imminent and irreparable. On August 25, 2026, existing 287(g) agreements become void and unenforceable by operation of law. On that same day, a three-month clock starts for the termination of existing agreements to house certain federal detainees. The Attorney General has already issued pre-enforcement letters requiring adherence to these prohibitions, and OIT has issued investigative demands seeking proof of compliance. Absent immediate relief from this Court, Plaintiffs will be stripped of their independent authority to maintain lawful cooperative agreements, will lose the operational and financial benefits of those agreements, and will face investigative coercion directed at their core constitutional functions.

9. Plaintiffs therefore bring this action to vindicate their rights under the U.S. Constitution—including under the Contracts Clause, the Tenth Amendment's prohibition on reverse commandeering, and the preemptive effect of the Supremacy Clause. Likewise, Plaintiffs invoke their rights under the New York Constitution—including its protections for the independent office of Sheriff, its Home Rule provisions, and its guarantee of the Separation of Powers. Plaintiffs' claims are distinct from those at issue in *United States v. New York*, No. 1:26-cv-1360 (N.D.N.Y.) because they are brought by independently elected constitutional officers whose own agreements are being nullified. They raise different questions about the autonomy of county law enforcement authorities and the state's ability to override the policy choices of local public officials regarding their resources, jails, and public-safety priorities.

10. Plaintiffs seek a declaratory judgment that Executive Law §§ 170-K and 63-E are unconstitutional, a permanent injunction prohibiting the enforcement of these provisions against Plaintiffs, and a temporary restraining order and preliminary injunction that preserves the *status quo* and bars further enforcement of these statutes pending a final judgment.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

12. This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

13. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' claims arising under the New York Constitution.

14. Venue is proper in the Northern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and because multiple Plaintiffs reside and operate their offices and jails within this District.

15. This action is related to *United States v. New York*, No. 1:26-cv-1360 (N.D.N.Y.), and *New York v. United States*, No. 1:26-cv-1281 (N.D.N.Y.), both pending in this District. Assignment consistent with Local Rule 3.3 and the Court's related-case practices is appropriate.

## THE PARTIES

### Plaintiffs

16. Plaintiff Kyle Bourgault is and has been Sheriff of Rensselaer County, New York, since 2024. He brings this action in his official capacity.

17. Plaintiff Patrick Engle is and has been Sheriff of St. Lawrence County, New York, since 2024. He brings this action in his official capacity.

18. Plaintiff Robert Milby is and has been Sheriff of Wayne County, New York, since 2022. He brings this action in his official capacity.

19. Plaintiff Frederick Akshar is and has been Sheriff of Broome County, New York, since 2023. He brings this action in his official capacity.

20. Plaintiff Todd Hood is and has been Sheriff of Madison County, New York, since 2018. He brings this action in his official capacity.

21. Plaintiff Eric Butler is and has been Sheriff of Cattaraugus County, New York, since 2024. He brings this action in his official capacity.

22. Plaintiff Paul Arteta is and has been Sheriff of Orange County, New York, since 2023. He brings this action in his official capacity.

23. Plaintiff Peter Barnett is and has been Sheriff of Jefferson County, New York, since 2023. He brings this action in his official capacity.

24. Plaintiff Jeffrey Brown is and has been Sheriff of Saratoga County, New York, since 2026. He brings this action in his official capacity.

25. Plaintiff Michael Carpinelli is and has been Sheriff of Lewis County, New York, since 2012. He brings this action in his official capacity.

26. Plaintiff Jay Cook is and has been Sheriff of Franklin County, New York, since 2023. He brings this action in his official capacity.

27. Plaintiff Craig DuMond is and has been Sheriff of Delaware County, New York, since 2018. He brings this action in his official capacity.

28. Plaintiff Richard Giardino is and has been Sheriff of Fulton County, New York, since 2019. He brings this action in his official capacity.

29. Plaintiff Don Hilton is and has been Sheriff of Oswego County, New York, since 2019. He brings this action in his official capacity.

30. Plaintiff Brian Schenck is and has been Sheriff of Cayuga County, New York, since 2014. He brings this action in his official capacity.

31. Each Plaintiff is an independently elected constitutional officer under Article XIII, § 13 of the New York Constitution. That provision states that "the sheriff ... of each county shall be chosen by the electors once in every three or four years as the legislature shall direct" and that "Sheriffs shall hold no other office." The Governor may remove an elective sheriff only after giving them a copy of the charges and an opportunity to be heard in their defense.

32. Before entering upon the duties of their office, each Plaintiff took and subscribed the constitutional oath required by Article XIII, § 1 of the New York Constitution: "I do solemnly

swear (or affirm) that I will support the constitution of the United States, and the constitution of the State of New York, and that I will faithfully discharge the duties of the office of Sheriff, according to the best of my ability."

33. All Plaintiffs share the same federal and state constitutional interests and are properly joined under Federal Rule of Civil Procedure 20.

**Defendants**

34. Defendant Kathy Hochul is the Governor of the State of New York. She is sued in her official capacity. As Governor, she must "take care that the laws are faithfully executed," which now includes Executive Law §§ 170-K and 63-E. NY Const. art. 4 § 3.

35. Defendant Letitia James is the Attorney General of the State of New York. She is sued in her official capacity. The Attorney General is responsible for directing, controlling, and supervising OIT and its investigative and enforcement activities under Executive Law § 63-E. Any declaratory or injunctive relief entered against the Attorney General and the State of New York necessarily binds OIT and all persons acting under its authority.

36. Defendant State of New York is a sovereign state of the United States.

## LEGAL AND FACTUAL ALLEGATIONS

### The Cooperative Framework of Immigration Enforcement

37. The U.S. Constitution vests the federal government with exclusive and plenary authority over immigration. That authority derives principally from the Naturalization Clause, which grants Congress the power "[t]o establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. The Supreme Court has held that the Naturalization Clause, together with the federal government's sovereign power over foreign relations, confers upon the political branches broad and exclusive authority to regulate the entry, presence, and removal of aliens. *See Arizona*, 567 U.S. at 394–95.

38. Article II, § 3 of the Constitution requires the President to "take Care that the Laws be faithfully executed." This duty extends to the enforcement of the immigration laws enacted by Congress. Meanwhile, the Supremacy Clause (U.S. Const. art. VI, cl. 2) provides that the Constitution and the laws of the United States made in pursuance thereof "shall be the supreme Law of the Land." State laws that conflict with federal immigration law, or that stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, are preempted. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000).

39. Exercising this authority, Congress has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, is the scaffolding of that scheme. A core element of the INA is the system of partnerships it authorizes to leverage the unique position of local law enforcement agencies (who routinely encounter removable aliens in the course of their ordinary operations).

40. Central to that cooperative framework is 8 U.S.C. § 1357(g). That statute authorizes the federal government to "enter into a written agreement with … any political subdivision of a State" that permits "an officer or employee of the … subdivision" to "perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." These agreements are undertaken at the expense of the subdivision, and must be consistent with State and local law.

41. Section 1357(g) requires that participating local officers receive adequate training in the enforcement of federal immigration laws, and that they remain subject to the supervision of federal authorities when performing immigration functions. 8 U.S.C. § 1357(g)(2)–(5). The written

instruments authorized by § 1357(g) are commonly known as "287(g) agreements" and operate under several recognized models.

42. Congress expressly preserved the inherent authority of state and local officers to cooperate with federal immigration enforcement even in the absence of a formal 287(g) agreement. Section 1357(g)(10) provides that an agreement is not required for any local officer or employee "to communicate with [DHS] regarding the immigration status of any individual ... or otherwise to cooperate with [DHS] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States."

43. Congress has also authorized cooperative arrangements for the detention of aliens. Under 8 U.S.C. § 1103(a)(11)(B), the federal government may enter into agreements with any State or political subdivision for the necessary construction, physical renovation, acquisition of equipment, supplies, or materials required to establish acceptable conditions of confinement and detention services. Separately, 8 U.S.C. § 1231(g) empowers DHS to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," and to expend the amounts necessary when using non-federal facilities. Together, these statutes serve as the authority for federal agencies to contract with local law enforcement agencies to house their detainees.

44. These provisions reflect Congress's deliberate judgment that effective immigration enforcement requires partnerships with local officers and local jails. Federal agencies, in turn, have implemented this framework through a series of formal programs and funding mechanisms that enable state and local law enforcement agencies to collaborate on immigration enforcement.

45. Under the 287(g) program, ICE enters into written MOAs with participating state and local law-enforcement agencies. Designated officers of those agencies receive specialized training and are authorized to perform specified immigration-enforcement functions under federal supervision.

ICE currently operates the 287(g) program under three primary models. Under the Jail Enforcement Model ("JEM"), trained local officers identify and process removable aliens who are already in the agency's custody on state or local charges. Under the Warrant Service Officer ("WSO") model, trained local officers are authorized to serve and execute administrative immigration warrants on aliens in their custody. And under the Task Force Model ("TFM"), trained local officers may exercise limited immigration authority in the course of their routine duties and may participate in ICE-led enforcement operations.

46. ICE also enters into Intergovernmental Service Agreements with local jails and correctional facilities. These IGSAs authorize the housing of ICE detainees in local facilities and provide for reimbursement of the costs of detention. USMS likewise enters into Intergovernmental Agreements with local jails for the housing of federal prisoners. The standard USMS IGA form includes a provision (commonly designated "Block 19") that expressly authorizes other federal agencies, including ICE, to use the facility to house their detainees under the same terms.

47. Beyond these contractual tools, Congress has further encouraged local participation in immigration enforcement through dedicated funding programs. The SCAAP program, administered by the U.S. Department of Justice's ("DOJ") Bureau of Justice Assistance pursuant to 8 U.S.C. § 1231(i), provides federal payments to states and localities that incur costs for incarcerating certain criminal aliens. SCAAP funds must be used for correctional purposes.

48. Operation Stonegarden, administered by DHS through the Federal Emergency Management Agency ("FEMA"), provides federal grant funding to eligible state and local law-enforcement agencies. The program's purpose is to enhance coordination between CBP and state and local agencies in order to strengthen border security along routes of ingress from international borders (including land, water, and travel corridors). Funds may be used for operational overtime,

equipment, personnel support, and other costs related to joint border-security and immigration-enforcement activities.

**The Role of New York Sheriffs in Immigration Enforcement**

*The Three Pillars of Sheriff Autonomy*

49. The New York Constitution establishes three independent but mutually reinforcing pillars of local autonomy that protect the authority of county Sheriffs to make their own judgments about local law-enforcement priorities. That authority extends to Sheriffs' decisions to enter cooperative arrangements with other entities—including federal immigration authorities.

50. The first pillar is the independence of the elected office of Sheriff. Article XIII, § 13 of the New York Constitution provides that "the sheriff ... of each county shall be chosen by the electors once in every three or four years as the legislature shall direct" and that "Sheriffs shall hold no other office." The Governor may remove an elective sheriff only after providing a copy of the charges and an opportunity to be heard in the sheriff's defense. N.Y. Const. art. XIII, § 13(a). The Sheriff is therefore a constitutional officer whose core law-enforcement functions are not subordinate to the Governor, the Attorney General, or any other statewide executive official.

51. Courts have long recognized the independent status of the office. *See Hanley v. New York*, 250 A.D. 552, 553 (1st Dept. 1937) (holding that sheriffs are independent state officers); *Enstrom v. New York*, 258 A.D. 672, 676 (2nd Dept. 1940) (recognizing the sheriff's "status as an independent agent" and "as a separate adjunct of the courts and of the State"). In light of this independent status, the core authority and duties of a sheriff cannot be altered by ordinary legislation. *See Commisso v. Meeker*, 8 N.Y.2d 109, 123 (1960) (holding that a county's liability for a sheriff's actions cannot be changed without a constitutional amendment).

52. The second pillar is home rule. Article IX, § 1 of the New York Constitution sets forth a "Bill of rights for local governments," expressly guaranteeing "effective local self-government" and enumerating rights including elected legislative bodies, the power to elect or appoint local officers, and authority over local property and services. Section 2 reinforces this by directing the Legislature to organize local governments so as to secure these rights. Under that scheme, local governments have broad affirmative powers to adopt laws relating to their "property, affairs or government" (§ 2(c)(i)), and to enumerated subjects such as the "powers, duties, … protection, welfare and safety of [their] officers and employees" (§ 2(c)(ii)(1)).

53. Sheriffs, as independently elected county officers charged with local law enforcement, operate within this home rule framework. The practices of Sheriffs and local correctional facilities are quintessential matters of local "property, affairs or government." *See City of New York v. Patrolmen's Benevolent Ass'n of the City of New York*, 89 N.Y.2d 380, 393–394 (1996) (holding that matters relating to law enforcement personnel constitute protected local affairs). Sheriffs manage county jails, allocate resources, set law-enforcement priorities, and enter contracts for their operation. The Legislature may act with respect to these local affairs only by general law or by special law upon a proper home-rule request. *See Wambat Realty Corp. v. New York*, 41 N.Y.2d 490, 493–96 (1977) (construing home rule protections). For the State to enact a law regulating local affairs without complying with home rule requirements, its interest in the subject matter must be substantial. *See Adler v. Deegan*, 251 N.Y. 467, 489–91 (1929) (permitting state intrusion only where a statewide interest predominates over local concerns).

54. The third pillar is Separation of Powers. The New York Constitution distributes governmental authority among distinct branches and officers. Courts have long recognized a robust implied doctrine that prevents one branch or level of government from usurping or unduly

interfering with the core functions of another. *See Boreali v. Axelrod*, 71 N.Y.2d 1, 11 (1987) (invalidating an executive agency's actions because they "usurped the Legislature's prerogative"); *County of Oneida v. Berle*, 49 N.Y.2d 515, 522 (1980) ("It is a fundamental principle of the organic law that each department should be free from interference, in the discharge of its peculiar duties, by either of the others"). An attempt by the Governor or the Attorney General to nullify the law-enforcement judgments of a constitutionally elected Sheriff concerning the use of local resources and personnel violates the separation of powers. *See Schumer v. Holtzman*, 60 N.Y.2d 46, 55 (1983) (observing that interference with the authority of a "constitutional officer chosen by the electorate … implicates separation of powers considerations"); *Cuomo v. New York State Commn. on Ethics & Lobbying in Govt.*, 44 N.Y.3d 141, 152 (2025) (acknowledging that the New York Constitution "reflects the intended diffusion of the power within the executive branch").

55. Together, these pillars secure for New York's Sheriffs the authority to decide—free from centralized state override—whether and how to participate in the cooperative framework of immigration enforcement that Congress created and federal agencies implement.

*Federal Constitutional Protections for Sheriffs*

56. The independent authority of Sheriffs is reinforced by two protections afforded to them by the U.S. Constitution. The first of these protections comes from the Contracts Clause, which provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Clause was adopted to prevent the States from using their legislative power to evade or nullify contractual obligations, whether those obligations run to private parties or arise from agreements entered by state actors. *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22–25 (1977); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242, 244–45 (1978).

57. The Supreme Court applies a three-step test to evaluate claims under the Contracts Clause: (1) whether the state law substantially impairs the obligation of an existing contract; (2) whether the state has a significant and legitimate public purpose for the impairment; and (3) whether the impairment is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation. *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12 (1983). The Clause "was intended to protect agreements from impairment by fluctuating policies of temporary state legislative majorities." *U.S. Trust Co.*, 431 U.S. at 16. Where a state actor is a party to the contract at issue, "the State's self-interest is at stake," so "these contracts occupy … a special status for Contract Clause purposes," and "must be more scrupulously examined." *Baltimore Tchrs. Union, Am. Fed'n of Tchrs. Loc. 340, AFL-CIO v. Mayor & City Council of Baltimore*, 6 F.3d 1012, 1019 (4th Cir. 1993) (citation modified).

58. When New York's Sheriffs exercise their authority under the State constitution by entering into written cooperative agreements with federal immigration authorities, those agreements are protected by the Contracts Clause. The Clause therefore safeguards the Sheriffs' policy judgments against free-wheeling state nullification.

59. Local Sheriff autonomy is further reinforced by the structural principles of dual sovereignty embodied in the Tenth Amendment. That Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Supreme Court has held that the Tenth Amendment's division of authority between the federal government, the states, and the people is designed to protect individual liberty. *Bond v. United States*, 564 U.S. 211, 222 (2011) ("By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power."); *Printz v. United States*, 521 U.S. 898,

921 (1997). As the Court has explained, this "constitutional division of power is for the benefit of the individual, not the State or state officials." *New York*, 505 U.S. at 181–82.

60. The anti-commandeering doctrine is the principal judicial expression of this dual-sovereignty principle. Under that doctrine, the federal government is barred from conscripting state legislatures or executive officers into enforcing federal regulatory programs. *See Printz*, 521 U.S. at 935 (Congress may not "commandeer" state officers to implement federal background-check requirements); *New York*, 505 U.S. at 161 (Congress may not compel states to enact and enforce federal radioactive-waste regulations). Nothing in the Tenth Amendment's text or the Court's elaboration of the doctrine, however, confines this structural protection to a single direction. Federalism involves two sovereigns, and both must be restrained from encroaching on the sovereignty of the other. *See* Margaret Hu, *Reverse-Commandeering*, 46 U.C. Davis L. Rev. 535, 537–38, 546 (2012).

61. If the federal government cannot commandeer states to advance federal ends, then states cannot commandeer local governments or officials to obstruct those same ends—particularly in a field of plenary federal authority like immigration. This structural protection carries particular force where the local officials being conscripted are independently elected officers under the State constitution. New York's Sheriffs occupy precisely that status. They are not mere administrative appendages of the State but independent actors uniquely positioned to translate federal partnerships into public-safety outcomes. *See* David J. Barron, *The Promise of Cooley's City: Traces of Local Constitutionalism*, 147 U. Pa. L. Rev. 487, 490–91 (1999) (local governments "are important political institutions that are directly responsible for shaping the contours of 'ordinary civic life in a free society'" and should receive constitutional protection from state coercion).

62. When Sheriffs exercise their independent authority by participating in the cooperative framework of immigration enforcement, the Tenth Amendment supplies a federal safeguard against state legislation that would nullify their policy judgments and subject their decision-making to centralized state control. *See* Richard C. Schragger, T*he Attack on American Cities*, 96 Tex. L. Rev. 1163, 1218–20 (2018) (exploring a municipal anti-commandeering principle grounded in the Tenth Amendment's reservation of power to the people). In that sense, the Amendment guards against state actions that undermine local democratic choice (here, the sheriffs' electoral mandate to prioritize public safety through removal of criminal aliens), impose unfunded mandates (termination of revenue-generating contracts), and override the sheriffs' home-rule discretion over "property, affairs or government." *See* Pratheepan Gulasekaram et al., *Anti-Sanctuary and Immigration Localism*, 119 Colum. L. Rev. 837, 860–70 (2019).

**The Current Climate of Cooperative Immigration Enforcement in New York**

63. Seizing on their independent authority and constitutional protections, New York Sheriffs have actively engaged in cooperative immigration-enforcement. Until May 2026, that participation was neither abstract nor isolated. It was a concrete, operational reality across the State—reflected in routine informal practices, formal written agreements, and federal funding streams that both supported and depended upon local-federal cooperation.

*Informal Cooperation Practices*

64. Plaintiffs have historically cooperated with federal immigration authorities through informal, day-to-day practices. Those practices include notifying ICE of the scheduled release of foreign-born inmates, honoring lawful detainers for a reasonable travel window, sharing information about individuals already in local criminal custody, and coordinating with federal task-force officers and border agents operating in their counties.

65. These informal practices are ordinary extensions of the same professional courtesy Sheriffs afford to every other American jurisdiction that has a warrant or detainer for a person sitting in a county jail. A federal immigration warrant or detainer is treated no differently from a warrant from a neighboring county or a neighboring state. The purpose is simple and non-ideological: to ensure that a person already lawfully arrested on state or local charges is fully identified before the jailhouse door opens, and that any jurisdiction with a lawful claim to custody has a reasonable opportunity to take that person.

66. In border and near-border counties, informal cooperation is especially routine. The Sheriffs in St. Lawrence, Franklin, Clinton, Jefferson, Oswego, Wayne, Orleans, and Cayuga Counties work daily with CBP's Swanton Sector, Homeland Security Investigations ("HIS"), and other federal partners on cross-border smuggling, human trafficking, and related investigations. Advance notice of federal operations, safety positioning of local units, and orderly handoffs at the jail are standard practice.

67. Even in non-border counties, informal notification and limited holds for travel time are the baseline. Plaintiffs do not, as a matter of ordinary practice, release a person known to be the subject of a federal immigration warrant simply because no formal 287(g) agreement is in place. The absence of a written memorandum does not mean the absence of cooperation.

*Formal 287(g) Agreements across New York*

68. Beginning in 2018, a growing number of New York law-enforcement agencies entered formal written agreements with ICE under 8 U.S.C. § 1357(g). By May 2026, approximately fourteen such agreements were active across nine counties. The agreements spanned all three models that ICE offers: the Jail Enforcement Model, the Warrant Service Officer Model, and the Task Force Model.

69. The first and longest-running agreement in New York is the Jail Enforcement Model MOA between the Rensselaer County Sheriff's Office and ICE. Originally executed in 2018 under Sheriff Patrick Russo and restated in 2020, the agreement has remained continuously in force through the Trump, Biden, and second Trump administrations. Under the agreement, designated jail personnel—trained, certified, and supervised by ICE—perform limited immigration functions inside the Rensselaer County Correctional Facility. The functions include interrogation concerning alienage and removability, service of administrative warrants at the time of scheduled release, preparation of charging documents for ICE supervisory review, and issuance of detainers. ICE provides the training, credentials, database access, and information-technology infrastructure. The County pays only the ordinary salaries and benefits of the participating officers.

70. The Rensselaer JEM program has produced measurable results. Between 2018 and mid-2026, the facility processed a consistent population of foreign-born inmates (approximately 46 in 2023, 56 in 2024, 76 in 2025, and 55 in the first eight months of 2026). Designated officers turned over nine individuals to federal authorities, including a person wanted for a sex crime committed in Ireland. In October 2024, the facility booked two Venezuelan nationals arrested near the Albany-Rensselaer Amtrak station in connection a homicide that occurred in Connecticut. *See* WNYT, "Rensselaer Police Arrest Pair from Venezuela in Connection with Homicide" (Oct. 17, 2024), https://wnyt.com/top-stories/rensselaer-police-arrest-pair-from-venezuela-in-connection-with-homicide/. ICE issued detainers and the individuals were held for federal processing. County Executive Steve McLaughlin and a majority of the Rensselaer County Legislature have supported continuation of the program as a core public-safety tool.

71. For nearly seven years, Rensselaer County's JEM agreement stood as the sole formal 287(g) partnership in New York. Then, in February and March 2025, Nassau County became the

second jurisdiction to enter formal 287(g) agreements. The Nassau County Police Department and the Nassau County Sheriff's Office executed MOAs that included both TFM and WSO components. Under these agreements, designated personnel received ICE training and authorization to perform specified immigration functions. Nassau's entry marked the beginning of a rapid expansion of formal cooperation statewide.

72. In March 2025, the Broome County Sheriff's Office executed a WSO MOA with ICE. Approximately eight staff members were subsequently trained and designated. The agreement was limited to the service of immigration warrants and the completion of transfers of individuals already in local criminal custody at the moment of scheduled release. No community arrests, traffic stops, or street-level questioning were authorized. Federal agencies, including ICE, had long housed detainees at the facility under separate arrangements. The WSO agreement formalized the handoff process at the point of release. Sheriff Frederick Akshar publicly described the decision as a public-safety measure ensuring that corrections staff were properly trained to handle immigration warrants on individuals already in custody. *See* WICZ, "Broome County Sheriff's Office Announces Participation in ICE 287(g) Program" (Mar. 21, 2025), https://www.wicz.com/news/broome-county-sheriffs-office-announces-participation-in-ice-287-g-program/article_7fdbbcb7-f300-4484-8305-2f2267cd0db4.html.

73. In May 2025, the Niagara County Sheriff's Office entered two 287(g) agreements—one under the WSO model and one under TFM. These agreements extended formal cooperative authority to a major northern-border county and reflected the same operational logic already present in the other 287(g) counties. Trained local officers, operating under ICE supervision, would identify and process removable individuals who were already in local criminal custody. Under the

TFM component, meanwhile, Niagara would perform limited immigration functions in the course of ordinary law-enforcement duties.

74. In July 2025, two additional upstate counties entered formal agreements. On June 30, 2025, Madison County signed a WSO MOA with ICE . The agreement's stated purpose was "to promote public safety by facilitating the custodial transfer of specific aliens in LEA jail/correctional facilities to ICE for removal purposes at the time of the alien's scheduled release from criminal custody." Designated officers were authorized only to serve and execute warrants of arrest for immigration violations, serve warrants of removal, and transport designated aliens to ICE-approved facilities upon the agency's request.

75. From September 2025 onward, the Office honored approximately seven ICE detainer requests involving individuals charged locally with robbery, driving while intoxicated, weapons offenses, and rape. One case involved a person arrested locally for a violent sexual assault who, upon release from the facility, was transferred to ICE. *See* Spectrum News 1, "Cooperation with ICE: A Breakdown of New York Counties That Work with Federal Immigration Agencies" (Feb. 16, 2026), https://spectrumlocalnews.com/nys/central-ny/news/2026/02/16/cooperation-with-ice--a-breakdown-of-which-new-york-counties-work-with-federal-immigration-agencies-.

76. Also in July 2025, the Steuben County Sheriff's Office executed 287(g) agreements that included both WSO and TFM components. These agreements authorized designated personnel to perform limited immigration functions inside the jail (and, under the TFM, in the course of ordinary law-enforcement duties). Steuben's participation extended the formal cooperative network into the Southern Tier.

77. In October 2025, the Otsego County Sheriff's Office entered a WSO MOA. The agreement authorized designated officers to serve immigration warrants and complete custodial transfers of

individuals already in the county jail at the time of scheduled release. Like the other WSO agreements, it was confined to the facility and to persons already in local criminal custody.

78. By late 2025, the Cattaraugus County Sheriff's Office maintained an active TTFM agreement with ICE. Designated personnel were authorized to perform limited immigration functions in the course of ordinary law-enforcement duties under ICE supervision.

79. Several municipal police departments also entered formal 287(g) agreements during this period. The Village of Camden Police Department in Oneida County executed a TFM agreement. The Allegany Village Police Department in Cattaraugus County and the Wayland Police Department in Steuben County likewise entered TFM agreements. These municipal arrangements, while smaller in scale, formed part of the same statewide expansion of formal cooperation with immigration enforcement.

80. The expansion was neither sudden nor isolated. It reflected an exercise of independent judgment by local law-enforcement leaders that formal cooperation with federal immigration authorities advances public safety. The agreements produced documented results: removable individuals charged with serious local crimes were identified, processed, and transferred to federal custody in an orderly manner rather than released back into the community.

*U.S. Marshals Service IGAs with ICE Pass-Through Capacity*

81. Parallel to the 287(g) program, numerous New York county jails maintain IGAs with USMS for the housing of federal prisoners. Many of those agreements expressly list ICE as an authorized agency user in Block 19 of the standard USMS form. The practical effect is that the same local correctional facilities that house USMS and BOP prisoners also supply bed space, on a reimbursable basis, for individuals held under ICE authority.

82. In Rensselaer County, Sheriff Kyle Bourgault signed a restated USMS IGA in November 2024. The agreement is perpetual unless terminated, authorizes approximately 145 federal beds at a per-diem rate of $136.00, and lists ICE as an authorized user alongside BOP. A 2017 modification had already added ICE as a rider, and the 2024 restatement continued that authorization. Federal housing revenue under the agreement runs in the millions of dollars annually (approximately $2.08 million in 2023, $2.16 million in 2024, and $3.89 million in 2025). The County also maintains a separate Memorandum of Understanding with CBP's Swanton Sector for the housing of federal detainees at $130 per night.

83. In Broome County, the Sheriff's Office maintains a longstanding USMS IGA for the housing of federal detainees at the Broome County Correctional Facility. The current operative agreement (No. 52-02-0066), signed by Sheriff Frederick Akshar on April 12, 2024, establishes a per-diem rate of $110.00 and expressly authorizes ICE as an "Other Authorized Agency User." Those payments offset the cost of operating a 600-bed jail whose average daily population is approximately 460. The facility has regularly housed both USMS and ICE detainees, with the ICE population reaching several dozen at a time. Either party may terminate only upon 30 days' written notice. An earlier iteration of the same relationship dates to April 2002.

84. In St. Lawrence County, Sheriff Patrick Engle signed a restated USMS IGA on July 31, 2026. The agreement authorizes housing of federal prisoners at $129.00 per day, lists ICE as an authorized agency user in Block 19, requires separate invoices to ICE's Eastern Regional Office when ICE prisoners are housed, and requires release of federal prisoners only to officers of the committing agency. Although the estimated federal bed allocation is modest, the contractual authorization of ICE as a user is unambiguous.

85. In Madison County, the Board of Supervisors authorized updated rates under the existing USMS IGA by Resolution No. 25-218 (dated October 7, 2025). The current per-diem rate is $110.00, while the guard/transportation hourly rate is $34.54. The estimated federal bed allocation under the IGA is six. Block 19 of the agreement lists ICE as an authorized agency user. The purpose clause permits the Marshals Service "or other authorized agency user as noted in block #19" to house individuals detained on federal charges or federal court orders. Billing provisions require separate invoices to ICE's Enforcement and Removal Office ("ERO") in Buffalo.

86. In Orleans County, the County Legislature approved a multi-year USMS IGA in March 2021 to house federal detainees at the Orleans County Jail. The agreement set a per-diem rate of $115.00 and provided additional reimbursement of $40.00 per hour for transport and court-appearance services. Sheriff Christopher Bourke projected that the arrangement could generate several hundred thousand dollars annually for the County. *See* Orleans Hub, "Orleans Approves Agreement to House Federal Detainees in County Jail" (Mar. 25, 2021), https://orleanshub.com/orleans-approves-agreement-to-house-federal-detainees-in-county-jail/. At the time of approval, the jail had substantial unused capacity (approximately 30 inmates in a facility rated for 82). The agreement supplied the federal government with secure bed space in western New York while providing the County with funds that offset taxpayer costs.

87. In Cayuga County, the Sheriff's Office has maintained a USMS IIGA (Agreement No. 52-92-0072) since September 30, 2002, for the housing of federal prisoners at the Cayuga County Jail. The Agreement establishes a fixed per-diem rate and contemplates use by federal agencies, including for the secure custody of federal detainees. Termination requires 30 days' written notice. The facility has served as a resource for federal detention needs in central New York. Sheriff Brian Schenck's Office has also provided operational support to federal partners (including perimeter

security and command coordination for HSI operations) consistent with the cooperative relationships that accompany formal housing agreements.

88. In Oswego County, the Sheriff's Office has maintained a longstanding USMS IGA for the housing, safekeeping, and subsistence of federal prisoners at the county Jail. The agreement follows the standard USMS form and establishes a formal binding relationship for the detention of persons charged with federal offenses. Sheriff Don Hilton has affirmed that the Office continues to notify federal immigration authorities of removable aliens in custody and assists with orderly transfers. *See* OCNN, "Oswego County Sheriff Will Continue to Cooperate with Immigration Enforcement" (Feb. 6, 2025), https://www.oswegocountynewsnow.com/news/oswego-county-sheriff-will-continue-to-cooperate-with-immigration-enforcement/article_48c7704e-e3f7-11ef-b46e-7fc1499d6db7.html. These are practices that align with the cooperative framework supported by the county's USMS housing relationship.

89. In Cattaraugus County, the Sheriff's Office maintains an active USMS Intergovernmental Agreement (Agreement No. 55-09-0026) for the housing of federal detainees at the Cattaraugus County Jail. The Agreement, signed by then-Sheriff Timothy S. Whitcomb on February 19, 2015, expressly authorizes ICE as an "Other Authorized Agency User" and contemplates the housing of individuals "who are awaiting a hearing on their immigration status or deportation." The Agreement provides a firm per-diem rate of $101.00 and authorizes up to 30 beds. Either party may terminate only upon 30 days' written notice (or in an emergency).

90. These federal housing arrangements have functioned in practice as ICE pass-through capacity. Through them, the federal government has obtained secure bed space for immigration across New York. In exchange, the participating counties have received per-diem reimbursement

that offset taxpayer cost. The resulting partnerships have allowed the orderly, supervised transfer of removable aliens already in local criminal custody.

*Dedicated ICE Intergovernmental Service Agreements*

91. In addition to USMS IGAs, at least two counties have maintained a dedicated IGSA with ICE for the housing of civil immigration detainees.

92. Orange County has maintained a dedicated ICE IGSA for detention services at the Orange County Jail in Goshen since 2008 (original Contract No. DROIGSA-08-0026 and successor instruments). Under this agreement, the County provides secure bed space, custody, care, and related services for individuals held under ICE authority, and receives per-diem reimbursement from the federal government. The facility has housed substantial numbers of ICE detainees over the years. In earlier periods, the average daily population of ICE detainees reached well into the hundreds. More recent data continue to show a significant ICE presence. The agreement has generated millions of dollars in federal reimbursement over its lifespan, offsetting a meaningful portion of the cost of operating the jail.

93. Clinton County has likewise maintained a formal agreement with ICE for the housing of immigration detainees. Since the opening of the Clinton County Jail in 2006, the County and ICE had an arrangement under which the facility held a designated number of beds (approximately 25) for ICE detainees. That agreement was a twenty-year arrangement that remained in force until it expired in March 2026. During its life, the facility regularly housed ICE detainees, and in multiple recent years ICE accounted for the majority of the federal population at the jail. The County received per-diem reimbursement (approximately $82 per day in the early 2020s). Although the agreement expired of its own terms in March 2026, it formed part of the pre-May 2026 cooperative climate in which New York county jails supplied secure, reimbursable bed space directly to ICE.

*Planned and Authorized Partnerships*

94. In addition to these existing 287(g) agreements, USMS IGAs, and ICE IGSAs, several Plaintiffs were taking concrete steps toward new or expanded cooperative arrangements that had not yet been fully executed by May 2026.

95. In St. Lawrence County, Sheriff Engle evaluated a 287(g) agreement beginning in mid-2025. After public comment, committee review, and a full Board of Legislators hearing, the Board adopted Resolution No. 44-2026 on February 2, 2026, by a vote of 11–4. The resolution authorized the Sheriff to enter a JEM MOA with ICE, required annual review and regular reporting, and expressly found the proposal "to be in the County's interest for public safety." The County Attorney was to review the form, and ICE was prepared to train the officers. The process was interrupted only by the subsequent enactment of the statutes at issue in this case. Sheriff Engle has not withdrawn his intent to enter a 287(g) partnership, and the Board has not rescinded its resolution.

96. In Wayne County, Sheriff Robert Milby took concrete steps in 2025 toward a WSO agreement. Between July and September 2025, he initiated discussions with ICE's National Program Manager for the 287(g) program, and specifically requested a modification to Appendix A so that the Office would not be responsible for transporting detainees. Although those discussions never produced a signed memorandum of agreement, the steps were real and advanced. Separately, Wayne County has historically maintained a USMS Intergovernmental Agreement that contemplates ICE as an authorized user. Sheriff Milby has been working to update and expand that instrument to increase federal housing capacity and secure associated per-diem payments.

97. These planned and authorized arrangements demonstrate that the cooperative framework was not static. Independently elected sheriffs continued to evaluate, and their local governing

bodies continued to authorize, additional formal partnerships right up to the moment that the State prohibited them.

*Federal Funding Streams Supporting Cooperation*

98. These cooperative practices have both generated and were supported by two principal streams of federal funding: SCAAP and Operation Stonegarden.

99. SCAAP, administered by DOJ's Bureau of Justice Assistance, reimburses state and local governments for a portion of the costs of incarcerating undocumented criminal aliens who have been convicted of certain offenses. Eligibility and payment depend on the ability of the local jurisdiction to identify the relevant population and to submit inmate-level data that DHS reviews. Plaintiff counties that maintain formal or informal cooperation with federal immigration authorities consistently received SCAAP awards in the years leading up to 2026.

100. Among the State's counties, Orange County has received the largest and most consistent awards (approximately $144,000 in FY 2021, $92,000 in FY 2022, $241,000 in FY 2023, and $236,000 in FY 2024). Broome and Franklin Counties have also received substantial awards (approximately $40,000–$48,000 and $58,000–$63,000, respectively). St. Lawrence, Wayne, Rensselaer, Jefferson, Chautauqua, Steuben, Oswego, and Clinton Counties have also received recurring reimbursements of up to $20,000. These funds are typically applied to jail medical costs, training, equipment, and other operational needs that would otherwise fall entirely on local taxpayers.

101. Operation Stonegarden, a DHS/FEMA grant program administered in New York through the Division of Homeland Security and Emergency Services, funds overtime, mileage, equipment, and related costs for joint operations along the northern border. Participation is

predicated on active cooperation with federal border and immigration partners. Plaintiff counties along or near the Canadian border have received substantial multi-year awards.

102. St. Lawrence County received approximately $300,000 of Stonegarden funding in each of FY 2022 and FY 2023, and $290,000 in FY 2024. A substantial portion of each award was passed through to municipal police departments and state agencies working the same border corridor. Franklin County has received approximately $280,000–$290,000 in Stonegarden funds annually, while Jefferson County's awards have risen significantly (from approximately $134,000 in FY 2022 to $325,000–$350,000 in later years). Clinton, Oswego, Wayne, Orleans, Chautauqua, and Cayuga Counties have likewise received consistent six-figure awards. These funds support border-patrol operations, K-9 work, equipment purchases, and overtime that local budgets could not otherwise sustain.

103. The existence and continuity of SCAAP and Stonegarden funding in the Plaintiff counties is evidence of the cooperative enforcement climate that prevailed in New York until May 2026. Federal agencies do not award reimbursement and border-security grants to jurisdictions that refuse to identify criminal aliens or that decline to work with federal partners. The awards confirm both the operational reality of cooperation and the financial interdependence on which immigration enforcement rests.

**The "Local Cops, Local Crimes Act" and OIT**

104. The climate of cooperative immigration enforcement came to an abrupt end with the enactment of Chapter 55 of the Laws of 2026. On May 27, 2026, Governor Kathy Hochul signed the Public Protection and General Government budget bill (S.9005-C / A.10005-C). *See* Press Release, Gov. Kathy Hochul, "Governor Hochul Signs Comprehensive Immigration Plan to Protect New Yorkers Against ICE" (May 29, 2026), https://www.governor.ny.gov/news/governor-

hochul-signs-comprehensive-immigration-plan-protect-new-yorkers-against-ice. Part LL of that bill contained a suite of provisions designed to entrench New York as a sanctuary jurisdiction, and to prohibit the very forms of local-federal cooperation that Plaintiffs had lawfully chosen to maintain. Two of those provisions are the subject of this action.

*Executive Law § 170-K*

105. Executive Law § 170-K, the so-called "Local Cops, Local Crimes Act," is the central provision at issue in this case. Its text is sweeping, its deadlines are fixed and imminent, and its effect is to nullify the cooperative arrangements that New York Sheriffs had lawfully chosen to maintain.

106. The statute begins by declaring a broad prohibition. Section 170-K(2) provides that no local government, law-enforcement agency, or correctional facility may enter into, modify, renew, remain in, or extend: (1) any 287(g) agreement or similar arrangement allowing officers to perform immigration functions, or (2) any agreement to house or detain individuals for federal civil immigration violations (including agreements under 8 U.S.C. § 1103(a) or § 1231(g)). The prohibition is not limited to formal written instruments. It also extends to any informal arrangement that would permit a local law enforcement agency to perform immigration functions or house individuals detained for immigration purposes.

107. The statute then turns to existing agreements. Section 170-K(7)(a) provides that any 287(g) agreement already in force "shall be deemed not consistent with state law" and shall therefore become "void and unenforceable" in its entirety ninety days after the statute's enactment (i.e. August 25, 2026). The statute requires each agency that is a party to a 287(g) MOA to exercise any applicable termination provision by that date. If the agency fails to do so, the agreement is nevertheless deemed null and void by operation of law.

108. For any existing ICE IGSAs and USMS IGAs with ICE pass-through capacity, Section 170-K(7)(b) requires the local agency to exercise any applicable termination provision within three months after the statute's effective date (i.e. November 25, 2026). After that period, any remaining housing agreement becomes void and unenforceable by operation of law.

109. The practical effect of § 170-K is immediate and severe. On August 25, 2026, every existing 287(g) agreement in New York becomes void and unenforceable. On that same day, a three-month clock begins to run on every existing agreement under which a local jail houses individuals for federal civil immigration purposes. At the end of that three-month period, those housing agreements become void.

110. The statute does not merely discourage cooperation; it extinguishes the very tools of cooperation that Congress authorized and that federal agencies have implemented for decades. By nullifying those agreements, the statute overrides the independent judgments of constitutionally elected Sheriffs and substitutes them with a statewide policy of non-cooperation on immigration enforcement. By setting fixed, short deadlines and by declaring the agreements void by operation of law, § 170-K also creates a self-executing prohibition that does not depend on case-by-case adjudication. The only remaining question is how the State will use the statute to punish any Sheriff that declines to comply.

*Executive Law § 63-E*

111. Executive Law § 63-E creates the enforcement machinery designed to give teeth to the prohibitions in § 170-K. It establishes OIT as a new bureau under the direction and control of the Attorney General. The statute vests OIT with a suite of investigative, subpoena, inspection, and civil-enforcement powers that are expressly calibrated to compel local compliance with § 170-K and override the independent judgments of elected Sheriffs.

112. Section 63-E(3) grants OIT the power to investigate any local government, law-enforcement agency, or correctional facility that the Attorney General has reason to believe is violating the prohibitions of § 170-K. This investigative authority is not only triggered by complaints submitted to the Office; it may be exercised on the Attorney General's own initiative. OIT is authorized to (1) issue subpoenas and enforce witness attendance, (2) administer oaths and examine witnesses, (3) examine, copy, or remove documents and records "notwithstanding any laws to the contrary," and (4) visit and inspect all local correctional facilities (including speaking with detainees to investigate violations and ensure compliance).

113. Section 63-E(5) also arms OIT with civil-enforcement authority. If a local law-enforcement agency has failed to terminate a 287(g) agreement by the August 25, 2026, deadline, has failed to unwind a prohibited housing agreement within the three-month window that follows, or has otherwise remained in a prohibited arrangement, OIT can take legal action. Specifically, it may commence a civil action in state court seeking injunctive relief, civil penalties, and any other remedy the Attorney General deems appropriate. The statute does not require OIT to make any preliminary showing or to exhaust avenues for informal resolution. The mere existence of a prohibited agreement after the statutory deadline is sufficient to trigger enforcement.

114. Section 63-E does not confine OIT's mandate to the mechanical enforcement of termination deadlines. The Office is charged with ensuring that local agencies do not engage in any formal or informal cooperation that the Attorney General construes as inconsistent with the non-cooperation policy of § 170-K. In practical terms, this means that OIT is empowered to second-guess the day-to-day operational judgments of independently elected Sheriffs—whether those judgments concern the honoring of a federal detainer for a reasonable travel window, the

sharing of information about a foreign-born inmate already in local custody, or the maintenance of a USMS IGA that lists ICE as an authorized user.

115. The creation of OIT transforms § 170-K's prohibitions into a regime of ongoing, centralized supervision. The Attorney General is not merely empowered to sue after the fact; she is equipped with a dedicated bureau whose mission is to monitor, investigate, and compel compliance by local constitutional officers. The combination of broad investigative authority, compulsory process, on-site inspection power, and civil-enforcement authority places the independent policy judgments of elected Sheriffs under continuous state scrutiny.

*The Post-Enactment Posture of Aggressive Enforcement*

116. From the moment of enactment, the State has made clear that it intends to enforce Executive Law §§ 170-K and 63-E aggressively and without delay. The State has pursued that objective through parallel litigation, formal pre-enforcement demands, public statements, and the exercise of OIT's newly created investigative powers.

117. On June 22, 2026—less than one month after the Governor signed the budget bill—the State filed an affirmative lawsuit in this District. *See New York v. U.S. Department of Justice*, No. 1:26-cv-1281 (N.D.N.Y.). In that action, the State seeks a declaratory judgment that Executive Law § 170-K is constitutional, and requests an injunction restraining the federal government from interfering with its enforcement. The filing was a deliberate signal that the State was prepared to aggressively litigate the validity of the new prohibitions.

118. The same day, Governor Hochul and Attorney General James held a joint press conference and issued public statements defending the statutes. They characterized § 170-K as a necessary measure to ensure that "local resources are being used for local crimes," asserted that the State possessed the "sovereign right" to enact such laws, and vowed that "we will defend them

every step of the way." Those statements confirmed that the State viewed the new prohibitions as a core policy priority and intended to litigate and enforce them vigorously. *See* Press Release, N.Y. State Off. of the Att'y Gen., "Governor Hochul and Attorney General James Sue To Defend New Community Safety Laws" (June 22, 2026), https://ag.ny.gov/press-release/2026/governor-hochul-and-attorney-general-james-sue-defend-new-community-safety-laws.

119. Simultaneously, the State has defended the statutes in a parallel action brought by the federal government. *See United States v. New York*, No. 1:26-cv-1360 (N.D.N.Y.); Press Release, U.S. Dep't of Justice, "Justice Department Files Complaint Challenging New York Mask Ban and Identification Requirements for Federal Officers" (June 23, 2026), https://www.justice.gov/opa/pr/justice-department-files-complaint-challenging-new-york-mask-ban-and-identification. In that case, DOJ sought a preliminary injunction against enforcement of § 170-K (among other provisions). The State opposed the motion in full, arguing that the statute is a lawful exercise of state authority over local governments and that the federal government lacked standing or a likelihood of success on its preemption and Contracts Clause theories.

120. While this dual litigation was pending, the State began enforcement efforts. On July 24, 2026, the newly created OIT sent pre-enforcement letters to the twelve New York law-enforcement agencies that then held active 287(g) agreements. The letters notified the recipients that state law requires them to terminate those agreements by August 25, 2026, demanded a written response by August 14, 2026 describing the steps taken to comply, and warned of the consequences of non-compliance. Governor Hochul and Attorney General James announced the letters as OIT's "first enforcement action," declaring that "nobody is above the law" and that the State "will not tolerate the diversion of local resources for federal civil immigration enforcement." *See* Press Release, N.Y. State Off. of the Att'y Gen., "Attorney General James & Governor Hochul Announce

First Enforcement Action by New Office of Immigrant Trust to Ensure Compliance with the Local Cops, Local Crimes Act" (July 24, 2026), https://ag.ny.gov/press-release/2026/attorney-general-james-and-governor-hochul-announce-first-enforcement-action-new.

121. On August 3, 2026, this Court issued a Memorandum-Decision and Order denying the United States' motion for a preliminary injunction with respect to Executive Law § 170-K. The Court concluded that the United States had not, at that stage, demonstrated a likelihood of success on its obstacle-preemption or Contracts Clause claims. The Order, however, left open significant questions about the statute's validity—particularly as applied to independently elected constitutional officers whose own agreements are being nullified. The State nevertheless publicly celebrated the Order as confirmation that "New York's ban on 287(g) agreements is legal and will keep our communities safe." *See* Press Release, "N.Y. Att'y Gen., Attorney General James and Governor Hochul Defend New York 287(g) Ban from Federal Attack" (Aug. 3, 2026), https://ag.ny.gov/press-release/2026/attorney-general-james-and-governor-hochul-defend-new-york-287g-ban-federal.

122. On August 14, 2026 (the deadline for responses to OIT's July 24 pre-enforcement letters), Governor Hochul and Attorney General James issued a joint public statement. They reported that five of the twelve agencies had indicated an intention to comply, while the remaining seven (including several Plaintiffs) still had until August 25 to "formally unwind their agreements with ICE." The statement reiterated that "our job is to enforce the law, and that is exactly what we plan on doing." *See* Press Release, N.Y. State Gov., "Statement From Governor Kathy Hochul and Attorney General Letitia James"(Aug. 14, 2026), https://www.governor.ny.gov/news/statement-governor-kathy-hochul-and-attorney-general-letitia-james-2.

123. Five days later, on August 19, 2026, OIT escalated from pre-enforcement letters to formal investigative demands issued pursuant to Executive Law § 63-E(3). Demands were served on the Broome County Sheriff's Office, the Rensselaer County Sheriff's Office, and the Cattaraugus County Sheriff's Office, among others. The demands command the production of a broad array of documents concerning the agencies' 287(g) agreements, housing arrangements, communications with federal authorities, and internal policies, with a return date of August 25, 2026. The demands invoke OIT's statutory investigative authority and warn of the obligation to preserve all related documents.

124. The sequence is deliberate and unmistakable. Within weeks of enactment, the State filed an affirmative lawsuit seeking judicial validation of the prohibitions. It publicly vowed to defend and enforce the statutes. It issued formal pre-enforcement letters demanding termination by a fixed deadline. When some agencies declined to respond, it escalated to compulsory investigative demands timed to coincide with the statutory voiding date. At every step, the State has signaled that it intends to use the full machinery of § 63-E to compel Plaintiffs to abandon the cooperative arrangements they lawfully entered under their independent constitutional authority.

**Consequences and Irreparable Harm**

125. The statutes at issue inflict concrete, imminent, and irreparable injuries on Plaintiffs in their official capacities. Those injuries fall into several overlapping categories.

126. First, counties that still maintain active 287(g) agreements face involuntary voiding on August 25, 2026, coupled with active OIT investigation. Rensselaer County's JEM agreement, continuously in force since 2018, remains operational. Cattaraugus County's TFM agreement and Steuben County's WSO/TFM agreements likewise remain in force. On July 24, 2026, OIT sent each of these offices a pre-enforcement letter demanding termination plans by August 14. On

August 19, OIT issued formal investigative demands to Rensselaer and Cattaraugus Counties (among others). The demands require production of documents showing steps taken to terminate the agreements by August 25. Absent immediate relief, these Plaintiffs will lose trained, ICE-credentialed officers, systems access, and years of operational experience overnight. The agreements cannot be revived after the fact. The credentials and training pipelines cannot be rebuilt in a day. Any removable individual released after the voiding date because formal warrant service is forbidden cannot be retrieved.

127. Second, the 287(g) terminations already effected in Broome and Madison Counties were coerced. Sheriff Akshar of Broome County entered a WSO agreement in early 2025, trained approximately eight officers, and operated the program. On July 24, he received an OIT pre-enforcement letter. This was followed by an investigative demand on August 19. The next day, under the compulsion of the statute and the pending demand, he sent ICE formal notice that the MOA would terminate effective August 25. He stated that the termination was the result of forced compliance with § 170-K, and that the county remained committed to public safety.

128. Sheriff Hood of Madison County, meanwhile, signed a WSO MOA in June 2025. During the time it was active, his Office honored approximately seven ICE detainers involving individuals charged with robbery, DWI, weapons offenses, and rape. On July 28, after receiving a pre-enforcement letter from OIT, the County Attorney (acting under the statute's command) immediately terminated the agreement. Both terminations were the direct result of state coercion backed by investigative process, not of any independent judgment that the programs had failed.

129. Third, the statute forecloses 287(g) agreements that local democratic processes had already authorized or that sheriffs were actively pursuing. In St. Lawrence County the Board of Legislators—after public comment, committee review, and a full hearing—adopted Resolution

No. 44-2026 by a vote of 11–4. The resolution authorized Sheriff Engle to enter a JEM MOA, required annual review and regular reporting, and expressly found the proposal "to be in the County's interest for public safety." The process was interrupted only by the enactment of Executive Law § 170-K. Sheriff Engle has not withdrawn his intent to pursue a 287(g) agreement, and the Board has not rescinded the resolution.

130. In Wayne County, meanwhile, Sheriff Milby initiated concrete negotiations with ICE toward a WSO agreement (including a requested modification to Appendix A) and was simultaneously working to update the County's USMS IGA to expand federal housing capacity. Both efforts were halted by the statute. The injury is the foreclosure of a completed local authorization and of active contract negotiation—not a speculative interest in some future program.

131. Fourth, longstanding federal housing arrangements are now under a legal cloud that threatens both operational capacity and revenue. Multiple Plaintiffs maintain USMS IGAs that expressly list ICE as an authorized agency user in Block 19 (including Rensselaer, Broome, St. Lawrence, Madison, Steuben, Cattaraugus, Orleans, Cayuga, and Oswego). Orange County maintains a dedicated ICE IGSA dating to 2008. Section 170-K prohibits agreements to house individuals for federal civil immigration violations and starts a three-month termination clock on August 25, 2026. Even if the State later claims that it did not intend to reach pure criminal-prisoner housing, federal partners that need beds have every reason to treat facilities whose sheriffs are under OIT investigation as legally risky. The loss or freeze of these relationships will idle capacity, shift millions of dollars of jail cost onto county taxpayers, and strand federal agencies that have relied on these upstate facilities for years.

132. Fifth, the loss of formal, supervised screening and warrant-service capacity inside the jails creates an irreversible public-safety risk. Without designated 287(g) officers, Plaintiffs are

left with informal notification and hope. They can still attempt to coordinate with ICE, but they can no longer possess trained, credentialed personnel who can serve a federal immigration warrant at the moment of scheduled release and complete the transfer under ICE supervision. If a removable individual charged with a serious local crime (e.g., rape, robbery, weapons offenses, homicide-related charges) walks out because that formal step is gone, the release cannot be reversed. The risk is concrete, not theoretical. The 2024 homicide suspects processed in Rensselaer, the sexual-assault case transferred in Madison,, and the border-smuggling and human-trafficking cases that regularly appear in St. Lawrence illustrate the stakes.

133. Sixth, the investigative and enforcement apparatus of OIT inflicts ongoing irreparable injury. Plaintiffs have already received pre-enforcement letters and, in several cases, formal investigative demands timed to § 170-K's voiding date. OIT is empowered to enter local jails, examine records, interview detainees, compel testimony, and bring civil actions or place jurisdictions under monitoring. Continuing any form of cooperation invites further investigation and litigation. Ceasing cooperation, on the other hand, forces Plaintiffs to accept harmful public-safety and fiscal consequences. That forced choice is incompatible with the unique constitutional status and authority of the Office of Sheriff.

134. Seventh, the statutes displace the independent judgment that the New York Constitution and county voters have vested in the Office of Sheriff. Plaintiffs evaluated the available 287(g) models and housing contract options, sought or obtained local legislative authorization where required, entered or pursued these agreements, staffed them, and ran them. Those decisions were exercises of core law-enforcement authority over jail management and public-safety priorities. The State has now declared the results of that local democratic and professional process illegal because ICE was involved, and has stood up a bureau controlled by

the Attorney General to police the prohibition. That is not "local cops, local crimes." It is a statewide political override of county public-safety judgments, followed by coercive investigation of the officials who made those judgments.

135. Eighth, the statutes force Plaintiffs into a non-cooperation posture with the federal government that places critical federal funding streams at immediate risk. On April 28, 2025, President Trump issued an executive order directing the Attorney General and the Secretary of Homeland Security to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate." § 3, Executive Order 14287, *Protecting American Communities From Criminal Aliens*, 90 Fed. Reg. 18761, 18761-62 (May 2, 2025). By prohibiting sheriffs from entering or remaining in 287(g) agreements, from housing individuals for federal civil immigration purposes, and from the formal and informal cooperation that those arrangements enable, Executive Law §§ 170-K and 63-E render Plaintiffs' jurisdictions non-cooperative, exposing them to the loss of these critical federal funds.

136. Several counties rely on federal SCAAP funds as partial reimbursement for costs incurred in housing removable criminal aliens. Orange County has received the largest and most consistent awards (approximately $92,000 to $241,000 in recent fiscal years); Broome, Franklin, St. Lawrence, Wayne, Rensselaer, Jefferson, Chautauqua, Steuben, Oswego, and Clinton Counties have received recurring reimbursements. Eligibility and payment depend on the ability to identify the relevant population and submit inmate-level data that DHS reviews. Border and near-border Plaintiffs likewise rely on substantial multi-year Operation Stonegarden awards (often $200,000–$350,000 or more annually, with significant pass-through to municipal partners). Those grants are predicated on active cooperation with federal border and immigration partners. Compliance with § 170-K will jeopardize Plaintiffs' eligibility for these funds and force them to divert scarce

local resources to cover the shortfall, undermining their ability to maintain public-safety operations. Once those dollars are lost, a later judgment cannot restore them.

137. These injuries are occurring now and become permanent on August 25, 2026, unless the statutes are enjoined. Training and credentials cannot be rebuilt overnight. A voided agreement cannot be un-voided after a dangerous individual has already been released. Federal partners who view a facility as legally risky to use will not return. The loss of a Sheriff's institutional independence, once overridden by state investigative coercion, cannot be redressed. Preliminary relief is thus necessary to preserve the *status quo* and to prevent irreparable harm that no subsequent remedy can repair.

## CLAIMS FOR RELIEF

### <u>Count I</u>
### Contract Impairment (Contracts Clause)

138. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

139. The Contracts Clause of the U.S. Constitution provides that "[n]o State shall … pass any … Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Supreme Court applies a three-step test to evaluate claims under the Clause: (1) whether the state law substantially impairs the obligation of an existing contract; (2) whether the state has a significant and legitimate public purpose for the impairment; and (3) whether the impairment is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation. *Energy Reserves Grp.*, 459 U.S. at 411–12; *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22–25 (1977).

140. Plaintiffs are parties to existing, enforceable contracts with federal agencies—including 287(g) MOAs, USMS IGAs that expressly authorize ICE as a user, and dedicated ICE

IGSAs. Those instruments create binding contractual relationships under which the counties provide designated personnel, secure bed space, and related services, and under which the federal government provides training, credentials, supervision, and per-diem reimbursement.

141. Executive Law § 170-K impairs those contractual relationships. The statute declares existing 287(g) agreements "not consistent with state law" and "void and unenforceable" as of August 25, 2026. It requires the local parties to exercise any applicable termination provision by that date, and f they fail to do so, renders the agreements void by operation of law. For existing housing agreements, the statute starts a three-month termination clock on the same date, after which those agreements likewise become void and unenforceable. The statute does not merely regulate future conduct; it extinguishes the legal force of contracts already in existence and already being performed.

142. The impairment is also substantial. It eliminates the core benefit of the bargains Plaintiffs struck: the ability to maintain trained, ICE-supervised officers inside the jails; the ability to house federal detainees under binding reimbursement terms; and the operational and financial predictability that those long-term arrangements provide. The statute does not leave the contractual relationships intact subject to new procedural rules; it nullifies them. Courts have recognized substantial impairment in analogous contexts. *See, e.g.*, *Spannaus*, 438 U.S. at 247 (finding impairment where the statute in question "nullifies express terms of the company's contractual obligations"); U*nited Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 630 (5th Cir. 2010) (finding impairment where the state sought to "disrupt the purpose of the contracts at issue here").

143. This Contracts Clause claim raises fundamentally different issues from those presented by the United States in *United States v. New York*, No. 1:26-cv-1360 (N.D.N.Y.), and requires the Court to reevaluate the conclusions reached in its August 3, 2026, Memorandum-

Decision and Order. In that decision, the Court assumed substantial impairment for purposes of the preliminary-injunction analysis. It then accepted the State's asserted interest in controlling the allocation of local law-enforcement resources as a significant and legitimate public purpose. It also deferred to the State's judgment on reasonableness and necessity because the United States had not shown "self-interested reneging" or supplied "compelling evidence" that the means chosen were unreasonable or unnecessary.

144. The present action is brought by the local contracting parties affected by Executive Law § 170-K. Plaintiffs are the independently elected constitutional officers whose own agreements are being nullified, whose own institutional authority is being overridden. Their claims raises distinct questions of local reliance, democratic authorization, and independent constitutional authority. Plaintiffs' unique standing, and the nature and evidence of their injuries, require a close evaluation of their Contracts Clause claim.

145. The State's asserted public purpose does not survive scrutiny when tested against the concrete record Plaintiffs bring. The State claims that § 170-K is necessary to keep local resources focused on "local crimes" and to protect public safety. Yet the agreements the statute nullifies are themselves local public-safety tools. They were entered by independently elected Sheriffs, in many cases after local legislative authorization, and operated solely with respect to individuals already in local criminal custody. These local programs produced measurable results—*viz.,* the identification and orderly transfer of removable aliens charged with serious local offenses. The State's asserted purpose of "local control" is in reality a statewide political override of the very local judgments the New York Constitution vests in the Office of Sheriff and in county governing bodies. A purpose that extinguishes this independent authority in the name of "local control" is not legitimate.

146. Nor is thwarting federal immigration enforcement and rendering New York a sanctuary safe haven a legitimate public purpose. The State's true motive—to obstruct the immigration enforcement priorities announced by the current administration—is apparent from the legislative record and the coordinated enforcement mechanisms in Executive Law § 63-E. Such a purpose cannot qualify as legitimate under the Contracts Clause. *See United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest").

147. Even if the State's asserted purpose were accepted as significant and legitimate, the means chosen are neither reasonable nor necessary. Total nullification of every existing and future 287(g) agreement, and the forced termination of longstanding housing arrangements, is not "based upon reasonable conditions" nor is it "of a character appropriate to the public purpose justifying the legislation's adoption." *Energy Reserves Grp.*, 459 U.S. at 412. Less restrictive alternatives were available and were never considered. The State could have left existing contracts undisturbed while prohibiting only new ones. It could have required additional reporting or local legislative ratification. It could have limited the prohibition to particular models or functions. Instead, the Legislature imposed a self-executing voiding regime timed to a fixed deadline, armed a new investigative bureau with compulsory process and civil-enforcement authority, and deployed that bureau to coerce compliance from the very officers whose independent judgment the Constitution protects. That combination of total nullification and investigative coercion is not tailored to any legitimate resource-allocation interest. It is an effort to substitute a political preference for Plaintiffs' constitutional autonomy.

148. Because Plaintiffs are the actual contracting parties whose own agreements and institutional authority are being destroyed, the ordinary deference afforded legislative judgments

on reasonableness and necessity does not control. The record now before the Court includes detailed evidence of specific contractual relationships, local democratic authorizations, operational reliance, coerced terminations under threat of OIT enforcement, and investigative demands timed to the statutory voiding date. That record supplies the "compelling evidence" the Court found lacking when the claim was presented solely by the United States.

149. By enacting and enforcing Executive Law § 170-K (and by deploying the investigative and civil-enforcement machinery of Executive Law § 63-E to compel compliance with that nullification), Defendants have violated, and continue to violate, the Contracts Clause of the United States Constitution.

150. Plaintiffs have no adequate remedy at law. Absent declaratory and injunctive relief, they will suffer the irreversible loss of existing contractual relationships, the operational and financial benefits those relationships provide, and the independent constitutional authority to maintain them.

**Count II**
**Reverse Commandeering (Tenth Amendment)**

151. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

152. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Supreme Court has held that the federal government may not commandeer state legislatures or executive officers into administering or enforcing federal regulatory programs. *See Printz*, 521 U.S. at 935; *New York*, 505 U.S. at 161, 188. That anti-commandeering doctrine rests on the imperative of preserving the federal and state governments

as co-equal sovereigns and of securing "to citizens the liberties that derive from the diffusion of sovereign power." *New York*, 505 U.S. at 181; *Printz*, 521 U.S. at 921.

153. Nothing in the text of the Tenth Amendment or in the Court's reasoning limits that protection to a single direction. The same structural logic that prohibits the federal government from conscripting state officers to advance federal ends prohibits the States from conscripting local public officials—particularly independently elected constitutional officers—to obstruct those same federal ends. As Professor Margaret Hu has demonstrated, the anti-commandeering principle is reversible: "federalism involves two sovereigns and both must be restrained from encroaching on the sovereignty of the other. … [T]he underlying reasoning of the anti-commandeering doctrine lends itself to, or even logically implies, protecting the federal sovereign as well as the state sovereign." *Reverse-Commandeering*, 46 U.C. Davis L. Rev. at 537–38.

154. This reverse-commandeering principle applies with particular force in the field of immigration, where the federal government possesses plenary constitutional authority and where Congress has deliberately constructed a cooperative framework that invites the voluntary participation of state and local officers. *See Arizona*, 567 U.S. at 394–95, 399–400 (2012). When a State coerces local officials into abandoning the very cooperative mechanisms Congress authorized, it does not merely regulate its own internal affairs. It commandeers those officials into a regime of obstruction that frustrates the federal scheme.

155. Executive Law §§ 170-K and 63-E effect precisely that form of reverse commandeering. Section 170-K categorically prohibits Plaintiffs, as independently elected constitutional officers, from entering into, remaining in, or extending 287(g) agreements or contracts to house individuals for federal civil immigration violations. It declares existing agreements "not consistent with state law" and "void and unenforceable," and it imposes fixed

termination deadlines. Section 63-E then arms OIT with compulsory investigative process, subpoena power, facility-inspection authority, and the power to seek civil injunctions and court-ordered monitoring against any sheriff who declines to comply. The combination of categorical prohibition and coercive enforcement does not merely express a policy preference; it conscripts Plaintiffs into a statewide regime of non-cooperation.

156. That conscription is incompatible with the unique institutional status of the Office of Sheriff under the New York Constitution and under principles of local constitutionalism. Article XIII, § 13 elevates the sheriff to an independently elected constitutional officer whose core functions—managing county jails, setting law-enforcement priorities, and contracting for detention services—cannot be wholly eviscerated by ordinary legislation. Article IX's home-rule guarantees further protect the sheriff's authority over local "property, affairs or government."

157. Sheriffs are thus not mere administrative appendages of the State. They are public officials "directly responsible for shaping the contours of ordinary civic life in a free society" and therefore entitled to constitutional protection against state coercion that overrides their independent judgments. *See David J. Barron, The Promise of Cooley's City: Traces of Local Constitutionalism*, 147 U. Pa. L. Rev. at 610–11.

158. The structural harms identified in recent scholarship on state anti-sanctuary laws apply with equal (if not greater) force when the State conscripts local officials out of cooperation. State legislation that forces localities to abandon congressionally authorized partnerships undermines local democratic choice, imposes unfunded mandates by terminating revenue-generating agreements, and overrides the home-rule discretion of independently elected officers over their own jails and public-safety priorities. *See Anti-Sanctuary and Immigration Localism*, 119 Colum. L. Rev. at 860–70.

159. By enacting and enforcing Executive Law §§ 170-K and 63-E, Defendants have reverse-commandeered Plaintiffs to obstruct federal immigration enforcement priorities in violation of the Tenth Amendment.

160. Plaintiffs have no adequate remedy at law. Absent declaratory and injunctive relief, they will continue to suffer the irreversible loss of their independent constitutional authority to maintain lawful cooperative arrangements. They will also remain subject to coercive investigative and enforcement pressure directed at their core functions.

**Count III**
**Conflict-Obstacle Preemption (Supremacy Clause)**

161. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

162. The Supremacy Clause provides that the Constitution and the laws of the United States made in pursuance thereof "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Under the Clause, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 372–73 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Courts examine congressional intent and the practical effect of the state law: if it "undermines" or "frustrates" federal objectives, it is preempted. *See Arizona*, 567 U.S. at 399–400 (state measures that interfere with the "careful balance" struck by Congress in immigration are preempted).

163. Congress devised through the INA an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. This scheme includes an intricate system of cooperation between state and local authorities and the federal government on immigration enforcement. For example, federal law contemplates that removable aliens in state custody who have been convicted of state or local offenses will generally serve their

state or local criminal sentences before being subject to removal and taken into federal custody upon the expiration of their state prison terms. *See* 8 U.S.C. §§ 1226(c), 1231(a)(1)(B)(iii), (a)(4). Further, federal authorities must "make available" to state and local authorities "investigative resources … to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A). Likewise, federal officials must "designate and train officers and employees … to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B); *and see id.* §§ 1226(c), 1231(a).

164. Congress has also authorized state and local authorities "to cooperate with the [Secretary of DHS] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B). In effectuating this provision, DHS may issue an "immigration detainer" that "serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see* 8 U.S.C. §§ 1103(a)(3), 1226(a), 1231(a), 1357(d).

165. Through 8 U.S.C. § 1357(g), Congress authorized the federal government to enter into written agreements with political subdivisions of a State under which local officers may perform immigration functions after training and under federal supervision. Through 8 U.S.C. §§ 1103(a)(11)(B) and 1231(g), Congress also authorized cooperative arrangements for the detention of aliens in non-federal facilities. Congress further preserved the inherent authority of local officers to cooperate with federal immigration enforcement even in the absence of a formal agreement. 8 U.S.C. § 1357(g)(10). These provisions reflect Congress's deliberate judgment that effective immigration enforcement requires partnerships with local officers and local jails.

166. Executive Law § 170-K stands as a direct obstacle to that framework. It categorically prohibits local law-enforcement agencies and local correctional facilities from entering into, remaining in, or extending any 287(g) agreement or any contract to house individuals for federal civil immigration violations. It declares existing agreements "not consistent with state law" and "void and unenforceable," and it imposes fixed termination deadlines. Executive Law § 63-E then creates an aggressive enforcement apparatus armed with subpoena power, facility-inspection authority, and the power to seek civil injunctions and court-ordered monitoring against non-compliant jurisdictions. The combination of self-executing nullification and coercive enforcement eliminates the very collaborative mechanisms Congress authorized and encouraged.

167. The qualifier allowing cooperative agreements "to the extent consistent with State and local law" in 8 U.S.C. § 1357(g)(1) does not save the State's categorical ban. Congress included that language to ensure that federal agreements operate within the general framework of existing, neutral state laws governing officer qualifications, contracting procedures, and similar routine matters. It does not confer on the States a veto power to enact targeted legislation that specifically prohibits, voids, and punishes the cooperative agreements Congress expressly invited. A contrary reading would permit every State to nullify the 287(g) program simply by declaring participation "inconsistent" with state law, thereby defeating Congress's intent to create a nationwide system of voluntary cooperation.

168. This obstacle-preemption claim raises issues distinct from those decided in the Court's August 3, 2026 Memorandum-Decision and Order in *United States v. New York*, No. 1:26-cv-1360 (N.D.N.Y.). In that action the United States sued as the federal sovereign seeking to preserve the cooperative framework on a facial basis. The Court concluded that the United States had not, at the preliminary-injunction stage, shown a likelihood of success on its obstacle-

preemption theory as framed in that litigation. It relied in significant part on authorities holding that participation in federal immigration enforcement is voluntary and that States may decline to cooperate. *See City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018); *County of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020), *aff'd sub nom. Ocean County Board of Commissioners v. Attorney General of New Jersey*, 8 F.4th 176 (3d Cir. 2021); and *McHenry County v. Raoul*, 44 F.4th 581 (7th Cir. 2022).

169. The present action is brought by the actual local parties whose own agreements are being nullified. The claim is therefore as-applied to the concrete impairment of existing cooperative relationships and to the coercive enforcement apparatus directed at those relationships. The combination of automatic voiding, mandatory termination deadlines, and an investigative bureau empowered to police compliance is more than a mere decision not to cooperate. It is affirmative obstruction of the specific cooperative mechanisms Congress authorized.

170. By enacting and enforcing Executive Law §§ 170-K and 63-E, Defendants have created an obstacle to the accomplishment and execution of the full purposes and objectives of Congress on the issue of immigration in violation of the Supremacy Clause.

171. Plaintiffs have no adequate remedy at law. Absent declaratory and injunctive relief, they will suffer the irreversible loss of the cooperative arrangements Congress authorized them to maintain. They will remain subject to coercive state enforcement directed at those arrangements.

**Count IV**
**Intrusion on the Office of Sheriff (N.Y. Const. Art. XIII § 13)**

172. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

173. Article XIII, § 13 of the New York Constitution provides that "the sheriff … of each county shall be chosen by the electors once in every three or four years as the legislature shall

direct" and that "Sheriffs shall hold no other office." The Governor may remove an elective sheriff only after providing a copy of the charges and an opportunity to be heard in the sheriff's defense. These provisions elevate the sheriff to an independently elected constitutional officer whose core functions are not subordinate to the Governor, the Attorney General, or any other statewide executive official.

174. New York courts have long recognized the independent status of the office. *See Hanley*, 250 A.D. at 553 (sheriffs are independent state officers); *Enstrom*, 258 A.D. at 676 (recognizing the sheriff's "status as an independent agent" and "as a separate adjunct of the courts and of the State"); *Commisso*, 8 N.Y.2d at 123 (the core authority and duties of a sheriff cannot be altered by ordinary legislation without a constitutional amendment); *Barr v. County of Albany*, 50 N.Y.2d 247, 250–52 (1980) (Article XIII, § 13 affirms the independent status of the sheriff's office separate from ordinary county government).

175. Although the Legislature may, by statute, define and regulate certain of the sheriff's custodial powers (as recognized in *McNulty v. Chinlund*, 62 A.D.2d 682 (3d Dept. 1978)), it may not eviscerate the essential independence of the constitutional office itself. *McNulty* involved ordinary minimum-standards regulations governing day-to-day internal jail administration. It does not authorize the Legislature to nullify existing intergovernmental contracts authorized by federal law, or to impose fixed termination deadlines on those contracts. It also does not authorize the Legislature to create a specialized bureau whose purpose and powers are to target the independent public-safety and contracting judgments of independently elected Sheriffs. The intrusion effected by Executive Law §§ 170-K and 63-E is qualitatively different from the regulatory measures approved in *McNulty* and strikes at the core independence of the office.

176. Executive Law §§ 170-K and 63-E, operating together, substantially impair the independent authority of the Office of Sheriff. They declare existing 287(g) agreements and housing arrangements "not consistent with state law" and "void and unenforceable," impose fixed termination deadlines, prohibit new agreements of the same character, and subject any continued exercise of the sheriff's authority to ongoing investigative coercion by OIT. Those measures do not merely regulate the internal administration of the jail; they extinguish a core aspect of the sheriff's independent public-safety judgment.

177. By enacting and enforcing Executive Law §§ 170-K and 63-E, Defendants have intruded upon the independent constitutional office of Sheriff in violation of Article XIII, § 13 of the New York Constitution.

178. Plaintiffs have no adequate remedy at law. Absent declaratory and injunctive relief, they will continue to suffer the irreversible loss of the independent authority that the New York Constitution vests in their office. They will also remain subject to coercive investigative and enforcement pressure directed at their core constitutional functions.

**Count V**
**Violation of Home Rule (N.Y. Const. Art. IX)**

179. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

180. Article IX of the New York Constitution establishes a robust system of home rule. Section 1 sets forth a "Bill of rights for local governments," guaranteeing "effective local self-government." Section 2(c)(i) grants every local government the power to adopt and amend local laws relating to its "property, affairs or government," provided those laws are not inconsistent with the Constitution or any general law. Section 2(c)(ii)(1) further authorizes local laws relating to the "powers, duties, … protection, welfare and safety of its officers and employees." Critically, the

Legislature may only act with respect to the property, affairs, or government of any local government by general law, or by special law upon a proper home-rule request. N.Y. Const. art. IX, § 2(b)(2).

181. The practices of Sheriffs' offices and local correctional facilities (managing jails, allocating resources, setting law-enforcement priorities, and entering into cooperative contracts) are quintessential matters of local "property, affairs or government." *See Patrolmen's Benevolent Ass'n*, 89 N.Y.2d at 393–94 (matters relating to law-enforcement personnel and operations constitute protected local affairs).

182. Executive Law §§ 170-K and 63-E directly invade these protected local affairs. They categorically prohibit local law-enforcement agencies and local correctional facilities from entering into, remaining in, or extending 287(g) agreements or contracts to house individuals for federal civil immigration violations; declare existing agreements "not consistent with state law" and "void and unenforceable"; impose fixed termination deadlines; and create an investigative and civil-enforcement apparatus directed at policing compliance. These measures extinguish the local democratic judgments—often reflected in formal legislative resolutions—that authorized the cooperative arrangements in the first place.

183. The State cannot justify the intrusion under the "substantial state concern" exception recognized in *Adler v. Deegan*, 251 N.Y. 467, 473 (1929), *Wambat Realty Corp*, 41 N.Y.2d at 490, and *Patrolmen's Benevolent Ass'n*, 89 N.Y.2d at 380. Under that doctrine, the Legislature may only enact a special law affecting local property, affairs, or government without a home-rule message if the subject is, to a substantial degree, a matter of statewide concern and the statute bears a reasonable relationship to that concern.

184. The cooperative arrangements §§ 170-K and 63-E nullify are themselves local public-safety tools, entered by independently elected Sheriffs and, in several counties, after formal local legislative authorization. They operate solely with respect to individuals already in local criminal custody and produce measurable public-safety benefits. The State's asserted interest in "local resource allocation" or "public safety" is therefore circular: it claims the power to override local public-safety judgments in the name of public safety. That is not the kind of supervening statewide concern recognized in *Adler* (housing and public health), *Wambat Realty* (park preservation), or *Patrolmen's Benevolent Association*, (statewide labor-relations uniformity).

185. Even if a substantial statewide concern were assumed, the means chosen are not reasonable. Total nullification of every existing and future 287(g) agreement, forced termination of longstanding housing arrangements, and the creation of a specialized investigative bureau empowered to compel compliance constitute the most drastic possible response. Less restrictive alternatives—reporting requirements, local legislative ratification, or regulation limited to particular models—were available and were never considered.

186. By enacting and enforcing Executive Law §§ 170-K and 63-E without a home-rule request, and without a sufficient substantial statewide concern reasonably related to the means chosen, Defendants have violated the home-rule guarantees of Article IX of the New York Constitution.

187. Plaintiffs have no adequate remedy at law. Absent declaratory and injunctive relief, they will continue to suffer the irreversible loss of the local autonomy that Article IX guarantees. They will remain subject to coercive state enforcement directed at core matters of local property, affairs, and government.

**<u>Count VI</u>**
**Violation of the Separation of Powers (N.Y. Constitution)**

188. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

189. Although the New York Constitution contains no explicit separation-of-powers clause, the Court of Appeals has long recognized a robust implied doctrine that prevents one branch (or level) of government from usurping or unduly interfering with the core functions of another. *See Boreali*, 71 N.Y.2d at 13–14; *Cohen v. State*, 94 N.Y.2d 1, 14 (1999); *Maron v. Silver*, 14 N.Y.3d 230, 260–61 (2010); *Bourquin v. Cuomo*, 85 N.Y.2d 781, 784–85 (1995). The doctrine is functional and context-specific: it is violated when one governmental actor is allowed to dominate, subordinate, or impair the independent functioning of another constitutional actor.

190. The Office of Sheriff is itself a constitutional office. Article XIII, § 13 elevates the sheriff to an independently elected officer whose core law-enforcement and custodial functions are not subordinate to the Governor, the Attorney General, or any other statewide executive official. That structural independence is a necessary feature of the constitutional design.

191. Executive Law §§ 170-K and 63-E violate separation-of-powers principles in two related ways. First, the Legislature has dictated the precise manner in which independently elected constitutional executive officers must exercise their core public-safety and custodial discretion. By declaring existing cooperative agreements "not consistent with state law" and "void and unenforceable," imposing fixed termination deadlines, and prohibiting new agreements of the same character, the Legislature has substituted its own policy preference for the independent judgment that the Constitution vests in the Office of Sheriff. *See Cohen*, 94 N.Y.2d at 14 (separation of powers prevents usurpation or undue interference with core functions of another branch or level of government).

192. Second, the Legislature has created, in OIT, a specialized investigative and civil-enforcement bureau whose express purpose is to police the independent judgments of those same constitutional officers. OIT is armed with compulsory subpoena power, authority to examine and remove records, power to enter and inspect local jails and interview detainees, and authority to seek civil injunctions and court-ordered monitoring. This arrangement allows one statewide elected executive official to direct, investigate, and punish another set of independently elected constitutional officers. The resulting blurring of lines of accountability and subordination of one constitutional office to another is precisely the kind of structural interference the separation-of-powers doctrine forbids. *See Maron*, 14 N.Y.3d at 260–61 (separation of powers protects the functional independence of a constitutional actor from arrangements that threaten that independence); *Boreali*, 71 N.Y.2d at 13–14 (one governmental actor may not assume functions that belong to another); Schumer, 60 N.Y.2d at 55 (interference with the authority of an elected constitutional officer implicates separation of powers considerations).

193. By enacting and enforcing Executive Law §§ 170-K and 63-E, Defendants have violated the separation-of-powers principles of the New York Constitution.

194. Plaintiffs have no adequate remedy at law. Absent declaratory and injunctive relief, they will continue to suffer the irreversible loss of the independent authority that the constitutional structure vests in their office. They will remain subject to coercive investigative and enforcement pressure directed at their core constitutional functions.

## **Count VII**
## **Derivative Challenge to the Office of Immigrant Trust**

195. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

196. Executive Law § 63-E creates OIT within the Department of Law and places it under the direction and control of the Attorney General. The Office is charged with soliciting complaints, investigating alleged violations of Executive Law § 170-K (among other provisions), issuing subpoenas, examining and removing records, inspecting local correctional facilities, interviewing detainees, and commencing civil actions for injunctive relief, assurances of discontinuance, or court-ordered monitoring.

197. The powers conferred on OIT exist to enforce the prohibitions contained in Executive Law § 170-K. The Office has no independent regulatory or enforcement mission apart from policing compliance with those prohibitions (and its companion provisions enacted on May 27, 2026). Its investigative demands, subpoenas, and civil-enforcement authority are derivative of, and wholly dependent upon, the validity of § 170-K.

198. Because Executive Law § 170-K is unconstitutional for the reasons set forth in Counts I through VI, the enforcement apparatus created solely to compel compliance with that unconstitutional statute is itself invalid as applied to Plaintiffs. An investigative and civil-enforcement regime whose only purpose is to effectuate an unconstitutional command cannot lawfully be directed against the officers whom that command targets. *See Ex parte Young*, 209 U.S. 123, 159–60 (1908) (a state officer's attempt to enforce an unconstitutional statute is "without authority of" the State and may be enjoined).

199. The investigative demands already issued to several Plaintiffs illustrate the concrete harm. Those demands compel the production of documents concerning the Plaintiffs' cooperative agreements, housing arrangements, and internal policies, with a return date timed to the statutory voiding date of August 25, 2026. The demands rest entirely on the premise that § 170-K is valid

and enforceable. Because that premise is false, the demands themselves are *ultra vires* and unconstitutional as applied to Plaintiffs.

200. By creating and deploying OIT to enforce the unconstitutional prohibitions of Executive Law § 170-K against Plaintiffs, Defendants have violated the United States Constitution and the New York Constitution.

201. Plaintiffs have no adequate remedy at law. Absent declaratory and injunctive relief, they will remain subject to ongoing investigative coercion and the threat of civil enforcement by an office whose sole purpose is to compel compliance with an unconstitutional statute.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that Executive Law § 170-K is unconstitutional under the Contracts Clause of the United States Constitution, the Tenth Amendment to the United States Constitution, and the Supremacy Clause of the United States Constitution;

B. Declare that Executive Law § 170-K is unconstitutional under Article XIII, § 13 of the New York Constitution, Article IX of the New York Constitution, and the separation-of-powers principles of the New York Constitution;

C. Declare that Executive Law § 63-E, as applied to Plaintiffs, is unconstitutional under the United States Constitution and the New York Constitution;

D. Issue a temporary restraining order and preliminary injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons acting in concert or participation with them, from enforcing Executive Law §§ 170-K and 63-E against Plaintiffs, including but not limited to any further investigative demands, subpoenas, inspections, civil actions,

or other enforcement measures directed at Plaintiffs' existing or prospective cooperative agreements with federal immigration authorities;

E. Issue a permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons acting in concert or participation with them, from enforcing Executive Law §§ 170-K and 63-E against Plaintiffs;

F. Award Plaintiffs their costs and reasonable attorneys' fees as permitted by law; and

G. Grant such other and further relief as the Court deems just and proper.

Dated: August 25, 2026

Respectfully submitted,

Mateo Forero-Norena (Bar No. 707682)
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Telephone: (202) 328-7004
Fax: (202) 387-3447
mforero@fairus.org

*Counsel for Plaintiffs*