**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**(ALBANY DIVISION)**

| | |
|---|---|
| KYLE BOURGAULT, in his official capacity as Sheriff of Rensselaer County, New York, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KATHY HOCHUL, in her official capacity as Governor of the State of New York, *et al.*,<br><br>Defendants. | Civil Action No. ______________________<br><br>Related Cases:<br>No. 1:26-cv-1360 (MAD/ML);<br>No. 1:26-cv-1281 (MAD/ML) |

State of New York )
)
County of Rensselaer )

**<u>DECLARATION OF SHERIFF KYLE BOURGAULT</u>**

Pursuant to 28 U.S.C. § 1746, I, Kyle Bourgault, declare as follows:

1. I am the Sheriff of Rensselaer County, New York. I was elected in November 2023 and assumed office in January 2024. I am the 66th Sheriff of this County.

2. I submit this affidavit in support of my application for an emergency stay of Governor Hochul's "Local Cops, Local Crimes Act."

3. This affidavit is based on my personal knowledge, my review of official records of the Rensselaer County Sheriff's Office (RCSO), and information provided to me by my command staff and jail administrators in the ordinary course of our operations.

4. As Rensselaer County's Sheriff, I am independently elected to a constitutional office under Article XIII, Section 13 of the New York Constitution. I do not serve at the pleasure of the Governor, the Attorney General, or the County Executive.

5. I took an oath after I was elected to this office by the voters of this county. My oath requires me to support the Constitution of the United States and the Constitution of the State of New York, and to faithfully discharge the duties of Sheriff.

6. My duties as a Sheriff include the safe and lawful operation of the Rensselaer County Correctional Facility and the protection of the approximately 159,000 residents of this County. I take these law enforcement duties to heart.

7. I oppose the Local Cops, Local Crimes Act because it will interfere with my ability to (a) uphold the oath I swore to when I took office and (b) perform day-in-day-out law enforcement duties.

**The Rensselaer County Sheriff's Office**

8. Rensselaer County covers approximately 665 square miles. It includes 16 towns and villages and the cities of Troy and Rensselaer.

9. The Rensselaer County Sheriff's Office operates 24 hours a day, seven days a week. Our office employs myself, as Sheriff, as well as the following budgeted staff:

- Undersheriff
- 4 Highway Patrol Command Staff
- 38 full time Deputies, five (5) part-time deputies
- Five (5) Highway Patrol Sergeants
- Twelve (12) Correctional Command Staff
- Fourteen (14) Correctional Sergeants
- 147 budgeted Correctional Officers
- Three (3) Alternatives to Incarceration employees (ATI)
- Twenty-two (22) Civilian Employees

10. Rensselaer County Sheriff's Office's responsibilities include, among other things, highway patrol, criminal investigations, civil enforcement, court security, and administration of the Rensselaer County Correctional Facility.

11. The Rensselaer County Correctional Facility is located at 4000 Main Street, Troy, New York.

12. The Rensselaer County Correctional Facility is a 432-bed jail. It is a full-service local correctional facility.

13. We house sentenced and unsentenced local inmates, and we also house a substantial population of federal prisoners under intergovernmental agreements described below.

14. Knowing who is in that facility—and whether a person already lawfully arrested on criminal charges is wanted by another jurisdiction or by federal immigration authorities—is a core jail-management and a critical public-safety function.

15. My experience with the Rensselaer County Sheriff's Office is not limited to my time as the elected Sheriff. Before I was elected Sheriff, I served sixteen years with RCSO.

16. I most recently held the rank of Administrative Sergeant, where I was responsible for pistol-permit administration and served as the Office's Public Information Officer. In that role I worked closely with my predecessor, Sheriff Patrick Russo, on the day-to-day operations of the agency.

17. In other words, I am a working law enforcement official; I did not come to the Office of Sheriff as an outsider or a politician. I sought election in order to serve and protect the people of Rensselaer County.

18. The Local Cops, Local Crimes Act interferes with my independence as a Sheriff and interferes at a fundamental level with my ability to engage in basic law enforcement.

**Federal Partnerships**

***United States Marshals Service Agreement***

19. The Rensselaer County Correctional Facility has housed federal prisoners for many years under Intergovernmental Agreement No. 52-92-0032 with the United States Marshals Service (the "USMS IGA").

20. On November 1, 2024, I signed a restated IGA with the USMS. A true and correct copy is attached hereto as Exhibit A.

21. That agreement is perpetual unless terminated and authorizes the housing, safekeeping, and care of federal prisoners at our facility at a per-diem rate of $136.00. The agreement estimates that 145 federal beds (120 male and 25 female) will be used to house federally detained prisoners. Guard and transportation services are reimbursed to Rensselaer County at $49.00 per hour.

22. Prisoners brought into the Rensselaer County Correctional Facility under this agreement could be barred under the Local Cops, Local Crimes Act. Block 19 of the November 1, 2024 USMS IGA lists U.S. Immigration and Customs Enforcement (ICE) as an authorized agency user, alongside the U.S. Bureau of Prisons (BOP).

23. A 2017 modification added ICE as a rider to the USMS IGA. The current instrument that I signed continues that authorization.

24. ICE is therefore currently a named user of the Correctional Facility under this federal agreement that I executed as Sheriff.

***Financial Impact of the USMS IGA***

25. The USMS IGA is the primary federal housing contract at the Correctional Facility. Housing-revenue records for 2023 through 2026, attached hereto as Exhibit B, show that federal/USMS dollars run in the millions of dollars each year.

26. In 2025, we received approximately $3.89 million as a result of housing federal prisoners. Those payments offset a significant portion of the cost of operating our 432-bed jail. Without those funds, the county taxpayers would otherwise bear the full cost of operating the Facility directly.

27. The money we receive for housing federal prisoners under the USMS IGA is an integral resource for staffing and funding our Correctional Facility.

***U.S. Customs and Border Patrol Agreement***

28. On June 27, 2024, I also signed a Memorandum of Understanding with U.S. Customs and Border Protection (CBP), Swanton Sector, under which the RCSO houses federal detainees—including persons charged with federal offenses that are detained pending trial—at $130 per night. A true and correct copy of the CBP Agreement is attached hereto as Exhibit C.

29. The CBP Agreement requires 120 days' written notice if the County intends to terminate.

***Housing Federal Prisoners and Detainees is Integral to Law Enforcement***

30. The parties to these agreements entered into the USMS IGA and the CBP Agreement because the federal government needed secure bed space in upstate New York, and because this County has a professional corrections facility that can provide it.

31. For clarity, under these two agreements, the Rensselaer County Sheriff's Office is not placing people in the jail under these agreements; it is making the beds available to house people detained by the USMS or the CBP.

32. There is no non-law enforcement basis for federal prisoners or detainees to be placed in the Rensselaer County Correctional Facility.

33. Therefore, there is no lawful basis for the Local Laws, Local Crimes Act to prohibit either the USMS IGA or the CBP Agreement.

***287(g) Agreement***

34. Rensselaer County was the first county in New York State to enter into a 287(g) agreement.

35. My predecessor, Sheriff Patrick Russo, executed the first 287(g) agreement in 2018. That Agreement has operated continuously since then, through the Trump, Biden, and second Trump administrations.

36. The current Memorandum of Agreement was signed on March 5, 2020, by Sheriff Russo and by ICE Assistant Director C.M. Cronen. An addendum dated June 22, 2020, reserved ICE's right to conduct an internal review every three years. True and correct copies of the MOA and addendum are attached hereto as Exhibit D.

37. There are three types of 287(g) agreements available.

38. Our 287(g) agreement is the Jail Enforcement Model agreement. *See* Exhibit D.

39. Our officers do not go into the community to make civil immigration arrests. They do not conduct traffic stops for immigration status. They do not question people on the street about their papers.

40. The Rensselaer County 287(g) MOA was in place when I took my oath of office and I have maintained it throughout my term of office.

***The 287(g) MOU is a Law Enforcement Tool***

41. We use the 287(g) MOA to assist in law enforcement, including federal law enforcement and law enforcement in other jurisdictions. There is no set of circumstances wherein my office could effectively enforce the law and protect the residents of Rensselaer County by restricting our law enforcement to local crimes.

42. In ICE's words, the purpose of the MOA is "to enhance the safety and security of communities by focusing resources on identifying and processing removable aliens who have been arrested and booked into the [county]'s jail/correctional facilities." That is exactly how we use it.

***A person must already be in our lawful criminal custody before any 287(g) function is exercised.***

43. The only people who are screened through the 287(g) MOU are people who are housed within the Rensselaer County Correctional Facility.

44. Under the 287(g) MOA, ICE nominates, trains, certifies, and authorizes designated jail personnel to perform limited immigration-officer functions. This occurs only inside the jail, and only under ICE supervision.

45. ICE provides the training, the credentials, the database access, the computers, and the related information-technology infrastructure within the Rensselaer County Corrections Facility.

46. The functions delegated under Appendix A of the MOA are specific and limited. Designated personnel may:

a. interrogate a person already detained in our jail whom the officer has reason to believe is an alien about his or her right to be or remain in the United States, and process removable aliens who have been arrested for a federal, state, or local offense;

b. serve and execute warrants of arrest for immigration violations on designated aliens within the Correctional Facility at the time of scheduled release from criminal custody, in order to transfer custody to ICE;

c. serve warrants of removal within the Corrections Facility at the time of scheduled release;

d. administer oaths and take evidence to complete required processing, including fingerprinting, photographing, interviewing, and sworn statements for ICE supervisory review;

e. prepare charging documents, including a Notice to Appear, for the signature of an ICE officer;

f. detain and transport arrested aliens subject to removal to ICE-approved facilities; and

g. issue immigration detainers and Form I-213 within the Corrections Facility.

47. After ICE assumes custody, the MOA permits us to continue holding the person for no more than 48 hours unless a separate reimbursable housing agreement is in place.

48. Those functions occur only during the officers' normal detention duties, only inside the jail, and only under ICE direction.

***ICE Supervises all 287(g) Activity***

49. ICE reviews the officers' immigration-enforcement activity on an ongoing basis, although the RCSO retains supervision of all other aspects of the officers' employment.

50. ICE may revoke an individual officer's authority at any time.

51. Our office is not a freelance immigration force. It is a supervised, jail-based screening and processing function for people who are already in our custody because they were arrested for a crime.

52. I believe that a person who has already been arrested must be screened for outstanding warrants and requests for detainment before he or she is released back onto the streets of Troy, East Greenbush, or any other community in this County.

53. It is true that the County pays the ordinary salaries and benefits of the law enforcement staff of this office. However, this compensation would be paid whether or not they were designated under the 287(g) MOU.

54. In other words, the 287(g) program requires no additional County appropriation and no new tax levy.

**How the 287(g) Program is Administered at our Corrections Facility**

55. When a person is arrested by any agency in this County (e.g., Troy Police, Rensselaer Police, State Police, our own deputies) and is remanded to the jail, we book that person.

56. Booking includes identity verification and database checks.

57. We run those database checks on citizens and non-citizens alike.

58. We run these database checks because a person arrested on a local charge may be wanted in another county, another state, or another country. We would be derelict if we released someone when we had the ability to identify as a fugitive, but failed to do so.

59. When a booking indicates that the person is foreign-born, or when other indicators warrant it, the designated officer (working under ICE supervision and with ICE systems) can determine whether the person is removable, whether there is an outstanding immigration warrant, and whether ICE wants us to hold the person at the end of local custody.

60. If any of these searches reveals that the person is eligible for ICE involvement, we notify the Albany-area ICE office. We honor ICE detainers in the same manner we honor any other lawful detainer, warrant, or hold.

61. Transfers of custody to ICE, like all other aspects of the 287(g) program, occur inside the Corrections Facility.

62. Make no mistake, we do not take people off the street for civil immigration violations.

63. That is the entire operational footprint of 287(g) in Rensselaer County. It is the lowest-intensity model ICE offers. It is confined to people who have already been arrested, arraigned, and remanded.

**Rensselaer County Supports the Current 287(g) Program**

64. The Rensselaer County Legislature's August 10, 2026 letter of support, attached as Exhibit E, correctly describes the program as we administer it. Only individuals who are arrested, arraigned, and remanded are subjected to the state and federal database check.

**The Public Safety Results of our 287(g) Program**

65. Our Correctional Facility receives foreign-born inmates on a regular basis. Our Foreign-Born Inmates Reports reflect 46 such inmates in 2023, 56 in 2024, 76 in 2025, and 55 from January 1 through August 10, 2026. Our reports reflect countries of birth and, where available, the most serious charge.

66. We average approximately 58 per year from all over the world.

67. Foreign-born inmates within our Correctional Facility include people from Mexico, Venezuela, Honduras, Guatemala, El Salvador, China, India, Jamaica, Haiti, and many other

countries. Some are here on federal charges and others on local charges and include those charged with serious crimes such as sexual abuse, burglary, and illegal entry into the United States.

68. Since Rensselaer County entered the 287(g) program in 2018, we have turned over nine individuals to federal authorities. Nine is not a large number, but it does not have to be. If the program stops one person who is wanted for a sex offense—or a homicide, or a gang-related shooting—from walking out of this jail and back into a neighborhood in this County, the program has done its job.

69. One of these nine individuals was wanted for a sex crime committed in Ireland. Upon notification of this person's scheduled release from our custody, we notified ICE, and ICE took him into custody.

70. I am not aware of any instance, during the eight years the 287(g) program has operated in the County, in which we released a removable criminal alien who then committed a serious new crime in this community. That is the point of the program. Key information is shared with the appropriate authorities before release, not after a subsequent crime has been committed.

71. One case provides insight about how the cooperative model works:

a. In October 2024, after the program had been in operation for six years, Rensselaer Police arrested Moises Alejandro Candollo-Urbaneja (age 22) and Gregory Marlyn Galindez-Trias (age 24) near the Albany-Rensselaer Amtrak station. They had used a stolen credit card belonging to Angel Samaniego (a 59-year-old Stamford, Connecticut resident who had been found shot to death, bound with duct tape, in a Super 8 hotel). During booking, police learned that the pair were Venezuelan nationals in the country illegally and were believed to be affiliated with the Tren de Aragua gang. They were booked into our jail. ICE was notified and issued detainers. Here, a local arrest on a local or out-of-state crime and a booking into our jail resulted in a federal hold so that a person implicated in an execution-style homicide did not walk out the front door of our Corrections Facility.

72. Rensselaer County Executive Steve McLaughlin has publicly attributed arrests, including in 2024, to the cooperation that our 287(g) partnership with ICE provides. I agree with his assessment.

73. The question is not whether every foreign-born inmate is a public-safety threat. The question is whether this Office should be forbidden from finding out which inmates are.

**The Rationale for Continuing our Federal Partnerships**

***It is Not About the Money***

74. The decision to enter and to continue the 287(g) program was never a revenue decision.

75. ICE does not pay this County a bounty for designations. ICE pays for the training, the credentials, and the systems.

76. If every dollar of ICE-related funding disappeared tomorrow, I would still want the ability to determine whether a person sitting in my jail is wanted for a crime in another jurisdiction.

***State Criminal Alien Assistance Program Revenue***

77. Rensselaer County has received some funds through the State Criminal Alien Assistance Program (SCAAP) that the U.S. Department of Justice (DOJ) administers. SCAAP reimburses state and local governments for a portion of the costs of incarcerating removable aliens who have been convicted of serious crimes.

78. Our recent SCAAP reimbursements include $25,860 in FY 2020, $11,108 in FY 2021, and $1,134 in FY 2022. Those figures are reflected in the SCAAP awards attached hereto as Exhibit F.

79. Each SCAAP application requires us to submit inmate-level information that DHS reviews to determine who is an eligible undocumented criminal alien. That process works only if we can identify the population in our custody and work with federal immigration authorities.

80. SCAAP funding has never been the determining factor on the type of partnerships we maintain with federal authorities. It is, however, the federal government's own acknowledgment that housing criminal aliens imposes real costs on local jails, and those reimbursements exist as a result.

***USMS IGA Revenue***

81. Our federal housing relationship with USMS, on the other hand, is a major point of consideration for us.

82. As described above, the November 1, 2024 USMS IGA is perpetual unless terminated on thirty days' written notice.

83. The USMS IGA authorizes 145 federal beds at $136.00 per day and lists ICE and BOP as authorized users. Guard and transportation services are reimbursed at $49.00 per hour.

84. Federal/USMS housing revenue was approximately $2.08 million in 2023, $2.16 million in 2024, and $3.89 million in 2025 against a $2.5 million budget line. Those payments offset the cost of operating our Correctional Facility and are an integral resource for facility funding.

85. Anyone who claims we are staying in our 287(g) agreement because ICE pays the Correctional Facility is wrong. The 287(g) program costs the County nothing extra. The partnership that actually offsets taxpayer cost is the USMS IGA, which houses federal prisoners (including, as the IGA itself states, prisoners of ICE as an authorized user).

**The "Local Cops, Local Crimes Act" Threatens Law Enforcement**

86. On May 27, 2026, Governor Kathy Hochul signed Chapter 55 of the Laws of 2026. Part of that budget bill is the so-called "Local Cops, Local Crimes Act," now codified as Executive Law § 170-K.

87. The title "Local Cops, Local Crimes Act" is a misnomer. Law enforcement is not geographically confined; we routinely check for outstanding warrants from other jurisdictions as part of our routine booking procedures. Law enforcement would grind to a halt if each "Local Cop" was restricted to enforcing only "Local Crime."

88. A person wanted in Arizona is no less dangerous than a person wanted in a town within the county. Putting blinders on law enforcement that would prevent looking for warrants from other jurisdictions is unworkable in this time of widely available travel.

***Prohibition on Contracts***

89. Section 170-K(2)(a) forbids any local government, law enforcement agency, or local correctional facility from entering into, modifying, renewing, remaining in, or extending (i) any 287(g) agreement, formal or informal, or (ii) any contract or intergovernmental agreement to house or detain individuals for federal civil immigration violations.

90. Section 170-K(7) declares existing 287(g) agreements "not consistent with state law" and "void and unenforceable" ninety days after enactment (i.e. August 25, 2026). It also directs us to "exercise any applicable termination provision."

***Enforcement Mechanisms***

91. Chapter 55 of the Laws of 2026 also created the Office of Immigrant Trust (OIT) inside the Attorney General's Office.

92. In provisions now codified as Executive Law § 63-E, OIT is authorized to receive complaints, investigate, issue subpoenas, compel testimony, examine witnesses under oath, and bring civil actions.

93. It is a statewide enforcement bureau focused on local sheriffs and police departments that continue to cooperate with federal immigration authorities.

***Enforcement is Imminent***

94. On July 24, 2026, Meghan Faux, Chief Deputy Attorney General for Social Justice, sent me a letter on behalf of OIT. A true and correct copy of the letter I received is attached as Exhibit G.

95. This letter asserts that our 287(g) agreement is prohibited effective May 27, 2026; that we must terminate it; that it becomes void on August 25, 2026; and that I must, by August 14, 2026 at 5:00 p.m., submit a letter and documents describing current activities under the agreement, its status, and our plans for termination.

96. This letter also states that the new law prohibits using correctional facilities to house federal civil immigration detainees.

***The Local Cops, Local Crime Act Reaches Too Far***

97. As the July 24 pre-enforcement letter indicates, the ban on remaining in any contract or intergovernmental agreement to house or detain individuals for federal civil immigration violations is not limited to our existing 287(g) MOA.

98. The USMS IGA that I signed on November 1, 2024, names ICE as an authorized user. The CBP MOU I signed on June 27, 2024, is a housing agreement for federal detainees. If the State treats those instruments (or any ICE placement under them) as agreements to house for

civil immigration purposes, the statute requires us to exercise termination provisions and then deems the agreements void.

99. Even if the State later claims it did not mean to invalidate USMS or CBP criminal-prisoner housing, the chill is real. Federal partners will likely not send prisoners to a facility that is under threat of state enforcement for accepting those individuals.

100. If that happens, the emptying of federal beds would shift millions of dollars of costs onto county taxpayers and would leave federal agencies that rely on this facility without access to facilities that are reasonably close to federal courts.

***OIT Demands Cancellation of the Very Contracts that are Deemed Void***

101. The RCSO did not submit the written response the Attorney General demanded by August 14, 2026, in part because the statute does not require a confession of termination.

102. The OIT attempts to declare legitimate federal agreements void by state fiat while simultaneously demanding steps be taken to cancel; steps that will be moot should the law not be stayed.

103. The statutory deadline for invalidity pursuant to the Act is days away: August 25, 2026. Absent relief from this Court, the State could claim that our multi-year federal agreements are legal nullities, that my designated officers may no longer perform the functions ICE trained them to perform, and that our Correctional Facility may no longer house or process a removable criminal already in our custody.

***Enforcement of the Act is Imminent***

104. OIT has already indicated that noncompliance will be met with swift legal action.

105. On August 19, 2026 (five days after the response deadline set in the July 24 letter) OIT issued a formal Investigative Demand for Documents under Executive Law § 63-E(3). A true and correct copy is attached hereto as Exhibit H.

106. The Demand commands RSCO to produce, on or before August 25, 2026, "[d]ocuments sufficient to show what action(s) Rensselaer County Sheriff's Office (RCSO), or any agent thereof, has taken to terminate the 2020 ICE MOA." It also requires preservation of all related documents.

107. The production deadline is the same day Executive Law § 170-K deems existing 287(g) agreements void.

108. The Demand converts the July 24 warning letter into an active investigation that requires me to document steps toward the very termination the State is attempting to force.

**My Position, and the County's Support**

109. I did not terminate the 287(g) agreement because my ability to meaningfully engage in law enforcement activities will be curtailed.

110. I have not instructed my officers to stop screening inmates already in our custody.

111. I have not refused a lawful ICE detainer.

112. My official, public position as Sheriff has been that I support compliance with the Rensselaer County 287(g) agreement, and this has been this Office's position since 2018, well before I took office.

113. I reiterated this position on January 29, 2026, with County Executive Steve McLaughlin, when we announced that Rensselaer County would continue the program. I stated it again on May 27, 2026, the day the Governor signed Executive Law § 170-K into law: "The 287(g)

program has been an important part of how we keep the public safe while managing the county lock-up.

114. Without 287(g), we could be caught unaware that a suspect or criminal was wanted internationally, putting the public at risk." I echoed this sentiment on June 3, July 20, July 26, August 3, and August 6, 2026. True and correct copies of these statements are attached hereto as Exhibit I.

115. These statements are not campaign rhetoric; they are the operating policy of this Office.

116. County Executive McLaughlin has been equally clear on this issue. He has called the State's directive an "illegal order," has said we are "not going to comply," and has said he will not let Albany endanger the residents of this County.

117. Moreover, as mentioned above, a majority of the Rensselaer County Legislature voiced this same opinion on August 10, 2026. Chairwoman Kelly Hoffman and Legislators Robert Bayly, Thomas Grant, William Maloney, William Film, Jeffrey Wysocki, Robert Loveridge, Kenneth Herrington, Daniel Casale, Thomas Choquette, and Bruce Patire wrote that public safety does not end at the jail door; that only persons already arrested, arraigned, and remanded are checked; and that they urge continued support for the Jail Enforcement Model.

118. In Rensselaer County, the elected legislative majority of this County, the County Executive, and the Sheriff are thus all aligned on this position.

119. I do not accept the attempt to strip an independently elected Sheriff of lawful federal arrangements that this County has used without incident for many years.

**The Irreparable Harm We Face**

120. If Executive Law § 170-K is enforced against this Office on August 25, 2026, the harms we face will be immediate and cannot be undone with a money award.

121. These harms include:

a. First, loss of the trained, ICE-supervised capacity to identify and process removable aliens who are already in our criminal custody. The credentials, the systems access, and eight years of operational experience become unusable overnight. A person booked after August 25 on a local charge who is wanted for a homicide, a sex offense, or a foreign warrant will be processed as if that information did not exist.

b. Second, we would be forced to release individuals we know—or would have known—are wanted by federal authorities. We will likewise be forbidden from honoring a lawful federal detainer inside the jail. The man wanted for a sex crime in Ireland discussed above is the example, not the exception. Executive Law § 170-K's defenders say it targets only "civil" immigration enforcement. That is a slogan. In our Correctional Facility, the people our 287(g) arrangement identifies are people who have already been arrested for crimes. Forbidding us from telling ICE that they are here is the wrong decision for public safety.

c. Third, OIT is a powerful investigative and enforcement bureau that is specifically aimed at this Office. On August 19, 2026, it served a formal Investigative Demand requiring me to produce, by August 25, documents showing what steps I have taken to terminate the 2020 ICE MOA. If we continue the federal contracts that Executive Law § 170-K forbids, we face continued investigation, compelled testimony, further document demands, and a civil action by the Attorney General. If we stop these programs, we face public-safety consequences. Neither path is consistent with an independently elected Sheriff's control of his own correctional facility.

d. Fourth, the housing prohibition and the Attorney General's accompanying warning put our existing USMS IGA and the CBP MOU under a cloud. The State has told us we may not use our Correctional Facility to house federal civil immigration detainees. Federal agencies that need beds will reasonably hesitate to send prisoners to Rensselaer County. The loss or freeze of our relationship with ICE and CBP will disrupt jail operations, idle capacity, and shift substantial cost to county taxpayers. That injury is not speculative; the statute is written to produce it.

e. Fifth, the same cooperation the Act forbids is what makes SCAAP reimbursement possible. Those payments, though modest, exist because this jail houses the population the program addresses and because we can identify that population for DHS review. If we must stop screening and ICE cooperation to stay on the right side of § 170-K, those dollars are lost. Once lost, they are not restored by a later judgment.

side of § 170-K, those dollars are lost. Once lost, they are not restored by a later judgment.

f. Sixth, the statute substitutes a statewide political judgment for my judgment. I am the official that the Constitution and the voters have charged with running our corrections facility. Other New York sheriffs have entered 287(g) agreements since 2018 because the model works. The State's answer is to criminalize the partnership and to create a bureau controlled by the Attorney General to police the prohibition. That is not "local cops, local crimes." It is Albany dictating how a county sheriff conducts his law enforcement duties.

g. Seventh, the August 25 statutory deadline is not theoretical. Every day after the deadline in which this Office is forbidden from screening a booked inmate is a day of irreversible risk. OIT's August 19 Investigative Demand, which requires production of termination documents on the same day, makes that risk concrete.

**Conclusion**

122. I took an oath to protect the people of Rensselaer County. I did not take an oath to follow a state statute that attempts to nullify a federal agreement, to blind this jail to federal warrants, and to expose this community to the release of people we had the lawful ability to hold. I respectfully request that this Court stay the enforcement of the Local Cops, Local Crimes Act so that we may continue to operate the 287(g) Jail Enforcement Model, so I may continue to honor lawful federal detainers and housing arrangements, unless and until this Court orders otherwise.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 24th day of August, 2026, in Rensselaer County, New York.

[signature]

Kyle Bourgault
Sheriff of Rensselaer County, New York

# Declaration of Sheriff Bourgault

# Exhibit A

**U.S. Department of Justice**
**United States Marshals Service**
**Prisoner Operations Division**

**Office of Detention Services**
**Intergovernmental Agreement**

| | | | |
|---|---|---|---|
| 1. Agreement Number<br>52-92-0032 | 2. Effective Date<br>November 1, 2024 | 3. Facility Code(s)<br>3TW | 4. UEI Number<br>KN8QNKNL4NM9 |
| 5. Issuing Federal Agency<br><br>United States Marshals Service<br>Prisoner Operations Division<br>Office of Detention Services<br>CG-3, 3rd Floor<br>Washington, DC 20530-0001 | | 6. Local Government<br><br>Rensselaer County Jail<br>4000 Main Street<br>Troy, NY 12180<br><br>Tax ID#: 14-6002569 | |
| 7. Appropriation Data<br><br>15-1020/XD | | 8. Local Contact Person:<br>E-mail:<br>Telephone: | Michael DiNardo, Undersheriff<br>mdinardo@rensco.com<br>(518) 266-1902 |

| **9. Services** | **10. Estimated Number of Federal Beds** | **11. Per Diem Rate** | **12. Period of Performance** |
|---|---|---|---|
| This agreement is for the housing, safekeeping, subsistence, and care of Federal prisoners, in accordance with content set forth herein. | Male: 120<br>Female: 25<br>Juvenile: 0<br>**Total: 145** | $136.00 | Perpetual |

**13. Guard/Transportation Hourly Rate**

Guard/Transportation Hourly Rate: $49.00

Mileage shall be reimbursed by the Federal Government at the current General Services Administration (GSA) Federal Travel Regulation Mileage Rate.

**14. Optional Guard/Transportation Services**

☒ Medical, Hospital Guards

☒ U.S. Courthouse

☒ JPATS

☒ Encompassed - Video Teleconferencing

☐ Video Teleconferencing (VTC) Hearings

☒ Other: Jail to Jail

**15. Department of Labor Wage Determination**

☐ Wages Incorporated ________

16. Local Government Certification

*To the best of my knowledge and belief, information submitted in support of this agreement is true and correct. This document has been duly authorized by the governing authorities of their applying Department or Agency State or County Government and therefore agree to comply with all provisions set forth herein this document.*

17. Signature of Person Authorized to Sign (Local)

[signature]
Signature

Kyle Bourgault
Print Name

Sheriff — 10/4/24
Title — Date

18. Federal Prisoner Type Authorized

☒ Adult Male
☒ Adult Female
☐ Juvenile Male
☐ Juvenile Female
☐ Transgender

19. Other Authorized Agency User

☒ BOP
☒ ICE
☐ Other

20. Signature of Person Authorized to Sign (Federal)

TIFFANI EASON Digitally signed by TIFFANI EASON Date: 2024.10.30 11:39:21 -04'00'
Signature

Tiffani Eason
Print Name

Assistant Chief, Intergovernmental Agreements
Title — Date

**Table of Contents**

Section Description Page Number

1. Authority ........................................ 3
2. Purpose ........................................ 3
3. Administration ........................................ 3
4. Place of Performance ........................................ 5
5. Agreements Specialist ........................................ 5
6. Termination ........................................ 5
7. Assignment and Outsourcing of Jail Operations ........................................ 6
8. Medical Services ........................................ 6
9. Affordable Care Act (ACA) ........................................ 8
10. Receiving and Discharging of Federal Prisoners ........................................ 8
11. Prisoner Work Program ........................................ 8
12. Guard/Transportation Services to/from Medical Facility ........................................ 9
13. Guard/Transportation Services to/from U.S. Courthouse ........................................ 10
14. Guard/Transportation Services to Justice Prisoner & Alien Transportation System (JPATS) or Other ........................................ 10
15. Video Teleconference Hearing within the Facility ........................................ 11
16. Optional Guard Services to Video Teleconference Hearing within the Facility ........................................ 11
17. Special Notifications ........................................ 11
18. Body Worn Camera Information Requests ........................................ 12
19. Restrictive Housing and Suicide Prevention ........................................ 12
20. Prison Rape Elimination Act (PREA) ........................................ 13
21. PREA Prisoner Incident Reporting ........................................ 13
22. Federal Acquisition Regulation (FAR) Agreement Provisions ........................................ 14
23. Guaranteed Minimum Bed Space ........................................ 14
24. Economic Rate Adjustments ........................................ 15
25. Billing and Financial Provisions ........................................ 16
26. Payment Procedures ........................................ 16
27. Hold Harmless ........................................ 17
28. Disputes ........................................ 17
29. Review of Services ........................................ 17
30. IGA Amendments ........................................ 17
31. Litigation ........................................ 18
32. The First Step Act ........................................ 18
33. Ensuring Access to Voter Registration for Eligible Individuals in Federal Custody ........................................ 18



**Local Government (initial):**
**Federal Government (initial):**

## 1. Authority

Pursuant to the authority, 106th Congress Public Law 553, Section 119 of the "Department of Justice Appropriations Act, 2001", this Intergovernmental Agreement (hereinafter referred to as "agreement") is entered into between the United States Marshals Service (USMS) (hereinafter referred to as the "Federal Government") and ***Rensselaer County Jail*** (hereinafter referred to as "Local Government"), who hereby agree as described in this document.

## 2. Purpose

The Federal Government and the Local Government establish this agreement allowing the USMS or other authorized agency user as noted in block #19, page one (1) of this agreement to house individuals detained on federal charges or federal court orders (hereinafter referred to as "Federal prisoners") with the Local Government at the **Rensselaer County Jail 4000 MAIN ST, TROY, NY 12180** (hereinafter referred to as "the Facility") designated in block #6 on page one (1) of this agreement.

## 3. Administration (October 2021)

The Local Government shall provide for the secure custody, safekeeping, housing, subsistence, and care of Federal prisoners in accordance with all state, local, and federal laws, standards, regulations, policies, and court orders applicable to the operation of the Facility. Federal prisoners shall be housed in a manner consistent with the Federal Performance Based Detention Standards (FPBDS) subset utilized by the USMS Detention Facility Review Program. These standards are set forth in Form USM-218 (provided as an attachment to this agreement). Facilities shall follow the current standards summarized in Form USM-218 and any other standards required by an authorized agency whose prisoners are housed by the Local Government pursuant to this agreement. Full text of the FPBDS can be found at: http://wwwASD.usmarshals.gov/prisoner/detention-standards.htm as an additional reference source for best practices.

***Rensselaer County Jail*** shall comply with Congressional mandates, federal laws, Executive Orders and all existing ***Rensselaer County Jail*** policies ***Rensselaer County Jail*** shall provide a means for verification of any state inspections, accreditation, and, if applicable, any alternative correctional facility accreditations such as an accreditation from the American Correctional Association accreditation.

The USMS ensures the secure custody, care, and safekeeping of USMS prisoners. Accordingly, all housing or work assignments, and recreation or other activities for USMS prisoners are permitted only within secure areas of the building or within the secure external recreational/exercise areas. All work assignments for unsentenced Federal prisoners must be voluntary.

The Local Government shall conduct initial and periodic background and reference checks of applicants, employees, contractors, and volunteers. All allegations of staff misconduct shall be investigated and reported to law enforcement as appropriate. Staff misconduct involving or affecting USMS prisoners shall be reported to the local district United States Marshal (USM), Chief,



**Local Government (initial):** 
**Federal Government (initial):**

or their designee and to the USMS Prisoner Operations Division (POD) at PODCoCInquiries@usdoj.gov.
At all times, the Federal Government shall have access to the Facility and to the Federal prisoners, and to all records pertaining to this agreement, including financial records, for a retention period of three (3) years from the date of request by the Federal Government.

The Local Government shall maintain written policies and procedures that describe all facets of facility operations, maintenance, and administration. The Local Government shall maintain written contingency and emergency plans for situations including but not limited to riots, hunger strikes, disturbances, escapes, hostage situations, and mass prisoner relocation.

The Local Government shall maintain records of annual fire safety inspections. The Local Government shall maintain dangerous materials in accordance with government regulations.

The Local Government shall maintain an objective review, classification, and housing process. Federal prisoners shall be clearly identified as USMS prisoners in the classification system.

The Local Government shall ensure Federal prisoners under the age of 18 receive an age-appropriate diet, exercise, and education.

The Local Government shall ensure Federal prisoners under the age of 18 or charged as a juvenile shall be separated by sight and sound and out of regular contact with adult prisoners, except in emergency situations or approval from the court.

The Local Government shall keep the Facility clean and in good repair. Food service equipment shall meet established health and safety codes. The Local Government shall provide a minimum of three (3) meals per day that are varied and nutritionally adequate.
The Local Government shall provide safe and clean space and items for proper prisoner hygiene.

The Local Government will provide clean and serviceable bedding and clothing. Clothing and shoes shall be properly sized and temperature and weather appropriate. The Local government shall provide appropriate attire upon release.

The Local Government shall properly inventory, store, and return prisoner property upon release. The Local Government shall provide adequate accommodations for prisoners with disabilities once accepted by the Local Government.
The Local Government shall prohibit discrimination on the basis of disability, race, gender, sexual orientation, religion, and national origin in the provision of services, programs, and activities.

The Local Government shall provide prisoners with reasonable opportunities to participate in religious practices, exercise, and access to mail, telephones, personal legal materials and legal reference materials or confidential counsel.

The Local Government shall maintain a grievance program with at least one level of appeal. The grievance procedures shall be made available to prisoners.

(End of Provision)



**Local Government (initial):**
**Federal Government (initial):**

**4. Place of Performance (May 2021)**

The principal place of performance for this agreement shall be:

Rensselaer County Jail
4000 Main Street
Troy, New York 12180

(End of Provision)

**5. Agreements Specialist (November 2021)**

The Contracting Officer (KO) may designate in writing one or more government employees, by name and position title, to act for the KO under this agreement. Each designee shall be identified as an Agreements Specialist. Such designation(s) shall specify the scope and limitations of the authority so delegated; provided, that the designee(s) shall not change the terms or conditions of the agreement, unless the Agreements Specialist is a warranted KO, and this authority is delegated in the designation.

The Agreements Specialist is:

Name: Ramona Mosby
Title: Grants Specialist
Contact Information: (202) 868-2789

(End of Provision)

**6. Termination (May 2021)**

The agreement can be terminated by either party for any reason. The requesting party, requester, seeking to terminate this agreement may do so by providing a written notice to the receiving party, requestee, at least thirty (30) calendar days in advance of the proposed termination date. An exception is made when an emergency situation requires the immediate relocation of Federal prisoners.

In order for the Local Government to initiate a termination of this agreement, the Local Government must:

a. As noted in this section, paragraph one above, the Local Government shall provide the Federal Government via the KO or designee a written notification by email at least thirty (30) calendar days in advance of the potential termination date unless an emergency situation requires the immediate relocation of Federal prisoners.
b. The Local Government shall provide adequate time, if applicable, for the Federal Government to transport and relocate Federal prisoners. Based on the number of Federal prisoners at the facility, a thirty (30) day notice may not be adequate to vacate the premises; thus, the Local Government shall agree to provide the Federal Government a reasonable time frame to exit the facility.



**Local Government (initial):**
**Federal Government (initial):**

c. The Local Government shall work with the Federal Government to locate alternative housing solutions for the Federal prisoners.
d. The Local Government may not request rate or per-diem increases once the Local Government has provided a termination notice to the Federal Government and the Federal Government has acknowledged the receipt of before mentioned notice.

Where the Local Government has received a cooperative agreement through the POD's Cooperative Agreement Program, the cooperative agreement termination and other applicable provisions shall:

a. be incorporated into this agreement;
b. survive after the expiration of the cooperative agreement; and
c. supersede the termination provisions of this agreement.

(End of Provision)

**7. Assignment and Outsourcing of Jail Operations (May 2021)**

The overall management and operation of the Facility housing Federal prisoners shall not be contracted out without the prior written notification of the Federal Government.

(End of Provision)

**8. Medical Services (May 2021)**

The Local Government shall maintain written procedures that describe actions taken in the event of a prisoner's death, assault, or medical emergency to include notification to the USMS.

The Local Government shall provide a medical and mental health screening upon admission to the Facility. The Local Government shall inform prisoners how to access health services.

*The Local Government shall notify the local USMS district office of any infectious disease outbreak.*

The Local Government shall provide Federal prisoners with the same level and range of care **inside** the Facility as that provided to state and local prisoners. The Local Government is financially responsible for all medical care provided **inside** the Facility to Federal prisoners. This includes the cost of all medical, dental, and mental health care as well as the cost of medical supplies, over-the-counter medications and any prescription medications routinely stocked by the Facility. The Facility is encouraged to purchase non-OTC medications for USMS prisoners through the USMS' National Managed Care Contract (NMCC) Discount Pharmacy Program. When possible, generic medications should be prescribed. The cost of all of the above-referenced medical care is covered by the Federal per-diem rate. The Federal Government will pay for the cost of specialized medical services not routinely provided within the Facility, such as dialysis.

The Federal Government is financially responsible for all medical care provided **outside** the Facility to Federal prisoners. The Federal Government must be billed directly by outside medical care providers pursuant to arrangements made by the Local Government for outside medical care. The



**Local Government (initial):** [initials]
**Federal Government (initial):** [initials]

Local Government shall utilize outside medical care providers that are covered by the USMS' NMCC Preferred Provider Network to the maximum extent practicable. The Local Government can obtain information about NMCC covered providers from the local USMS District Office. The Federal Government will be billed directly by the medical care provider **not** the Local Government. To ensure that Medicare rates are properly applied, medical claims for Federal prisoners must be on Centers for Medicare and Medicaid Services (CMS) Forms so that they can be re-priced to Medicare rates in accordance with the provisions of Title 18 U.S.C. Section 4006. The USMS will not reimburse the detention facility for medical payments made on behalf of USMS prisoners in the absence of a specific arrangement approved in writing by the USMS.

All **outside** medical care provided to Federal prisoners must be pre-approved by the Federal Government except in a medical emergency. In the event of an emergency, the Local Government shall proceed immediately with necessary medical treatment. The Local Government shall notify the Federal Government immediately regarding the nature of the Federal prisoner's illness or injury as well as the types of treatment provided.
The Facility shall have in place an adequate infectious disease control program which includes testing of all Federal prisoners for Tuberculosis (TB) in accordance with *National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails.* TB testing shall occur with 14 days of intake (unless current TB tests results are available), be promptly documented in the Federal prisoner's medical record and the results forwarded to the local USMS District within thirty (30) days of intake. Special requests for expedited TB testing and clearance (to include time sensitive moves) shall be accomplished through advance coordination by the Federal Government and Local Government.

The Local Government shall immediately notify the Federal Government to include the local district office of any cases of suspected or active TB or any other highly communicable diseases such as but not limited to Coronavirus Disease (COVID), severe acute respiratory syndrome (SARS), Avian Flu, Methicillin-Resistant Staphylococcus Aureus (MRSA), Chicken Pox, etc., which might affect scheduled transports or productions.

When a federal prisoner is being transferred or released from the Facility, they will be provided with a minimum of seven (7) days of prescription medications and any medications already dispensed to the prisoner. Medical records and Form USM-553, *Prisoner in Transit Medical Summary* must travel with the Federal prisoner. If the records are maintained at a medical contractor's facility, it is the Local Government's responsibility to obtain them before a federal prisoner is transferred.

Federal prisoners may be charged a medical co-payment by the Local Government in accordance with the provisions of Title 18 U.S.C. Section 4013(d). The Federal Government is not responsible for medical co-payments and shall not be billed if the federal prisoner is indigent and cannot make the co-payment. Indigent Federal prisoners shall not be denied medical evaluation and treatment for failure to provide a co-payment.

(End of Provision)



**Local Government (initial):**
**Federal Government (initial):**

### 9. Affordable Care Act (ACA) (May 2021)

Upon release of a Federal prisoner, the Local Government shall provide information regarding the Affordable Care Act (ACA). The ACA website is located at: http://www.hhs.gov/healthcare/about-the-aca/index.html.

(End of Provision)

### 10. Receiving and Discharging of Federal Prisoners (May 2021)

The Local Government agrees to accept Federal prisoners only upon presentation by a Law Enforcement Officer (LEO), USMS Task Force Officer (TFO) or a USMS designee with proper credentials.
The Local Government shall not relocate a Federal prisoner from one facility under its control to another facility not described in this agreement without permission of the Federal Government. Additional facilities within the same agreement shall be identified in a modification.

The Local Government agrees to release Federal prisoners only to LEOs of the authorized Federal Government agency initially committing the Federal prisoner (e.g., Drug Enforcement Administration (DEA), Immigration and Customs Enforcement (ICE)) or to a Deputy United States Marshal (DUSM) or USMS designee with proper credentials. Those Federal prisoners who are remanded to custody by the USMS may only be released to the USMS or an individual specified by the USMS in the Judicial District.

USMS Federal prisoners sought for a state or local court proceeding must be acquired through a Writ of Habeas Corpus or the Interstate Agreement on Detainers and then only with the concurrence of the jurisdictional United States Marshal (USM).

(End of Provision)

### 11. Prisoner Work Program (November 2021)

Federal prisoner labor shall be used in accordance with the Federal prisoner work plan developed by the Local Government and approved by the USMS. The Federal prisoner work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial, service, or other jobs. Federal prisoners may not be required to work. Federal prisoners may volunteer to work within the secure confines of the facility if they sign a waiver of their right not to work. A Federal prisoner with suicidal tendencies, attempted escapes or escape history, violent history, gang affiliations or with retainers for pending charges with other local, state, or federal agencies will not be considered for the volunteer program. Federal prisoners are not permitted to act as trustees and may not work in positions that permit unsupervised contact with segregated prisoners or Federal prisoners of the opposite sex.

The Federal prisoners are restricted from operating equipment that may expose the Federal prisoners to grave bodily harm or any work assignment requiring security risk items and controlled tools which could be used to facilitate an escape or used as a weapon that could endanger staff, citizens, or other inmates. Federal prisoners will not have access to prisoner or employee records.

The Local Government will ensure that prisoners who volunteer to work are prohibited Keep on Person medications while at the worksite.

Federal prisoners must obtain required medical clearances before working in the food service areas. The Federal prisoner work program shall not conflict with any other requirements of the agreement and must comply with all applicable laws and regulations. Federal prisoners shall not be used to perform the responsibilities or duties of an employee of the Local Government. Appropriate safety/protective clothing and equipment shall be provided to Federal prisoner workers as appropriate. Federal prisoners shall not be assigned work that is considered hazardous or dangerous. This includes, but is not limited to, areas or assignments requiring great heights, extreme temperatures, use of toxic substances and unusual physical demands. Federal prisoner workers can be paid the identical rates of pay as other facility prisoners.

Federal prisoners shall be required to participate in normal housekeeping duties which help ensure the cleanliness of their housing area. Increases and reductions in privileges may be used as incentives to ensure that Federal prisoners keep their living areas clean.

(End of Provision)

## 12. Guard/Transportation Services to/from Medical Facility (May 2021)

When Medical Facility in block #14 on page one (1) of this agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide transportation and guard services for Federal prisoners housed at the Facility to and from a medical facility for outpatient care, and transportation and stationary guard services for Federal prisoners admitted to a medical facility.

These services shall be performed by at least two (2) armed and qualified LEOs or Correctional Officers (CO) according to the criteria specified by the County Entity running the facility. In all cases, these are part of a fulltime Law Enforcement Organization or Correctional Organization and that they have met the minimum training requirements.

The Local Government agrees to provide additional personnel if requested by the USMS to enhance specific requirements for security, prisoner monitoring, and contraband control. Federal prisoners are not permitted to use the telephone, internet or WIFI enabled devices, or to receive outside food, drinks, or deliveries (including flowers) without consent from the USMS. The Local Government shall restrain Federal prisoners by attaching at least one extremity to the hospital bed, stretcher, or chair at all times when medically possible. Pregnant or postpartum prisoners should not be restrained. Postpartum is the twelve-week period following childbirth, miscarriage, or abortion. See First Step Act provision for more information.

The reimbursable hourly rate, if agreed upon, will be shown in block #13 on page one (1) of this agreement.

Mileage shall be reimbursed in accordance with the current GSA mileage rate.

(End of Provision)



**Local Government (initial):** 
**Federal Government (initial):**

## 13. Guard/Transportation Services to/from U.S. Courthouse (May 2021)

When U.S. Courthouse in block #14 on page one (1) of this agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide transportation and guard services for Federal prisoners housed at its facility to and from the U.S. Courthouse. These services shall be performed by at least two (2) armed and qualified LEOs or COs. In all cases, these are part of a fulltime Law Enforcement Organization or Correctional Organization and that they have met the minimum training requirements.

The Local Government agrees to provide additional personnel if requested by the USMS to enhance specific requirements for security, prisoner monitoring, and contraband control.

Upon arrival at the courthouse, the Local Government's transportation guard will turn Federal prisoners over to the USMS only upon presentation of proper law enforcement credentials.

The Local Government will not transport Federal prisoners to any U.S. Courthouse without a specific request from the USMS who will provide the prisoner's name, the U.S. Courthouse, and the date the prisoner is to be transported.

Each prisoner will be fully restrained in handcuffs, waist chain, and leg restraints during transportation unless otherwise authorized by the USMS. Deviations from full restraints must be documented and reported monthly to the local district USM, Chief, or their designee and to the USMS POD at PODCoCInquiries@usdoj.gov.

The reimbursable hourly rate, if agreed upon, will be shown in block #13 on page one (1) of this agreement.

Mileage shall be reimbursed in accordance with the current GSA mileage rate.

(End of Provision)

## 14. Guard/Transportation Services to Justice Prisoner & Alien Transportation System (JPATS) or Other (May 2021)

When JPATS, Other or both in block #14 on page one (1) of this agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide transportation and escort guard services for Federal prisoners housed at its facility to and from the JPATS or other locations designated by the Federal Government.

These services shall be performed by at least two (2) armed and qualified LEOs or COs. In all cases, these are part of a fulltime Law Enforcement Organization or Correctional Organization and that they have met the minimum training requirements.

The Local Government agrees to provide additional personnel if requested by the USMS to enhance specific requirements for security, prisoner monitoring, and contraband control.



**Local Government (initial):** LB
**Federal Government (initial):** [signature]

The Local Government shall not transport Federal prisoners to the airlift or any other location without a specific request from the USMS who will provide the prisoner's name, location (district), and the date the prisoner is to be transported.

The Local Government shall turn Federal prisoners over to the USMS or an officer specified by the USMS only upon presentation of proper credentials.

Each prisoner will be fully restrained in handcuffs, waist chain, and leg restraints during transportation unless otherwise authorized by the USMS. Deviations from full restraints must be documented and reported monthly to the local district USM, Chief, or their designee and to the USMS POD at PODCoCInquiries@usdoj.gov.

The reimbursable hourly rate, if agreed upon, will be shown in block #13 on page one (1) of this agreement.

Mileage shall be reimbursed in accordance with the current GSA mileage rate.

(End of Provision)

**15. Video Teleconference Hearings within the Facility (October 2021)**

If available, the facility shall furnish, as applicable to this agreement, all things necessary for, or incident to, providing Video Teleconference (VTC) hearings within the facility. When VTC equipment is not available at the facility, the Federal Government, in coordination with the Courts, may assist with providing VTC equipment and ancillary items to the facility.

(End of Provision)

**16. Optional Guard Services to Video Teleconference Hearings within Facility (May 2021)**

When Video Teleconferencing (VTC) Hearings in block #14 on page one (1) of this agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide escort guard services for Federal prisoners housed at its facility to monitor, on a case-by-case basis, court hearings conducted via VTC within its facility per instruction of the Federal Judiciary.

The reimbursable hourly rate, if agreed upon, will be shown in block #13 on page one (1) of this agreement.

(End of Provision)

**17. Special Notifications (May 2021)**

The Local Government shall notify the Federal Government of any activity by a Federal prisoner, which would likely result in litigation or alleged criminal activity.

The Local Government shall immediately notify the Federal Government of an escape of a Federal prisoner. The Local Government shall use all reasonable means to apprehend the escaped Federal

prisoner and all reasonable costs in connection therewith shall be borne by the Local Government. The Federal Government shall have primary responsibility and authority to direct the pursuit and capture of such escaped Federal prisoners. Additionally, the Local Government shall notify the Federal Government as soon as possible when a Federal prisoner is involved in an attempted escape or conspiracy to escape from the Facility.

In the event of a medical emergency, death, or assault on or by a Federal prisoner, the Local Government shall immediately notify the Federal Government.

(End of Provision)

## 18. Body Worn Camera Information Requests (November 2021)

If the Local Government adopts a Body Worn Camera (BWC) use policy that mandates use of BWC for transport or other activities covered under the IGA, the agency shall, upon request by USMS, provide USMS with the audio/video footage and any metadata captured by the BWC pertaining to USMS prisoner incidents. The audio/video footage and any metadata may be requested by the USMS Body Worn Camera Program and the USMS Office of General Counsel. The agency agrees that no BWC footage depicting a USMS prisoner will be released without advance written notification to the USMS.

(End of Provision)

## 19. Restrictive Housing and Suicide Prevention (May 2021)

For the purposes of this agreement, "restrictive housing" means any type of detention that involves all of the following elements:

a. Removal from the general population, whether voluntary or involuntary;
b. Placement in a locked room or cell, whether alone or with another prisoner; and
c. Inability to leave the room or cell for the vast majority of the day, typically 22 hours or more.

For the purposes of this agreement, "vulnerable population" refers to prisoners who are more likely to be victimized in confinement settings, including but not limited to: juveniles; young adults (age 18-24 at time of admission through conviction); prisoners with serious mental illness; lesbian, gay, bisexual, transgender, intersex, and gender nonconforming prisoners; pregnant and postpartum prisoners; and prisoners with medical needs.

The Local Government shall have written policies, procedures, and practices requiring that all prisoners in restrictive housing are personally observed by a CO at least twice per hour, but no more than thirty (30) minutes apart, on an irregular schedule. Prisoners who are violent or mentally ill or who demonstrate unusual or bizarre behavior shall receive more frequent observation; suicidal prisoners shall be under constant observation.



**Local Government (initial):** 
**Federal Government (initial):** 

The Local Government shall immediately notify the appropriate Chief Deputy U.S. Marshal (CDUSM), or designee, and POD at rhinquiries@usdoj.gov when a member of a vulnerable population is placed in restrictive housing or their restrictive housing status changes.

The Local Government shall also provide reports to the USMS on a monthly basis listing all USMS prisoners who were detained in restrictive housing, and the reasons for their assignment to restrictive housing. When no USMS prisoners have been placed in restrictive housing during the reporting month, the Local Government shall notify USMS that there are no USMS prisoners to report. The report or a notification of no USMS prisoners in restrictive housing ' shall be submitted to the CDUSM or his or her designee and POD at rhinquiries@usdoj.gov, no later than the tenth day of each month in a standard format established by the USMS.

The Local Government shall have a comprehensive suicide-prevention program in place incorporating all aspects of identification, assessment, evaluation, treatment, preventive intervention, and annual training of all medical, mental health, and correctional staff.

Additional prisoner suicide prevention resources can be found at: https://www.usmarshals.gov/prisoner/suicide_prevention.htm and https://nicic.gov/.

(End of Provision)

## 20. Prison Rape Elimination Act (PREA) (November 2021)

The Facility must post Prison Rape Elimination Act (PREA) brochure/bulletins in each housing unit of the Facility. The Facility must abide by all relevant PREA regulations at: (https://www.prearesourcecenter.org/about/prison-rape-elimination-act-prea).

All sexual harassment and sexual assaults of or by a USMS prisoner must be reported to the district CDUSM or designee and the POD at: PREAinquiries@usdoj.gov.

In accordance with PREA, the Facility must arrange for a PREA audit every three (3) years. The Facility must maintain PREA compliance or be actively working towards compliance.
Additional resources can be found at: https://www.prearesourcecenter.org/.

Templates for PREA posters and brochures can be found at:
https://www.prearesourcecenter.org/library/search?keys=poster&cat=All

(End of Provision)

## 21. PREA Prisoner Incident Reporting (November 2021)

PREA posters shall contain information on how to report a sexual assault by using one of the following methods:

- Speaking with a staff member;



**Local Government (initial):** [initials]
**Federal Government (initial):** [initials]

- Writing a letter reporting the alleged sexual misconduct to the person in charge or the USMS. To ensure confidentiality, use special (Legal) mail procedures;
- Filing an Emergency Prisoner Grievance - If you decide your complaint is too sensitive to file with the Officer in Charge, you can file your Grievance directly with the CDUSM. You can get the forms from your housing unit officer, or a Facility supervisor;
- Writing to the Office of Inspector General (OIG), which investigates allegations of staff misconduct. The address is: Office of Inspector General, U.S. Department of Justice, 950 Pennsylvania Ave. Room 4706, Washington, DC. 20530; or
- Calling, **at no expense to the victim,** the OIG. The phone number is 1-800-869-4499.

All allegations of sexual abuse reported to Facility staff must be reported and will be investigated. Information concerning the identity of a prisoner victim reporting a sexual assault, and the facts of the report itself, shall be limited to those who have the need to know in order to make decisions concerning the prisoner-victim's welfare and for law enforcement investigative purposes.

(End of Provision)

## 22. Federal Acquisition Regulation (FAR) Agreement Provisions (May 2021)

This agreement incorporates the following agreement provisions by reference, with the same force and effect as if it was given in full text. Upon request, the full text will be made available. The full text of this provision may be accessed electronically at: http://www.acquisition.gov.

**Agreement Provisions:**

FAR 52.222-41 Service Contract Labor Standards. (Aug 2018)

FAR 52.222-42 Statement of Equivalent Rates for Federal Hires (May 2014)

FAR 52.222-43 Fair Labor Standards Act and the Service Contract Labor Standards – Price Adjustment (Multiyear and Option Contracts) (August 2018)

The current Local Government per-diem rates shall be the prevailing wages unless notified by the Federal Government.

If the Department of Labor Wage Determination in block #15 on page one (1) of this Agreement is checked, the Local Government agrees, in accordance with FAR 52.222.43 (f), that it must notify the Federal Government of any increase or decrease in applicable wages and fringe benefits claimed under this clause within thirty (30) days after receiving a new wage determination.

(End of Provision)

## 23. Guaranteed Minimum Bed Space (September 2021)

This IGA ***does not*** contain a guaranteed minimum for bed space.

(End of Provision)



**Local Government (initial):** kz
**Federal Government (initial):** [illegible]

## 24. Economic Rate Adjustments (October 2021)

The Federal Government will use various price analysis techniques and procedures to ensure the rates established by this agreement is considered a fair and reasonable price. Examples of such techniques include, but are not limited to, the following:

a. Comparison of the requested rate with the Independent Government Estimate for detention services, otherwise known as the Core Rate;
b. Comparison with rates at other state or local facilities of similar size and economic conditions;
c. Comparison of previously proposed prices and previous Federal Government and commercial contract prices with current proposed prices for the same or similar items; and
d. Evaluation of the provided jail operating expense information.

The firm-fixed price per-diem rate for services is stipulated in block #11 on page one (1) of this agreement and shall not be subject to adjustment on the basis of ***Rensselaer County Jail*** actual cost experience in providing the service. The per-diem rate shall be fixed for a period from the effective date of this agreement forward for **thirty-six (36) consecutive months**. The per-diem rate covers the support of one Federal prisoner per "Federal prisoner day", which shall include the day of arrival, but not the day of departure.

The per-diem rate and the guard/transportation hourly rate will remain unchanged during the renewal period(s) unless the Local Government requests an economic rate adjustment. To request a per-diem economic rate adjustment, the Local Government will need to access USMS' Capture system via the Law Enforcement Enterprise Portal (LEEP) at https://portal.cjis.gov/wps/myportal/LEEPNG. The Local Government may contact the Agreements Specialist for more information.

An economic rate adjustment to either rate can be requested by the Local Government after **thirty-six (36) months of continuous performance**. Request for economic rate adjustments prior to the ending of the **thirty-six (36) month period** preceding the most recent rate adjustment shall only be considered if there are extreme circumstances that warrants a review of an out of cycle economic rate adjustment. Granting an out of cycle economic rate adjustment is not guaranteed.

To request an out of cycle per-diem economic rate adjustment, the Local Government will need to follow the same instructions as requesting an economic rate adjustment during the renewal period. For the request to be considered, the Local Government must demonstrate that its costs have substantially increased during the current **thirty-six (36) month period**. The Local Government shall provide the Agreements Specialist documentation to include cost and pricing data to justify the facility's out of cycle economic rate adjustment request. The request and its supporting documentation are the sole responsibility of the Local Government to provide a complete request package to the Agreements Specialist. Incomplete or missing data may delay the request being processed or causing the request to be denied altogether.



**Local Government (initial):** B
**Federal Government (initial):** [illegible]

Two (2) or more out of cycle economic rate adjustment requests within the same **thirty-six (36) month period** with an aggregate proposed increase of 25% or more are not permissible under this agreement.

(End of Provision)

## 25. Billing and Financial Provisions (May 2021)

The Local Government shall prepare and submit for certification and payment, original and separate invoices each month to each Federal Government component responsible for Federal prisoners housed at the Facility.

Address(es) for the component(s) is/are:

| | | |
|---|---|---|
| United States Marshals Service<br>Northern District of New York<br>445 Broadway,2nd Floor<br>Albany, New York 12207<br>(518) 472-5401 | United States Marshals Service<br>Eastern District of New York<br>225 Cadman Plaza East, G-20<br>Brooklyn, NY 11201<br>(718)-473-3081 | United States Marshals Service<br>Southern District of New York<br>500 Pearl Street, Suite 400<br>New York, NY 10007<br>(646)-563-9800 |
| United States Marshals Service<br>Western District of New York<br>2 Niagara Square, Ste 400<br>Buffalo, NY 14202<br>716-348-5300 | Federal Bureau of Prisons<br>RRM Pittsburgh<br>1000 Liberty Ave, STE 1315<br>Pittsburgh, PA 15222<br>(412) 395-7930 | U.S. Immigration and Customs Enforcement<br>Buffalo Field Office<br>250 Delaware Ave, Floor 7<br>Buffalo, NY 14202<br>(716) 464-5800 |

To constitute a proper monthly invoice, the name and address of the Facility, the name of each Federal prisoner, their specific dates of confinement, the total days to be paid, the appropriate per diem rate as approved in the agreement, and the total amount billed (total days multiplied by the per-diem rate per day) shall be listed, along with the name, title, complete address, and telephone number of the Local Government official responsible for invoice preparation. Additional services provided, such as transportation and guard services, shall be listed separately and itemized.

Nothing contained herein shall be construed to obligate the Federal Government to any expenditure or obligation of funds in excess of, or in advance of, appropriations in accordance with the 31 U.S.C Section 1341 – Limitations on expending and obligating amounts.

(End of Provision)

## 26. Payment Procedures (May 2021)

The Federal Government will make payments to the Local Government at the address listed in block #6 on page one (1) of this agreement. The payments will be made promptly after the district office has received and certified the invoice is correct.



**Local Government (initial):** [initials]
**Federal Government (initial):** [initials]

(End of Provision)

## 27. Hold Harmless (May 2021)

It is understood and agreed that the Local Government shall fully defend, indemnify, and hold harmless the United States of America, its officers, employees, agents, and servants, individually and officially, for any and all liability caused by any act of any member of the Local Government or anyone else arising out of the use, operation, or handling of any property (to include any vehicle, equipment, and supplies) furnished to the Local Government in which legal ownership is retained by the United States of America, and to pay all claims, damages, judgments, legal costs, adjuster fees, and attorney fees related thereto. The Local Government will be solely responsible for all maintenance, storage, and other expenses related to the care and responsibility for all property furnished to the Local Government.

(End of Provision)

## 28. Disputes (May 2021)

Disputes, questions, or concerns pertaining to this Agreement will be resolved between appropriate officials of each party. Both the parties agree that they will use their best efforts to resolve the dispute in an informal fashion through consultation and communication, or other forms of non-binding alternative dispute resolution mutually acceptable to the parties.

(End of Provision)

## 29. Review of Services (November 2021)

Review standards for prisoners may differ among authorized agency users. The Local Government agrees to allow periodic unannounced reviews by Federal Government, to include approved Federal contractors, in accordance with the standards required by any or all of the Federal authorized agency users whose prisoners may be housed pursuant to this Agreement. A summary of inspection findings will be shared with the facility administrator in order to promote improvements to facility operations, conditions of confinement, and levels of services. If the Federal Government identifies significant finding(s) during the review, the Local Government will provide the Federal Government with a corrective action plan to address the issue(s).

(End of Provision)

## 30. IGA Amendments (May 2021)

For all amendments except for full or partial terminations, either party may initiate a request for amendment to this agreement in writing. All amendments negotiated will be effective only upon written approval of both parties.

(End of Provision)



**Local Government (initial):** KZ
**Federal Government (initial):** JE

**31. Litigation (May 2021)**

The Federal Government shall be notified, in writing, of all litigation pertaining to this agreement and provided copies of any pleadings filed or said litigation within five (5) business days of the filing.

The Local Government shall cooperate with the Federal Government legal staff and the United States Attorney regarding any requests pertaining to Federal Government or Local Government litigation.

(End of Provision)

**32. The First Step Act (May 2021)**

This agreement refers the Local Government facility operations and administrations to the following sections of the First Step Act:

a. Section 613 of Public Law 115-391 the FIRST STEP Act of 2018 and 18 USC 5043 with respect to any USMS juveniles in custody.

b. Section 301 of Public Law 115-391 the FIRST STEP Act of 2018 and that pursuant to USMS policy that these requirements have been adopted for all pregnant and postpartum USMS prisoners, regardless of case status. The postpartum period is twelve weeks after childbirth, miscarriage, or abortion.

(End of Provision)

**33. Ensuring Access to Voter Registration for Eligible Individuals in Federal Custody (February 2022)**

The facility, to the extent practicable and appropriate, will provide federal prisoners educational materials related to voter registration and voting and, upon request by the federal prisoner, facilitate voting by mail by prisoners who are eligible to vote under the laws of the applicable jurisdiction. The facility will work with state and local election officials and, in appropriate circumstances, may also work with other reliable sources of voter information to assist federal prisoners with voter registration, voting by mail, and notification of upcoming elections. This clause does not endorse or advocate in support of or in opposition to any candidate or political party.

(End of Provision)

(End of Agreement)



**Local Government (initial):** 
**Federal Government (initial):**

# Declaration of Sheriff Bourgault

# Exhibit B

# HOUSED IN REVENUES

| 2026 | FEDERAL Projected | | FEDERAL Actual | | BUREAU OF PRISONS Actual | | Projected All Counties | CBP Actual | | ICE Actual | | TOTAL Projected | | TOTAL Actual | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JAN | 65 | $ 274,040 | 78 | $ 328,032 | 0 | $ 1,904 | $ - | - | $ - | - | $ - | 65 | $ 274,040 | 78 | 329,936 |
| FEB | 63 | $ 239,904 | 84 | $ 319,192 | 1 | $ 2,312 | $ - | - | $ - | - | $ - | 63 | $ 239,904 | 84 | 321,504 |
| MARCH | 65 | $ 274,040 | 76 | $ 320,960 | 0 | $ 1,768 | $ - | - | $ - | - | $ - | 65 | $ 274,040 | 78 | 326,808 |
| APRIL | 64 | $ 261,120 | 73 | $ 298,248 | 0 | $ 1,632 | $ - | - | $ - | - | $ - | 64 | $ 261,120 | 75 | 303,960 |
| MAY | 65 | $ 274,040 | 81 | $ 340,544 | 1 | $ 6,120 | $ - | 0 | $ 544 | - | $ - | 65 | $ 274,040 | 84 | 350,880 |
| JUNE | 64 | $ 261,120 | 86 | $ 351,696 | 1 | $ 4,488 | $ - | 1 | $ 2,448 | - | $ - | 64 | $ 261,120 | 88 | 358,632 |
| JULY | 65 | $ 274,040 | 79 | $ 335,104 | 1 | $ 2,856 | $ - | - | $ - | - | $ - | 65 | $ 274,040 | 80 | 337,960 |
| AUGUST | 65 | $ 274,040 | - | $ - | - | $ - | $ - | - | $ - | - | $ - | 65 | $ 274,040 | - | - |
| SEPTEMBER | 64 | $ 261,120 | - | $ - | - | $ - | $ - | - | $ - | - | $ - | 64 | $ 261,120 | - | - |
| OCTOBER | 65 | $ 274,040 | - | $ - | - | $ - | $ - | - | $ - | - | $ - | 65 | $ 274,040 | - | - |
| NOVEMBER | 64 | $ 261,120 | - | $ - | - | $ - | $ - | - | $ - | - | $ - | 64 | $ 261,120 | - | - |
| DECEMBER | 65 | $ 274,040 | - | $ - | - | $ - | $ - | - | $ - | - | $ - | 65 | $ 274,040 | - | - |
| Totals | | $ 3,202,664 | | $ 2,293,776 | | $ 21,080 | $ - | | $ 2,992 | | $ - | | $ 3,202,368 | | $ 2,329,680 |
| | | | | | | | | | | | | | Other | | $ 39,172 |
| | | | | | | | | | | | | | Total | | $ 2,368,852 |

Average 64.5

$ 3,200,000 2026

Actual Totals 557

568

| | |
|---|---|
| Budget - Initial | 3200000 |
| Budget Adj - Reso | 0 |
| | 0 |
| | 0 |
| | 0 |
| | 0 |
| | 3200000 |

$ 332,811 AVG per MONTH

| | | | |
|---|---|---|---|
| | $2,329,680 | | |
| Est. | $1,625,000 | 5 | $ 325,000 |
| | **$ 3,954,680** | | |
| less - | $ 3,200,000 | Budget | |
| | **$ 754,680** | Over/( Under) Budget | |

# HOUSED IN REVENUES

| 2025 | FEDERAL Projected | FEDERAL Actual | BOP Actual | CBP Actual | HIS Actual | SCHOHARIE Actual | SCHENECTADY Actual | I.C.E. Actual | TOTAL Projected | TOTAL Actual |
|---|---|---|---|---|---|---|---|---|---|---|
| JAN | 51 $ 215,016 | 61 $ 259,216 | 1 $ 4,896 | 0 $ 1,088 | 0 $ 136 | - $ - | 0 $ 1,164 | - $ - | 51 $ 215,016 | 63 265,276 |
| FEB | 47 $ 178,976 | 67 $ 253,776 | 1 $ 5,345 | - $ - | - $ - | - $ - | - $ - | - $ - | 47 $ 178,976 | 68 259,121 |
| MARCH | 51 $ 215,016 | 72 $ 301,512 | - $ - | - $ - | 0 $ 136 | - $ - | - $ - | - $ - | 51 $ 215,016 | 72 301,512 |
| APRIL | 50 $ 204,000 | 76 $ 309,536 | 0 $ 1,360 | - $ - | - $ - | - $ - | - $ - | - $ - | 50 $ 204,000 | 76 310,896 |
| MAY | 51 $ 215,016 | 82 $ 344,896 | 1 $ 4,216 | - $ - | 0 $ 272 | - $ - | - $ - | - $ - | 51 $ 215,016 | 83 349,112 |
| JUNE | 50 $ 204,000 | 95 $ 387,056 | 0 $ 816 | - $ - | - $ - | - $ - | - $ - | - $ - | 50 $ 204,000 | 95 387,872 |
| JULY | 51 $ 215,016 | 95 $ 401,336 | 0 $ 1,632 | - $ - | 0 $ 544 | - $ - | - $ - | - $ - | 51 $ 215,016 | 96 402,968 |
| AUGUST | 51 $ 215,016 | 91 $ 383,520 | 1 $ 2,856 | - $ - | - $ - | - $ - | - $ - | - $ - | 51 $ 215,016 | 92 386,376 |
| SEPTEMBER | 50 $ 204,000 | 81 $ 328,567 | 1 $ 2,040 | - $ - | - $ - | - $ - | - $ - | - $ - | 50 $ 204,000 | 81 330,607 |
| OCTOBER | 51 $ 215,016 | 75 $ 315,112 | 0 $ 2,040 | - $ - | - $ - | - $ - | - $ - | - $ - | 51 $ 215,016 | 75 317,152 |
| NOVEMBER | 50 $ 204,000 | 73 $ 298,248 | 0 $ 1,904 | - $ - | - $ - | - $ - | - $ - | - $ - | 50 $ 204,000 | 74 300,152 |
| DECEMBER | 51 $ 215,016 | 73 $ 308,176 | 0 $ 1,632 | - $ - | - $ - | - $ - | - $ - | - $ - | 51 $ 215,016 | 73 309,808 |
| Totals | $ 2,500,000 | $ 3,890,951 | $ 28,737 | $ 1,088 | $ 1,088 | $ - | $ 1,164 | $ - | $ 2,498,360 | $ 3,920,852 |
| | | | | | | | | | Other | $ 206,568 |
| | | | | | | | | | Total | $ 4,127,420 |

| | |
|---|---|
| $ 2,500,000 | 2025 |
| | 947 |
| $ 326,738 | AVG per MONTH |

| | |
|---|---|
| Budget - Initial | 2500000 |
| Budget Adj - Reso | 0 |
| | 0 |
| | 0 |
| | 0 |
| | 2500000 |

| | | |
|---|---|---|
| | $3,920,852 | |
| | $0 | |
| | **$ 3,920,852** | |
| less - | $ 2,500,000 | Budget |
| | **$ 1,420,852** | Over/( Under) Budget |

# HOUSED IN REVENUES

| 2024 | FEDERAL Projected | | FEDERAL Actual | | BOP Actual | | ULSTER Actual | | SCHOHARIE Actual | | SCHENECTADY Actual | | I.C.E. Actual | | TOTAL Projected | | TOTAL Actual | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JAN | 57 | $ 171,399 | 53 | $ 160,826 | - | $ - | - | $ - | - | $ - | - | $ - | - | $ - | 57 | $ 171,399 | 53 | 160,826 |
| FEB | 56 | $ 152,096 | 52 | $ 141,329 | 0 | $ 194 | - | $ - | - | $ - | - | $ - | - | $ - | 56 | $ 152,096 | 52 | 141,523 |
| MARCH | 57 | $ 171,399 | 54 | $ 161,893 | 0 | $ 485 | - | $ - | - | $ - | - | $ - | - | $ - | 57 | $ 171,399 | 54 | 162,378 |
| APRIL | 56 | $ 162,960 | 55 | $ 160,244 | - | $ - | - | $ - | - | $ - | - | $ - | - | $ - | 56 | $ 162,960 | 55 | 160,244 |
| MAY | 57 | $ 171,399 | 51 | $ 153,066 | - | $ - | - | $ - | - | $ - | - | $ - | - | $ - | 57 | $ 171,399 | 51 | 153,066 |
| JUNE | 56 | $ 162,960 | 51 | $ 149,768 | - | $ - | - | $ - | - | $ - | 0 | $ 1,358 | - | $ - | 56 | $ 162,960 | 52 | 151,126 |
| JULY | 57 | $ 171,399 | 54 | $ 161,796 | - | $ - | - | $ - | - | $ - | 1 | $ 3,007 | - | $ - | 57 | $ 171,399 | 55 | 164,803 |
| AUGUST | 56 | $ 168,392 | 55 | $ 166,452 | - | $ - | 0 | $ 1,400 | - | $ - | 1 | $ 3,007 | - | $ - | 56 | $ 169,792 | 57 | 170,859 |
| SEPTEMBER | 57 | $ 165,870 | 60 | $ 173,242 | 1 | $ 2,134 | - | $ - | - | $ - | 1 | $ 2,910 | - | $ - | 57 | $ 165,870 | 61 | 178,286 |
| OCTOBER | 56 | $ 168,392 | 58 | $ 173,339 | 1 | $ 2,328 | - | $ - | 0 | $ 1,950 | 1 | $ 3,007 | - | $ - | 56 | $ 168,392 | 59 | 178,674 |
| NOVEMBER | 57 | $ 165,870 | 66 | $ 269,280 | 1 | $ 3,264 | - | $ - | 1 | $ 3,900 | 1 | $ 2,910 | - | $ - | 57 | $ 165,870 | 68 | 275,454 |
| DECEMBER | 56 | $ 168,392 | 68 | $ 288,728 | 1 | $ 4,216 | - | $ - | 0 | $ 260 | 1 | $ 3,007 | - | $ - | 56 | $ 168,392 | 70 | 295,951 |
| Totals | | $ 2,000,000 | | $ 2,159,963 | | $ 12,621 | | $ 1,400 | | $ 6,110 | | $ 19,206 | | $ - | | $ 2,000,200 | | $ 2,193,190 |
| | | | | | | | | | | | | | | | | Other | | $ 38,786 |
| | | | | | | | | | | | | | | | | Total | | $ 2,231,976 |
| Actual Totals | | | 678 | | 4 | | | | | | 6 | | - | | | | 688 | |

$ 2,000,000 2024

242930

$ 219,319 AVG per MONTH

| | | |
|---|---|---|
| | $2,193,190 | |
| Estimated Remaining | $0 | 0 |
| | **$ 2,193,190** | |
| less - | $ 2,000,000 | Budget |
| | **$ 193,190** | Over/( Under) Budget |

# HOUSED IN REVENUES

| 2023 | FEDERAL | | | | BUREAU OF PRISONS | | | JEFFERSON | | I.C.E. | | TOTAL | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Projected | | Actual | | Actual | | Projected All Counties | Actual | | Actual | | Projected | | Actual | |
| JAN | 50 | $ 150,350 | 54 | $ 163,639 | 1 | $ 3,007 | $ - | - | $ - | - | $ - | 50 | $ 150,350 | 55 | 166,646 |
| FEB | 50 | $ 135,800 | 53 | $ 145,015 | 0 | $ 873 | $ - | - | $ - | - | $ - | 50 | $ 135,800 | 54 | 145,888 |
| MARCH | 50 | $ 150,350 | 55 | $ 164,512 | 0 | $ 970 | $ - | - | $ - | - | $ - | 50 | $ 150,350 | 55 | 165,482 |
| APRIL | 50 | $ 145,500 | 55 | $ 160,147 | - | $ - | $ - | 3 | $ 6,984 | - | $ - | 50 | $ 145,500 | 58 | 167,131 |
| MAY | 50 | $ 150,350 | 61 | $ 184,688 | 0 | $ 1,067 | $ - | 8 | $ 20,952 | - | $ - | 50 | $ 150,350 | 70 | 206,707 |
| JUNE | 50 | $ 145,500 | 59 | $ 172,466 | 2 | $ 6,596 | $ - | 4 | $ 10,185 | - | $ - | 50 | $ 145,500 | 65 | 189,247 |
| JULY | 50 | $ 150,350 | 61 | $ 183,621 | 2 | $ 7,372 | $ - | 5 | $ 12,901 | - | $ - | 50 | $ 150,350 | 68 | 203,894 |
| AUGUST | 50 | $ 150,350 | 63 | $ 189,247 | 1 | $ 3,492 | $ - | 12 | $ 32,689 | - | $ - | 50 | $ 150,350 | 77 | 225,428 |
| SEPTEMBER | 50 | $ 145,500 | 61 | $ 177,413 | - | $ - | $ - | 14 | $ 36,569 | - | $ - | 50 | $ 145,500 | 75 | 213,982 |
| OCTOBER | 50 | $ 150,350 | 64 | $ 191,769 | - | $ - | $ - | 6 | $ 16,684 | - | $ - | 50 | $ 150,350 | 70 | 208,453 |
| NOVEMBER | 50 | $ 145,500 | 59 | $ 171,787 | - | $ - | $ - | 0 | $ 1,164 | - | $ - | 50 | $ 145,500 | 59 | 172,951 |
| DECEMBER | 50 | $ 150,350 | 59 | $ 178,189 | - | $ - | $ - | - | $ - | - | $ - | 50 | $ 150,350 | 59 | 178,189 |
| Totals | | $ 1,770,250 | | $ 2,082,493 | | $ 23,377 | $ - | | $ 138,128 | | $ - | | $ 1,770,250 | 766 | $ 2,243,998 |
| | | | | | | | | | | | | | Other | | $ 90,555 |
| | | | | | | | | | | | | | Total | | $ 2,334,553 |

$ 1,770,250 2023

Actual Totals 705 8 53 -

128 Avg Inmates

$ 187,000 AVG per MONTH

242930

$2,243,998

Estimated Remaining $0 0 $ -

$ 2,243,998

less - $ 1,770,250 Budget

$ 473,748 Over/( Under) Budget

# HOUSED IN REVENUES

| 2022 | FEDERAL Projected | | FEDERAL Actual | | BUREAU OF PRISONS Actual | | Projected All Counties | I.C.E. Actual | | TOTAL Projected | | TOTAL Actual | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JAN | 65 | $ 195,455 | 60 | $ 181,487 | - | $ - | $ - | 1 | $ 3,007 | 65 | $ 195,455 | 60 | 184,494 |
| FEB | 65 | $ 176,540 | 68 | $ 184,397 | - | $ - | $ - | 2 | $ 3,783 | 65 | $ 176,540 | 68 | 188,180 |
| MARCH | 65 | $ 195,455 | 69 | $ 206,610 | 1 | $ 2,813 | $ - | 3 | $ 7,954 | 65 | $ 195,455 | 70 | 217,377 |
| APRIL | 65 | $ 189,150 | 60 | $ 175,958 | - | $ - | $ - | 2 | $ 3,880 | 65 | $ 189,150 | 60 | 179,838 |
| MAY | 65 | $ 195,455 | 56 | $ 169,556 | - | $ - | $ - | 5 | $ 12,804 | 65 | $ 195,455 | 56 | 182,360 |
| JUNE | 65 | $ 189,150 | 53 | $ 153,357 | 0 | $ 970 | $ - | 2 | $ 5,917 | 65 | $ 189,150 | 55 | 160,244 |
| JULY | 65 | $ 195,455 | 47 | $ 141,814 | 1 | $ 3,007 | $ - | 2 | $ 6,499 | 65 | $ 195,455 | 48 | 151,320 |
| AUGUST | 65 | $ 195,455 | 49 | $ 148,410 | 1 | $ 1,552 | $ - | 3 | $ 6,887 | 65 | $ 195,455 | 50 | 156,849 |
| SEPTEMBER | 65 | $ 189,150 | 47 | $ 137,546 | - | $ - | $ - | - | $ - | 65 | $ 189,150 | 47 | 137,546 |
| OCTOBER | 65 | $ 195,455 | 41 | $ 122,317 | 0 | $ 1,164 | $ - | - | $ - | 65 | $ 195,455 | 41 | 123,481 |
| NOVEMBER | 65 | $ 189,150 | 47 | $ 138,031 | 0 | $ 1,164 | $ - | - | $ - | 65 | $ 189,150 | 48 | 139,195 |
| DECEMBER | 65 | $ 195,455 | 51 | $ 151,902 | 1 | $ 3,007 | $ - | - | $ - | 65 | $ 195,455 | 52 | 154,909 |
| Totals | | $ 2,301,325 | | $ 1,911,385 | | $ 13,677 | $ - | | $ 50,731 | | $ 2,301,325 | | $ 1,975,793 |
| | | | | | | | | | | | Other | | $ 49,621 |
| | | | | | | | | | | | Total | | $ 2,025,414 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | $ 2,301,325 | 2022 |
| Actual Totals | 649 | 5 | 20 | | 656 |
| | | | | $ 164,649 | AVG per MONTH |
| | | 242930 | | | |
| | | | | $1,975,793 | |
| | | | Estimated Remaining | $0 | 0 $ - |
| | | | | $ 1,975,793 | |
| | | | less - | $ 2,301,325 | Budget |
| | | | | $ (325,532) | Over/( Under) Budget |

# Declaration of Sheriff Bourgault

# Exhibit C

**MEMORANDUM OF UNDERSTANDING**
**Between**
**United States Border Patrol, Swanton Sector,**
**And**
**Rensselaer County Sheriff's Office**

Pursuant to the authority contained in 19 C.F.R. § 162.6 and 8 C.F.R. § 287.5, this Memorandum of Understanding (Agreement) is entered into between U.S. Customs and Border Protection (CBP), U.S. Border Patrol, Swanton Sector, (USBP) and the Rensselaer County Sheriff's Office (RCSO) (collectively, the Parties).

I. **Purpose:** The Parties establish this Agreement to allow the Agency to house federal detainees (federal detainees) with the RCSO, 4000 Main St, Troy, NY. 12180 (facility). The federal detainees will include individuals charged with federal offenses and detained while awaiting trial.

II. **Responsibilities:**

The Parties agree as follows:

A. RCSO agrees to accept and provide for the secure custody, safekeeping, housing, subsistence, and care of federal detainees in accordance with all state and local laws, standards, regulations, policies, and court orders applicable to the operation of the facility, and consistent with Federal law.

B. All Border Patrol Agents transporting federal detainees will adhere to Agency policies and directives covering secure transportation, escort, and detention procedures.

C. At all times, the Agency shall have access to the facility and to the federal detainees housed there, and to any records pertaining to this Agreement, including financial records, for a period going back three (3) years from the date of request by the Agency.

D. Overall management and operation of the facility housing federal detainees may not be contracted out without the prior express written consent of the Agency.

E. RCSO agrees to provide transportation and escort guard services for federal detainees housed at its facility to and from the U.S. courthouse.

F. Medical Services:

a. RCSO shall provide federal detainees with the full range of medical care inside the detention facility. The level of care inside the facility should be the same as that provided to state and local detainees. RCSO is financially responsible for all medical care provided inside the facility to federal detainees.

b. RCSO must notify the Agency of any medical issues requiring a federal detainee to be transported to a medical facility. RCSO will provide transportation and escort guard services for federal detainees housed at their facility to and from a medical facility for outpatient care, and transportation and stationary guard services for federal detainees admitted to a medical facility. The Agency will be liable for medical costs of subjects transported to a medical facility and ensuing treatments. The Agency will also be liable for any and all medical services and treatments provided to Federal detainees outside of the facility.

**III. Points of Contact:**

Travis Doe
USBP, Swanton Sector
155 Grand Ave.
Swanton, VT. 05488
802-868-3361

Kyle Bourgault
Sheriff
Rensselaer County Sheriff's Office
4000 Main St,
Troy, NY 12180
(518) 853-5500

**IV. Financial Responsibilities:** The Agency agrees to pay RCSO a fee of $130 per night per federal detainee with weekly billing invoices. The fee will remain consistent with the per diem contract rate agreed upon between the United States Marshall Service and RCSO.

**V. Effective Date:** This Agreement is effective on the date in which the last party signs this Agreement.

**VI.** **Modification:** This Agreement may be modified only upon the mutual written consent of the parties.

**VII.** **Suspension, Revocation and/or Termination:** The terms of this Agreement will remain in effect for one year unless terminated by the parties. This Agreement is entered into and granted with the express understanding that either party maintains the right to suspend, revoke, or terminate this Agreement as it deems necessary or appropriate for the safety and security of the parties or for any other reason. Either party must notify the other party in writing if it intends to suspend, revoke, or terminate this Agreement. RCSO shall provide no less than 120 calendar days notice of their intent to terminate.

**VIII.** **Special Notifications:**

a. RCSO shall notify the Agency of any activity by a federal detainee which would likely result in litigation or alleged criminal activity.

b. RCSO shall immediately notify the Agency of an escape of a federal detainee. RCSO shall use all reasonable means to apprehend the escaped federal detainee and all reasonable costs in connection therewith shall be the responsibility of RCSO.

**IX.** **Other Provisions:**

a. Nothing in this Agreement is intended to conflict with current law or regulation, policy, or directives, of the United States Department of Homeland Security, the Agency, or RCSO. If a term of this Agreement is inconsistent with such authority, then that term shall be invalid, but the remaining terms and conditions shall remain in full force and effect.

b. The facility shall post the Prisoner Rape Elimination Act brochure/bulletin in each housing unit of the facility. All detainees have a right to be safe and free from sexual harassment and sexual assaults.

**AGREED TO AND APPROVED BY:**

ROBERT N GARCIA Digitally signed by ROBERT N GARCIA Date: 2024.08.10 07:47:53 -04'00'

Robert N. Garcia
Chief
U.S. Border Patrol
Swanton Sector

Date

6/27/24

Kyle Bourgault
Sheriff
Rensselaer County Sheriff's Office

Date

# Declaration of Sheriff Bourgault

# Exhibit D

# MEMORANDUM OF AGREEMENT
# 287(g) Jail Enforcement Model

## I. PARTIES

This Memorandum of Agreement (MOA) constitutes an agreement between U.S. Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and Rensselaer County Sheriff's Office, hereinafter the law enforcement agency (LEA), pursuant to which ICE delegates to nominated, trained, certified, and authorized LEA personnel the authority to perform certain immigration enforcement functions as specified herein. The LEA and ICE enter into this MOA in good faith and agree to abide by the terms and conditions contained herein.

## II. PURPOSE

The purpose of this collaboration is to enhance the safety and security of communities by focusing resources on identifying and processing removable aliens who have been arrested and booked into the LEA's jail/correctional facilities. This MOA sets forth the terms and conditions pursuant to which selected LEA personnel (participating LEA personnel) will be nominated, trained, and approved by ICE to perform certain limited functions of an immigration officer within the LEA's jail/correctional facilities. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating LEA personnel as members of the LEA. However, the exercise of the immigration enforcement authority delegated under this MOA to participating LEA personnel shall occur only as provided in this MOA.

## III. AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1357(g) (1996), as amended by the Homeland Security Act of 2002, Pub. L. No. 107-296, authorizes the Secretary of DHS to enter into written agreements with a State or any political subdivision of a State so that qualified personnel can perform certain functions of an immigration officer. Such authority has been delegated by the Secretary to ICE, and this MOA constitutes such a written agreement.

## IV. RESPONSIBILITIES

ICE retains sole discretion in determining how it will manage its limited resources and meet its mission requirements. ICE will assume custody of an alien only after said individual has been released from LEA custody.

### A. DESIGNATION OF AUTHORIZED FUNCTIONS

Approved participating LEA personnel will be authorized to perform only those immigration officer functions set forth in the Standard Operating Procedures (SOP) in Appendix A.

### B. NOMINATION OF PERSONNEL

The LEA will use due diligence to screen and nominate candidates for ICE training and approval under this MOA. All candidates must be United States citizens, have knowledge of, and authority to enforce, laws and regulations pertinent to their law enforcement activities and their jurisdictions, and have been trained on maintaining the security of LEA facilities, and have the authority to enforce rules and regulations governing inmate accountability and conduct.

ICE will conduct a background investigation and make an eligibility determination on each candidate prior to personnel being authorized to perform duties under this MOA.

All LEA candidates must be approved by ICE and must be able to qualify for access to the appropriate DHS and ICE databases/systems and associated applications. Should a candidate not be approved, a qualified substitute candidate may be submitted.

## C. TRAINING OF PERSONNEL

Before participating LEA personnel receive authorization to perform immigration officer functions under this MOA, they must successfully complete delegation of immigration authority training provided by ICE on relevant administrative, legal, and operational issues tailored to the immigration enforcement functions to be performed.

The training will be taught by ICE instructors and tailored to the immigration enforcement functions to be performed. Each LEA nominee must pass each examination with a minimum score of 70-percent to receive certification. If an LEA nominee fails to attain a 70-percent rating on an examination, the LEA nominee will have an opportunity to review the testing material and re-take a similar examination. During the entirety of training, the LEA nominee will be offered a maximum of one remedial examination. Failure to achieve a 70-percent rating on any two examinations (inclusive of any remedial examination), will result in the disqualification of the LEA nominee and discharge of the nominee from the training.

Participating LEA personnel will also be required to complete refresher training as needed, but not more frequently than every two years after the initial course completion. Participating LEA personnel will also complete any additional training required by ICE on relevant administrative, legal, and operational issues related to the immigration officer functions to be performed.

## D. CERTIFICATION AND AUTHORIZATION

Upon successful completion of initial training, LEA personnel shall be deemed "certified" under this MOA.

ICE will certify in writing the names of those LEA personnel who successfully complete training and pass all required test(s). Upon receipt of the certification, the ICE Field Office Director (FOD) will provide the participating LEA personnel a signed authorization letter allowing the named LEA personnel to perform specified functions of an immigration officer. ICE will also provide a copy of the authorization letter to the LEA. ICE will also execute ICE Form 70-006, Designated Immigration Officer. Only those certified LEA personnel who receive authorization letters and ICE Form 70-006 issued by ICE and whose immigration enforcement efforts are overseen by ICE may conduct immigration officer functions described in this MOA.

Along with the authorization letter and ICE Form 70-006, ICE will issue the certified LEA personnel official immigration officer credentials. Participating LEA personnel shall carry their ICE-issued credentials while performing immigration officer functions under this MOA. Such credentials provided by ICE shall remain the property of ICE and shall be returned to ICE upon termination of this agreement, when a participating LEA employee ceases his/her participation, or when deemed necessary by the FOD.

LEA personnel may have their delegated authority revoked at any time for any reason. However, where a revocation would effectively amount to the suspension/termination of the entire MOA (i.e. where a revocation would leave no participating LEA personnel available to carry out responsibilities under the 287(g) program), ICE will follow the suspension and termination notice processes described in Section VIII, below. The letter of authorization issued to LEA personnel will remain valid until the LEA personnel is revoked via the issuance of a letter of revocation signed by the FOD. The LEA and FOD will be responsible for notification to the appropriate personnel in their respective agencies. The suspension or termination of this MOA, a process described in Section VIII, shall constitute immediate revocation of all immigration enforcement authorizations delegated hereunder.

## E. COSTS AND EXPENDITURES

ICE is responsible for the installation and maintenance of the Information Technology (IT) infrastructure. The use of the IT infrastructure and the DHS/ICE IT security policies are defined in the Interconnection Security Agreement (ISA). The ISA is the agreement between ICE's Chief Information Security Officer and the LEA's Designated Accreditation Authority. The LEA agrees that each of its sites using an ICE-provided network access or equipment will sign the ISA, which defines the DHS ICE 4300A Sensitive System Policy and Rules of Behavior for each user granted access to the DHS network and software applications. Failure to adhere to the terms of the ISA could result in the loss of all user privileges.

The LEA is responsible for personnel expenses, including, but not limited to, salaries and benefits, local transportation, and official issue material used in the execution of the LEA's mission. ICE will provide instructors and training materials. The LEA is responsible for the salaries and benefits, including any overtime, of all of its personnel being trained or performing duties under this MOA and of those personnel performing the regular functions of the participating LEA personnel while they are receiving training. ICE is responsible for the costs of the LEA personnel's travel expenses while in a training status, as authorized by the Federal Travel Regulation and the ICE Travel Handbook. These expenses include housing, per diem and all transportation costs associated with getting to and from training. ICE is responsible for the salaries and benefits of all ICE personnel, including instructors and supervisors.

The LEA is responsible for providing all administrative supplies (e.g. paper, printer toner) necessary for normal office operations. The LEA is also responsible for providing the necessary security equipment, such as handcuffs, leg restraints, etc.

## F. ICE SUPERVISION

Immigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized to perform immigration officer functions except when working under the supervision or direction of ICE. Additional supervisory and administrative responsibilities are specified in Appendix A.

The actions of participating LEA personnel will be reviewed by ICE officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for individual training or guidance.

For purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only to immigration enforcement functions as authorized in this MOA. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these delegated authorities under this MOA shall be DHS and ICE policies and procedures. ICE is responsible for providing the LEA with the applicable DHS and ICE policies. However, when engaged in immigration enforcement activities, no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law.

If a conflict arises between an order or direction of an ICE officer or a DHS or ICE policy and the LEA's rules, standards, or policies, the conflict shall be promptly reported to the points of contact in Section VII, who shall attempt to resolve the conflict.

**G. INTERPRETATION SERVICES**

Participating LEA personnel will provide an opportunity for aliens with limited English language proficiency to request an interpreter. Qualified foreign language interpreters will be provided by the LEA, as needed. Whether or not an interpreter is used, the record should always include questions and answers concerning the need for an interpreter.

The LEA will maintain a list of qualified interpreters or companies it contracts with to provide such interpreters. A qualified interpreter, which may include LEA personnel, means an interpreter who can interpret effectively, accurately, and impartially, using any specialized vocabulary.

**H. LIABILITY AND RESPONSIBILITY**

Except as otherwise noted in this MOA or allowed by Federal law, and to the extent required by 8 U.S.C. § 1357(g)(7) and (8), the LEA will be responsible and bear the costs of participating LEA personnel with regard to their property or personal expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating LEA personnel will be treated as Federal employees only for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. *See* 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. In addition, it is the understanding of the parties to this MOA that participating LEA personnel performing a function on behalf of ICE as authorized by this MOA will be considered acting under color of Federal authority for purposes of determining liability and immunity from suit under Federal or State law. *See* 8 U.S.C. § 1357(g)(8).

Participating LEA personnel named as personal-capacity defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice. *See* 28 C.F.R. § 50.15. Absent exceptional circumstances, such requests must be made in writing. LEA personnel who wish to submit a request for representation shall notify the local ICE Office of the Principal Legal Advisor (OPLA) field location at 250 Delaware Avenue, Suite 773, Buffalo, NY 14202. OPLA, through its headquarters, will assist LEA personnel with the request for representation, including the appropriate forms and instructions. Unless OPLA concludes that representation clearly is unwarranted, it will forward the request for representation, any supporting documentation, and an advisory statement opining whether: 1) the requesting individual was acting within the scope of his/her authority under 8 U.S.C. § 1357(g) and this MOA; and, 2) such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Tort Litigation Section, Civil Division, Department of Justice (DOJ). Representation is granted at the discretion of DOJ; it is not an entitlement. *See* 28 C.F.R. § 50.15.

The LEA agrees to cooperate with any Federal investigation related to this MOA to the full extent of its available powers, including providing access to appropriate databases, personnel, individuals in custody and documents. Failure to do so may result in the termination of this MOA. Failure of any participating LEA employee to cooperate in any Federal investigation related to this MOA may result in revocation of such individual's authority provided under this MOA. The LEA agrees to cooperate with Federal personnel conducting reviews to ensure compliance with the terms of this MOA and to provide access to appropriate databases, personnel, and documents necessary to complete such compliance review. It is understood that information provided by any LEA personnel under threat of disciplinary action in an administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with *Garrity v. New Jersey*, 385 U.S. 493 (1967), and its progeny.

As the activities of participating LEA personnel under this MOA derive from Federal authority, the participating LEA personnel will comply with Federal standards and guidelines relating to the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny, which govern the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

The LEA and ICE are each responsible for compliance with the Privacy Act of 1974, 5 U.S.C. §552a, DHS Privacy Act regulations, 6 C.F.R. §§ 5.20-5.36, as applicable, and related system of records notices with regard to data collection and use of information under this MOA.

### I. CIVIL RIGHTS STANDARDS

Participating LEA personnel are bound by all Federal civil rights laws, regulations, and guidance relating to non-discrimination, including the U.S. Department of Justice "Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity," dated December 2014; Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency," (Aug. 2000); Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 et seq., which prohibits discrimination based upon race, color, or national origin (including limited English proficiency) in any program or activity receiving Federal financial assistance; and Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination based on disability and requires the LEA to provide effective communication to individuals with disabilities, and/or Title II of the Americans with Disabilities Act of 1990, which also prohibits discrimination based on disability and requires the LEA to provide effective communication to individuals with disabilities.

## V. REPORTING AND DOCUMENTATION

### A. COMPLAINT PROCEDURES

The complaint reporting procedure for allegations of misconduct by participating LEA personnel, including activities undertaken under the authority of this MOA, is included in Appendix B.

### B. COMMUNICATION

The FOD, or the FOD's management representative, and the LEA shall make every effort to meet at least annually to ensure compliance with the terms of this MOA. When necessary, ICE and the LEA may limit the participation of these meetings in regard to non-law enforcement personnel. The attendees will meet at a location to be agreed upon by the parties, or via teleconference. An

initial review meeting between ICE and the LEA should be held within approximately 12 months of the MOA's operational date.

## C. COMMUNITY OUTREACH

The LEA, in coordination with the local ICE Field Office, will engage, as necessary, in Steering Committee meetings to enhance support for the 287(g) mission, and to ensure compliance with the terms of this MOA.

## D. RELEASE OF INFORMATION TO THIRD PARTIES

The LEA may, at its discretion, communicate the substance of this agreement to media and other third parties expressing an interest in the law enforcement activities to be engaged in under this MOA. It is the practice of ICE to provide a copy of this MOA, only after it has been signed, to requesting media outlets; the LEA is authorized to do the same.

The LEA hereby agrees to coordinate with ICE prior to releasing any information relating to, or exchanged under, this MOA. For releases of information to the media, the LEA must coordinate in advance of release with the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval prior to any release. The points of contact for ICE and the LEA for this purpose are identified in Appendix C. For releases of information to all other parties, the LEA must coordinate in advance of release with the FOD or the FOD's representative.

Information obtained or developed as a result of this MOA, including any documents created by the LEA that contain information developed or obtained as a result of this MOA, is under the control of ICE and shall not be disclosed unless: 1) permitted by applicable laws, regulations, or executive orders; and 2) the LEA has coordinated in advance of release with (a) the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval, prior to any release to the media, or (b) an ICE officer prior to releases to all other parties. LEA questions regarding the applicability of this section to requests for the release of information shall be directed to an ICE officer.

Nothing herein limits LEA's compliance with state public records laws regarding those records that are solely state records and not ICE records.

## VI. MODIFICATIONS TO THIS MOA

Modifications to this MOA, including the Appendices, must be proposed in writing and approved and signed by both parties.

## VII. POINTS OF CONTACT

ICE and the LEA points of contact (POCs) for purposes of this MOA are:

For the LEA: Rensselaer County Sheriff's Office, Sheriff
For DHS: Buffalo, Field Office Director

## VIII. EFFECTIVE DATE, SUSPENSION, AND TERMINATION OF THIS MOA

This MOA becomes effective upon signature of both parties and will remain in effect until either party terminates or suspends the MOA. Termination by the LEA shall be provided, in writing, to the local Field Office.

In instances where serious misconduct or violations of the terms of the MOA come to the attention of ICE, the ICE Director may, upon recommendation of the Executive Associate Director for Enforcement and Removal Operations, elect to immediately suspend the MOA pending investigation of the misconduct and/or violations.

Notice of the suspension will be provided to the LEA, and the notice will include, at a minimum, (1) an overview of the reason(s) that ICE is suspending the 287(g) agreement, (2) the length of the temporary suspension, and (3) how the LEA can provide ICE with information regarding the alleged misconduct and/or violations, as well as any corrective measures it has undertaken.

ICE shall provide the LEA with a reasonable opportunity to respond to the alleged misconduct and/or violations and to take actions to implement corrective measures (e.g., replace the officer(s) who are the focus of the allegations). ICE will provide the LEA timely notice of a suspension being extended or vacated.

If the LEA is working to take corrective measures, ICE will generally not terminate an agreement. The termination of an agreement is generally reserved in instances involving problems that are unresolvable and detrimental to the 287(g) Program.

If ICE decides to move from suspension to termination, ICE will provide the LEA a 90-day notice in advance of the partnership being terminated. The notice will include, at a minimum: (1) An overview of the reason(s) that ICE seeks to terminate the 287(g) agreement; (2) All available data on the total number of aliens identified under the 287(g) agreement; and (3) Examples of egregious criminal aliens identified under the 287(g) agreement. ICE's decision to terminate a MOA will be published on ICE's website 90 days in advance of the MOA's termination.

This MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents it is fully authorized to enter into this MOA, accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law.

Date: CHRISTOPHER M CRONEN Digitally signed by CHRISTOPHER M CRONEN Date: 2020.06.10 11:06:33 -04'00'

C.M. Cronen
Assistant Director, Enforcement
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
Department of Homeland Security

Date: 3/5/20

Patrick A. Russo
Sheriff
Rensselaer County Sheriff's Office

## APPENDIX A

## STANDARD OPERATING PROCEDURE (SOP)

The purpose of this appendix is to establish standard, uniform procedures for the implementation and oversight of this MOA within the FOD area of responsibility.

Pursuant to this MOA, the LEA has been delegated authorities under the Jail Enforcement Model (JEM) Program as outlined below. The 287(g) JEM Program is designed to identify and process removable aliens within the LEA's jail/correctional facilities.

**Authorized Functions:**

Participating LEA personnel performing immigration-related functions pursuant to this MOA will be LEA officers assigned to detention duties. Those participating LEA personnel will exercise their immigration-related authorities only during the course of their normal duties while assigned to the LEA's jail/correctional facilities.

Participating LEA personnel are delegated only those authorities listed below:

- The power and authority to interrogate any person detained in the participating law enforcement agency's detention center who the officer believes to be an alien about his or her right to be or remain in the United States, 8 U.S.C. § 1357(a)(1) and 8 C.F.R. § 287.5(a)(1), and to process for immigration violations any removable alien or those aliens who have been arrested for violating a Federal, State, or local offense;

- The power and authority to serve and execute warrants of arrest for immigration violations, 8 U.S.C. § 1357(a) and 8 C.F.R. § 287.5(e)(3), on designated aliens in LEA jail/correctional facilities at the time of the alien's scheduled release from criminal custody in order to transfer custody of the alien to ICE;
    - Upon transfer of the alien's custody to ICE, the alien will continue to be held in the LEA's jail/correctional facilities for no more than 48 hours unless there exists an agreement pursuant to which the LEA will continue to detain, for a reimbursable fee, aliens for immigration purposes. In the absence of an agreement, if the alien is not transferred to an ICE field office or an immigration detention facility within 48 hours, the alien shall be released from the LEA's jail/correctional facility.

- The power and authority to serve warrants of removal, 8 U.S.C. § 1357(a) and 8 C.F.R. §§ 241.2(b)(2), 287.5(e)(3), on designated aliens in LEA jail/correctional facilities at the time of the alien's scheduled release from criminal custody that executes the custodial transfer of the alien to ICE for removal purposes;
    - Upon transfer of the alien's custody to ICE, the alien will continue to be held in the LEA's jail/correctional facilities for no more than 48 hours unless there exists an agreement pursuant to which the LEA will continue to detain, for a reimbursable fee, aliens for immigration purposes. In the absence of an agreement, if the alien is not transferred to an ICE field office or an immigration detention facility within 48 hours, the alien shall be released from the LEA's jail/correctional facility.

- The power and authority to administer oaths and to take and consider evidence, 8 U.S.C § 1357(b) and 8 C.F.R. § 287.5(a)(2), to complete required alien processing, including fingerprinting, photographing, and interviewing of aliens, as well as the preparation of affidavits and the taking of sworn statements for ICE supervisory review;

- The power and authority to prepare charging documents, 8 U.S.C. §§ 1225(b)(1), 1228, 1229, and 1231(a)(5); 8 C.F.R. §§ 235.3, 238.1, 239.1, and 241.8, including the preparation of a Notice to Appear or other charging document, as appropriate, for the signature of an ICE officer;

- The power and authority to detain and transport, 8 U.S.C. § 1357(g)(1) and 8 C.F.R. § 287.5(c)(6), arrested aliens subject to removal to ICE-approved detention facilities; and

- The power and authority to issue immigration detainers, 8 U.S.C. §§ 1226 and 1357, and 8 C.F.R. § 287.7, and I-213, Record of Deportable/Inadmissible Alien, for processing aliens.

**<u>Additional Supervisory and Administrative Responsibilities:</u>**

Participating LEA personnel are only authorized to conduct immigration enforcement functions while under the direction and supervision of ICE.

Additional supervisory and administrative responsibilities for each entity include, but are not limited to:

- Participating LEA personnel must notify ICE of any immigration detainer issued under the authority conferred by the MOA as soon as possible, but no longer than approximately 24 hours.

- Participating LEA personnel are responsible for ensuring proper record checks have been completed.

- Participating LEA personnel must report all encounters with asserted or suspected claims of U.S. citizenship to ICE immediately, but generally within one hour of the claim.

- Administrative files (A-files) are Federal records, subject to the Federal Records Act and applicable Federal confidentiality statues. It follows that the utilization and handling of the A-files must be consistent with applicable laws and DHS and ICE policy. ICE is responsible for requesting A-files and reviewing them for completeness. A-files can be maintained at an LEA facility as long as there are ICE personnel assigned to that facility and the personnel have a work area where documents can be adequately secured and stored by ICE personnel. Representatives from DHS must be permitted access to the facility where ICE records are maintained.

## APPENDIX B

## COMPLAINT PROCEDURE

The training, supervision, and performance of participating LEA personnel pursuant to the MOA, as well as the protections for U.S. citizens' and aliens' civil and constitutional rights, are to be monitored. Part of that monitoring will be accomplished through the complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

If any participating LEA personnel are the subject of a complaint or allegation involving the violation of the terms of this MOA or a complaint or allegation of any sort that may result in that individual receiving professional discipline or becoming the subject of a criminal investigation or civil lawsuit, the LEA shall, to the extent allowed by State law, make timely notification to an ICE officer within 48 hours of the LEA receiving notice of the complaint or allegation, excluding weekends, of the existence and nature of the complaint or allegation. The results of any internal investigation or inquiry connected to the complaint or allegation and the resolution of the complaint shall also be reported to an ICE officer, as soon as practicable, but no later than 30 days from the date of the resolution. It is the responsibility of the ICE officer to ensure notification is made to the ICE Office of Professional Responsibility (OPR) via the Joint Intake Center (JIC) at JointIntake@cbp.dhs.gov.

The LEA will also handle complaints filed against LEA personnel who are not designated and certified pursuant to this MOA but are acting in immigration functions in violation of this MOA. Any such complaints regarding non-designated LEA personnel acting in immigration functions must be forwarded to an ICE officer within 48 hours of the LEA receiving notice of the complaint. It is the responsibility of the ICE officer to ensure notification is made to the JIC.

287(g) Complaint Process posters will be displayed in processing areas of the LEA to ensure aliens encountered under the 287(g) Program are aware of the complaint process. Posters will be displayed in English and Spanish. If the alien understands a language other than English or Spanish or is unable to read, LEA personnel will read and/or translate the complaint process in a language the alien understands.

## APPENDIX C

## PUBLIC INFORMATION POINTS OF CONTACT

Pursuant to Section V(D) of this MOA, the signatories agree to coordinate appropriate release of information to the media, provided the release has been previously approved by both the ICE Privacy Officer and Public Affairs Officer, regarding actions taken under this MOA before any information is released. The points of contact for coordinating such activities are:

For the LEA:

Public Information Officer
Rensselaer County Sheriff's Office
4000 Main Street
Troy, NY 12180
518-266-1986

For ICE:

Public Affairs Office
Office of Public Affairs and Internal Communication
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Washington, DC 20536
202-732-4242

**ADDENDUM TO MODIFY MEMORANDUM OF AGREEMENT**

U.S. Immigration and Customs Enforcement (ICE) and the Rensselaer County Sheriff's Office, hereinafter the law enforcement agency (LEA), hereby agree to modify the new 287(g) Jail Enforcement Model Memorandum of Agreement that was effective on June 10, 2020 by which ICE delegates nominated, trained, certified, and authorized LEA personnel to perform certain immigration enforcement functions, as follows:

The following language shall be added to the beginning of the second paragraph of Section VIII. EFFECTIVE DATE, SUSPENSION, AND TERMINATION OF THIS MOA:

"ICE reserves the right to conduct an internal review of this MOA every three years".

All other provisions of the MOA remain in full force and effect as set forth therein.

By signing this addendum, each party represents it is fully authorized to enter into this addendum, accepts the terms, responsibilities, obligations, and limitations of this addendum, and agrees to be bound thereto to the fullest extent allowed by law. This addendum is effective upon signature by both parties.

Date: CHRISTOPHER M CRONEN Digitally signed by CHRISTOPHER M CRONEN Date: 2020.06.22 13:00:48 -04'00'

C. M. Cronen
Assistant Director, Enforcement
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
Department of Homeland Security

Date: 6/18/20

Patrick A. Russo
Sheriff
Rensselaer County Sheriff's Office

Declaration of Sheriff Bourgault

Exhibit E

# RENSSELAER COUNTY LEGISLATURE

## OFFICE OF THE MAJORITY

*KELLY HOFFMAN*
**CHAIRWOMAN**

*ROBERT LOVERIDGE*
**VICE CHAIRMAN**

*ROBERT W. BAYLY*
**VICE CHAIRMAN-FINANCE**

*KENNETH H. HERRINGTON*
**MAJORITY LEADER**

**DISTRICT 2**
*Robert W. Bayly*
*Tom Grant*
*Kelly Hoffman*

**DISTRICT 3**
*Daniel Casale*
*Kenneth H. Herrington*
*William E. Maloney*

**DISTRICT 4**
*Thomas Choquette*
*William Film*
*Robert Loveridge*

**DISTRICT 5**
*Bruce Patire*
*Jeffrey Wysocki*

August 10, 2026

Re: Letter of Support for the Rensselaer County 287(g) Program (Modified Jail Contract)

To Whom It May Concern:

We are writing to express our support for the continued administration of the 287(g) Jail Model Program, as modified for Rensselaer County with the cooperation of federal authorities.

We think it should be noted that in 2018, Rensselaer County reviewed the original 287 (g) proposed agreement by the federal authorities and decided to create a modified contract that limited law enforcement engagement (a non-law enforcement model).

As elected members of the Rensselaer County Legislature, we believe that public safety must remain our highest priority. Our responsibility does not end at the front door of the Rensselaer County Jail. We must work to maintain a safe and secure correctional facility. Meaning that regardless of ethnicity, only individuals that are arrested, arraigned, and remanded would be subjected to a state and federal database check.

Therefore, as implemented, the 287(g) Jail Model Program provides, additional tools for trained and designated corrections personnel to ensure that arrested individuals who are already in the custody of the Rensselaer County Jail and who may present legitimate public-safety concerns within the facility are appropriately identified.

Maintaining a secure correctional environment protects correction officers, jail employees, inmates, visitors, and the public. Effective cooperation and information-sharing with federal authorities can assist local officials in addressing individuals who may otherwise be released into the community.

We also believe that the program is administered professionally, consistently, and in accordance with the law, with appropriate training, oversight, and respect for individual rights. Our objective is clear: to protect the public, support our corrections professionals, and maintain a safe and secure County for all residents.

For these reasons, we respectfully urge continued support for the Rensselaer County 287(g) Jail Model Program and the cooperative relationship it establishes with federal authorities. The residents of Rensselaer County deserve to know that their officials are using every appropriate resource available to protect their communities. Thank you for your consideration and for your continued commitment to public safety.

Respectfully,

Kelly Hoffman
Chairwoman

Robert Loveridge
Vice Chairman

Robert Bayly
Vice Chairman-Finance

Kenneth Herrington
Majority Leader

Thomas Grant
County Legislator

Daniel Casale
County Legislator

William Maloney
County Legislator

Thomas Choquette
County Legislator

William Film
County Legislator

Bruce Patire
County Legislator

Jeffrey Wysocki
County Legislator

# Declaration of Sheriff Bourgault

# Exhibit F

## BJA FY 2022 State Criminal Alien Assistance Program (SCAAP) Award Details

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2023 | NY | COUNTY OF ROCKLAND | $15,032,883.31 | 33,959 | 1,857 | 871 | $314,139.00 |
| 2023 | NY | GENESEE COUNTY, NY | $2,052,138.98 | 19,322 | 259 | 37 | $8,411.00 |
| 2023 | NY | COUNTY OF WARREN | $5,234,008.59 | 35,023 | 0 | 186 | $6,509.00 |
| 2023 | NY | LIVINGSTON, COUNTY OF | $4,245,553.31 | 43,161 | 0 | 104 | $2,396.00 |
| 2023 | NY | COUNTY OF STEUBEN | $4,059,262.77 | 58,697 | 0 | 20 | $324.00 |
| 2023 | NY | PUTNAM COUNTY | $5,518,949.94 | 20,850 | 357 | 9 | $26,290.00 |
| 2023 | NY | NASSAU COUNTY OF | $107,890,065.80 | 292,557 | 20,428 | 18,566 | $3,654,718.00 |
| 2023 | NY | COUNTY OF ULSTER | $11,105,409.96 | 56,669 | 857 | 402 | $64,180.00 |
| 2023 | NY | COUNTY OF CHAUTAUQUA | $6,175,802.26 | 70,045 | 379 | 361 | $16,553.00 |
| 2023 | NY | COUNTY OF HERKIMER | $1,989,336.85 | 14,590 | 0 | 574 | $18,328.00 |
| 2023 | NY | COUNTY OF ALBANY | $23,670,517.82 | 162,592 | 106 | 900 | $34,884.00 |
| 2023 | NY | COUNTY OF ONONDAGA | $25,300,142.22 | 133,715 | 0 | 600 | $26,585.00 |
| 2023 | NY | WAYNE, COUNTY OF | $5,090,088.79 | 22,828 | 0 | 422 | $22,036.00 |
| 2023 | NY | COUNTY OF ORANGE | $32,969,004.00 | 143,825 | 2,155 | 1,979 | $240,748.00 |
| 2023 | NY | NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION | $386,364,286.09 | 2,801,701 | 346,363 | 156,858 | $18,012,527.00 |
| 2023 | NY | COUNTY OF RENSSELAER | $11,246,232.19 | 63,412 | 0 | 5 | $208.00 |
| 2023 | NY | COUNTY OF WESTCHESTER | $104,397,937.30 | 243,667 | 677 | 1,424 | $221,859.00 |
| 2023 | NY | COUNTY OF SCHENECTADY, NEW YORK | $10,801,633.10 | 57,358 | 6 | 620 | $27,650.00 |
| 2023 | OH | UNION, COUNTY OF | $787,671.78 | 21,066 | 0 | 100 | $876.00 |
| 2023 | OH | MONTGOMERY COUNTY | $10,406,434.76 | 234,614 | 393 | 1,500 | $20,329.00 |
| 2023 | OH | GREENE COUNTY | $5,122,174.48 | 229,944 | 4 | 827 | $4,339.00 |
| 2023 | OH | OHIO DEPARTMENT OF REHABILITATION & CORRECTION | $504,522,117.00 | 15,965,781 | 72,124 | 93,561 | $1,304,907.00 |
| 2023 | OH | BUTLER, COUNTY OF OHIO | $8,732,822.00 | 308,187 | 4,280 | 9,750 | $97,736.00 |
| 2023 | OK | OKLAHOMA DEPARTMENT OF CORRECTIONS | $111,253,363.84 | 6,617,520 | 99,238 | 155,919 | $1,060,892.00 |
| 2023 | OK | COUNTY OF TULSA | $14,426,706.36 | 469,879 | 2,236 | 10,542 | $94,481.00 |
| 2023 | OK | COMANCHE COUNTY FACILITIES AUTHORITY | $1,541,919.73 | 133,151 | 60 | 2,802 | $7,788.00 |
| 2023 | OK | CLEVELAND COUNTY | $3,495,316.11 | 181,657 | 772 | 2,330 | $14,543.00 |
| 2023 | OK | CUSTER, COUNTY OF | $858,585.54 | 53,611 | 0 | 289 | $1,084.00 |
| 2023 | OK | COUNTY OF CARTER | $1,481,760.00 | 50,865 | 20 | 343 | $2,498.00 |
| 2023 | OR | POLK COUNTY | $2,645,557.35 | 34,914 | 21 | 1,185 | $21,460.00 |
| 2023 | OR | JACKSON, COUNTY OF | $4,754,372.62 | 100,629 | 795 | 2,551 | $38,455.00 |
| 2023 | OR | COUNTY OF MALHEUR | $946,021.17 | 23,041 | 114 | 785 | $8,823.00 |
| 2023 | OR | UMATILLA COUNTY | $1,766,495.24 | 49,874 | 973 | 1,383 | $20,856.00 |
| 2023 | PA | COUNTY OF LYCOMING | $2,779,400.04 | 96,859 | 0 | 131 | $880.00 |
| 2023 | PA | COUNTY OF FAYETTE | $4,185,617.29 | 57,480 | 0 | 199 | $3,394.00 |
| 2023 | PA | COUNTY OF LEHIGH | $18,438,337.23 | 259,836 | 783 | 6,354 | $170,716.00 |
| 2023 | PA | COUNTY OF BERKS | $16,856,330.60 | 267,049 | 1,228 | 2,487 | $57,867.00 |
| 2023 | PA | MONROE, COUNTY OF | $7,297,565.69 | 138,268 | 522 | 2,201 | $34,706.00 |
| 2023 | PA | WESTMORELAND COUNTY COURTHOUSE | $8,294,662.83 | 225,918 | 54 | 2,011 | $17,833.00 |
| 2023 | PA | COUNTY OF ADAMS | $7,497,185.75 | 71,070 | 1,575 | 1,637 | $85,681.00 |
| 2023 | PA | COUNTY OF CUMBERLAND | $5,462,461.76 | 114,427 | 476 | 916 | $16,428.00 |
| 2023 | PA | COUNTY OF NORTHAMPTON | $12,286,124.65 | 223,916 | 562 | 2,126 | $35,715.00 |
| 2023 | PA | COUNTY OF LUZERNE | $17,401,688.47 | 208,674 | 1,987 | 8,438 | $209,897.00 |
| 2023 | PA | CENTRE, COUNTY OF | $4,194,094.02 | 72,708 | 545 | 769 | $18,947.00 |
| 2023 | PA | LEBANON CORRECTIONAL FACILITY | $4,948,621.49 | 103,289 | 0 | 1,485 | $16,661.00 |
| 2023 | PA | COUNTY OF CHESTER | $14,699,225.42 | 216,148 | 2,751 | 6,031 | $146,999.00 |
| 2023 | PA | CRAWFORD, COUNTY OF | $3,028,961.37 | 62,626 | 0 | 622 | $7,046.00 |
| 2023 | PA | COUNTY OF ERIE | $11,560,632.23 | 231,308 | 30 | 1,973 | $23,501.00 |
| 2023 | PA | COUNTY OF BLAIR | $5,682,856.78 | 105,827 | 0 | 147 | $1,849.00 |
| 2023 | PA | LACKAWANNA COUNTY GOVERNMENT | $15,156,387.05 | 243,226 | 542 | 2,791 | $49,921.00 |
| 2023 | PA | COUNTY OF PIKE | $4,779,708.83 | 62,639 | 99 | 1,166 | $22,894.00 |
| 2023 | PA | PENNSYLVANIA DEPARTMENT OF CORRECTIONS | $769,654,537.90 | 13,520,270 | 0 | 181,422 | $2,390,549.00 |
| 2023 | PA | COUNTY OF DAUPHIN | $19,833,486.99 | 330,834 | 1,701 | 2,449 | $62,149.00 |
| 2023 | PA | COUNTY MONTGOMERY | $13,043,971.00 | 327,711 | 509 | 2,052 | $24,642.00 |
| 2023 | PA | BUCKS, THE COUNTY OF | $18,997,454.00 | 286,907 | 874 | 6,844 | $121,873.00 |
| 2023 | PR | CORRECTIONS & REHAB, PR DEPT OF | $11,580,716.35 | 2,900,963 | 1,460 | 15,426 | $142,847.00 |
| 2023 | RI | DEPARTMENT OF CORRECTIONS, RHODE ISLAND | $95,248,203.00 | 770,329 | 18,955 | 23,775 | $1,318,639.00 |
| 2023 | SC | COUNTY OF AIKEN | $4,462,985.38 | 134,355 | 345 | 2,288 | $20,920.00 |
| 2023 | SC | COUNTY OF HORRY | $10,637,289.00 | 241,194 | 450 | 204 | $7,511.00 |
| 2023 | SC | COUNTY OF BEAUFORT | $3,093,600.46 | 40,282 | 1,703 | 1,445 | $61,602.00 |
| 2023 | SC | COUNTY OF GREENWOOD | $1,333,881.94 | 65,710 | 524 | 429 | $4,936.00 |
| 2023 | SC | COUNTY OF LAURENS | $1,679,923.94 | 73,791 | 62 | 579 | $3,472.00 |
| 2023 | SC | COUNTY OF YORK | $3,736,882.58 | 168,564 | 994 | 1,945 | $16,099.00 |
| 2023 | SC | COUNTY COUNCIL FOR DORCHESTER COUNTY | $3,591,047.49 | 70,704 | 8 | 1,402 | $16,786.00 |
| 2023 | SC | SOUTH CAROLINA DEPARTMENT OF CORRECTIONS | $70,130,831.00 | 5,653,120 | 61,413 | 51,667 | $355,935.00 |
| 2023 | SD | COUNTY OF MINNEHAHA | $8,238,993.81 | 142,990 | 176 | 3,787 | $53,861.00 |
| 2023 | SD | DEPARTMENT OF CORRECTIONS SOUTH DAKOTA | $26,175,792.81 | 1,255,566 | 3,017 | 13,655 | $83,026.00 |
| 2023 | TN | DICKSON COUNTY | $2,465,031.39 | 102,474 | 1,289 | 173 | $9,420.00 |
| 2023 | TN | COUNTY OF SUMNER | $4,956,726.59 | 221,258 | 550 | 3,648 | $22,491.00 |
| 2023 | TN | HAMBLEN, COUNTY OF | $1,720,358.42 | 99,692 | 243 | 3,015 | $13,328.00 |
| 2023 | TN | KNOX COUNTY | $12,099,690.20 | 371,948 | 310 | 71 | $3,287.00 |
| 2023 | TN | MONTGOMERY, COUNTY OF | $5,100,320.43 | 143,324 | 96 | 7,180 | $60,771.00 |
| 2023 | TN | DEPARTMENT OF CORRECTION TENNESSEE | $140,561,564.67 | 7,808,810 | 28,279 | 79,094 | $468,127.00 |
| 2023 | TN | RUTHERFORD, COUNTY OF | $5,248,819.47 | 240,159 | 1,969 | 6,710 | $46,070.00 |
| 2023 | TN | COUNTY OF HAMILTON | $3,487,034.00 | 389,443 | 2,077 | 3,911 | $13,259.00 |
| 2023 | TX | COUNTY OF BURNET | $3,413,775.37 | 138,194 | 695 | 551 | $7,862.00 |
| 2023 | TX | WASHINGTON COUNTY | $1,201,794.23 | 23,504 | 10 | 702 | $8,548.00 |
| 2023 | TX | COUNTY OF WEBB | $7,763,457.00 | 176,653 | 7,562 | 10,478 | $198,340.00 |
| 2023 | TX | COUNTY OF PALO PINTO | $1,197,267.83 | 36,652 | 15 | 1,225 | $9,505.00 |
| 2023 | TX | SMITH, COUNTY OF | $11,784,247.85 | 398,229 | 3,391 | 8,957 | $89,388.00 |
| 2023 | TX | COUNTY OF CASTRO | $453,186.28 | 8,422 | 193 | 421 | $8,133.00 |
| 2023 | TX | BRAZOS COUNTY TEXAS | $7,501,752.32 | 219,508 | 947 | 4,514 | $44,945.00 |
| 2023 | TX | COUNTY OF BOWIE | $4,721,352.62 | 192,780 | 378 | 1,548 | $11,399.00 |
| 2023 | TX | COUNTY OF CRANE | $395,762.55 | 5,558 | 7 | 0 | $136.00 |
| 2023 | TX | SAN JACINTO, COUNTY OF | $857,966.43 | 41,914 | 0 | 190 | $911.00 |
| 2023 | TX | WALKER, COUNTY OF | $1,603,923.01 | 67,890 | 1,635 | 1,332 | $17,891.00 |
| 2023 | TX | COUNTY OF WOOD | $1,146,510.17 | 49,926 | 142 | 376 | $2,909.00 |
| 2023 | TX | COUNTY OF HUNT | $2,859,508.98 | 110,777 | 587 | 2,028 | $16,383.00 |
| 2023 | TX | COMAL COUNTY | $7,293,415.17 | 172,127 | 1,594 | 7,787 | $95,654.00 |
| 2023 | TX | COUNTY OF WHEELER | $695,869.87 | 12,567 | 1,205 | 508 | $24,755.00 |
| 2023 | TX | MEDINA, COUNTY OF | $1,079,009.00 | 26,528 | 214 | 317 | $5,389.00 |
| 2023 | TX | COUNTY OF BROWN | $1,460,273.10 | 62,817 | 287 | 401 | $4,000.00 |

# BJA FY 2022 State Criminal Alien Assistance Program (SCAAP) Award Details

| Fiscal Year | State | Legal Name | Salary | Total Days | DHS Confirmed Days | Unknown Days | Award Amount |
|---|---|---|---|---|---|---|---|
| 2022 | MN | WRIGHT, COUNTY OF | $4,095,820.18 | 44,998 | 193 | 548 | $16,609 |
| 2022 | MO | DEPARTMENT OF CORRECTIONS MISSOURI | $144,844,953.90 | 8,524,303 | 12,483 | 23,727 | $152,387 |
| 2022 | MO | PETTIS COUNTY | $1,065,609.07 | 48,475 | 323 | 2,324 | $14,018 |
| 2022 | MO | PLATTE, COUNTY OF (INC) | $1,349,271.83 | 42,704 | 417 | 16 | $3,739 |
| 2022 | MO | SAINT CHARLES, COUNTY OF | $7,934,655.15 | 105,819 | 390 | 415 | $15,384 |
| 2022 | MT | CORRECTIONS, MONTANA DEPARTMENT OF | $30,758,354.94 | 923,882 | 1,763 | 2,213 | $33,324 |
| 2022 | NC | BUNCOMBE, COUNTY OF | $7,368,142.81 | 144,892 | 1,437 | 2,400 | $48,904 |
| 2022 | NC | CABARRUS, COUNTY OF | $6,468,474.42 | 105,133 | 1,863 | 1,413 | $52,028 |
| 2022 | NC | CATAWBA, COUNTY OF | $4,190,188.89 | 88,178 | 20 | 1,271 | $14,530 |
| 2022 | NC | CHATHAM, COUNTY OF | $1,723,267.77 | 25,967 | 944 | 710 | $28,339 |
| 2022 | NC | COUNTY OF ALAMANCE | $5,517,235.00 | 106,193 | 3,027 | 3,745 | $89,159 |
| 2022 | NC | COUNTY OF BRUNSWICK | $3,596,549.75 | 92,599 | 959 | 1,505 | $24,041 |
| 2022 | NC | COUNTY OF COLUMBUS | $1,131,718.47 | 49,359 | 33 | 348 | $2,093 |
| 2022 | NC | COUNTY OF CUMBERLAND | $9,541,756.00 | 177,590 | 427 | 2,898 | $43,087 |
| 2022 | NC | COUNTY OF DAVIDSON | $1,605,930.00 | 86,430 | 69 | 701 | $3,429 |
| 2022 | NC | COUNTY OF LEE | $976,933.32 | 44,625 | 372 | 2,365 | $14,467 |
| 2022 | NC | COUNTY OF LENOIR | $1,718,996.16 | 64,756 | 0 | 638 | $4,002 |
| 2022 | NC | COUNTY OF MONTGOMERY | $814,493.35 | 21,906 | 493 | 1,549 | $18,641 |
| 2022 | NC | COUNTY OF RANDOLPH | $3,460,398.09 | 82,744 | 513 | 325 | $9,104 |
| 2022 | NC | COUNTY OF ROCKINGHAM | $1,594,849.96 | 63,497 | 0 | 968 | $5,744 |
| 2022 | NC | CRAVEN COUNTY GOVERNMENT | $1,536,696.22 | 95,142 | 0 | 1,340 | $5,113 |
| 2022 | NC | DEPARTMENT OF ADULT CORRECTION | $682,394,785.13 | 10,941,147 | 285,140 | 115,399 | $6,565,880 |
| 2022 | NC | DUPLIN COUNTY | $642,953.85 | 29,668 | 996 | 1,394 | $13,065 |
| 2022 | NC | DURHAM COUNTY GOVERNMENT | $9,544,046.00 | 136,408 | 584 | 4,265 | $81,725 |
| 2022 | NC | GASTON COUNTY | $6,717,354.00 | 178,975 | 2,721 | 2,642 | $51,477 |
| 2022 | NC | IREDELL COUNTY | $4,470,500.00 | 95,916 | 1,296 | 1,733 | $35,676 |
| 2022 | NC | MECKLENBURG COUNTY | $42,095,729.00 | 545,626 | 2,505 | 2,657 | $101,515 |
| 2022 | NC | MOORE, COUNTY OF | $2,919,175.01 | 50,959 | 42 | 119 | $2,271 |
| 2022 | NC | ORANGE COUNTY NC | $2,377,480.22 | 25,863 | 514 | 1,407 | $43,537 |
| 2022 | NC | TRANSYLVANIA COUNTY | $1,055,581.50 | 16,682 | 0 | 1,013 | $15,144 |
| 2022 | NC | WAYNE COUNTY GOVERNMENT | $3,785,436.08 | 112,790 | 607 | 1,500 | $17,488 |
| 2022 | NC | WILSON, COUNTY OF (INC) | $1,785,448.37 | 43,127 | 986 | 1,606 | $26,921 |
| 2022 | NE | COUNTY OF BUFFALO | $1,765,210.43 | 54,609 | 307 | 616 | $7,429 |
| 2022 | NE | COUNTY OF DAKOTA | $1,163,891.89 | 36,965 | 221 | 1,001 | $9,358 |
| 2022 | NE | COUNTY OF PLATTE | $1,701,651.19 | 19,027 | 254 | 576 | $18,409 |
| 2022 | NE | DAWSON COUNTY | $1,635,333.80 | 32,450 | 648 | 836 | $18,925 |
| 2022 | NE | DOUGLAS COUNTY CORRECTIONS | $22,894,869.00 | 434,099 | 8,069 | 12,061 | $267,174 |
| 2022 | NE | HALL COUNTY OF | $4,307,697.18 | 79,889 | 1,650 | 1,310 | $41,127 |
| 2022 | NE | LANCASTER, COUNTY OF | $11,989,388.44 | 200,958 | 750 | 4,869 | $80,916 |
| 2022 | NE | NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES | $63,113,865.86 | 1,995,744 | 29,010 | 18,334 | $387,343 |
| 2022 | NE | SALINE, COUNTY OF | $880,625.12 | 24,214 | 29 | 323 | $3,065 |
| 2022 | NE | SARPY, COUNTY OF | $4,406,514.22 | 40,802 | 74 | 1,904 | $50,774 |
| 2022 | NH | CORRECTIONS, NEW HAMPSHIRE DEPARTMENT OF | $37,246,243.00 | 776,187 | 4,085 | 4,069 | $99,447 |
| 2022 | NJ | ATLANTIC COUNTY | $17,267,322.78 | 195,729 | 776 | 6,670 | $157,817 |
| 2022 | NJ | BERGEN, COUNTY OF | $40,014,896.87 | 175,262 | 9,016 | 4,049 | $783,843 |
| 2022 | NJ | CORRECTIONS, NEW JERSEY DEPARTMENT OF | $487,994,715.29 | 5,069,182 | 186,206 | 45,741 | $5,952,478 |
| 2022 | NJ | COUNTY OF CAMDEN | $24,167,913.37 | 295,281 | 1,443 | 2,181 | $74,617 |
| 2022 | NJ | COUNTY OF CAPE MAY | $5,469,918.59 | 58,962 | 342 | 989 | $30,391 |
| 2022 | NJ | COUNTY OF CUMBERLAND | $10,477,554.64 | 93,805 | 718 | 215 | $27,705 |
| 2022 | NJ | COUNTY OF ESSEX | $57,435,260.00 | 894,961 | 8,192 | 5,049 | $220 980 |
| 2022 | NJ | COUNTY OF GLOUCESTER | $3,177,199.25 | 51,579 | 661 | 508 | $18,578 |
| 2022 | NJ | COUNTY OF HUDSON | $24,556,839.00 | 302,325 | 6,067 | 2,876 | $190,569 |
| 2022 | NJ | COUNTY OF MONMOUTH | $35,284,263.40 | 164,597 | 7,511 | 8,815 | $888,723 |
| 2022 | NJ | COUNTY OF OCEAN | $14,327,658.00 | 105,850 | 2,260 | 6,827 | $302,346 |
| 2022 | NJ | COUNTY OF SOMERSET | $9,635,359.30 | 46,840 | 5,257 | 1,707 | $380,021 |
| 2022 | NJ | COUNTY OF WARREN | $5,850,307.36 | 20,047 | 831 | 1,906 | $198,022 |
| 2022 | NJ | MORRIS, COUNTY OF | $12,356,928.90 | 70,412 | 2,457 | 2,377 | $216,991 |
| 2022 | NJ | UNION, COUNTY OF | $14,389,391.34 | 147,503 | 1,958 | 4,321 | $152,048 |
| 2022 | NM | COUNTY OF BERNALILLO | $34,126,300.98 | 437,692 | 2,720 | 14,130 | $318,530 |
| 2022 | NM | COUNTY OF CURRY | $2,252,240.00 | 68,580 | 202 | 746 | $7,610 |
| 2022 | NM | COUNTY OF OTERO | $1,484,334.44 | 68,206 | 126 | 1,466 | $8,289 |
| 2022 | NM | COUNTY OF QUAY | $685,854.14 | 12,418 | 0 | 449 | $5,858 |
| 2022 | NM | COUNTY OF VALENCIA | $1,998,100.14 | 64,001 | 373 | 1,081 | $11,172 |
| 2022 | NM | SANTA FE, COUNTY OF | $4,186,318.24 | 124,968 | 844 | 1,747 | $21,593 |
| 2022 | NM | TAOS COUNTY CLERK | $1,207,445.26 | 15,106 | 0 | 168 | $3,172 |
| 2022 | NV | CITY OF CARSON CITY | $2,114,899.68 | 50,597 | 402 | 1,814 | $17,530 |
| 2022 | NV | CLARK, COUNTY OF | $104,759,594.00 | 1,042,816 | 1,965 | 16,915 | $455,668 |
| 2022 | NV | COUNTY OF ELKO | $2,156,748.76 | 41,826 | 365 | 1,087 | $18,410 |
| 2022 | NV | COUNTY OF HUMBOLDT | $1,288,276.09 | 7,482 | 0 | 428 | $17,409 |
| 2022 | NV | COUNTY OF NYE | $1,378,863.19 | 75,190 | 1,180 | 892 | $9,810 |
| 2022 | NV | COUNTY OF PERSHING | $446,642.20 | 4,212 | 0 | 140 | $3,507 |
| 2022 | NV | COUNTY OF WASHOE | $21,340,049.60 | 336,442 | 5,362 | 11,048 | $258,981 |
| 2022 | NV | NV DEPARTMENT OF CORRECTIONS | $224,499,634.47 | 4,205,415 | 105,809 | 98,748 | $2,782,320 |
| 2022 | NY | BROOME COUNTY | $13,932,393.64 | 139,956 | 365 | 1,602 | $47,657 |
| 2022 | NY | COUNTY OF ALBANY | $19,862,338.75 | 124,772 | 283 | 688 | $37,375 |
| 2022 | NY | COUNTY OF CHAUTAUQUA | $5,932,787.35 | 64,369 | 601 | 252 | $20,704 |
| 2022 | NY | COUNTY OF FRANKLIN | $3,500,307.81 | 18,993 | 0 | 1,334 | $58,078 |
| 2022 | NY | COUNTY OF HERKIMER | $1,972,802.99 | 11,433 | 0 | 19 | $775 |
| 2022 | NY | COUNTY OF JEFFERSON | $4,596,935.68 | 46,447 | 0 | 285 | $6,664 |
| 2022 | NY | COUNTY OF NASSAU | $104,399,019.50 | 262,859 | 11,452 | 11,980 | $2,373,505 |
| 2022 | NY | COUNTY OF NIAGARA | $9,613,196.71 | 107,655 | 0 | 190 | $4,008 |
| 2022 | NY | COUNTY OF ONEIDA | $10,812,816.34 | 96,594 | 0 | 1,627 | $43,026 |
| 2022 | NY | COUNTY OF ONONDAGA | $25,419,371.14 | 122,062 | 0 | 501 | $24,648 |
| 2022 | NY | COUNTY OF ORANGE | $30,160,224.71 | 138,045 | 760 | 893 | $91,704 |
| 2022 | NY | COUNTY OF RENSSELAER | $11,392,417.99 | 68,803 | 0 | 29 | $1,134 |
| 2022 | NY | COUNTY OF ROCKLAND | $13,303,749.44 | 35,021 | 4,115 | 1,642 | $576,772 |
| 2022 | NY | COUNTY OF SCHENECTADY, NEW YORK | $11,199,884.81 | 56,901 | 6 | 1,034 | $48,405 |
| 2022 | NY | COUNTY OF STEUBEN | $4,095,865.96 | 53,442 | 0 | 177 | $3,205 |
| 2022 | NY | COUNTY OF SUFFOLK | $121,878,770.00 | 238,852 | 11,258 | 3,742 | $2,029,135 |
| 2022 | NY | COUNTY OF ULSTER | $11,167,373.39 | 64,364 | 1,344 | 658 | $91,026 |
| 2022 | NY | COUNTY OF WARREN | $5,250,745.01 | 32,540 | 0 | 326 | $12,427 |
| 2022 | NY | COUNTY OF WESTCHESTER | $95,635,917.71 | 223,162 | 1,225 | 2,559 | $403,287 |
| 2022 | NY | COUNTY OF WYOMING | $2,189,954.21 | 14,017 | 122 | 0 | $5,236 |
| 2022 | NY | DUTCHESS COUNTY OF (INC) | $19,411,022.00 | 63,422 | 689 | 559 | $98,346 |

**JBI, Ltd.**
1711 E. Beltline Road
Coppell, TX 75019
USA

972-406-3712

# INVOICE

Invoice Number: 201705807
Invoice Date: 10/13/23
Page: 1

**Bill To:**

RENSSELAER COUNTY, NY
Mr. Daniel Carroll
4000 MAIN STREET
TROY, NY 12180

| Customer PO | Payment Terms | Preferred Delivery | Due Date |
|---|---|---|---|
| | Net 21 Days | Email | 11/3/23 |

| Description | Amount |
|---|---|
| SCAAP FY 2022 | |
| Award Amount x 22% | |
| $1,134.00 x 22% | 249.48 |

| | |
|---|---|
| Subtotal | 249.48 |
| Sales Tax | |
| Total Invoice Amount | 249.48 |
| Payment/Credit Applied | |
| **TOTAL** | **249.48** |

*Thank you for your business. It is a pleasure to serve your County.*

## Payment Transaction Confirmation

Payment Request Sequence Number : 03-28-2023 09076960

| | |
|---|---|
| Payment Request Type : | Individual |
| Payment Method : | ACH |
| Bank Relationship : | 021302567******7621 |
| Requested Settlement Date : | 03/28/2023 |
| Requested Date and Time : | 03/28/2023:11:34 |
| Total Items : | 1 |

**Recipient : RENSSELAER COUNTY OF (1141761)**

**Federal Agency : DEPARTMENT OF JUSTICE (15040001)**

**Cash On Hand :** **Total :$11,108.00**

| Seq # / Item # | Account ID | Account Status | Request Reference Number | Available Balance | Remittance Code | Remittance Amount | Amount Requested | Payment Request Status |
|---|---|---|---|---|---|---|---|---|
| 00001/1 | 15PBJA21RR05016SCAA | Open | 1141761 | $0.00 | | | $11,108.00 | Queued to be sent to ACH |

**JBI, Ltd.**
1711 E. Beltline Road
Coppell, TX 75019
USA

972-406-3712

# INVOICE

Invoice Number: 201704875
Invoice Date: 1/16/23
Page: 1

COPY

**Bill To:**

RENSSELAER COUNTY, NY
Mr. Daniel Carroll
4000 MAIN STREET
TROY, NY 12180

| Customer PO | Payment Terms | Preferred Delivery | Due Date |
|---|---|---|---|
| | Net 30 Days | Email | 2/15/23 |

| Description | Amount |
|---|---|
| SCAAP FY 2021<br>Award Amount x 22%<br>$11,108.00 x 22% | 2,443.76 |

| | |
|---|---|
| Subtotal | 2,443.76 |
| Sales Tax | |
| Total Invoice Amount | 2,443.76 |
| Payment/Credit Applied | |
| **TOTAL** | **2,443.76** |

*Thank you for your business. It is a pleasure to serve your County.*

Print Date 10/06/2022

Cash Desk 10/07/22

A-00080

Print Close X

$25,860.00

Transaction Date

10/05/2022

Account

6252757621

Transaction Type

ACH Credit Received

Credit/Debit

Credit

Amount

$25,860.00

Bank Reference

752769448

Reference Text

AC-ASAP -GRANT PAY 100522B0000041

Sheriff

2020 State Criminal Alien Assistance Program

$25,860.00

A.3150.43896

**JBI, Ltd.**
1711 E. Beltline Road
Coppell, TX 75019
USA

972-406-3722

# INVOICE

Invoice Number: 201704282
Invoice Date: 7/15/22
Page: 1

**Bill To:**

RENSSELAER COUNTY, NY
Lieutenant Daniel Carroll
4000 MAIN STREET
TROY, NY 12180

| Customer PO | Payment Terms | Preferred Delivery | Due Date |
|---|---|---|---|
| | Net 30 Days | Email | 8/14/22 |

| Description | Amount |
|---|---|
| SCAAP FY 2020 | |
| Award Amount x 22% | |
| $25,860.00 x 22% | 5,689.20 |

| | |
|---|---|
| Subtotal | 5,689.20 |
| Sales Tax | |
| Total Invoice Amount | 5,689.20 |
| Payment/Credit Applied | |
| TOTAL | 5,689.20 |

*Thank you for your business. It is a pleasure to serve your County.*

# Declaration of Sheriff Bourgault

# Exhibit G

**Office of the New York Attorney General**

**Letitia James**
**Attorney General**

July 24, 2026

**Rensselaer County Sheriff's Office**
4000 Main Street
Troy, NY 12180
kbourgault@rensco.com

*By certified mail & email*

Dear Sheriff Bourgault,

I write from the Office of the New York State Attorney General with regard to new provisions of state law that were enacted on May 27, 2026, within the state Public Protection and General Government budget bill. Among other provisions, the legislature passed the "Local Cops, Local Crimes Act," which amends the Executive Law by adding a new Section 170-k.[1]

According to public information, your agency has an agreement with U.S. Immigration and Customs Enforcement (ICE) pursuant to Section 287(g) of the Immigration and Nationality Act (INA) that is affected by the state legislation. We provide the following summary of the legislation for your awareness, and to aid in your compliance and in providing the response requested below, **by August 14, 2026**, regarding the status of your agency's Section 287(g) agreement and steps undertaken to comply with the requirement for its termination.

First, the new law prohibits any local government or law enforcement agency from entering into, modifying, renewing, remaining in, or extending "any agreement pursuant to subsection 287(g)" of the INA, including, but not limited to, any agreement "under which an officer or employee may engage in or assist immigration enforcement, or otherwise may perform a function of an immigration officer." *See* Exec. L. § 170-k(2)(a). Such prohibition became effective immediately upon the statute's enactment. *See* Local Cops, Local Crimes Act, Bill No. S. 9005-C, A. 10005-C, Part LL § 4. Local law enforcement officials may not engage in civil immigration enforcement pursuant to a Section 287(g) agreement by arresting an individual based on a civil ICE warrant or detainer request, or by stopping and questioning an individual in the community based on a suspicion that the individual lacks lawful immigration status.

[1] Local Cops, Local Crimes Act, Bill No. S. 9005-C, A. 10005-C, Part LL (codified as Executive Law (Exec. L.) § 170-k).

Second, the new law states that any Section 287(g) agreements in force at the time of the statute's enactment "shall be deemed not consistent with state law" and will therefore become "void and unenforceable" in their entirety ninety days after the statue's enactment, or August 25, 2026. Exec. L. § 170-k(7)(a); *see* Local Cops, Local Crimes Act, Bill No. S. 9005-C, A. 10005-C, Part LL § 4. The new law further directs any law enforcement agency that is a party to a Section 287(g) agreement to "exercise any applicable termination provision contained within such an agreement." Exec. L. § 170-k(7).

The statute therefore prohibits your agency from conducting civil immigration enforcement pursuant to your Section 287(g) agreement, effective immediately upon the Governor's signing the legislation on May 27, 2026. *See* Exec. L. § 170-k(2)(a). The statute also requires your agency to terminate its agreement with ICE and provides that the Section 287(g) agreement will be deemed null and void in its entirety as of August 25, 2026. *See* Exec. L. § 170-k(7); Local Cops, Local Crimes Act § 4.

In light of this new state law, we request that you submit information to our office regarding the status of your Section 287(g) agreement, including any ongoing activities pursuant to that agreement and steps you have taken to comply with the termination requirement. This can be in the form of a letter and/or documents sufficient to demonstrate your current activities under the agreement, the status of the agreement, and your plans for termination.

**Please submit your response by Friday, August 14, 2026, at 5:00 PM ET to: Immigrant.Trust@ag.ny.gov.**

If you have questions about the foregoing, have questions about or need assistance with your compliance with the new laws, or want to discuss this letter, please reach out to: Immigrant.Trust@ag.ny.gov.

Thank you in advance for your cooperation.

Sincerely,

Meghan Faux
Chief Deputy Attorney General for Social Justice

# Declaration of Sheriff Bourgault

# Exhibit H

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

# EXECUTIVE LAW § 63-E(3) INVESTIGATIVE DEMAND FOR DOCUMENTS
# THE PEOPLE OF THE STATE OF NEW YORK

**TO**: Sheriff Kyle Bourgault
Rensselaer County Sheriff's Office
4000 Main Street
Troy, NY 12180

***Via Email***

**PLEASE TAKE NOTICE** that the Attorney General is conducting an investigation pursuant to New York Executive Law § 63-E(3) and has reasonable cause to believe that the Rensselaer County Sheriff's Office has information relevant to that investigation.

**THEREFORE**, pursuant to Executive Law § 63-E(3)(iv), we command you or a designated agent, all business and excuses being laid aside, to produce, at the offices of Letitia James, Attorney General of the State of New York, 28 Liberty, 20th Floor, New York, New York, 10005, on or before August 25, 2026, the following documents that are within your possession, custody, or control or possession, custody or control of your agents or attorneys, subject to the instructions, definitions and relevant time period set forth below.

**PLEASE TAKE FURTHER NOTICE** that the Rensselaer County Sheriff's Office shall preserve all documents relating to the subject matter of this Demand, including all documents concerning the specific documents demanded herein.

## Definitions

1. "Communication" means any conversation, discussion, letter, email, text message, postings or messages on any social media platform, memorandum, meeting, note or other transmittal of information or message, whether transmitted in writing, orally, electronically or by any other means, and shall include any Document that abstracts, digests, transcribes, records or reflects any of the foregoing.

2. "Document" means any written, recorded, printed, imprinted, digitized, or graphic matter, whether an original, a draft, or a copy, whether produced, reproduced, or stored on papers, cards, tapes, belts, computer devices, and each and every tangible thing from which information can be processed or transcribed, such as tape or other electronic data communications. The term includes, but is not limited to, letters, memoranda, notes,

instructions, reports, analyses, faxes, telexes, diaries, calendars, studies, logs, journals, books, notebooks, plans, records, forms, charts, graphs, recordings, photographs (positive prints and negatives), slides, work-sheets, customer checks, credit card charge slips, computation sheets, computer printouts and programs, voice mail, web site and e-mail tapes, discs, microfilm, microfiche, any marginal comments appearing on any document, and copies of documents which are not identical duplications of the originals (e.g., because handwritten or "blind" copy notes appear thereon or are attached thereto).

3. "2020 ICE MOA" means the Memorandum of Agreement entered into by Rensselaer County Sheriff's Office and U.S. Immigration and Customs Enforcement (ICE) in 2020.

4. "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

5. "All" means "any and all" and "any" means "any and all."

6. "Including" means without limitation.

7. "Concerning" means relating to, referring to, describing, evidencing, regarding or constituting.

8. The use of a verb in any tense shall be construed as the use of that verb in all other tenses, wherever necessary to bring within the scope of the document request all responses which might otherwise be construed to be outside its scope.

9. The singular of any word includes the plural; the plural of any word includes the singular.

## Time Period

The relevant time period for this Demand is from May 1, 2026, until the present unless otherwise indicated.

## Instructions

1. Continuing Obligation to Produce. This Demand imposes a continuing obligation to produce the Documents and information requested. Documents located, and information learned or acquired, at any time after your response is due shall be promptly produced at the place specified in this Demand.

2. Preservation of Relevant Documents and Information: Spoliation. Please preserve Documents and information relevant or potentially relevant to this request from destruction or loss. Your duty to preserve such documents for litigation or investigation supersedes any data retention policy to the contrary. The destruction of any and all information raises a presumption that disclosure of materials would be damaging.

3. Demand Modifications. No agreement, written or otherwise, purporting to modify, limit, or otherwise vary the terms of this Demand, shall be construed in any way to narrow, qualify, eliminate, or otherwise diminish your aforementioned preservation obligations. Nor shall you act, in reliance upon any such agreement or otherwise, in any manner inconsistent with your preservation obligations under law. No agreement purporting to modify, limit, or otherwise vary your preservation obligations under law shall be construed as in any way narrowing, qualifying, eliminating, or otherwise diminishing such aforementioned preservation obligations, nor shall you act in reliance upon any such agreement, unless an Assistant Attorney General, Deputy Bureau Chief, or Chief in the Office of the New York State Attorney General (OAG) confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

4. No Oral Modification. No agreement purporting to modify, limit, or otherwise vary this Demand shall be valid or binding, and you shall not act in reliance upon any such agreement, unless an Assistant Attorney General, Deputy Bureau Chief, or Chief in OAG confirms or acknowledges such agreement in writing or makes such agreement a matter of record in open court.

5. Possession, Custody, and Control. This Demand calls for all responsive Documents or information in your possession, custody, or control. This includes, without limitation, Documents or information possessed or held by any present or former officers, directors, employees, agents, representatives, divisions, affiliates, subsidiaries, or Persons from whom you could request Documents or information. If Documents or information responsive to a request in this Demand are in your control, but not in your possession or custody, you shall promptly identify the Person with possession or custody.

6. No Documents Responsive to Demand. If there are no Documents responsive to any particular document request set forth below, you shall so state in writing, identifying the paragraph number(s) of the Demand concerned.

7. Existing Organization of Documents to be Preserved. Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization, or other order or layout in which it was maintained before production in the ordinary course of business, including but not limited to, production of any Document or other material indicating filing or other organization. Such production shall include without limitation any file folder, file jacket, cover, or similar organizational material, as well as any folder bearing any title or legend that contains no Document. Likewise, all Documents that are physically attached to each other in your files shall remain so attached in any production; or if such production is electronic, shall be accompanied by notation or information sufficient to indicate clearly such physical attachment.

8. Privilege. If you withhold any Document responsive to this Demand on the ground of privilege or other legal doctrine, you shall submit with the Documents produced a statement in writing under oath that:

   a. specifies the privilege or other asserted basis for withholding the document;

b. describes the nature and general topic or subject matter of the document;

c. identifies the persons who prepared the document and any persons to whom the document was sent or disclosed;

d. identifies any persons who have seen or had possession of the document; and,

e. specifies the dates on which the document was prepared, transmitted and received.

9. <u>Documents No Longer in Your Possession.</u> If any Document requested herein was formerly in your possession, custody, or control but is no longer available, or no longer exists, you shall submit a statement in writing under oath that:

a. describes in detail the nature of such Document and its contents;

b. identifies the Person who prepared the Document and any persons to whom the document was sent or disclosed;

c. identifies all Persons who have seen or had possession of such Document;

d. specifies the date on which such Document was prepared, transmitted, and received;

e. specifies the date on which the document was unavailable, lost, or destroyed and specifies the reason why such Document is unavailable, including without limitation whether it was misplaced, lost, destroyed, or transferred, and if such Document has been destroyed or transferred, the conditions of and reasons for such destruction or transfer and the identity of the Persons requesting and performing such destruction or transfer; and identifies all Persons with knowledge of any portion of the contents of the Document.

10. <u>Cover Letter.</u> Accompanying any production made pursuant to this Demand, you shall include a cover letter that shall at a minimum provide an index containing:

a. a description of the type and content of each Document produced therewith;

b. the paragraph number of any Demand requests to which each such Document is responsive; and

c. the identity of any Custodian of each such Document.

## **Document Requests**

**YOU ARE HEREBY REQUIRED TO PRODUCE**, at the time and place aforesaid, originals or true copies of the following materials:

1. Documents sufficient to show what action(s) Rensselaer County Sheriff's Office (BCSO), or any agent thereof, has taken to terminate the 2020 ICE MOA.

**WITNESS**, **the Honorable Letitia James**, Attorney General of the State of New York, August 19, 2026.

LETITIA JAMES
Attorney General of the State of New York

By: ___________________________
Zoe Levine
Interim Bureau Chief
Office of Immigrant Trust
New York State Office of the Attorney General
28 Liberty Street, New York, NY 10005

# Declaration of Sheriff Bourgault

# Exhibit I

Sheriff Kyle Bourgault's Post

Sheriff Kyle Bourgault
January 29 ·

RENSSELAER COUNTY WILL CONTINUE PARTICIPATION IN THE 287 (g) PROGRAM, SAYS COUNTY EXECUTIVE STEVE MCLAUGHLIN AND SHERIFF KYLE BOURGAULT

COUNTY HAS PARTICIPATED IN PROGRAM SINCE 2018, AND SAYS 287 (g) IS EFFECTIVE IN PROTECTING PUBLIC AND PROVIDING NEEDED INFORMATION AT COUNTY JAIL

Rensselaer County officials today (1/29/26) noted the county's participation in the federal 287(g) program and said that based on the program's effectiveness during the past decade, will be continuing participation.

Both County Executive Steve McLaughlin and Sheriff Kyle Bourgault said the program, which is based in the county jail and involves screening those brought to the facility on criminal charges, is an effective resource for public safety efforts in the county.

"Our county always prioritizes protecting our residents, and the 287(g) program has been an effective tool for law enforcement by providing additional and timely information about those brought to our jail," said McLaughlin.

"We have no plans to end what has been an effective partnership over nearly a decade between our county and the federal government. Knowing who is being brought into our jail and what other charges they may face is common-sense," he added.

"Thanks to our participation in the 287(g) program, we know if a person arrested on local charges is also wanted on other charges in another country. Access to that information is crucial in ensuring criminals and fugitives are brought to justice," said Bourgault.

The county became the first county in the state to join the federal 287(g) program in 2018. There are four levels to the 287(g) program, with Rensselaer County participating in the Jail Enforcement Model.

The Jail Enforcement Model, according to the U.S. Immigration and Customs Enforcement "is designed to identify and process removable aliens — with criminal or pending criminal charges — who are arrested by state or local law enforcement agencies." That means the county's 287(g) efforts are centered at the county jail.

There are three other 287 (g) models for participation, with various counties participating at different levels. The 287 (g) program was started under the Clinton administration, continued through the Obama and other administrations, including most recently the Biden administration.

"The reason more counties are joining the 287 (g) program, some at more expanded levels, is because the program provides needed information in real-time to law enforcement. This program ensures a person arrested on relatively minor charges locally but facing more serious charges in another country is not released into the public and instead is brought to justice. The program as done in our county is effective and necessary," said Bourgault.

"The Governor may look toward to the organized chaos in one state and attempt to end the 287 (g) program in the state. By her actions, she is a supporter of open borders at any cost. Those policies endanger the public and will cause further tragedies like we have seen too often in our state," said

Comment as Mateo Forero

# Rensselaer County's Post

**Rensselaer County**
May 27 ·

RENSSELAER COUNTY TO CONTINUE PARTICIPATION IN 287(g) PROGRAM, COUNTY EXECUTIVE STEVE MCLAUGHLIN AND SHERIFF KYLE BOURGAULT ANNOUNCE

Rensselaer County will continue to participate in the 287(g) program because of the public safety benefits to residents, County Executive Steve McLaughlin and Sheriff Kyle Bourgault announced today.
The county was the first county in the state to enlist in the 287(g) program, starting in 2018. The program has been useful during the past decade in identifying those wanted for crimes identifying and preventing their release into the community.
“The 287(g) program is a common-sense way to keep those who live and work in Rensselaer County safe. As County Executive, I am announcing that we will be continuing our participation in the program,” said McLaughlin.
“Thanks to 287(g), we have been able to identify a number of individuals wanted for serious offenses and crimes elsewhere in the world. It is an essential tool for our department and we will continue our partnership through the 287(g) program,” said Bourgault.
The county’s participation in 287(g) started under McLaughlin during the administration of former Sheriff Patrick Russo. There are three levels of participation in the 287(g) program with the county participating at the Jail Enforcement Model level.
The Jail Enforcement Model allows for individuals already booked into a jail to be screened to see if those individuals are wanted for other crimes or in violation of other statutes.
The 287(g) program was launched in 1996 under the Clinton administration. The program has been used during six presidential administrations.
In recent days, Governor Hochul has announced plans to prevent counties from entering into agreements with the federal government to participate in the 287(g) program. That move has drawn criticism, including from former Governor David Paterson, a Democrat.
Both McLaughlin and Bourgault said they expect the state’s effort to cancel 287(g) in counties will ultimately fail.
“We recognize that the federal law is determinative in this case, and that the state does not have the ability to cancel 287(g) and essentially stop a federal program. We also recognize our obligation to protect the safety of our residents,” said McLaughlin.
“We do not have the ability to pick and choose what laws we follow. The state does not have the ability to decide what federal laws they will follow, a fact that has been established time and time again in our courts,” said Bourgault.

Comment as Mateo Forero

Sheriff Kyle Bourgault's Post

**Sheriff Kyle Bourgault**
June 3 ·

Our county was the first in the state to enroll in the 287(g) program in 2018. It was right then and right now as a resource to protect residents.
So the Governor can expect a fight if she tries to cancel an effective means of ensuring those wanted for criminal activity elsewhere do not get released back into our neighborhoods.
County Executive Steve McLaughlin and I are teaming up to ensure public safety is the priority, not the Governor's political agenda. Your safety comes first.




NEWS10.COM
**Rensselaer County pushes back on new law that limits ICE cooperation**

277 53 23

Most relevant

**Bob Miner** · 11w
Thank you Sheriff Bourgault and County Executive Steve McLaughlin! Great Job! 🙏 ☝️
Reply

**Ralph Ambrosio** · 11w
When I think of stand-up people, great law enforcement with outstanding backing, it's

Comment as Mateo Forero

## Sheriff Kyle Bourgault's Post

**Sheriff Kyle Bourgault**
July 20 ·

"In the Capital Region, Rensselaer County Sheriff Kyle Bourgault has previously stated he would not comply with the law and intends to file a lawsuit challenging it."

We put the safety of our people ahead of politics, always. That means continuing common-sense and effective law enforcement like the 287(g) program.




TIMESUNION.COM

**As ICE cooperation ban nears, some New York law enforcement agencies prepare to defy it**

355 52 7

Most relevant

**Joe Downer** · 5w
Thank you Sheriff for doing the right thing!!!As always I pray for ICE and all law enforcement agencies to make it home safely everyday!!!!

Reply

**Peter Mahan** · 4w

Comment as Mateo Forero

## Sheriff Kyle Bourgault's Post

**Sheriff Kyle Bourgault**
July 26 at 5:25 PM ·

If you are standing up for what is right, you are never alone.
Looks like we may have a battle ahead, but we have faith that we will prevail.



TIMESUNION.COM

**Attorney general warns 12 NY police agencies to end ICE agreements**

494 225 25

Most relevant

**Michelle Franklin Burton** · 4w
It has been my honor to witness Rensselaer County be an example for the entire state of New York as what is best for the safety of it's residents.

Reply

View 6 replies

**Jim Butler** · 4w
The Sheriff's swore an oath to uphold the law. Perhaps you should remember your oath.

Reply

Comment as Mateo Forero

Sheriff Kyle Bourgault's Post

Sheriff Kyle Bourgault
August 6 at 7:16 PM ·

The 287g program has been in place in our county since 2018 and has been an effective and common-sense tool.
The program allows for non-citizens brought to our jail to be checked to ensure they are not wanted for crimes in another country. That is the same process any citizen would go through if brought to our jail.
Serious question: How does not allowing counties to participate in 287g make any of us safer?



CBS6ALBANY.COM
**Rensselaer County exec, sheriff face backlash for defying NY immigration law**

229 79 10

Most relevant

Maria Janzen · 2w
I believe there would be backlash if the Sheriff and county Executive would not defy NY immigration law. Simply obeying federal laws.
Reply

Comment as Mateo Forero