**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**(ALBANY DIVISION)**

| | |
|---|---|
| KYLE BOURGAULT, in his official capacity as Sheriff of Rensselaer County, New York, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KATHY HOCHUL, in her official capacity as Governor of the State of New York, *et al.*,<br><br>Defendants. | Civil Action No. ____________________<br><br>Related Cases:<br>No. 1:26-cv-1360 (MAD/ML);<br>No. 1:26-cv-1281 (MAD/ML) |

**DECLARATION OF SHERIFF TODD M. HOOD**

Pursuant to 28 U.S.C. § 1746, I, Todd M. Hood, declare as follows:

**Background on My Office and Jurisdiction**

1. I am the Sheriff of Madison County, New York. I was first elected in November 2017 and assumed office in January 2018. I have been re-elected and continue to serve as Sheriff. I submit this declaration based on my personal knowledge, my review of official records of the Madison County Sheriff's Office (MCSO), and information provided to me by my command staff and jail administrators in the ordinary course of our operations.

2. I began my career with the Madison County Sheriff's Office as a Corrections Officer and graduated from the Mohawk Valley Police Academy in 1991. I later served as a patrolman with the New York State Parks Police, the Village of Clinton, and the Town of Kirkland. In 1993 I joined the Syracuse Police Department, where I served for twenty-two years as a patrolman, a Detective on the Gang Task Force, a S.W.A.T. Supervisor and Team Leader, a Firearms Instructor, and a deputized member of the U.S. Marshals Service NY/NJ Regional Fugitive Task Force. After retiring from Syracuse PD, I worked as an Investigator for Criminal Investigations and Homicides with the Onondaga County District Attorney's Office. I did not come to the Office of Sheriff as a politician. I came to it as a career law-enforcement officer who had already worked this region's streets, its jail, and its federal task forces.

3. The Office of Sheriff is an independently elected constitutional office under Article XIII, Section 13 of the New York Constitution. I do not serve at the pleasure of the Governor, the Attorney General, or the Board of Supervisors. I answer to the voters of Madison County. My oath requires me to support the Constitution of the United States and the

Constitution of the State of New York, and to faithfully discharge the duties of Sheriff. Those duties include the safe and lawful operation of the Madison County Jail and the protection of the approximately 77,000 residents of this County.

4. Madison County is located in central New York. The County seat is Wampsville. The County includes the City of Oneida and towns and villages that are residential, agricultural, and small-commercial in character. The Madison County Jail is located at 138 North Court Street, Wampsville, New York. Our rated capacity is approximately 150 beds. Our recent average daily population has been in the range of 70 to 80. The jail is a full-service local correctional facility. We house sentenced and unsentenced local inmates and, as described below, we are authorized to house federal prisoners under an intergovernmental agreement with the United States Marshals Service.

5. MCSO operates twenty-four hours a day, seven days a week. Our responsibilities include highway patrol, criminal investigations, civil enforcement, court security, and the county jail. The Office is organized into a Criminal Division, a Corrections Division, a Civil Division, and supporting staff. We currently employ approximately 187 total personnel. The adopted operating budget for the Office is $9,690,923 for Road Patrol, while the Jail is another $7,690,247. Every partnership that supplies training, systems access, or a service I cannot otherwise provide without raising local taxes is a partnership I am obligated to evaluate on the merits.

**Public-Safety Conditions and Criminal-Alien Encounters in This County**

6. The primary public-safety challenges in Madison County over the last several years have included the effects of bail reform and the management of repeat offenders. Those challenges are not unique to this County, but they shape the operational setting in which we decide who is in our custody and who should be notified before we release an individual.

7. This County also encounters removable aliens who commit local crimes. In the past year, we have seen approximately seven deportations of individuals who offended in Madison County. The underlying local charges have included Rape in the First Degree, Assault, Driving While Intoxicated, and Weapons possession, among others. These are not theoretical cases. They are people who were arrested on local criminal charges, booked into our jail, and later removed.

8. I do not treat every foreign-born inmate as a threat. I do treat every person already in our custody on a criminal charge as someone whose identity and warrants should be fully checked before we open the door. When someone is arrested in Madison County on a local charge, the jail must be able to determine who that person is. Equally important, we must be able to determine whether another jurisdiction (including the federal government) wants them before they are released back into the community.

9. Since September 2025, under the Warrant Service Officer agreement described below, this Office has honored approximately seven U.S. Immigration and Customs Enforcement

(ICE) detainer requests. The individuals involved had been charged locally with offenses that included robbery, driving while intoxicated, weapons offenses, and rape. Each case began with a local criminal booking, not an immigration sweep. That is the entire scope of what we did: people already in the jail on criminal charges, already subject to ordinary release procedures, and already of interest to federal authorities.

**Our Baseline Detainer Practice**

10. Our ordinary practice when any agency—state or federal—lodges a detainer is straightforward. We notify the agency of the inmate's scheduled release. If the agency is coming to take custody, we hold the person for a reasonable travel window. We do not hold anyone solely on an immigration detainer past that window. That is the same courtesy we extend to every other jurisdiction that has a warrant on someone in our jail.

11. What we could not do on our own, before the agreement described below, was serve a federal immigration warrant inside the facility at the moment of scheduled release and complete a formal custodial transfer under ICE supervision. We could call ICE and hope the pickup arrived in time. We could not ourselves execute the federal warrant or finish the handoff with credentialed officers. That gap is why I entered the Warrant Service Officer program.

**Federal Housing Relationship with the U.S. Marshals Service**

12. Madison County houses federal prisoners under Intergovernmental Agreement No. 52-01-0047 with the United States Marshals Service (the "USMS IGA"). By Resolution No. 25-318, dated October 7, 2025, the Board of Supervisors authorized updated rates. A true and correct copy of that resolution is attached as <u>Exhibit A</u>. Under the current terms of the IGA, the per-diem rate is $110.00 and the guard/transportation hourly rate is $34.54. The estimated federal bed allocation is six. The agreement runs perpetually unless either side gives thirty days' written notice. A true and correct copy of the USMS IGA is attached hereto as <u>Exhibit B</u>.

13. Block 19 of the agreement lists ICE as an authorized agency user, together with the U.S. Bureau of Prisons (BOP). The purpose clause lets the Marshals Service "or other authorized agency user as noted in block #19" house people detained on federal charges or federal court orders in our facility. The receiving-and-discharge language requires us to release federal prisoners only to officers of the agency that committed them; ICE is named as an example alongside DEA and the Marshals Service. The billing section requires separate monthly invoices to each federal component whose prisoners we hold and lists ICE's Enforcement and Removal Office in Buffalo as an addressee.

14. I include the Marshals agreement for two reasons. First, it is a living federal housing arrangement this County has kept in force and recently re-priced. Second, the document itself names ICE as an authorized user. Six beds at $110 a day will not balance our budget. The point is simpler: the United States, including ICE, is contractually authorized to use this jail, and we are obligated to accept and release federal prisoners on the terms we signed.

**Our 287(g) Warrant Service Officer Agreement**

15. Section 287(g) of the Immigration and Nationality Act lets the Department of Homeland Security (DHS) enter written agreements with state and local agencies so that trained local officers can perform limited federal immigration functions under ICE supervision. ICE offers more than one model. The Warrant Service Officer model is one of the narrowest. It stays inside the jail. Its purpose is to let designated officers serve immigration warrants and complete custodial transfers of people who are already in local criminal custody, at the time of their scheduled release.

16. I signed a Memorandum of Agreement with ICE for the Warrant Service Officer Program on June 30, 2025. Deputy Director Madison Sheahan signed for ICE on July 2, 2025. A true and correct copy of the MOA and its appendices is attached as Exhibit C. The agreement took effect on signature and was to continue until either side gave ninety days' written notice of termination.

17. The MOA's stated purpose is "to promote public safety by facilitating the custodial transfer of specific aliens in LEA jail/correctional facilities to ICE for removal purposes at the time of the alien's scheduled release from criminal custody." That matches how we used it. No function under the agreement applied to anyone who was not already in our criminal custody. Our officers did not make civil immigration arrests in the community, did not stop cars for immigration status, and did not question people on the street about papers.

18. Appendix A limited the delegated authorities to three activities: (1) serving and executing warrants of arrest for immigration violations on designated aliens in our jail at the time of scheduled release, so custody could transfer to ICE; (2) serving warrants of removal on designated aliens at the time of scheduled release; and (3) detaining and transporting aliens to ICE-approved facilities, but only on an ICE officer's request and only by personnel whose ICE credentials authorized transport. After custody transferred to ICE, the person could remain in our facility for no more than 48 hours unless a separate reimbursable housing arrangement existed. Without that arrangement, if ICE did not take the person within 48 hours, the person was released.

19. Those functions happened only during ordinary detention duties, only inside the jail, and only under ICE direction. ICE selected, trained, certified, and credentialed the officers. ICE supplied the training and the credentials. The County paid the same salaries and benefits the officers would have received without the designation. No new County appropriation and no new taxes were required. ICE could pull an officer's authority at any time. This was supervised warrant service and transfer work attached to people already locked up on criminal charges.

20. I chose the narrowest model on purpose. I did not request a task-force agreement. I did not request authority to serve immigration warrants outside the jail. I have said publicly that the agreement stopped at the walls of the building. That is still accurate.

21. From September 2025 until the agreement ended, we honored roughly seven ICE detainer requests. The local charges included robbery, driving while intoxicated, weapons offenses, and rape. One case involved a person arrested locally for a violent sexual assault who, on release from our facility, was transferred to ICE on the immigration warrant. Volume is not the measure. If the arrangement kept even one person wanted for a sex offense, a robbery, or a weapons charge from walking back into a Madison County neighborhood, it did what it was supposed to do.

**The "Local Cops, Local Crimes Act" and the Forced End of the Agreement**

22. While the Warrant Service Officer agreement was operating, New York enacted the statute it calls the "Local Cops, Local Crimes Act," now Executive Law § 170-K. Governor Kathy Hochul signed it on May 27, 2026. The Act targets the partnerships Congress authorized in 8 U.S.C. § 1357(g) and the use of local jails to house civil immigration detainees.

23. As I read it, the Act bars any local government, law-enforcement agency, correctional facility, or agent from entering, modifying, renewing, remaining in, or extending any Section 287(g) agreement. As of August 25, 2026, any remaining agreement is treated as inconsistent with state law and terminated. After that date, a sheriff who wants to keep or enter such an agreement is forbidden from doing so. The Act also limits the use of local correctional facilities to house people held for federal civil immigration purposes. Those provisions reach my Office.

24. The same legislation created an enforcement office. Executive Law § 63-E establishes the Office of Immigrant Trust (OIT) inside the Department of Law, led by an appointee of the Attorney General. That Office may receive complaints, open investigations on its own, issue subpoenas, examine records, and visit local jails and speak with people held there. If OIT finds a violation, it may sue for injunctive or declaratory relief, enter an assurance of discontinuance, or place a county under monitoring.

25. On July 24, 2026, the Attorney General's Office, acting for OIT, sent me a letter. It stated that our 287(g) agreement was prohibited, that we had to terminate it, that it would become void on August 25, 2026, and that we had to submit documents describing our termination plans. Twelve sheriffs and police chiefs total received this same letter. A true and correct copy of the letter sent to me is attached as Exhibit D.

26. Four days later, on July 28, 2026, Madison County Attorney Tina M. Wayland-Smith wrote to ICE Deputy Director Madison Sheahan. A true and correct copy of that correspondence is attached hereto as Exhibit E. The letter informed ICE that New York had enacted the Local Cops, Local Crimes Act, that the Act forbids local agencies from remaining in any 287(g) agreement, that existing agreements become void on August 25, 2026, and that "the Madison County Sheriff, by and through this office, is terminating the Memorandum of Agreement Warrant Service Officer Program with you immediately." It closed: "Given New York State's actions, we can no longer remain engaged in this Agreement."

27. The July 28 termination letter does not reflect that it was my decision to walk away from a program that was working. Instead, it shows compelled compliance with a state statute that declared the agreement unlawful, backed by an Attorney General demand to unwind by August 25 under threat of enforcement by OIT. The County Attorney carried out the state command. I did not ask ICE to end the partnership because I had decided it was a mistake. The State made it illegal to keep it.

28. I have said it in public, and I say it again here, that the formal 287(g) contract is gone because the statute required it. This Office, however, will still notify ICE when someone comes into the jail on a criminal charge and appears to be removable—and we will still arrange an orderly handoff to the extent the law allows. I have described the change as the loss of the contract, not the loss of ordinary cooperation on people already arrested for local crimes. That is still my position. The statute, however, does more than ban our 287(g) arrangement. It also restricts the jail's use for federal civil immigration purposes and arms the OIT with investigative and litigation power. The practical result is to discourage even the informal cooperation the public expects when we already have a criminal alien in custody.

**What the Act Does to This Office**

29. The most immediate effect is the forced end of a working federal agreement. The Warrant Service Officer MOA was signed, staffed, and producing transfers. Officers had been trained and credentialed. Detainers had been honored. The State then declared the agreement void, ordered us to use the termination clause, and produced the July 28 letter. I cannot put the MOA back in force. I cannot put officers through 287(g) training under that instrument or accept ICE credentials for it. The agreement is gone because the State forbade it.

30. I have not changed my view of the public-safety value of the program. I have not told ICE that Madison County is unwilling to facilitate orderly transfers of removable people already in our criminal custody. A state statute stopped me. If this Court enjoins the Act, I am prepared to restore a Warrant Service Officer arrangement, or an equivalent jail-only arrangement, limited to the Madison County Jail.

31. The second effect is legal uncertainty over the Marshals Service agreement. That agreement names ICE as an authorized user, requires us to bill ICE for its prisoners, and requires us to release ICE's prisoners only to ICE. The Act forbids using a local jail to house federal civil immigration detainees and forbids agreements that carry out that function. A core term of a federal contract I am bound to honor is now treated as forbidden by state law. Federal agencies that need bed space have reason to pause before sending prisoners to a facility whose sheriff faces investigation for performing the contract. That hesitation is real even without a pile of ICE invoices.

32. The third effect is the loss of the formal warrant-service capacity. Without the Warrant Service Officer program, we are back to notification and hope. We can call ICE, but we no longer have trained, credentialed officers who can serve the federal warrant inside the

facility at the scheduled release and finish the transfer under ICE supervision. If a removable person charged with a local crime walks out because that formal step is gone, the release cannot be reversed. The statute does not supply a state officer to do the same work. It simply takes the federal tool away.

33. The fourth effect is the enforcement machinery. I received the July 24 pre-enforcement letter from the Attorney General. OIT is built to police the prohibitions in Executive Law § 170-K. State law lets OIT enter our jail, examine records, interview inmates, and then sue the County or place it under monitoring. Reinstating a 287(g) agreement directly invites an investigation and litigation. Honoring the ICE-user terms of the USMS IGA invites the same. Declining both accepts the public-safety and local-control consequences I describe in more detail below. The New York Constitution does not give the Attorney General the power to put an elected sheriff to that choice.

34. The fifth effect is the displacement of local judgment. I evaluated the Warrant Service Officer model, signed the MOA, and ran it. Local arrests produced local detainers and local transfers. Albany then outlawed the result because ICE was involved. That is not local control of local crimes. It is a state override of a county public-safety decision.

**The Irreparable Harm We Face**

35. These injuries are happening now. They harden on August 25, 2026, unless the Act is enjoined. Other relief at a later date will not repair them.

    a. The forced termination of the Warrant Service Officer MOA is permanent without relief. A later money judgment cannot rebuild the training, the credentials, or the agreement the State has declared void. We had a working partnership that was moving removable criminal defendants to federal custody. That is not a speculative future interest.

    b. The damage to the independence of a constitutional office is not something money can fix. Article XIII, Section 13 does not make the Sheriff a subordinate of the Attorney General. When the State tells an elected sheriff that his judgment about a jail-only federal partnership is irrelevant, no later relief restores that independence.

    c. A release that should not have happened cannot be undone. If a removable person charged with a serious local crime leaves the jail because we can no longer serve the federal warrant and complete the transfer, I cannot call him back. The seven detainers we handled under the program involved robbery, DWI, weapons, and rape. That risk is concrete.

    d. Uncertainty over the USMS IGA is practical, not theoretical. Once federal agencies treat the jail as legally risky, they do not return the moment a court rules. A small housing program is easy to abandon when an OIT investigation is in prospect.

e. The August 25 deadline does not wait for training cycles or new credentials. Designated officers cannot be created overnight. A voided agreement cannot be revived after someone has already been released. Each booking after the deadline at which formal warrant service is forbidden is a booking we do not get to redo. That is the kind of harm preliminary relief exists to prevent.

f. The same dilemma puts pressure on the federal housing arrangement itself. If partners pull back, or if the legal risk of performing the ICE-user terms causes us to decline prisoners the contract allows, the lost per diem lands on Madison County taxpayers. If we perform the contract and draw an investigation, that cost lands on the same taxpayers. Both options are coercive. Neither is consistent with an independently elected sheriff managing his own jail.

36. This case is not about a bounty. ICE paid no fee for designations under the Warrant Service Officer model. It is not a request for street-enforcement power I never asked for. It is, however, a claim that the injuries described above are present now and cannot be repaired after the fact.

**Conclusion**

37. I swore an oath to protect the people of Madison County. I did not swear an oath to accept a state statute that forces the end of a federal agreement I signed, that casts doubt on a federal housing contract naming ICE as an authorized user, and that leaves this jail without the formal tool we used to identify and transfer removable people already in custody on criminal charges. If the Act is enjoined, I am prepared to restore a Warrant Service Officer agreement with ICE in substantially the form I previously signed. I will continue to perform the Marshals Service agreement, including its terms on authorized agency users, unless a court of competent jurisdiction orders otherwise.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _24_ day of _August________, 2026, in Madison County, New York.

______________________________

Todd M. Hood
Sheriff of Madison County, New York

# Declaration of Sheriff Hood

# Exhibit A

# RESOLUTION NO. 25-318

## AUTHORIZING THE CHAIRMAN TO ENTER INTO AN INTERGOVERNMENTAL AGREEMENT WITH UNITED STATES MARSHALS SERVICE

**WHEREAS,** Madison County is currently in agreement with the United States Marshals Service for the housing, safekeeping, subsistence, and care of Federal prisoners; and

**WHEREAS,** housing and incarcerated individual care costs for the County has increased due to the cost of living expenses; and

**WHEREAS,** the United States Marshals Service is in agreement to increase the reimbursement rate to the County from $81.00 to $110.00 per day per federal prisoner; and

**WHEREAS,** the United States Marshals Service has also agreed to the increase the reimbursement rate to the County for the Guard/Transportation hourly rate from $25.68 to $34.54; and

**WHEREAS,** this intergovernmental agreement will formalize the relationship between Madison County and the United States Marshals Service for the care of Federal prisoners; and

**WHEREAS,** the rate for this agreement shall be effective November 1, 2025 and shall automatically renew each year. The agreement may be terminated by either party by a written notice at least 30 calendar days prior to the proposed termination date; and

**WHEREAS,** this agreement has been reviewed and approved by the Criminal Justice, Public Safety and Emergency Communications Committee;

**NOW, THEREFORE BE IT RESOLVED,** that the Chairman of the Board of Supervisors be and is hereby authorized to enter into an intergovernmental agreement on behalf of the County of Madison with the United States Marshals Service in the form as is on file with the Clerk of the Board.

Dated: October 7, 2025

*Rex Vosburg, Chairman*

Rex Vosburg, Chairman
Criminal Justice, Public Safety and
Emergency Communications Committee

# Declaration of Sheriff Hood

# Exhibit B

**U.S. Department of Justice**
**United States Marshals Service**
**Prisoner Operations Division**

**Office of Detention Services**
**Intergovernmental Agreement**

| 1. Agreement Number<br>52-01-0047 | 2. Effective Date | 3. Facility Code(s)<br>2FE | 4. UEI Number<br>R3TAXFFBEL84 |
|---|---|---|---|
| 5. Issuing Federal Agency<br><br>United States Marshals Service<br>Prisoner Operations Division<br>Office of Detention Services<br>CG-3, 3rd Floor<br>Washington, DC 20530-0001 | | 6. Local Government<br><br>Madison County Jail<br>138 N Court Street<br>Wampsville, NY 13163<br><br>Tax ID#: 15-6000459 | |
| 7. Appropriation Data<br><br>15-1020/XD | | 8. Local Contact Person:<br>E-mail:<br>Telephone: | Michael Currier, Lieutenant<br>mike.currier@madisoncounty.ny.gov<br>(315) 366-2300 |

| **9. Services** | **10. Estimated Number of Federal Beds** | **11. Per Diem Rate** | **12. Period of Performance** |
|---|---|---|---|
| This agreement is for the housing, safekeeping, subsistence, and care of Federal prisoners, in accordance with content set forth herein. | Male: 6<br>Female: 0<br>Juvenile: 0<br>**Total: 6** | $110.00 | Perpetual |

| **13. Guard/Transportation Hourly Rate** | **14. Optional Guard/Transportation Services** |
|---|---|
| Guard/Transportation Hourly Rate: $34.54<br><br>Mileage shall be reimbursed by the Federal Government at the current General Services Administration (GSA) Federal Travel Regulation Mileage Rate. | ☒ Medical<br>☒ U.S. Courthouse<br>☒ JPATS<br>☒ Encompassed **VTC** |
| **15. Department of Labor Wage Determination** | ☐ Video Teleconferencing (VTC) Hearings |
| ☐ Wages Incorporated # ______<br><br>☒ Collective Bargaining Agreement #SAM CBA-2025-490, CBA-2025-491, CBA-2025-492 | ☒ Hospitalization<br>☒ Other Jail-to-Jail |

| 16. Local Government Certification | 17. Signature of Person Authorized to Sign (Local) |
|---|---|
| *To the best of my knowledge and belief, information submitted in support of this agreement is true and correct. This document has been duly authorized by the governing authorities of their applying Department or Agency State or County Government and therefore agree to comply with all provisions set forth herein this document.* | [signature]<br>Signature<br><br>James Cunningham<br>Print Name<br><br>Chairman of the Board of Supervisors<br>Title Date |

| 18. Federal Prisoner Type Authorized | 19. Other Authorized Agency User | 20. Signature of Person Authorized to Sign (Federal) |
|---|---|---|
| ☒ Adult Male<br>☐ Adult Female<br>☐ Juvenile Male<br>☐ Juvenile Female | ☒ BOP<br>☒ ICE<br>☐ Other | Signature<br><br>Tiffani Eason<br>Print Name<br><br>Assistant Chief, Intergovernmental Agreements<br>Title Date |

## Table of Contents

Section Description — Page Number

1. Authority ... 3
2. Purpose ... 3
3. Administration ... 3
4. Place of Performance ... 5
5. Agreements Specialist ... 5
6. Termination ... 5
7. Assignment and Outsourcing of Jail Operations ... 6
8. Medical Services ... 6
9. Affordable Care Act (ACA) ... 8
10. Receiving and Discharging of Federal Prisoners ... 8
11. Prisoner Work Program ... 8
12. Guard/Transportation Services to/from Medical Facility ... 9
13. Guard/Transportation Services to/from U.S. Courthouse ... 10
14. Guard/Transportation Services to Justice Prisoner & Alien Transportation System (JPATS) or Other ... 10
15. Video Teleconference Hearing within the Facility ... 11
16. Optional Guard Services to Video Teleconference Hearing within the Facility ... 11
17. Special Notifications ... 11
18. Body Worn Camera Information Requests ... 12
19. Restrictive Housing and Suicide Prevention ... 12
20. Prison Rape Elimination Act (PREA) ... 13
21. PREA Prisoner Incident Reporting ... 13
22. Federal Acquisition Regulation (FAR) Agreement Provisions ... 14
23. Guaranteed Minimum Bed Space ... 15
24. Economic Rate Adjustments ... 15
25. Billing and Financial Provisions ... 16
26. Payment Procedures ... 17
27. Hold Harmless ... 17
28. Disputes ... 17
29. Review of Services ... 17
30. IGA Amendments ... 17
31. Litigation ... 18
32. The First Step Act ... 18



**Local Government (initial):** ____
**Federal Government (initial):** ____

## 1. Authority

Pursuant to the authority, 106th Congress Public Law 553, Section 119 of the "Department of Justice Appropriations Act, 2001", this Intergovernmental Agreement (hereinafter referred to as "agreement") is entered into between the United States Marshals Service (USMS) (hereinafter referred to as the "Federal Government") and ***Madison County Jail*** (hereinafter referred to as "Local Government"), who hereby agree as described in this document.

## 2. Purpose

The Federal Government and the Local Government establish this agreement allowing the USMS or other authorized agency user as noted in block #19, page one (1) of this agreement to house individuals detained on federal charges or federal court orders (hereinafter referred to as "Federal prisoners") with the Local Government at the ***Madison County Jail, 138 N Court Street Wampsville, NY 13163*** (hereinafter referred to as "the Facility") designated in block #6 on page one (1) of this agreement.

## 3. Administration (October 2021)

The Local Government shall provide for the secure custody, safekeeping, housing, subsistence, and care of Federal prisoners in accordance with all state, local, and federal laws, standards, regulations, policies, and court orders applicable to the operation of the Facility. Federal prisoners shall be housed in a manner consistent with the Federal Performance Based Detention Standards (FPBDS) subset utilized by the USMS Detention Facility Review Program. These standards are set forth in Form USM-218 (provided as an attachment to this agreement). Facilities shall follow the current standards summarized in Form USM-218 and any other standards required by an authorized agency whose prisoners are housed by the Local Government pursuant to this agreement. Full text of the FPBDS can be found at: http://wwwASD.usmarshals.gov/prisoner/detention-standards.htm as an additional reference source for best practices.

***Madison County Jail*** shall comply with Congressional mandates, federal laws, Executive Orders and all existing ***Madison County Jail*** policies. ***Madison County Jail*** shall provide a means for verification of any state inspections, accreditation, and, if applicable, any alternative correctional facility accreditations such as an accreditation from the American Correctional Association accreditation.

The USMS ensures the secure custody, care, and safekeeping of USMS prisoners. Accordingly, all housing or work assignments, and recreation or other activities for USMS prisoners are permitted only within secure areas of the building or within the secure external recreational/exercise areas. All work assignments for unsentenced Federal prisoners must be voluntary.

The Local Government shall conduct initial and periodic background and reference checks of applicants, employees, contractors, and volunteers. All allegations of staff misconduct shall be investigated and reported to law enforcement as appropriate. Staff misconduct involving or affecting USMS prisoners shall be reported to the local district United States Marshal (USM), Chief,

or their designee and to the USMS Prisoner Operations Division (POD) at PODCoCInquiries@usdoj.gov.
At all times, the Federal Government shall have access to the Facility and to the Federal prisoners, and to all records pertaining to this agreement, including financial records, for a retention period of three (3) years from the date of request by the Federal Government.

The Local Government shall maintain written policies and procedures that describe all facets of facility operations, maintenance, and administration. The Local Government shall maintain written contingency and emergency plans for situations including but not limited to riots, hunger strikes, disturbances, escapes, hostage situations, and mass prisoner relocation.

The Local Government shall maintain records of annual fire safety inspections. The Local Government shall maintain dangerous materials in accordance with government regulations.

The Local Government shall maintain an objective review, classification, and housing process. Federal prisoners shall be clearly identified as USMS prisoners in the classification system.

The Local Government shall ensure Federal prisoners under the age of 18 receive an age-appropriate diet, exercise, and education.

The Local Government shall ensure Federal prisoners under the age of 18 or charged as a juvenile shall be separated by sight and sound and out of regular contact with adult prisoners, except in emergency situations or approval from the court.

The Local Government shall keep the Facility clean and in good repair. Food service equipment shall meet established health and safety codes. The Local Government shall provide a minimum of three (3) meals per day that are varied and nutritionally adequate.
The Local Government shall provide safe and clean space and items for proper prisoner hygiene.

The Local Government will provide clean and serviceable bedding and clothing. Clothing and shoes shall be properly sized and temperature and weather appropriate. The Local government shall provide appropriate attire upon release.

The Local Government shall properly inventory, store, and return prisoner property upon release.
The Local Government shall provide adequate accommodations for prisoners with disabilities once accepted by the Local Government.
The Local Government shall prohibit discrimination on the basis of disability, race, sex, sexual orientation, religion, and national origin in the provision of services, programs, and activities.

The Local Government shall provide prisoners with reasonable opportunities to participate in religious practices, exercise, and access to mail, telephones, personal legal materials and legal reference materials or confidential counsel.

The Local Government shall maintain a grievance program with at least one level of appeal. The grievance procedures shall be made available to prisoners.

(End of Provision)



**Local Government (initial):** ______
**Federal Government (initial):** ______

### 4. Place of Performance (May 2021)

The principal place of performance for this agreement shall be:

***Madison County Jail, 138 N Court Street, Wampsville, NY 13163***

(End of Provision)

### 5. Agreements Specialist (November 2021)

The Contracting Officer (KO) may designate in writing one or more government employees, by name and position title, to act for the KO under this agreement. Each designee shall be identified as an Agreements Specialist. Such designation(s) shall specify the scope and limitations of the authority so delegated; provided, that the designee(s) shall not change the terms or conditions of the agreement, unless the Agreements Specialist is a warranted KO, and this authority is delegated in the designation.

The Agreements Specialist is:

Name: Ramona Mosby
Title: Grants Specialist
Contact Information: (202) 868-2789

(End of Provision)

### 6. Termination (May 2021)

The agreement can be terminated by either party for any reason. The requesting party, requester, seeking to terminate this agreement may do so by providing a written notice to the receiving party, requestee, at least thirty (30) calendar days in advance of the proposed termination date. An exception is made when an emergency situation requires the immediate relocation of Federal prisoners.

In order for the Local Government to initiate a termination of this agreement, the Local Government must:

a. As noted in this section, paragraph one above, the Local Government shall provide the Federal Government via the KO or designee a written notification by email at least thirty (30) calendar days in advance of the potential termination date unless an emergency situation requires the immediate relocation of Federal prisoners.
b. The Local Government shall provide adequate time, if applicable, for the Federal Government to transport and relocate Federal prisoners. Based on the number of Federal prisoners at the facility, a thirty (30) day notice may not be adequate to vacate the premises; thus, the Local Government shall agree to provide the Federal Government a reasonable time frame to exit the facility.
c. The Local Government shall work with the Federal Government to locate alternative housing solutions for the Federal prisoners.

d. The Local Government may not request rate or per-diem increases once the Local Government has provided a termination notice to the Federal Government and the Federal Government has acknowledged the receipt of before mentioned notice.

Where the Local Government has received a cooperative agreement through the POD's Cooperative Agreement Program, the cooperative agreement termination and other applicable provisions shall:

a. be incorporated into this agreement;
b. survive after the expiration of the cooperative agreement; and
c. supersede the termination provisions of this agreement.

(End of Provision)

## 7. Assignment and Outsourcing of Jail Operations (May 2021)

The overall management and operation of the Facility housing Federal prisoners shall not be contracted out without the prior written notification of the Federal Government.

(End of Provision)

## 8. Medical Services (May 2021)

The Local Government shall maintain written procedures that describe actions taken in the event of a prisoner's death, assault, or medical emergency to include notification to the USMS.

The Local Government shall provide a medical and mental health screening upon admission to the Facility. The Local Government shall inform prisoners how to access health services.

*The Local Government shall notify the local USMS district office of any infectious disease outbreak.*

The Local Government shall provide Federal prisoners with the same level and range of care **inside** the Facility as that provided to state and local prisoners. The Local Government is financially responsible for all medical care provided **inside** the Facility to Federal prisoners. This includes the cost of all medical, dental, and mental health care as well as the cost of medical supplies, over-the-counter medications and any prescription medications routinely stocked by the Facility. The Facility is encouraged to purchase non-OTC medications for USMS prisoners through the USMS' National Managed Care Contract (NMCC) Discount Pharmacy Program. When possible, generic medications should be prescribed. The cost of all of the above-referenced medical care is covered by the Federal per-diem rate. The Federal Government will pay for the cost of specialized medical services not routinely provided within the Facility, such as dialysis.

The Federal Government is financially responsible for all medical care provided **outside** the Facility to Federal prisoners. The Federal Government must be billed directly by outside medical care providers pursuant to arrangements made by the Local Government for outside medical care. The Local Government shall utilize outside medical care providers that are covered by the USMS' NMCC Preferred Provider Network to the maximum extent practicable. The Local Government can obtain



**Local Government (initial):** ______
**Federal Government (initial):** ______

information about NMCC covered providers from the local USMS District Office. The Federal Government will be billed directly by the medical care provider **not** the Local Government. To ensure that Medicare rates are properly applied, medical claims for Federal prisoners must be on Centers for Medicare and Medicaid Services (CMS) Forms so that they can be re-priced to Medicare rates in accordance with the provisions of Title 18 U.S.C. Section 4006. The USMS will not reimburse the detention facility for medical payments made on behalf of USMS prisoners in the absence of a specific arrangement approved in writing by the USMS.

All **outside** medical care provided to Federal prisoners must be pre-approved by the Federal Government except in a medical emergency. In the event of an emergency, the Local Government shall proceed immediately with necessary medical treatment. The Local Government shall notify the Federal Government immediately regarding the nature of the Federal prisoner's illness or injury as well as the types of treatment provided.
The Facility shall have in place an adequate infectious disease control program which includes testing of all Federal prisoners for Tuberculosis (TB) in accordance with *National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails.* TB testing shall occur with 14 days of intake (unless current TB tests results are available), be promptly documented in the Federal prisoner's medical record and the results forwarded to the local USMS District within thirty (30) days of intake. Special requests for expedited TB testing and clearance (to include time sensitive moves) shall be accomplished through advance coordination by the Federal Government and Local Government.

The Local Government shall immediately notify the Federal Government to include the local district office of any cases of suspected or active TB or any other highly communicable diseases such as but not limited to Coronavirus Disease (COVID), severe acute respiratory syndrome (SARS), Avian Flu, Methicillin-Resistant Staphylococcus Aureus (MRSA), Chicken Pox, etc., which might affect scheduled transports or productions.

When a federal prisoner is being transferred or released from the Facility, they will be provided with a minimum of seven (7) days of prescription medications and any medications already dispensed to the prisoner. Medical records and Form USM-553, *Prisoner in Transit Medical Summary* must travel with the Federal prisoner. If the records are maintained at a medical contractor's facility, it is the Local Government's responsibility to obtain them before a federal prisoner is transferred.

Federal prisoners may be charged a medical co-payment by the Local Government in accordance with the provisions of Title 18 U.S.C. Section 4013(d). The Federal Government is not responsible for medical co-payments and shall not be billed if the federal prisoner is indigent and cannot make the co-payment. Indigent Federal prisoners shall not be denied medical evaluation and treatment for failure to provide a co-payment.

(End of Provision)



**Local Government (initial):**
**Federal Government (initial):**

### 9. Affordable Care Act (ACA) (May 2021)

Upon release of a Federal prisoner, the Local Government shall provide information regarding the Affordable Care Act (ACA). The ACA website is located at: http://www.hhs.gov/healthcare/about-the-aca/index.html.

(End of Provision)

### 10. Receiving and Discharging of Federal Prisoners (May 2021)

The Local Government agrees to accept Federal prisoners only upon presentation by a Law Enforcement Officer (LEO), USMS Task Force Officer (TFO) or a USMS designee with proper credentials.
The Local Government shall not relocate a Federal prisoner from one facility under its control to another facility not described in this agreement without permission of the Federal Government. Additional facilities within the same agreement shall be identified in a modification.

The Local Government agrees to release Federal prisoners only to LEOs of the authorized Federal Government agency initially committing the Federal prisoner (e.g., Drug Enforcement Administration (DEA), Immigration and Customs Enforcement (ICE)) or to a Deputy United States Marshal (DUSM) or USMS designee with proper credentials. Those Federal prisoners who are remanded to custody by the USMS may only be released to the USMS or an individual specified by the USMS in the Judicial District.

USMS Federal prisoners sought for a state or local court proceeding must be acquired through a Writ of Habeas Corpus or the Interstate Agreement on Detainers and then only with the concurrence of the jurisdictional United States Marshal (USM).

(End of Provision)

### 11. Prisoner Work Program (November 2021)

Federal prisoner labor shall be used in accordance with the Federal prisoner work plan developed by the Local Government and approved by the USMS. The Federal prisoner work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial, service, or other jobs. Federal prisoners may not be required to work. Federal prisoners may volunteer to work within the secure confines of the facility if they sign a waiver of their right not to work. A Federal prisoner with suicidal tendencies, attempted escapes or escape history, violent history, gang affiliations or with detainers for pending charges with other local, state, or federal agencies will not be considered for the volunteer program. Federal prisoners are not permitted to act as trustees and may not work in positions that permit unsupervised contact with segregated prisoners or Federal prisoners of the opposite sex.

The Federal prisoners are restricted from operating equipment that may expose the Federal prisoners to grave bodily harm or any work assignment requiring security risk items and controlled tools which could be used to facilitate an escape or used as a weapon that could endanger staff, citizens, or other inmates. Federal prisoners will not have access to prisoner or employee records.

The Local Government will ensure that prisoners who volunteer to work are prohibited from keeping medication on their person while at the worksite, unless deemed necessary by medical personnel.

Federal prisoners must obtain required medical clearances before working in the food service areas. The Federal prisoner work program shall not conflict with any other requirements of the agreement and must comply with all applicable laws and regulations. Federal prisoners shall not be used to perform the responsibilities or duties of an employee of the Local Government. Appropriate safety/protective clothing and equipment shall be provided to Federal prisoner workers as appropriate. Federal prisoners shall not be assigned work that is considered hazardous or dangerous. This includes, but is not limited to, areas or assignments requiring great heights, extreme temperatures, use of toxic substances and unusual physical demands. Federal prisoner workers can be paid the identical rates of pay as other facility prisoners.

Federal prisoners shall be required to participate in normal housekeeping duties which help ensure the cleanliness of their housing area. Increases and reductions in privileges may be used as incentives to ensure that Federal prisoners keep their living areas clean.

(End of Provision)

## 12. Guard/Transportation Services to/from Medical Facility (May 2021)

When Medical Facility in block #14 on page one (1) of this agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide transportation and guard services for Federal prisoners housed at the Facility to and from a medical facility for outpatient care, and transportation and stationary guard services for Federal prisoners admitted to a medical facility.

These services shall be performed by at least two (2) armed and qualified LEOs or Correctional Officers (CO) according to the criteria specified by the County Entity running the facility. In all cases, these are part of a fulltime Law Enforcement Organization or Correctional Organization and that they have met the minimum training requirements.

The Local Government agrees to provide additional personnel if requested by the USMS to enhance specific requirements for security, prisoner monitoring, and contraband control. Federal prisoners are not permitted to use the telephone, internet or WIFI enabled devices, or to receive outside food, drinks, or deliveries (including flowers) without consent from the USMS. The Local Government shall restrain Federal prisoners by attaching at least one extremity to the hospital bed, stretcher, or chair at all times when medically possible. Pregnant or postpartum prisoners should not be restrained. Postpartum is the twelve-week period following childbirth, miscarriage, or abortion. See First Step Act provision for more information.

The reimbursable hourly rate, if agreed upon, will be shown in block #13 on page one (1) of this agreement.

Mileage shall be reimbursed in accordance with the current GSA mileage rate.

(End of Provision)



**Local Government (initial):** _____
**Federal Government (initial):** _____

**13. Guard/Transportation Services to/from U.S. Courthouse (May 2021)**

When U.S. Courthouse in block #14 on page one (1) of this agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide transportation and guard services for Federal prisoners housed at its facility to and from the U.S. Courthouse. These services shall be performed by at least two (2) armed and qualified LEOs or COs. In all cases, these are part of a fulltime Law Enforcement Organization or Correctional Organization and that they have met the minimum training requirements.

The Local Government agrees to provide additional personnel if requested by the USMS to enhance specific requirements for security, prisoner monitoring, and contraband control.

Upon arrival at the courthouse, the Local Government's transportation guard will turn Federal prisoners over to the USMS only upon presentation of proper law enforcement credentials.

The Local Government will not transport Federal prisoners to any U.S. Courthouse without a specific request from the USMS who will provide the prisoner's name, the U.S. Courthouse, and the date the prisoner is to be transported.

Each prisoner will be fully restrained in handcuffs, waist chain, and leg restraints during transportation unless otherwise authorized by the USMS. Deviations from full restraints must be documented and reported monthly to the local district USM, Chief, or their designee and to the USMS POD at PODCoCInquiries@usdoj.gov.

The reimbursable hourly rate, if agreed upon, will be shown in block #13 on page one (1) of this agreement.

Mileage shall be reimbursed in accordance with the current GSA mileage rate.

(End of Provision)

**14. Guard/Transportation Services to Justice Prisoner & Alien Transportation System (JPATS) or Other (May 2021)**

When JPATS, Other or both in block #14 on page one (1) of this agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide transportation and escort guard services for Federal prisoners housed at its facility to and from the JPATS or other locations designated by the Federal Government.

These services shall be performed by at least two (2) armed and qualified LEOs or COs. In all cases, these are part of a fulltime Law Enforcement Organization or Correctional Organization and that they have met the minimum training requirements.

The Local Government agrees to provide additional personnel if requested by the USMS to enhance specific requirements for security, prisoner monitoring, and contraband control.



**Local Government (initial):**
**Federal Government (initial):**

The Local Government shall not transport Federal prisoners to the airlift or any other location without a specific request from the USMS who will provide the prisoner's name, location (district), and the date the prisoner is to be transported.

The Local Government shall turn Federal prisoners over to the USMS or an officer specified by the USMS only upon presentation of proper credentials.

Each prisoner will be fully restrained in handcuffs, waist chain, and leg restraints during transportation unless otherwise authorized by the USMS. Deviations from full restraints must be documented and reported monthly to the local district USM, Chief, or their designee and to the USMS POD at PODCoCInquiries@usdoj.gov.

The reimbursable hourly rate, if agreed upon, will be shown in block #13 on page one (1) of this agreement.

Mileage shall be reimbursed in accordance with the current GSA mileage rate.

(End of Provision)

## 15. Video Teleconference Hearings within the Facility (October 2021)

If available, the facility shall furnish, as applicable to this agreement, all things necessary for, or incident to, providing Video Teleconference (VTC) hearings within the facility. When VTC equipment is not available at the facility, the Federal Government, in coordination with the Courts, may assist with providing VTC equipment and ancillary items to the facility.

(End of Provision)

## 16. Optional Guard Services to Video Teleconference Hearings within Facility (May 2021)

When Video Teleconferencing (VTC) Hearings in block #14 on page one (1) of this agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide escort guard services for Federal prisoners housed at its facility to monitor, on a case-by-case basis, court hearings conducted via VTC within its facility per instruction of the Federal Judiciary.

The reimbursable hourly rate, if agreed upon, will be shown in block #13 on page one (1) of this agreement.

(End of Provision)

## 17. Special Notifications (May 2021)

The Local Government shall notify the Federal Government of any activity by a Federal prisoner, which would likely result in litigation or alleged criminal activity.

The Local Government shall immediately notify the Federal Government of an escape of a Federal prisoner. The Local Government shall use all reasonable means to apprehend the escaped Federal prisoner and all reasonable costs in connection therewith shall be borne by the Local Government.

The Federal Government shall have primary responsibility and authority to direct the pursuit and capture of such escaped Federal prisoners. Additionally, the Local Government shall notify the Federal Government as soon as possible when a Federal prisoner is involved in an attempted escape or conspiracy to escape from the Facility.

In the event of a medical emergency, death, or assault on or by a Federal prisoner, the Local Government shall immediately notify the Federal Government.

(End of Provision)

## 18. Body Worn Camera Information Requests (November 2021)

If the Local Government adopts a Body Worn Camera (BWC) use policy that mandates use of BWC for transport or other activities covered under the IGA, the agency shall, upon request by USMS, provide USMS with the audio/video footage and any metadata captured by the BWC pertaining to USMS prisoner incidents. The audio/video footage and any metadata may be requested by the USMS Body Worn Camera Program and the USMS Office of General Counsel. The agency agrees that no BWC footage depicting a USMS prisoner will be released without advance written notification to the USMS.

(End of Provision)

## 19. Restrictive Housing and Suicide Prevention (May 2021)

For the purposes of this agreement, "restrictive housing" means any type of detention that involves all of the following elements:

a. Removal from the general population, whether voluntary or involuntary;
b. Placement in a locked room or cell, whether alone or with another prisoner; and
c. Inability to leave the room or cell for the vast majority of the day, typically 22 hours or more.

For the purposes of this agreement, "vulnerable population" refers to prisoners who are more likely to be victimized in confinement settings, including but not limited to: juveniles; young adults (age 18-24 at time of admission through conviction);prisoners with serious mental illness; lesbian, gay, bisexual, prisoners who identify as sex nonconforming; pregnant and postpartum prisoners; infirmed prisoners and prisoners with medical needs.

The Local Government shall have written policies, procedures, and practices requiring that all prisoners in restrictive housing are personally observed by a CO at least twice per hour, but no more than thirty (30) minutes apart, on an irregular schedule. Prisoners who are violent or mentally ill or who demonstrate unusual or bizarre behavior shall receive more frequent observation; suicidal prisoners shall be under constant observation.

The Local Government shall immediately notify the appropriate Chief Deputy U.S. Marshal (CDUSM), or designee, and POD at PODCoCinquiries@usms.doj.gov when a member of a vulnerable population is placed in restrictive housing or their restrictive housing status changes.



**Local Government (initial):**
**Federal Government (initial):** ______

The Local Government shall also provide reports to the USMS on a monthly basis listing all USMS prisoners who were detained in restrictive housing, and the reasons for their assignment to restrictive housing. When no USMS prisoners have been placed in restrictive housing during the reporting month, the Local Government shall notify USMS that there are no USMS prisoners to report. The report or a notification of no USMS prisoners in restrictive housing ' shall be submitted to the CDUSM or his or her designee and POD at PODCoCinquiries@usms.doj.gov, no later than the tenth day of each month in a standard format established by the USMS.

The Local Government shall have a comprehensive suicide-prevention program in place incorporating all aspects of identification, assessment, evaluation, treatment, preventive intervention, and annual training of all medical, mental health, and correctional staff.

Additional prisoner suicide prevention resources can be found at: https://www.usmarshals.gov/prisoner/suicide_prevention.htm and https://nicic.gov/.

(End of Provision)

## 20. Prison Rape Elimination Act (PREA) (November 2021)

The Facility must post Prison Rape Elimination Act (PREA) brochure/bulletins in each housing unit of the Facility. The Facility must abide by all relevant PREA regulations at: (https://www.prearesourcecenter.org/about/prison-rape-elimination-act-prea).

All sexual harassment and sexual assaults of or by a USMS prisoner must be reported to the district CDUSM or designee and the POD at: PREAinquiries@usdoj.gov.

In accordance with PREA, the Facility must arrange for a PREA audit every three (3) years. The Facility must maintain PREA compliance or be actively working towards compliance.
Additional resources can be found at: https://www.prearesourcecenter.org/.

Templates for PREA posters and brochures can be found at:
https://www.prearesourcecenter.org/library/search?keys=poster&cat=All

(End of Provision)

## 21. PREA Prisoner Incident Reporting (November 2021)

PREA posters shall contain information on how to report a sexual assault by using one of the following methods:

- Speaking with a staff member;
- Writing a letter reporting the alleged sexual misconduct to the person in charge or the USMS. To ensure confidentiality, use special (Legal) mail procedures;
- Filing an Emergency Prisoner Grievance - If you decide your complaint is too sensitive to file with the Officer in Charge, you can file your Grievance directly with the CDUSM. You can get the forms from your housing unit officer, or a Facility supervisor;

- Writing to the Office of Inspector General (OIG), which investigates allegations of staff misconduct. The address is: Office of Inspector General, U.S. Department of Justice, 950 Pennsylvania Ave. Room 4706, Washington, DC. 20530; or
- Calling, **at no expense to the victim,** the OIG. The phone number is 1-800-869-4499.

All allegations of sexual abuse reported to Facility staff must be reported and will be investigated. Information concerning the identity of a prisoner victim reporting a sexual assault, and the facts of the report itself, shall be limited to those who have the need to know in order to make decisions concerning the prisoner-victim's welfare and for law enforcement investigative purposes.

(End of Provision)

## 22. Federal Acquisition Regulation (FAR) Agreement Provisions (September 2025)

This agreement incorporates the following agreement provisions by reference, with the same force and effect as if it was given in full text. Upon request, the full text will be made available. The full text of this provision may be accessed electronically at: http://www.acquisition.gov.

**Agreement Provisions:**

FAR 52.222-4 Contract Work Hours and Safety Standards – Overtime (May 2018)

FAR 52.222-41 Service Contract Labor Standards. (August 2018)

FAR 52.222-42 Statement of Equivalent Rates for Federal Hires (May 2014)

FAR 52.222-43 Fair Labor Standards Act and the Service Contract Labor Standards – Price Adjustment (Multiyear and Option Contracts) (August 2018)

If the Collective Bargaining Agreement in block #15 on page one (1) of this Agreement is checked, the Local Government agrees In accordance with Section 2 (a) and 4 (c) of the Services Contract Act, as amended, employees employed by the contractor (s) in performing services covered by the Collective Bargaining Agreement (s) are to be paid wage rates and fringe benefits set forth in the current collective bargaining agreement and modified extension agreements. (Added to the IGA November 2024)

The current Local Government per-diem rates shall be the prevailing wages unless notified by the Federal Government.

If the Department of Labor Wage Determination in block #15 on page one (1) of this Agreement is checked, the Local Government agrees, in accordance with FAR 52.222.43 (a), (f), that it must notify the Federal Government of any increase or decrease in applicable wages and fringe benefits claimed under this clause within thirty (30) days after receiving a new wage determination.

(End of Provision)



**Local Government (initial):** ____
**Federal Government (initial):** ____

## 23. Guaranteed Minimum Bed Space (September 2021)

This IGA ***does not*** contain a guaranteed minimum for bed space.

(End of Provision)

## 24. Economic Rate Adjustments (October 2021)

The Federal Government will use various price analysis techniques and procedures to ensure the rates established by this agreement is considered a fair and reasonable price. Examples of such techniques include, but are not limited to, the following:

a. Comparison of the requested rate with the Independent Government Estimate for detention services, otherwise known as the Core Rate;
b. Comparison with rates at other state or local facilities of similar size and economic conditions;
c. Comparison of previously proposed prices and previous Federal Government and commercial contract prices with current proposed prices for the same or similar items; and
d. Evaluation of the provided jail operating expense information.

The firm-fixed price per-diem rate for services is stipulated in block #11 on page one (1) of this agreement and shall not be subject to adjustment on the basis of ***Madison County Jail*** actual cost experience in providing the service. The per-diem rate shall be fixed for a period from the effective date of this agreement forward for **thirty-six (36) consecutive months**. The per-diem rate covers the support of one Federal prisoner per "Federal prisoner day", which shall include the day of arrival, but not the day of departure.

The per-diem rate and the guard/transportation hourly rate will remain unchanged during the renewal period(s) unless the Local Government requests an economic rate adjustment. To request a per-diem economic rate adjustment, the Local Government will need to access USMS' Capture system via the Law Enforcement Enterprise Portal (LEEP) at https://portal.cjis.gov/wps/myportal/LEEPNG. The Local Government may contact the Agreements Specialist for more information.

An economic rate adjustment to either rate can be requested by the Local Government after **thirty-six (36) months of continuous performance**. Request for economic rate adjustments prior to the ending of the **thirty-six (36) month period** preceding the most recent rate adjustment shall only be considered if there are extreme circumstances that warrants a review of an out of cycle economic rate adjustment. Granting an out of cycle economic rate adjustment is not guaranteed.

To request an out of cycle per-diem economic rate adjustment, the Local Government will need to follow the same instructions as requesting an economic rate adjustment during the renewal period. For the request to be considered, the Local Government must demonstrate that its costs have substantially increased during the current **thirty-six (36) month period**. The Local Government shall provide the Agreements Specialist documentation to include cost and pricing data to justify



**Local Government (initial):** ______
**Federal Government (initial):** ______

the facility's out of cycle economic rate adjustment request. The request and its supporting documentation are the sole responsibility of the Local Government to provide a complete request package to the Agreements Specialist. Incomplete or missing data may delay the request being processed or causing the request to be denied altogether.

Two (2) or more out of cycle economic rate adjustment requests within the same **thirty-six (36) month period** with an aggregate proposed increase of 25% or more are not permissible under this agreement.

(End of Provision)

## 25. Billing and Financial Provisions (May 2021)

The Local Government shall prepare and submit for certification and payment, original and separate invoices each month to each Federal Government component responsible for Federal prisoners housed at the Facility.

Address(es) for the component(s) is/are:

**United States Marshals Service**
**Northern District** of New York
James M. Hanley Federal Building
100 S. Clinton Street, 10th Floor
Syracuse, NY 13261
(315) 473-7601

**United States Marshals Service**
**Western District** of New York
Robert H. Jackson United States Courthouse
2 Niagara Square, Suite 400
Buffalo, NY 14202
(716) 348-5300

**Federal Bureau Of Prisons**
Residential Reentry Office New York
201 Varick Street Room 849
New York, NY 10014
(212) 336-5419

**U.S. Immigration & Customs Enforcement**
Enforcement and Removal Office Buffalo
250 Delaware Avenue, Floor 7
Buffalo, NY 14202
(716) 464-5800
Buffalo.Outreach@ice.dhs.gov

To constitute a proper monthly invoice, the name and address of the Facility, the name of each Federal prisoner, their specific dates of confinement, the total days to be paid, the appropriate per diem rate as approved in the agreement, and the total amount billed (total days multiplied by the per-diem rate per day) shall be listed, along with the name, title, complete address, and telephone number of the Local Government official responsible for invoice preparation. Additional services provided, such as transportation and guard services, shall be listed separately and itemized.

Nothing contained herein shall be construed to obligate the Federal Government to any expenditure or obligation of funds in excess of, or in advance of, appropriations in accordance with the 31 U.S.C Section 1341 – Limitations on expending and obligating amounts.

(End of Provision)



**Local Government (initial):** ______
**Federal Government (initial):** ______

## 26. Payment Procedures (May 2021)

The Federal Government will make payments to the Local Government at the address listed in block #6 on page one (1) of this agreement. The payments will be made promptly after the district office has received and certified the invoice is correct.

(End of Provision)

## 27. Hold Harmless (May 2021)

It is understood and agreed that the Local Government shall fully defend, indemnify, and hold harmless the United States of America, its officers, employees, agents, and servants, individually and officially, for any and all liability caused by any act of any member of the Local Government or anyone else arising out of the use, operation, or handling of any property (to include any vehicle, equipment, and supplies) furnished to the Local Government in which legal ownership is retained by the United States of America, and to pay all claims, damages, judgments, legal costs, adjuster fees, and attorney fees related thereto. The Local Government will be solely responsible for all maintenance, storage, and other expenses related to the care and responsibility for all property furnished to the Local Government.

(End of Provision)

## 28. Disputes (May 2021)

Disputes, questions, or concerns pertaining to this Agreement will be resolved between appropriate officials of each party. Both the parties agree that they will use their best efforts to resolve the dispute in an informal fashion through consultation and communication, or other forms of non-binding alternative dispute resolution mutually acceptable to the parties.

(End of Provision)

## 29. Review of Services (November 2021)

Review standards for prisoners may differ among authorized agency users. The Local Government agrees to allow periodic unannounced reviews by Federal Government, to include approved Federal contractors, in accordance with the standards required by any or all of the Federal authorized agency users whose prisoners may be housed pursuant to this Agreement. A summary of inspection findings will be shared with the facility administrator in order to promote improvements to facility operations, conditions of confinement, and levels of services. If the Federal Government identifies significant finding(s) during the review, the Local Government will provide the Federal Government with a corrective action plan to address the issue(s).

(End of Provision)

## 30. IGA Amendments (May 2021)

For all amendments except for full or partial terminations, either party may initiate a request for amendment to this agreement in writing. All amendments negotiated will be effective only upon written approval of both parties.



**Local Government (initial):** ______
**Federal Government (initial):** ______

(End of Provision)

## 31. Litigation (May 2021)

The Federal Government shall be notified, in writing, of all litigation pertaining to this agreement and provided copies of any pleadings filed or said litigation within five (5) business days of the filing.

The Local Government shall cooperate with the Federal Government legal staff and the United States Attorney regarding any requests pertaining to Federal Government or Local Government litigation.

(End of Provision)

## 32. The First Step Act (May 2021)

This agreement refers the Local Government facility operations and administrations to the following sections of the First Step Act:

a. Section 613 of Public Law 115-391 the FIRST STEP Act of 2018 and 18 USC 5043 with respect to any USMS juveniles in custody.

b. Section 301 of Public Law 115-391 the FIRST STEP Act of 2018 and that pursuant to USMS policy that these requirements have been adopted for all pregnant and postpartum USMS prisoners, regardless of case status. The postpartum period is twelve weeks after childbirth, miscarriage, or abortion.

(End of Provision)

(End of Agreement)

```
REGISTER OF WAGE DETERMINATION UNDER   | U.S. DEPARTMENT OF LABOR
   THE SERVICE CONTRACT ACT            |EMPLOYMENT STANDARDS ADMINISTRATION
   By direction of the Secretary       | WAGE AND HOUR DIVISION
          of Labor                     |        WASHINGTON D.C.  20210
                                       |
                                       |
                                       |
                                       | Wage Determination No.: CBA-2025-490
Diane Koplewski          Division of   |          Revision No.: 0
Director            Wage Determinations|  Date Of Last Revision: 09/22/2025
_______________________________________|_______________________________________
```

State: New York

Area: Madison

---

Employed on U.S. MARSHALS SERVICE contract for Employed on DEPT OF JUSTICE US MARSHALS SVC(IGA 52-01-0047) for Prisoner Housing and ard/Transport Services.

Collective Bargaining Agreement between contractor: COUNTY OF MADISON, and union: TEAMSTERS LOCAL 294 Corrections Officer, Corrections Corporal or Corrections Sergeant Local 294, effective 01/01/2023 throug /31/2025.

In accordance with Section 2(a) and 4(c) of the Service Contract Act, as amended, employees employed by the contractor(s) in performing services covered by the Collective Bargaining Agreement(s) are to be paid wage rates and fringe benefits set forth in the current collective bargaining agreement and modified extension agreement(s).

| | |
|---|---|
| REGISTER OF WAGE DETERMINATION UNDER<br>THE SERVICE CONTRACT ACT<br>By direction of the Secretary<br>of Labor | U.S. DEPARTMENT OF LABOR<br>EMPLOYMENT STANDARDS ADMINISTRATION<br>WAGE AND HOUR DIVISION<br>WASHINGTON D.C. 20210 |
| | Wage Determination No.: CBA-2025-491 |
| Diane Koplewski Division of | Revision No.: 0 |
| Director Wage Determinations | Date Of Last Revision: 09/22/2025 |

State: New York

Area: Madison

Employed on U.S. MARSHALS SERVICE contract for Employed on DEPT OF JUSTICE US MARSHALS SVC(IGA 52-01-0047) for Prisoner Housing and ard/Transport Services.

Collective Bargaining Agreement between contractor: COUNTY OF MADISON, and
union: CSEA, Local 1000 AFSCME, AFL-CIO, Madison Blue Collar Unit #7350-01 Local 827 Local 1000, effective 01/01/2020 through 12/31

In accordance with Section 2(a) and 4(c) of the Service Contract Act, as amended, employees employed by the contractor(s) in performing services covered by the Collective Bargaining Agreement(s) are to be paid wage rates and fringe benefits set forth in the current collective bargaining agreement and modified extension agreement(s).

| | |
|---|---|
| REGISTER OF WAGE DETERMINATION UNDER<br>THE SERVICE CONTRACT ACT<br>By direction of the Secretary<br>of Labor | U.S. DEPARTMENT OF LABOR<br>EMPLOYMENT STANDARDS ADMINISTRATION<br>WAGE AND HOUR DIVISION<br>WASHINGTON D.C. 20210 |
| Diane Koplewski Division of<br>Director Wage Determinations | Wage Determination No.: CBA-2025-492<br>Revision No.: 0<br>Date Of Last Revision: 09/22/2025 |

State: New York

Area: Madison

---

Employed on U.S. MARSHALS SERVICE contract for Employed on DEPT OF JUSTICE US MARSHALS SVC(IGA 52-01-0047) for Prisoner Housing and ard/Transport Services.

Collective Bargaining Agreement between contractor: COUNTY OF MADISON, and union: NEW YORK STATE NURSES ASSOCIATION Local , effective 01/01/2022 through 01/01/2025.

In accordance with Section 2(a) and 4(c) of the Service Contract Act, as amended, employees employed by the contractor(s) in performing services covered by the Collective Bargaining Agreement(s) are to be paid wage rates and fringe benefits set forth in the current collective bargaining agreement and modified extension agreement(s).

# Declaration of Sheriff Hood

# Exhibit C

# MEMORANDUM OF AGREEMENT
## Warrant Service Officer Program

## I. PARTIES

This Memorandum of Agreement (MOA) constitutes an agreement between U.S. Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and the Madison County Sheriff's Office NY, hereinafter the law enforcement agency (LEA), pursuant to which ICE delegates to nominated, trained, certified, and authorized LEA personnel the authority to perform certain immigration enforcement functions as specified herein. The LEA and ICE enter into this MOA in good faith and agree to abide by the terms and conditions contained herein.

## II. PURPOSE

The purpose of this collaboration is to promote public safety by facilitating the custodial transfer of specific aliens in LEA jail/correctional facilities to ICE for removal purposes at the time of the alien's scheduled release from criminal custody. This MOA sets forth the terms and conditions pursuant to which selected LEA personnel (participating LEA personnel) will be nominated, trained, and approved by ICE to perform certain limited functions of an immigration officer within the LEA's jail/correctional facilities. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating LEA personnel as members of the LEA. However, the exercise of the immigration enforcement authority delegated under this MOA to participating LEA personnel shall occur only as provided in this MOA.

## III. AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1357(g) (1996), as amended by the Homeland Security Act of 2002, Pub. L. No. 107-296, authorizes the Secretary of DHS to enter into written agreements with a State or any political subdivision of a State so that qualified personnel can perform certain functions of an immigration officer. Such authority has been delegated by the Secretary to ICE, and this MOA constitutes such a written agreement.

## IV. RESPONSIBILITIES

The LEA is expected to pursue to completion all criminal charges that caused the alien to be taken into custody and over which it has jurisdiction. ICE will assume custody of an alien only after said individual has been released from LEA custody.

### A. DESIGNATION OF AUTHORIZED FUNCTIONS

Approved participating LEA personnel will be authorized to perform only those immigration officer functions set forth in the Standard Operating Procedures (SOP) in Appendix A.

### B. NOMINATION OF PERSONNEL

The LEA will use due diligence to screen and nominate candidates for ICE training and approval under this MOA. All candidates must be United States citizens, have knowledge of and have enforced laws and regulations pertinent to their law enforcement activities and their jurisdictions, and have been trained on maintaining the security of LEA facilities, and have enforced rules and regulations governing inmate accountability and conduct.

ICE reserves the right to conduct an independent background check for each candidate. This background check requires all candidates to complete a background questionnaire. The questionnaire requires, but is not limited to, the submission of fingerprints, a personal history questionnaire, and the candidate's disciplinary history (including allegations of excessive force or discriminatory action). ICE reserves the right to query any and all national and international law enforcement databases to evaluate a candidate's suitability to participate in the enforcement of immigration authorities under this MOA. Upon request by ICE, the LEA will provide continuous access to disciplinary records of all candidates along with a written authorization by the candidate allowing ICE to have access to his or her disciplinary records.

Any expansion in the number of participating LEA personnel or scheduling of additional training classes is subject to all the requirements of this MOA and the accompanying SOP.

## C. TRAINING OF PERSONNEL

Before participating LEA personnel receive authorization to perform immigration officer functions under this MOA, they must successfully complete initial training provided by ICE on relevant administrative, legal, and operational issues tailored to the immigration enforcement functions to be performed.

Each LEA nominee must pass a final examination with a minimum score of 70 percent to receive certification. If an LEA nominee fails to attain a 70-percent rating on the examination, he or she will have one opportunity to review the testing material and re-take a similar examination. Failure to achieve a 70-percent rating upon retaking the final examination will result in the disqualification of the LEA nominee and discharge of the nominee from training.

ICE will review the training requirements annually, reserves the right to amend them, and may require additional training as needed.

## D. CERTIFICATION AND AUTHORIZATION

Upon successful completion of initial training, LEA personnel shall be deemed "certified" under this MOA.

ICE will certify in writing the names of those LEA personnel who successfully complete training and pass all required test(s). Upon receipt of the certification, the ICE Field Office Director (FOD) will provide the participating LEA personnel a signed authorization letter allowing the named LEA personnel to perform specified functions of an immigration officer. ICE will also provide a copy of the authorization letter to the LEA. ICE will also execute ICE Form 70-006, Designated Immigration Officer. Only those certified LEA personnel who receive authorization letters and ICE Form 70-006 issued by ICE and whose immigration enforcement efforts are overseen by ICE may conduct immigration officer functions described in this MOA.

Along with the authorization letter and ICE Form 70-006, ICE will issue the certified LEA personnel official immigration officer credentials. Participating LEA personnel shall carry their ICE-issued credentials while performing immigration officer functions under this MOA. Such credentials provided by ICE shall remain the property of ICE and shall be returned to ICE upon termination of this agreement, when a participating LEA employee ceases his/her participation, or when deemed necessary by the FOD.

Authorization of participating LEA personnel to act pursuant to this MOA may be withdrawn at any time and for any reason by ICE and must be memorialized in a written notice of withdrawal identifying an effective date of withdrawal and the personnel to whom the withdrawal pertains.

Such withdrawal may be effectuated immediately upon notice to the LEA. The LEA and the FOD will be responsible for notification of the appropriate personnel in their respective agencies. The termination of this MOA shall constitute immediate revocation of all immigration enforcement authorizations delegated hereunder.

The LEA will make every attempt, where practicable, to provide ICE with a 90-day notice if participating LEA personnel cease their participation in the program, so that appropriate action can be taken in accordance with ICE policies, including inventorying and retrieval of credentials, and training replacement personnel as needed.

**E. COSTS AND EXPENDITURES**

The LEA is responsible for personnel expenses, including, but not limited to, salaries and benefits, local transportation, and official issue material. ICE will provide instructors and training materials. The LEA is responsible for the salaries and benefits, including any overtime, of all of its personnel being trained or performing duties under this MOA and of those personnel performing the regular functions of the participating LEA personnel while they are receiving training. The LEA will cover the costs of all LEA personnel's travel, housing, and per diem affiliated with the training required for participation in this MOA. ICE is responsible for the salaries and benefits of all of its personnel, including instructors and supervisors.

If ICE determines the training provides a direct service for the Government and it is in the best interest of the Government, the Government may issue travel orders to selected personnel and reimburse travel, housing, and per diem expenses only. The LEA remains responsible for paying salaries and benefits of the selected personnel.

The LEA is responsible for providing all administrative supplies (e.g. printer toner) necessary for normal office operations. The LEA is also responsible for providing the necessary security equipment, such as handcuffs, leg restraints, etc.

**F. ICE SUPERVISION**

Immigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized to perform immigration officer functions except when working under the supervision or direction of ICE. Additional supervisory and administrative responsibilities are specified in Appendix A.

The actions of participating LEA personnel will be reviewed by ICE officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for individual training or guidance.

For purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only to immigration enforcement functions as authorized in this MOA. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these delegated authorities under this MOA shall be DHS and ICE policies and procedures. ICE is responsible for providing the LEA with the

applicable DHS and ICE policies. However, when engaged in immigration enforcement activities, no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law.

If a conflict arises between an order or direction of an ICE officer or a DHS or ICE policy and the LEA's rules, standards, or policies, the conflict shall be promptly reported to the points of contact in Section VII. who shall attempt to resolve the conflict.

**G. INTERPRETATION SERVICES**

Participating LEA personnel will provide an opportunity for aliens with limited English language proficiency to request an interpreter. Qualified foreign language interpreters will be provided by the LEA, as needed.

The LEA will maintain a list of qualified interpreters or companies it contracts with to provide such interpreters. A qualified interpreter, which may include LEA personnel, means an interpreter who can interpret effectively, accurately, and impartially, using any specialized vocabulary. If an interpreter is used when a designated officer is performing functions under this MOA, the interpreter must be identified, by name, in records by annotating on the Warrant for Arrest of Alien or the Warrant of Removal/Deportation.

**H. LIABILITY AND RESPONSIBILITY**

Except as otherwise noted in this MOA or allowed by Federal law, and to the extent required by 8 U.S.C. § 1357(g)(7) and (8), the LEA will be responsible and bear the costs of participating LEA personnel with regard to their property or personal expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating LEA personnel will be treated as Federal employees only for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. *See* 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. In addition, it is the understanding of the parties to this MOA that participating LEA personnel will enjoy the same defenses and immunities from personal liability for their in-scope acts that are available to ICE officers based on actions conducted in compliance with this MOA. *See* 8 U.S.C. § 1357(g)(8).

Participating LEA personnel named as personal-capacity defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice. *See* 28 C.F.R. § 50.15. Absent exceptional circumstances, such requests must be made in writing. LEA personnel who wish to submit a request for representation shall notify the ICE Office of the Principal Legal Advisor (OPLA) in writing at OPLA-DCLD-TortClaims@ice.dhs.gov . ICE OPLA will then assist LEA personnel with the request for representation, including the appropriate forms and instructions. Unless OPLA concludes that representation clearly is unwarranted, it will forward the request for representation, any supporting documentation, and an advisory statement opining whether: 1) the requesting individual was acting within the scope of his/her authority under 8 U.S.C. § 1357(g); and, 2) such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Tort Litigation Section, Civil Division, Department of Justice (DOJ). Representation is granted at the discretion of DOJ; it is not an entitlement. *See* 28 C.F.R. § 50.15.

The LEA agrees to cooperate with any Federal investigation related to this MOA to the full extent of its available powers, including providing access to appropriate databases, personnel, individuals in custody and documents. Failure to do so may result in the termination of this MOA. Failure of any participating LEA employee to cooperate in any Federal investigation related to this MOA may result in revocation of such individual's authority provided under this MOA. The LEA agrees to cooperate with Federal personnel conducting reviews to ensure compliance with the terms of this MOA and to provide access to appropriate databases, personnel, and documents necessary to complete such compliance review. It is understood that information provided by any LEA personnel under threat of disciplinary action in an administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with *Garrity v. New Jersey*, 385 U.S. 493 (1967), and its progeny.

As the activities of participating LEA personnel under this MOA are undertaken under Federal authority, the participating LEA personnel will comply with Federal standards and guidelines relating to the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny, which govern the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

The LEA and ICE are each responsible for compliance with the Privacy Act of 1974, 5 U.S.C. §552a, DHS Privacy Act regulations, 6 C.F.R. §§ 5.20-5.36, as applicable, and related system of records notices with regard to data collection and use of information under this MOA.

### I. CIVIL RIGHTS STANDARDS

Participating LEA personnel are bound by all Federal civil rights laws, regulations, and guidance relating to non-discrimination, including the U.S. Department of Justice "Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity," dated December 2014, , Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000 et seq., which prohibits discrimination based upon race, color, or national origin (including limited English proficiency) in any program or activity receiving Federal financial assistance, Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination based on disability and requires the LEA to provide effective communication to individuals with disabilities, and Title II of the Americans with Disabilities Act of 1990, which also prohibits discrimination based on disability and requires the LEA to provide effective communication to individuals with disabilities.

## V. REPORTING AND DOCUMENTATION

### A. COMPLAINT PROCEDURES

The complaint reporting procedure for allegations of misconduct by participating LEA personnel, including activities undertaken under the authority of this MOA, is included in Appendix B.

### B. COMMUNICATION

The FOD (or the FOD's management representative) and the LEA shall make every effort to meet at least annually to ensure compliance with the terms of this MOA. When necessary, ICE and the LEA may limit the participation of these meetings in regard to non-law enforcement personnel. The attendees will meet at locations to be agreed upon by the parties, or via teleconference. An initial review meeting between ICE and the LEA should be held within approximately 12 months of the MOAs operational date.

### C. RELEASE OF INFORMATION TO THIRD PARTIES

The LEA may, at its discretion, communicate the substance of this agreement to organizations and groups expressing an interest in the law enforcement activities to be engaged in under this MOA. It is the practice of ICE to provide a copy of this MOA, only after it has been signed, to requesting media outlets; the LEA is authorized to do the same.

The LEA hereby agrees to coordinate with ICE prior to releasing any information relating to, or exchanged under, this MOA. For releases of information to the media, the LEA must coordinate in advance of release with the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval prior to any release. The points of contact for ICE and the LEA for this purpose are identified in Appendix C. For releases of information to all other parties, the LEA must coordinate in advance of release with the FOD or the FOD's representative.

Information obtained or developed as a result of this MOA, including any documents created by the LEA that contain information developed or obtained as a result of this MOA, is under the control of ICE and shall not be disclosed unless: 1) permitted by applicable laws, regulations, or executive orders; and 2) the LEA has coordinated in advance of release with (a) the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval, prior to any release to the media, or (b) an ICE officer prior to releases to all other parties. LEA questions regarding the applicability of this section to requests for the release of information shall be directed to an ICE officer.

Nothing herein limits LEA's compliance with state public records laws regarding those records that are solely state records and not ICE records.

## VI. MODIFICATIONS TO THIS MOA

Modifications to this MOA must be proposed in writing and approved and signed by both parties. Modification to Appendix A shall be done in accordance with the procedures outlined in the SOP.

## VII. POINTS OF CONTACT

ICE and the LEA points of contact (POCs) for purposes of this MOA are:
For the LEA: Madison County Sheriff's Office, Sheriff
For ICE: Buffalo Field Office, Field Office Director

## VIII. EFFECTIVE DATE AND TERMINATION OF THIS MOA

This MOA becomes effective upon signature of both parties and will remain in effect until either party, upon 90-day written notice to the other party, provides notice of termination or suspension of the MOA. A termination or suspension notice by ICE shall be delivered personally or by certified or registered mail to the LEA and termination or suspension shall take effect 90-days after receipt of such notice, unless exigent circumstances involving public safety dictate otherwise. Notice of termination or suspension by the LEA shall be given to the FOD and termination or suspension shall take effect 90-days after receipt of such notice, unless exigent circumstances involving public safety dictate otherwise.

This MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents it is fully authorized to enter into this MOA, accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law.

**For the LEA:**

Date: 06-30-2025

Signature: [signature]

Name: Todd M. Hood

Title: Sheriff

Agency: Madison County Sheriff's Office

**For ICE:**

Date: 7/2/2025

Signature: [signature]

Name: Madison Sheahan

Title: Deputy Director

Agency: Immigration and Customs Enforcement

Department of Homeland Security

## APPENDIX A

## STANDARD OPERATING PROCEDURES (SOP)

The purpose of this appendix is to establish standard, uniform procedures for the implementation and oversight of the program within the FOD area of responsibility. This appendix can be modified only in writing and by mutual acceptance of ICE and the LEA.

Pursuant to this MOA, the LEA has been delegated authorities as outlined below. This MOA is designed to facilitate the custodial transfer of designated aliens in LEA's jail/correctional facilities to ICE within 48 hours of alien's release from criminal custody.

**Authorized Functions:**

Participating LEA personnel are delegated only the following authorities listed below:

- The power and authority to serve and execute warrants of arrest for immigration violations, 8 U.S.C. § 1357(a) and 8 C.F.R. § 287.5(e)(3), on designated aliens in LEA jail/correctional facilities at the time of the alien's scheduled release from criminal custody in order to transfer custody of the alien to ICE;
    - Upon transfer of the alien's custody to ICE, the alien will continue to be held in the LEA's jail/correctional facilities for no more than 48 hours unless there exists an agreement pursuant to which the LEA will continue to detain, for a reimbursable fee, aliens for immigration purposes. In the absence of an agreement, if the alien is not transferred to an ICE field office or an immigration detention facility within 48 hours, the alien shall be released from the LEA jail/correctional facility.

- The power and authority to serve warrants of removal, 8 U.S.C. § 1357(a) and 8 C.F.R. §§ 241.2(b)(2), 287.5(e)(3), on designated aliens in LEA jail/correctional facilities at the time of the alien's scheduled release from criminal custody that executes the custodial transfer of the alien to ICE for removal purposes;
    - Upon transfer of the alien's custody to ICE, the alien will continue to be held in the LEA's jail/correctional facilities for no more than 48 hours unless there exists an agreement pursuant to which the LEA will continue to detain, for a reimbursable fee, aliens for immigration purposes. In the absence of an agreement, if the alien is not transferred to an ICE field office or an immigration detention facility within 48 hours, the alien shall be released from the LEA jail/correctional facility.

  and

- The power and authority to detain and transport, 8 U.S.C. § 1357(g)(1) and 8 C.F.R. § 287.5(c)(6), any aliens arrested pursuant to the immigration laws, to ICE-approved detention facilities.
    - Only upon a request of an ICE officer authorizing such action may participating LEA personnel transport the alien(s) to an ICE-approved detention facility for immigration purposes, and only participating LEA personnel whose ICE Form 70-006 authorizes such action and who are authorized by their LEA to conduct transport operations, may conduct such action.

**Additional Supervisory and Administrative Responsibilities:**

The above immigration enforcement functions conducted by the participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized to perform immigration officer functions except when working under the supervision or direction of ICE. Additional supervisory and administrative responsibilities for each entity include, but are not limited to:

- The LEA shall provide notification to the ICE officer immediately after participating LEA personnel serve any warrant of arrest or warrant of removal that executes the custodial transfer of the alien to ICE for removal purposes, in a manner mutually agreed upon by the LEA and the FOD.

- Participating LEA personnel must report all encounters with asserted or suspected claims of U.S. citizenship to ICE immediately, but generally within one hour of the claim.

## APPENDIX B

## COMPLAINT PROCEDURE

The training, supervision, and performance of participating LEA personnel pursuant to the MOA, as well as the protections for U.S. citizens' and aliens' civil and constitutional rights, are to be monitored. Part of that monitoring will be accomplished through the complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

If any participating LEA personnel are the subject of a complaint or allegation involving the violation of the terms of this MOA or a complaint or allegation of any sort that may result in that individual receiving professional discipline or becoming the subject of a criminal investigation or civil lawsuit, the LEA shall, to the extent allowed by State law, make timely notification to an ICE officer within 48 hours, excluding weekends, of the existence and nature of the complaint or allegation. The results of any internal investigation or inquiry connected to the complaint or allegation and the resolution of the complaint shall also be reported to an ICE officer, as established by ICE. It is the responsibility of the ICE officer to ensure notification is made to the ICE Office of Professional Responsibility (OPR) at **ICEOPRIntake@ice.dhs.gov**.

The LEA will also handle complaints filed against LEA personnel who are not designated and certified pursuant to this MOA but are acting in immigration functions in violation of this MOA. Any such complaints regarding non-designated LEA personnel acting in immigration functions must be forwarded to the ICE officer within 48 hours of the LEA receiving notice of the complaint. It is the responsibility of the ICE officer to ensure notification is made to OPR.

287(g) Complaint Process posters will be displayed in the processing areas of the LEA to ensure aliens encountered under the 287(g) Program are aware of the complaint process. Posters will be displayed in English and Spanish. If the alien understands a language other than English or Spanish or is unable to read, LEA personal will read and/or translate the complaint process in a language the alien understands.

## APPENDIX C

## PUBLIC INFORMATION POINTS OF CONTACT

Pursuant to Section V(D) of this MOA, the signatories agree to coordinate appropriate release of information to the media, provided the release has been previously approved by both the ICE Privacy Officer and Public Affairs Officer, regarding actions taken under this MOA before any information is released. The points of contact for coordinating such activities are:

For the LEA:

Press Information Officer
PO Box 16, 138 North Court Street, Bldg #7
Wampsville, NY 13163
315-366-2822

For ICE:

Public Affairs Office
Office of Public Affairs and Internal Communication
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement Washington,
DC 20536
202-732-4242

# Declaration of Sheriff Hood

# Exhibit D

**Office of the New York Attorney General**

**Letitia James Attorney General**

July 24, 2026

**Madison County Sheriff's Office**
138 N Court Street, Building 7, P.O. Box 16
Wampsville, NY 13163
todd.hood@madisoncounty.ny.gov

*By certified mail & email*

Dear Sheriff Hood,

I write from the Office of the New York State Attorney General with regard to new provisions of state law that were enacted on May 27, 2026, within the state Public Protection and General Government budget bill. Among other provisions, the legislature passed the "Local Cops, Local Crimes Act," which amends the Executive Law by adding a new Section 170-k.[1]

According to public information, your agency has an agreement with U.S. Immigration and Customs Enforcement (ICE) pursuant to Section 287(g) of the Immigration and Nationality Act (INA) that is affected by the state legislation. We provide the following summary of the legislation for your awareness, and to aid in your compliance and in providing the response requested below, **by August 14, 2026**, regarding the status of your agency's Section 287(g) agreement and steps undertaken to comply with the requirement for its termination.

First, the new law prohibits any local government or law enforcement agency from entering into, modifying, renewing, remaining in, or extending "any agreement pursuant to subsection 287(g)" of the INA, including, but not limited to, any agreement "under which an officer or employee may engage in or assist immigration enforcement, or otherwise may perform a function of an immigration officer." *See* Exec. L. § 170-k(2)(a). Such prohibition became effective immediately upon the statute's enactment. *See* Local Cops, Local Crimes Act, Bill No. S. 9005-C, A. 10005-C, Part LL § 4. Local law enforcement officials may not engage in civil immigration enforcement pursuant to a Section 287(g) agreement by arresting an individual based on a civil ICE warrant or detainer request, or by stopping and questioning an individual in the community based on a suspicion that the individual lacks lawful immigration status.

[1] Local Cops, Local Crimes Act, Bill No. S. 9005-C, A. 10005-C, Part LL (codified as Executive Law (Exec. L.) § 170-k).

Second, the new law states that any Section 287(g) agreements in force at the time of the statute's enactment "shall be deemed not consistent with state law" and will therefore become "void and unenforceable" in their entirety ninety days after the statue's enactment, or August 25, 2026. Exec. L. § 170-k(7)(a); *see* Local Cops, Local Crimes Act, Bill No. S. 9005-C, A. 10005-C, Part LL § 4. The new law further directs any law enforcement agency that is a party to a Section 287(g) agreement to "exercise any applicable termination provision contained within such an agreement." Exec. L. § 170-k(7).

The statute therefore prohibits your agency from conducting civil immigration enforcement pursuant to your Section 287(g) agreement, effective immediately upon the Governor's signing the legislation on May 27, 2026. *See* Exec. L. § 170-k(2)(a). The statute also requires your agency to terminate its agreement with ICE and provides that the Section 287(g) agreement will be deemed null and void in its entirety as of August 25, 2026. *See* Exec. L. § 170-k(7); Local Cops, Local Crimes Act § 4.

In light of this new state law, we request that you submit information to our office regarding the status of your Section 287(g) agreement, including any ongoing activities pursuant to that agreement and steps you have taken to comply with the termination requirement. This can be in the form of a letter and/or documents sufficient to demonstrate your current activities under the agreement, the status of the agreement, and your plans for termination.

**Please submit your response by Friday, August 14, 2026, at 5:00 PM ET to: Immigrant.Trust@ag.ny.gov.**

If you have questions about the foregoing, have questions about or need assistance with your compliance with the new laws, or want to discuss this letter, please reach out to: Immigrant.Trust@ag.ny.gov.

Thank you in advance for your cooperation.

Sincerely,

Meghan Faux

Meghan Faux
Chief Deputy Attorney General for Social Justice

# Declaration of Sheriff Hood

# Exhibit E

**MADISON COUNTY**
**DEPARTMENT OF LAW**

**TINA M. WAYLAND-SMITH,** County Attorney
**JEFFREY A. AUMELL,** First Assistant County Attorney
**MELISSA E. MARTEL FELTON,** Second Assistant County Attorney

**Phone:** 315-366-2203
**Fax:** 315-366-2502

July 28, 2026

Madison Sheahan, Deputy Director
United States Immigration and Customs Enforcement
250 Delaware Avenue, Floor 7
Buffalo, New York 14202

**RE: Madison County Sheriff 287(g) Memorandum of Agreement Warrant Service Officer Program**

Dear Deputy Director Sheahan:

Please be advised that that New York State enacted the "Local Cops, Local Crimes Act" which amends the Executive Law by adding a new Section 170-k. This new law prohibits any local government or law enforcement agency from entering into, modifying, renewing, remaining in, or extending "any agreement pursuant to subsection 287(g)" of the INA, including, but not limited to, any agreement under which an officer or employee may engage in or assist immigration enforcement, or otherwise may perform a function of an immigration officer. Such prohibition became effective immediately upon the statute's enactment.

The law goes further to state that any Section 287(g) agreements in force at the time of the statue's enactment "shall be deemed not consistent with state law" and will therefore become "void and unenforceable" in their entirety ninety days after the statue's enactment, or August 25, 2026.

Given the above, the Madison County Sheriff, by and through this office, is terminating the Memorandum of Agreement Warrant Service Officer Program with you immediately. Given New York State's actions, we can no longer remain engaged in this Agreement.

Thank you for your courtesies.

Very truly yours,

Tina M. Wayland-Smith

TW-S/hs
Cc: Sheriff Todd Hood