**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**(ALBANY DIVISION)**

| | |
|---|---|
| KYLE BOURGAULT, in his official capacity as Sheriff of Rensselaer County, New York, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KATHY HOCHUL, in her official capacity as Governor of the State of New York, *et al.*,<br><br>Defendants. | Civil Action No. ________________<br><br>Related Cases:<br>No. 1:26-cv-1360 (MAD/ML);<br>No. 1:26-cv-1281 (MAD/ML) |

**DECLARATION OF SHERIFF FREDERICK J. AKSHAR**

Pursuant to 28 U.S.C. § 1746, I, Frederick J. Akshar, declare as follows:

**Background on My Office and Jurisdiction**

1. I am the Sheriff of Broome County, New York. I was elected by the voters of this County and continue to serve in that office. I submit this declaration based on my personal knowledge, my review of official records of the Broome County Sheriff's Office (BCSO), and information provided to me by my command staff and jail administrators in the ordinary course of our operations.

2. I began my career in law enforcement with the Chenango County Sheriff's Office and then spent thirteen years with BCSO. I rose through the ranks from deputy to detective, sergeant, Captain of the Law Enforcement Division, and ultimately Undersheriff. After serving seven years in the New York State Senate representing the 52nd District, I returned to local law enforcement and was elected Sheriff of Broome County, taking office on January 1, 2023. I did not come to this Office as a stranger to its work. I came to it as someone who had already spent the better part of two decades inside the same agency and the same communities I now serve.

3. The Office of Sheriff is an independently elected constitutional office under Article XIII, Section 13 of the New York Constitution. I do not report to the Governor or the Attorney General. I report to the roughly 198,000 people who live in Broome County. My oath requires me to support the Constitution of the United States and the Constitution of the State of New York, and to faithfully discharge the duties of Sheriff. Those duties include the safe and lawful operation of the Broome County Correctional Facility and the protection of the people of this County.

4. Decisions about how the jail is managed and whether this Office cooperates with federal authorities belong to me. If those decisions are wrong, the voters can remove me. Albany does not get a veto. Unfortunately, there has been a slow and consistent degradation of the independence of this Office over the years, and the statutes at issue in this case represent a sharp acceleration of that trend.

5. Broome County is located in the Southern Tier of New York. Binghamton is the principal population center. The Sheriff's Office employs approximately 300 personnel, including roughly 65 sworn deputies. Our annual budget is approximately $55 million. The Correctional Facility is a 600-bed jail with a recent average daily population of approximately 460. It is a full-service local correctional facility. Knowing who is in that facility—and whether a person already lawfully arrested on criminal charges is wanted by another jurisdiction or by federal immigration authorities—is a core jail-management and public-safety function.

**Public-Safety Conditions and Criminal-Alien Encounters in This County**

6. The primary public-safety challenges in Broome County over the last several years have included drug trafficking and gang activity. Those challenges are real and ongoing.

7. This County has also experienced high-profile cases involving removable aliens. One example is the arrest in Broome County of a Peruvian national wanted in connection with approximately 23 killings in his home country. That individual was taken into custody here. Cases of that gravity underscore why a jail must be able to identify fully the people already in its custody and to coordinate orderly transfers with federal authorities when those authorities have a lawful interest in the person.

8. I do not assume every foreign-born inmate is dangerous. I do assume that every person already locked up on a criminal charge should have his identity and warrants checked thoroughly before the doors of our jail open. When someone is arrested in Broome County, the first job of the jail is to know who that person is. The second is to find out whether another jurisdiction—including the United States—wants them before we put that individual back on the street.

**Federal Housing Relationships and Revenue**

9. For decades, the Broome County Correctional Facility has housed detainees for federal agencies under a longstanding Intergovernmental Agreement with the U.S. Marshals Service (USMS). The current operative IGA (Agreement No. 52-02-0066) was executed in May 2024. A true and correct copy is attached hereto as <u>Exhibit A</u>. An earlier iteration of the same agreement dates to April 2002. Both versions authorize the housing, safekeeping, and subsistence of federal prisoners at the facility.

10. The 2024 IGA expressly lists U.S. Immigration and Customs Enforcement (ICE) as an authorized federal user alongside USMS and the U.S. Bureau of Prisons (BOP). The

current per-diem rate is $110.00. Those payments go into the Broome County General Fund and offset the cost of running a 600-bed jail that local taxpayers would otherwise fund alone. The facility has regularly held both USMS and ICE detainees. In recent periods, the ICE population has reached several dozen at a time alongside a steady USMS population.

11. Broome County has also received reimbursements under the State Criminal Alien Assistance Program (SCAAP) administered by the U.S. Department of Justice. Recent awards have been in the range of roughly $25,000 to $48,000 in individual fiscal years. Those funds have been used for training and related operational needs. SCAAP exists precisely because local jails house removable criminal aliens and can identify that population for federal review. The same cooperation the State is now trying to forbid is what makes those reimbursements possible.

12. Losing that housing capacity and the associated revenue would shift real cost onto Broome County taxpayers and would reduce available federal bed space in this part of the State.

**Our 287(g) Warrant Service Officer Agreement**

13. In early 2025, this Office entered a Memorandum of Agreement with ICE for the Warrant Service Officer Program under 8 U.S.C. § 1357(g). A true and correct copy of the operative MOA is attached hereto as Exhibit B. About eight staff members were trained and designated under it.

14. The Warrant Service Officer model is one of the most limited forms of 287(g) cooperation ICE offers. It operates only inside the jail. Its purpose is to allow designated officers to serve immigration warrants and complete custodial transfers of people who are already in local criminal custody at the moment of scheduled release. Our designated officers did not make civil immigration arrests in the community, did not conduct traffic stops for immigration status, and did not question people on the street about their papers.

15. ICE selected, trained, certified, and credentialed the participating officers. The County paid the same salaries and benefits those officers would have received in any event. No new appropriation and no new taxes were required. The work took place only during ordinary detention duties, only inside the facility, and only under ICE direction.

16. The arrangement we had with ICE let this Office finish formal, supervised transfers of removable individuals who were already in our custody on criminal charges. That is ordinary public-safety work. It is the same principle we apply when any other jurisdiction has a warrant on someone sitting in our jail.

**The "Local Cops, Local Crimes Act" and its Enforcement**

17. On May 27, 2026, Governor Kathy Hochul signed Chapter 55 of the Laws of 2026. One piece of that legislation is the statute branded the "Local Cops, Local Crimes Act," now Executive Law § 170-K. Section 170-K(2)(a) prohibits any local government, law-enforcement agency, or local correctional facility from entering into, modifying, renewing,

remaining in, or extending any 287(g) agreement. Section 170-k(7) declares existing 287(g) agreements "not consistent with state law" and "void and unenforceable" ninety days after enactment (i.e. August 25, 2026). It directs agencies to exercise any termination provision that exists.

18. The same legislation created the Office of Immigrant Trust (OIT) inside the Attorney General's Office. Executive Law § 63-E gives that office power to receive complaints, open investigations, issue subpoenas, examine records, enter local jails, and bring civil actions or place jurisdictions under monitoring.

19. On July 24, 2026, the Attorney General's Office, acting for OIT, sent this Office a pre-enforcement letter. The letter claimed that our 287(g) agreement was already prohibited, that we had to terminate it, that it would become void on August 25, 2026, and that we were required to submit documents describing our termination plans by August 14. On the advice of counsel, I did not respond to that July 24 letter.

20. On August 19, 2026, OIT issued a formal Investigative Demand for Documents under Executive Law § 63-e(3). A true and correct copy is attached hereto as Exhibit C. The Demand requires this Office to produce, on or before August 25, 2026, documents sufficient to show what actions we have taken to terminate the ICE MOA. It also requires preservation of all materials related to the termination. The production deadline is the same day the statute treats existing 287(g) agreements as void. The Demand turns the July 24 warning letter into an active investigation that requires me to document the very termination the State is trying to compel.

21. On August 20, 2026, I sent ICE formal notice that, by operation of the Local Cops, Local Crimes Act, the Warrant Service Officer MOA is terminated effective August 25, 2026. A true and correct copy of that notice is attached hereto as Exhibit D. In the same letter, I stated my objection that the statute is unconstitutional and an "egregious act of government overreach," and that I and other sheriffs intend to challenge it in court.

22. That notice does not reflect a change of mind on my part about the value of the program. As I said in the termination letter to ICE, "the Broome County Sheriff's Office remains resolute in its unwavering commitment to public safety and protecting and serving the people of Broome County." I did not ask ICE to end a partnership that was clearly working. Rather, termination was the product of forced compliance with a statute that declared our agreement illegal, and that was backed by an active Investigative Demand.

**What the Act Does to This Office**

23. The first and most direct consequence is the forced end of a working federal agreement. The Warrant Service Officer MOA was signed, staffed, and operational. Officers had been trained and credentialed. The State then declared the agreement void, ordered us to use the termination clause, and used an Investigative Demand to coerce the August 20 termination. I cannot reinstate the MOA. I cannot send officers to 287(g) training under that instrument or accept ICE credentials for it. The agreement is gone because the State forbade it.

24. The second consequence is legal uncertainty over our long-standing federal housing relationships. Our correctional facility has housed ICE detainees for years under the USMS IGA that expressly authorizes ICE as a user and generates real revenue at the current rate of $110 per day. Executive Law § 170-K restricts the use of local correctional facilities for federal civil immigration purposes and equips OIT with investigative power. Federal partners that need beds have reason to hesitate before sending prisoners to a facility whose sheriff is under investigation for performing the same function the facility has performed for decades under a written agreement. That hesitation is itself an injury.

25. The third consequence is the loss of formal warrant-service capacity inside the jail. Without the Warrant Service Officer program we are left with informal notification and hope. We can still try to coordinate with ICE, but we no longer have trained, credentialed officers who can serve the federal warrant at the moment of scheduled release and complete the transfer under ICE supervision. If a removable person charged with a local crime walks out because that formal step is gone, the release cannot be reversed.

26. The fourth consequence is the enforcement apparatus itself. I received the July 24 letter. I then received the August 19 Investigative Demand. OIT exists to police the prohibitions in Executive Law § 170-K. State law lets that office enter our jail, examine records, interview inmates, and then sue the County or place it under monitoring. Reinstating a 287(g) agreement invites further investigation and litigation. Continuing to house ICE detainees under existing federal arrangements invites the same. Declining both accepts the public-safety and fiscal consequences described above. The New York Constitution does not give the Attorney General the power to force an elected sheriff into that box.

27. The fifth consequence is the displacement of local judgment. I evaluated the Warrant Service Officer model, entered the agreement, staffed it, and ran it. Local arrests produced local detainers and local transfers. Albany then made the result illegal because ICE was involved, and then opened an investigation into whether I was complying with the prohibition. That is not local control of local crimes. It is a state override of a county public-safety decision, followed by an investigation of the official who made the decision.

**The Irreparable Harm We Face**

28. These injuries are present now. They become permanent on August 25, 2026, unless the Act is enjoined. A later damages award will not repair them.

    a. The forced termination of the Warrant Service Officer MOA cannot be undone after the fact. A later judgment cannot rebuild the training, the credentials, or the agreement the State has declared void. We had a functioning partnership. That is not a speculative future interest.

    b. The injury to the independence of a constitutional office is not compensable in money. Article XIII, Section 13 does not make the Sheriff an agent of the Attorney General. When the State tells an elected sheriff that his judgment about a jail-only

federal partnership is irrelevant, and then investigates him for non-compliance, no later order restores that independence.

c. A release that should not have occurred cannot be reversed. If a removable person charged with a serious local crime leaves the jail because we can no longer serve the federal warrant and complete the transfer, I cannot bring him back. The risk is concrete.

d. Uncertainty over federal housing arrangements is practical, not theoretical. Once federal agencies treat our jail as legally risky, they do not return the moment a court rules. Meaningful revenue and bed capacity are easy to lose when an investigation is already underway.

e. The dual August 25 deadlines do not wait. The statute voids the agreement on that date. The Investigative Demand requires production of termination documents on the same date. Designated officers cannot be created overnight. A voided agreement cannot be revived after someone has already been released. Each booking after the deadline at which formal warrant service is forbidden is one we do not get to redo.

f. The same pressure threatens federal funding and reimbursements that depend on cooperation. SCAAP dollars exist because this Office works with federal authorities and can identify the relevant population for DHS review. Housing reimbursements at approximately $110/day exist because we supply bed space the federal government needs. If formal cooperation is chilled or barred, both streams of funding are at risk. Once they are gone, a later judgment does not restore them.

29. This case is not about a fee or a bounty. ICE paid nothing for designations under the Warrant Service Officer model. It is not a request for street-level immigration authority I never sought. It is a claim that I, as an independently elected sheriff, entered a limited, jail-only federal partnership, staffed it, and ran it. A state statute then forced me to terminate the agreement under protest while subjecting me to an active investigation. Those injuries exist today and cannot be repaired later.

## Conclusion

30. I swore an oath to protect the people of Broome County. I did not swear an oath to accept a state statute that forces the end of a federal agreement I signed, that places long-standing federal housing arrangements under a legal cloud, and that leaves this jail without the formal tool we used to identify and transfer removable people already in custody on criminal charges. If the Act is enjoined, I am prepared to restore a Warrant Service Officer agreement with ICE in substantially the form previously in force. I will continue to perform lawful federal housing arrangements, including those involving ICE, to the extent the law permits, unless a court of competent jurisdiction orders otherwise.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 24th day of August, 2026, in Broome County, New York.

______________________________
Frederick J. Akshar
Sheriff of Broome County, New York

# Declaration of Sheriff Akshar

# Exhibit A

**U.S. Department of Justice**
**United States Marshals Service**
**Prisoner Operations Division**

**Office of Detention Services**
**Intergovernmental Agreement**

| 1. Agreement Number | 2. Effective Date | 3. Facility Code(s) | 4. UEI Number |
|---|---|---|---|
| 52-02-0066 | May 1, 2024 | 2EB | NDV4A46MPDE6 |

**5. Issuing Federal Agency**

United States Marshals Service
Prisoner Operations Division
Office of Detention Services
CG-3, 3rd Floor
Washington, DC 20530-0001

**6. Local Government**

Broome County Jail
155 Lt. Vanwinkle Drive
Binghamton, New York 13905

Tax ID#: 15-6000449

**7. Appropriation Data**

15-1020/XD

**8. Local Contact Person:** Scott Noyes, Lieutenant
E-mail: scott.noyes@broomecountyny.gov
Telephone: (607) 778-6439

| 9. Services | 10. Estimated Number of Federal Beds | 11. Per Diem Rate | 12. Period of Performance |
|---|---|---|---|
| This agreement is for the housing, safekeeping, subsistence, and care of Federal prisoners, in accordance with content set forth herein. | Male: 30<br>Female: 10<br>Juvenile: 0<br>Total: | $110.00 | Perpetual |

**13. Guard/Transportation Hourly Rate**

Guard/Transportation Hourly Rate: $35.00

Mileage shall be reimbursed by the Federal Government at the current General Services Administration (GSA) Federal Travel Regulation Mileage Rate.

**14. Optional Guard/Transportation Services**

☒ Medical (Including Hospital)

☒ U.S. Courthouse

☒ JPATS

☒ Encompassed VTC

☒ Video Teleconferencing (VTC) Hearings

☒ Other Jail to Jail

**15. Department of Labor Wage Determination**

☐ Wages Incorporated ______

**16. Local Government Certification**

*To the best of my knowledge and belief, information submitted in support of this agreement is true and correct. This document has been duly authorized by the governing authorities of their applying Department or Agency State or County Government and therefore agree to comply with all provisions set forth herein this document.*

**17. Signature of Person Authorized to Sign (Local)**

[signature]
Signature

Frederick J. Akshar II
Print Name

Sheriff — 4.12.24
Title — Date

| 18. Federal Prisoner Type Authorized | 19. Other Authorized Agency User |
|---|---|
| ☒ Adult Male | ☒ BOP |
| ☒ Adult Female | ☒ ICE |
| ☐ Juvenile Male | ☒ Other Middle District of Pennsylvania |
| ☐ Juvenile Female | |
| ☐ Transgender | |

**20. Signature of Person Authorized to Sign (Federal)**

[signature]
Signature

Tiffani Eason
Print Name

Assistant Chief, Intergovernmental Agreements
Title — Date

## Table of Contents

Section Description | Page Number


1. Authority ........ 3
2. Purpose ........ 3
3. Administration ........ 3
4. Place of Performance ........ 5
5. Agreements Specialist ........ 5
6. Termination ........ 5
7. Assignment and Outsourcing of Jail Operations ........ 6
8. Medical Services ........ 7
9. Affordable Care Act (ACA) ........ 8
10. Receiving and Discharging of Federal Prisoners ........ 8
11. Prisoner Work Program ........ 9
12. Guard/Transportation Services to/from Medical Facility ........ 10
13. Guard/Transportation Services to/from U.S. Courthouse ........ 11
14. Guard/Transportation Services to Justice Prisoner & Alien Transportation System (JPATS) or Other ........ 11
15. Video Teleconference Hearing within the Facility ........ 12
16. Optional Guard Services to Video Teleconference Hearing within the Facility ........ 12
17. Special Notifications ........ 13
18. Body Worn Camera Information Requests ........ 13
19. Restrictive Housing and Suicide Prevention ........ 13
20. Prison Rape Elimination Act (PREA) ........ 14
21. PREA Prisoner Incident Reporting ........ 15
22. Federal Acquisition Regulation (FAR) Agreement Provisions ........ 15
23. Guaranteed Minimum Bed Space ........ 16
24. Economic Rate Adjustments ........ 16
25. Billing and Financial Provisions ........ 18
26. Payment Procedures ........ 18
27. Hold Harmless ........ 19
28. Disputes ........ 19
29. Review of Services ........ 19
30. IGA Amendments ........ 20
31. Litigation ........ 20
32. The First Step Act ........ 20
33. Ensuring Access to Voter Registration for Eligible Individuals in Federal Custody ........ 20




**Local Government (initial):** ______

**Federal Government (initial):** ______

## 1. Authority

Pursuant to the authority, 106th Congress Public Law 553, Section 119 of the "Department of Justice Appropriations Act, 2001", this Intergovernmental Agreement (hereinafter referred to as "agreement") is entered into between the United States Marshals Service (USMS) (hereinafter referred to as the "Federal Government") and **BROOME COUNTY JAIL** (hereinafter referred to as "Local Government"), who hereby agree as described in this document.

## 2. Purpose

The Federal Government and the Local Government establish this agreement allowing the USMS or other authorized agency user as noted in block #19, page one (1) of this agreement to house individuals detained on federal charges or federal court orders (hereinafter referred to as "Federal prisoners") with the Local Government at the **BROOME COUNTY JAIL, 155 Lt Vanwinkle Drive, Binghamton, New York 13905** (hereinafter referred to as "the Facility") designated in block #6 on page one (1) of this agreement.

## 3. Administration (October 2021)

The Local Government shall provide for the secure custody, safekeeping, housing, subsistence, and care of Federal prisoners in accordance with all state, local, and federal laws, standards, regulations, policies, and court orders applicable to the operation of the Facility. Federal prisoners shall be housed in a manner consistent with the Federal Performance Based Detention Standards (FPBDS) subset utilized by the USMS Detention Facility Review Program. These standards are set forth in Form USM-218 (provided as an attachment to this agreement). Facilities shall follow the current standards summarized in Form USM-218 and any other standards required by an authorized agency whose prisoners are housed by the Local Government pursuant to this agreement. Full text of the FPBDS can be found at: http://wwwASD.usmarshals.gov/prisoner/detention-standards.htm as an additional reference source for best practices.

**BROOME COUNTY JAIL** shall comply with Congressional mandates, federal laws, Executive Orders, and all existing **BROOME COUNTY JAIL** policies. **BROOME COUNTY JAIL** shall provide a means for verification of any state inspections, accreditation, and, if applicable, any alternative correctional facility accreditations such as an accreditation from the American Correctional Association accreditation.

The USMS ensures the secure custody, care, and safekeeping of USMS prisoners. Accordingly, all housing or work assignments, and recreation or other activities for USMS prisoners are permitted only within secure areas of the building or within the secure external recreational/exercise areas. All work assignments for unsentenced Federal prisoners must be voluntary.

The Local Government shall conduct initial and periodic background and reference checks of applicants, employees, contractors, and volunteers. All allegations of staff misconduct shall be investigated and reported to law enforcement as appropriate. Staff misconduct involving or affecting USMS prisoners shall be reported to the local district United States Marshal (USM), Chief, or their designee and to the USMS Prisoner Operations Division (POD) at PODCoCInquiries@usdoj.gov.



**Local Government (initial):** 
**Federal Government (initial):**

At all times, the Federal Government shall have access to the Facility and to the Federal prisoners, and to all records pertaining to this agreement, including financial records, for a retention period of three (3) years from the date of request by the Federal Government.

The Local Government shall maintain written policies and procedures that describe all facets of facility operations, maintenance, and administration. The Local Government shall maintain written contingency and emergency plans for situations including but not limited to riots, hunger strikes, disturbances, escapes, hostage situations, and mass prisoner relocation.

The Local Government shall maintain records of annual fire safety inspections. The Local Government shall maintain dangerous materials in accordance with government regulations.

The Local Government shall maintain an objective review, classification, and housing process. Federal prisoners shall be clearly identified as USMS prisoners in the classification system.

The Local Government shall ensure Federal prisoners under the age of 18 receive an age-appropriate diet, exercise, and education.

The Local Government shall ensure Federal prisoners under the age of 18 or charged as a juvenile shall be separated by sight and sound and out of regular contact with adult prisoners, except in emergency situations or approval from the court.

The Local Government shall keep the Facility clean and in good repair. Food service equipment shall meet established health and safety codes. The Local Government shall provide a minimum of three (3) meals per day that are varied and nutritionally adequate.
The Local Government shall provide safe and clean space and items for proper prisoner hygiene.

The Local Government will provide clean and serviceable bedding and clothing. Clothing and shoes shall be properly sized and temperature and weather appropriate. The Local government shall provide appropriate attire upon release.

The Local Government shall properly inventory, store, and return prisoner property upon release. The Local Government shall provide adequate accommodations for prisoners with disabilities once accepted by the Local Government.
The Local Government shall prohibit discrimination on the basis of disability, race, gender, sexual orientation, religion, and national origin in the provision of services, programs, and activities.

The Local Government shall provide prisoners with reasonable opportunities to participate in religious practices, exercise, and access to mail, telephones, personal legal materials and legal reference materials or confidential counsel.

The Local Government shall maintain a grievance program with at least one level of appeal. The grievance procedures shall be made available to prisoners.

(End of Provision)



**Local Government (initial):** JAW
**Federal Government (initial):** [illegible]

## 4. Place of Performance (May 2021)

The principal place of performance for this agreement shall be:

**BROOME COUNTY JAIL, 155 Lt Vanwinkle Drive, Binghamton, New York 13905**

(End of Provision)

## 5. Agreements Specialist (November 2021)

The Contracting Officer (KO) may designate in writing one or more government employees, by name and position title, to act for the KO under this agreement. Each designee shall be identified as an Agreements Specialist. Such designation(s) shall specify the scope and limitations of the authority so delegated; provided, that the designee(s) shall not change the terms or conditions of the agreement, unless the Agreements Specialist is a warranted KO, and this authority is delegated in the designation.

The Agreements Specialist is:

Name: **Ramona Mosby**
Title: **Grants Specialist**
Contact Information: **(202) 868-2789**

(End of Provision)

## 6. Termination (May 2021)

The agreement can be terminated by either party for any reason. The requesting party, requester, seeking to terminate this agreement may do so by providing a written notice to the receiving party, requestee, at least thirty (30) calendar days in advance of the proposed termination date. An exception is made when an emergency situation requires the immediate relocation of Federal prisoners.

In order for the Local Government to initiate a termination of this agreement, the Local Government must:

a. As noted in this section, paragraph one above, the Local Government shall provide the Federal Government via the KO or designee a written notification by email at least thirty (30) calendar days in advance of the potential termination date unless an emergency situation requires the immediate relocation of Federal prisoners.
b. The Local Government shall provide adequate time, if applicable, for the Federal Government to transport and relocate Federal prisoners. Based on the number of Federal prisoners at the facility, a thirty (30) day notice may not be adequate to vacate the premises; thus, the Local Government shall agree to provide the Federal Government a reasonable time frame to exit the facility.
c. The Local Government shall work with the Federal Government to locate alternative housing solutions for the Federal prisoners.

d. The Local Government may not request rate or per-diem increases once the Local Government has provided a termination notice to the Federal Government and the Federal Government has acknowledged the receipt of before mentioned notice.

Where the Local Government has received a cooperative agreement through the POD's Cooperative Agreement Program, termination and other applicable provisions shall:

a. be incorporated into this agreement;
b. survive after the expiration of the cooperative agreement; and
c. supersede the termination provisions of this agreement.

(End of Provision)

## 7. Assignment and Outsourcing of Jail Operations (May 2021)

The overall management and operation of the Facility housing Federal prisoners shall not be contracted out without the prior written notification of the Federal Government.

(End of Provision)

## 8. Medical Services (May 2021)

The Local Government shall maintain written procedures that describe actions taken in the event of a prisoner's death, assault, or medical emergency to include notification to the USMS.

The Local Government shall provide a medical and mental health screening upon admission to the Facility. The Local Government shall inform prisoners how to access health services.

*The Local Government shall notify the local USMS district office of any infectious disease outbreak.*

The Local Government shall provide Federal prisoners with the same level and range of care **inside** the Facility as that provided to state and local prisoners. The Local Government is financially responsible for all medical care provided **inside** the Facility to Federal prisoners. This includes the cost of all medical, dental, and mental health care as well as the cost of medical supplies, over-the-counter medications and any prescription medications routinely stocked by the Facility. The Facility is encouraged to purchase non-OTC medications for USMS prisoners through the USMS' National Managed Care Contract (NMCC) Discount Pharmacy Program. When possible, generic medications should be prescribed. The cost of all of the above-referenced medical care is covered by the Federal per-diem rate. The Federal Government will pay for the cost of specialized medical services not routinely provided within the Facility, such as dialysis.

The Federal Government is financially responsible for all medical care provided **outside** the Facility to Federal prisoners. The Federal Government must be billed directly by outside medical care providers pursuant to arrangements made by the Local Government for outside medical care. The Local Government shall utilize outside medical care providers that are covered by the USMS' NMCC Preferred Provider Network to the maximum extent practicable. The Local Government can obtain information about NMCC covered providers from the local USMS District Office. The Federal Government will be billed directly by the medical care provider **not** the Local Government. To



**Local Government (initial):** AH
**Federal Government (initial):** [illegible]

ensure that Medicare rates are properly applied, medical claims for Federal prisoners must be on Centers for Medicare and Medicaid Services (CMS) Forms so that they can be re-priced to Medicare rates in accordance with the provisions of Title 18 U.S.C. Section 4006. The USMS will not reimburse the detention facility for medical payments made on behalf of USMS prisoners in the absence of a specific arrangement approved in writing by the USMS.

All **outside** medical care provided to Federal prisoners must be pre-approved by the Federal Government except in a medical emergency. In the event of an emergency, the Local Government shall proceed immediately with necessary medical treatment. The Local Government shall notify the Federal Government immediately regarding the nature of the Federal prisoner's illness or injury as well as the types of treatment provided.

The Facility shall have in place an adequate infectious disease control program which includes testing of all Federal prisoners for Tuberculosis (TB) in accordance with *National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails.* TB testing shall occur with 14 days of intake (unless current TB tests results are available), be promptly documented in the Federal prisoner's medical record and the results forwarded to the local USMS District within thirty (30) days of intake. Special requests for expedited TB testing and clearance (to include time sensitive moves) shall be accomplished through advance coordination by the Federal Government and Local Government.

The Local Government shall immediately notify the Federal Government to include the local district office of any cases of suspected or active TB or any other highly communicable diseases such as but not limited to Coronavirus Disease (COVID), severe acute respiratory syndrome (SARS), Avian Flu, Methicillin-Resistant Staphylococcus Aureus (MRSA), Chicken Pox, etc., which might affect scheduled transports or productions.

When a federal prisoner is being transferred or released from the Facility, they will be provided with a minimum of seven (7) days of prescription medications and any medications already dispensed to the prisoner. Medical records and Form USM-553, *Prisoner in Transit Medical Summary* must travel with the Federal prisoner. If the records are maintained at a medical contractor's facility, it is the Local Government's responsibility to obtain them before a federal prisoner is transferred.

Federal prisoners may be charged a medical co-payment by the Local Government in accordance with the provisions of Title 18 U.S.C. Section 4013(d). The Federal Government is not responsible for medical co-payments and shall not be billed if the federal prisoner is indigent and cannot make the co-payment. Indigent Federal prisoners shall not be denied medical evaluation and treatment for failure to provide a co-payment.

(End of Provision)



**Local Government (initial):**
**Federal Government (initial):**

## 9. Affordable Care Act (ACA) (May 2021)

Upon release of a Federal prisoner, the Local Government shall provide information regarding the Affordable Care Act (ACA). The ACA website is located at: http://www.hhs.gov/healthcare/about-the-aca/index.html.

(End of Provision)

## 10. Receiving and Discharging of Federal Prisoners (May 2021)

The Local Government agrees to accept Federal prisoners only upon presentation by a Law Enforcement Officer (LEO), USMS Task Force Officer (TFO) or a USMS designee with proper credentials.
The Local Government shall not relocate a Federal prisoner from one facility under its control to another facility not described in this agreement without permission of the Federal Government. Additional facilities within the same agreement shall be identified in a modification.

The Local Government agrees to release Federal prisoners only to LEOs of the authorized Federal Government agency initially committing the Federal prisoner (e.g., Drug Enforcement Administration (DEA), Immigration and Customs Enforcement (ICE)) or to a Deputy United States Marshal (DUSM) or USMS designee with proper credentials. Those Federal prisoners who are remanded to custody by the USMS may only be released to the USMS or an individual specified by the USMS in the Judicial District.

USMS Federal prisoners sought for a state or local court proceeding must be acquired through a Writ of Habeas Corpus or the Interstate Agreement on Detainers and then only with the concurrence of the jurisdictional United States Marshal (USM).

(End of Provision)

## 11. Prisoner Work Program (November 2021)

Federal prisoner labor shall be used in accordance with the Federal prisoner work plan developed by the Local Government and approved by the USMS. The Federal prisoner work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial, service, or other jobs. Federal prisoners may not be required to work. Federal prisoners may volunteer to work within the secure confines of the facility if they sign a waiver of their right not to work. A Federal prisoner with suicidal tendencies, attempted escapes or escape history, violent history, gang affiliations or with retainers for pending charges with other local, state, or federal agencies will not be considered for the volunteer program. Federal prisoners are not permitted to act as trustees and may not work in positions that permit unsupervised contact with segregated prisoners or Federal prisoners of the opposite sex.

The Federal prisoners are restricted from operating equipment that may expose the Federal prisoners to grave bodily harm or any work assignment requiring security risk items and controlled tools which could be used to facilitate an escape or used as a weapon that could endanger staff, citizens, or other inmates. Federal prisoners will not have access to prisoner or employee records.



**Local Government (initial):**
**Federal Government (initial):**

The Local Government will ensure that prisoners who volunteer to work are prohibited Keep on Person medications while at the worksite.

Federal prisoners must obtain required medical clearances before working in the food service areas. The Federal prisoner work program shall not conflict with any other requirements of the agreement and must comply with all applicable laws and regulations. Federal prisoners shall not be used to perform the responsibilities or duties of an employee of the Local Government. Appropriate safety/protective clothing and equipment shall be provided to Federal prisoner workers as appropriate. Federal prisoners shall not be assigned work that is considered hazardous or dangerous. This includes, but is not limited to, areas or assignments requiring great heights, extreme temperatures, use of toxic substances and unusual physical demands. Federal prisoner workers can be paid the identical rates of pay as other facility prisoners.

Federal prisoners shall be required to participate in normal housekeeping duties which help ensure the cleanliness of their housing area. Increases and reductions in privileges may be used as incentives to ensure that Federal prisoners keep their living areas clean.

(End of Provision)

## 12. Guard/Transportation Services to/from Medical Facility (May 2021)

When Medical Facility in block #14 on page one (1) of this agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide transportation and guard services for Federal prisoners housed at the Facility to and from a medical facility for outpatient care, and transportation and stationary guard services for Federal prisoners admitted to a medical facility.

These services shall be performed by at least two (2) armed and qualified LEOs or Correctional Officers (CO) according to the criteria specified by the County Entity running the facility. In all cases, these are part of a fulltime Law Enforcement Organization or Correctional Organization and that they have met the minimum training requirements.

The Local Government agrees to provide additional personnel if requested by the USMS to enhance specific requirements for security, prisoner monitoring, and contraband control. Federal prisoners are not permitted to use the telephone, internet or WIFI enabled devices, or to receive outside food, drinks, or deliveries (including flowers) without consent from the USMS. The Local Government shall restrain Federal prisoners by attaching at least one extremity to the hospital bed, stretcher, or chair at all times when medically possible. Pregnant or postpartum prisoners should not be restrained. Postpartum is the twelve-week period following childbirth, miscarriage, or abortion. See First Step Act provision for more information.

The reimbursable hourly rate, if agreed upon, will be shown in block #13 on page one (1) of this agreement.

Mileage shall be reimbursed in accordance with the current GSA mileage rate.

(End of Provision)

### 13. Guard/Transportation Services to/from U.S. Courthouse (May 2021)

When U.S. Courthouse in block #14 on page one (1) of this agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide transportation and guard services for Federal prisoners housed at its facility to and from the U.S. Courthouse. These services shall be performed by at least two (2) armed and qualified LEOs or COs. In all cases, these are part of a fulltime Law Enforcement Organization or Correctional Organization and that they have met the minimum training requirements.

The Local Government agrees to provide additional personnel if requested by the USMS to enhance specific requirements for security, prisoner monitoring, and contraband control.

Upon arrival at the courthouse, the Local Government's transportation guard will turn Federal prisoners over to the USMS only upon presentation of proper law enforcement credentials.

The Local Government will not transport Federal prisoners to any U.S. Courthouse without a specific request from the USMS who will provide the prisoner's name, the U.S. Courthouse, and the date the prisoner is to be transported.

Each prisoner will be fully restrained in handcuffs, waist chain, and leg restraints during transportation unless otherwise authorized by the USMS. Deviations from full restraints must be documented and reported monthly to the local district USM, Chief, or their designee and to the USMS POD at PODCoCInquiries@usdoj.gov.

The reimbursable hourly rate, if agreed upon, will be shown in block #13 on page one (1) of this agreement.

Mileage shall be reimbursed in accordance with the current GSA mileage rate.

(End of Provision)

### 14. Guard/Transportation Services to Justice Prisoner & Alien Transportation System (JPATS) or Other (May 2021)

When JPATS, Other or both in block #14 on page one (1) of this agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide transportation and escort guard services for Federal prisoners housed at its facility to and from the JPATS or other locations designated by the Federal Government.

These services shall be performed by at least two (2) armed and qualified LEOs or COs. In all cases, these are part of a fulltime Law Enforcement Organization or Correctional Organization and that they have met the minimum training requirements.

The Local Government agrees to provide additional personnel if requested by the USMS to enhance specific requirements for security, prisoner monitoring, and contraband control.



**Local Government (initial):** 
**Federal Government (initial):** 

The Local Government shall not transport Federal prisoners to the airlift or any other location without a specific request from the USMS who will provide the prisoner's name, location (district), and the date the prisoner is to be transported.

The Local Government shall turn Federal prisoners over to the USMS or an officer specified by the USMS only upon presentation of proper credentials.

Each prisoner will be fully restrained in handcuffs, waist chain, and leg restraints during transportation unless otherwise authorized by the USMS. Deviations from full restraints must be documented and reported monthly to the local district USM, Chief, or their designee and to the USMS POD at PODCoCInquiries@usdoj.gov.

The reimbursable hourly rate, if agreed upon, will be shown in block #13 on page one (1) of this agreement.

Mileage shall be reimbursed in accordance with the current GSA mileage rate.

(End of Provision)

### 15. Video Teleconference Hearings within the Facility (October 2021)

If available, the facility shall furnish, as applicable to this agreement, all things necessary for, or incident to, providing Video Teleconference (VTC) hearings within the facility. When VTC equipment is not available at the facility, the Federal Government, in coordination with the Courts, may assist with providing VTC equipment and ancillary items to the facility.

(End of Provision)

### 16. Optional Guard Services to Video Teleconference Hearings within Facility (May 2021)

When Video Teleconferencing (VTC) Hearings in block #14 on page one (1) of this agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide escort guard services for Federal prisoners housed at its facility to monitor, on a case-by-case basis, court hearings conducted via VTC within its facility per instruction of the Federal Judiciary.

The reimbursable hourly rate, if agreed upon, will be shown in block #13 on page one (1) of this agreement.

(End of Provision)

### 17. Special Notifications (May 2021)

The Local Government shall notify the Federal Government of any activity by a Federal prisoner, which would likely result in litigation or alleged criminal activity.

The Local Government shall immediately notify the Federal Government of an escape of a Federal prisoner. The Local Government shall use all reasonable means to apprehend the escaped Federal prisoner and all reasonable costs in connection therewith shall be borne by the Local Government.

The Federal Government shall have primary responsibility and authority to direct the pursuit and capture of such escaped Federal prisoners. Additionally, the Local Government shall notify the Federal Government as soon as possible when a Federal prisoner is involved in an attempted escape or conspiracy to escape from the Facility.

In the event of a medical emergency, death, or assault on or by a Federal prisoner, the Local Government shall immediately notify the Federal Government.

(End of Provision)

## 18. Body Worn Camera Information Requests (November 2021)

If the Local Government adopts a Body Worn Camera (BWC) use policy that mandates use of BWC for transport or other activities covered under the IGA, the agency shall, upon request by USMS, provide USMS with the audio/video footage and any metadata captured by the BWC pertaining to USMS prisoner incidents. The audio/video footage and any metadata may be requested by the USMS Body Worn Camera Program and the USMS Office of General Counsel. The agency agrees that no BWC footage depicting a USMS prisoner will be released without advance written notification to the USMS.

(End of Provision)

## 19. Restrictive Housing and Suicide Prevention (May 2021)

For the purposes of this agreement, "restrictive housing" means any type of detention that involves all of the following elements:

a. Removal from the general population, whether voluntary or involuntary;
b. Placement in a locked room or cell, whether alone or with another prisoner; and
c. Inability to leave the room or cell for the vast majority of the day, typically 22 hours or more.

For the purposes of this agreement, "vulnerable population" refers to prisoners who are more likely to be victimized in confinement settings, including but not limited to: juveniles; young adults (age 18-24 at time of admission through conviction); prisoners with serious mental illness; lesbian, gay, bisexual, transgender, intersex, and gender nonconforming prisoners; pregnant and postpartum prisoners; and prisoners with medical needs.

The Local Government shall have written policies, procedures, and practices requiring that all prisoners in restrictive housing are personally observed by a CO at least twice per hour, but no more than thirty (30) minutes apart, on an irregular schedule. Prisoners who are violent or mentally ill or who demonstrate unusual or bizarre behavior shall receive more frequent observation; suicidal prisoners shall be under constant observation.

The Local Government shall immediately notify the appropriate Chief Deputy U.S. Marshal (CDUSM), or designee, and POD at rhinquiries@usdoj.gov when a member of a vulnerable population is placed in restrictive housing or their restrictive housing status changes.



**Local Government (initial):**
**Federal Government (initial):**

The Local Government shall also provide reports to the USMS on a monthly basis listing all USMS prisoners who were detained in restrictive housing, and the reasons for their assignment to restrictive housing. When no USMS prisoners have been placed in restrictive housing during the reporting month, the Local Government shall notify USMS that there are no USMS prisoners to report. The report or a notification of no USMS prisoners in restrictive housing ' shall be submitted to the CDUSM or his or her designee and POD at rhinquiries@usdoj.gov, no later than the tenth day of each month in a standard format established by the USMS.

The Local Government shall have a comprehensive suicide-prevention program in place incorporating all aspects of identification, assessment, evaluation, treatment, preventive intervention, and annual training of all medical, mental health, and correctional staff.

Additional prisoner suicide prevention resources can be found at: https://www.usmarshals.gov/prisoner/suicide_prevention.htm and https://nicic.gov/.

(End of Provision)

### 20. Prison Rape Elimination Act (PREA) (November 2021)

The Facility must post Prison Rape Elimination Act (PREA) brochure/bulletins in each housing unit of the Facility. The Facility must abide by all relevant PREA regulations at: (https://www.prearesourcecenter.org/about/prison-rape-elimination-act-prea).

All sexual harassment and sexual assaults of or by a USMS prisoner must be reported to the district CDUSM or designee and the POD at: PREAinquiries@usdoj.gov.

In accordance with PREA, the Facility must arrange for a PREA audit every three (3) years. The Facility must maintain PREA compliance or be actively working towards compliance.
Additional resources can be found at: https://www.prearesourcecenter.org/.

Templates for PREA posters and brochures can be found at:
https://www.prearesourcecenter.org/library/search?keys=poster&cat=All

(End of Provision)

### 21. PREA Prisoner Incident Reporting (November 2021)

PREA posters shall contain information on how to report a sexual assault by using one of the following methods:

- Speaking with a staff member;
- Writing a letter reporting the alleged sexual misconduct to the person in charge or the USMS. To ensure confidentiality, use special (Legal) mail procedures;
- Filing an Emergency Prisoner Grievance - If you decide your complaint is too sensitive to file with the Officer in Charge, you can file your Grievance directly with the CDUSM. You can get the forms from your housing unit officer, or a Facility supervisor;



**Local Government (initial):**
**Federal Government (initial):**

- Writing to the Office of Inspector General (OIG), which investigates allegations of staff misconduct. The address is: Office of Inspector General, U.S. Department of Justice, 950 Pennsylvania Ave. Room 4706, Washington, DC. 20530; or
- Calling, **at no expense to the victim,** the OIG. The phone number is 1-800-869-4499.

All allegations of sexual abuse reported to Facility staff must be reported and will be investigated. Information concerning the identity of a prisoner victim reporting a sexual assault, and the facts of the report itself, shall be limited to those who have the need to know in order to make decisions concerning the prisoner-victim's welfare and for law enforcement investigative purposes.

(End of Provision)

## 22. Federal Acquisition Regulation (FAR) Agreement Provisions (May 2021)

This agreement incorporates the following agreement provisions by reference, with the same force and effect as if it was given in full text. Upon request, the full text will be made available. The full text of this provision may be accessed electronically at: http://www.acquisition.gov.

**Agreement Provisions:**

FAR 52.222-41 Service Contract Labor Standards. (Aug 2018)

FAR 52.222-42 Statement of Equivalent Rates for Federal Hires (May 2014)

FAR 52.222-43 Fair Labor Standards Act and the Service Contract Labor Standards - Price Adjustment (Multiyear and Option Contracts) (August 2018)

The current Local Government per-diem rates shall be the prevailing wages unless notified by the Federal Government.

If the Department of Labor Wage Determination in block #15 on page one (1) of this Agreement is checked, the Local Government agrees, in accordance with FAR 52.222.43 (f), that it must notify the Federal Government of any increase or decrease in applicable wages and fringe benefits claimed under this clause within thirty (30) days after receiving a new wage determination.

(End of Provision)

## 23. Guaranteed Minimum Bed Space (September 2021)

This IGA **does not** contain a guaranteed minimum for bed space.

(End of Provision)

## 24. Economic Rate Adjustments (October 2021)



**Local Government (initial):**
**Federal Government (initial):**

The Federal Government will use various price analysis techniques and procedures to ensure the rates established by this agreement is considered a fair and reasonable price. Examples of such techniques include, but are not limited to, the following:

a. Comparison of the requested rate with the Independent Government Estimate for detention services, otherwise known as the Core Rate;
b. Comparison with rates at other state or local facilities of similar size and economic conditions;
c. Comparison of previously proposed prices and previous Federal Government and commercial contract prices with current proposed prices for the same or similar items; and
d. Evaluation of the provided jail operating expense information.

The firm-fixed price per-diem rate for services is stipulated in block #11 on page one (1) of this agreement and shall not be subject to adjustment on the basis of **BROOME COUNTY JAIL** actual cost experience in providing the service. The per-diem rate shall be fixed for a period from the effective date of this agreement forward for **thirty-six (36) consecutive months.** The per-diem rate covers the support of one Federal prisoner per "Federal prisoner day", which shall include the day of arrival, but not the day of departure.

The per-diem rate and the guard/transportation hourly rate will remain unchanged during the renewal period(s) unless the Local Government requests an economic rate adjustment. To request a per-diem economic rate adjustment, the Local Government will need to access USMS' Capture system via the Law Enforcement Enterprise Portal (LEEP) at https://portal.cjis.gov/wps/myportal/LEEPNG. The Local Government may contact the Agreements Specialist for more information.

An economic rate adjustment to either rate can be requested by the Local Government after **thirty-six (36) months of continuous performance**. Request for economic rate adjustments prior to the ending of the **thirty-six (36) month period** preceding the most recent rate adjustment shall only be considered if there are extreme circumstances that warrants a review of an out of cycle economic rate adjustment. Granting an out of cycle economic rate adjustment is not guaranteed.

To request an out of cycle per-diem economic rate adjustment, the Local Government will need to follow the same instructions as requesting an economic rate adjustment during the renewal period. For the request to be considered, the Local Government must demonstrate that its costs have substantially increased during the current **thirty-six (36) month period**. The Local Government shall provide the Agreements Specialist documentation to include cost and pricing data to justify the facility's out of cycle economic rate adjustment request. The request and its supporting documentation are the sole responsibility of the Local Government to provide a complete request package to the Agreements Specialist. Incomplete or missing data may delay the request being processed or causing the request to be denied altogether.

Two (2) or more out of cycle economic rate adjustment requests within the same **thirty-six (36) month period** with an aggregate proposed increase of 25% or more are <u>not</u> permissible under this agreement.

(End of Provision)



**Local Government (initial):**
**Federal Government (initial):**

## 25. Billing and Financial Provisions (May 2021)

The Local Government shall prepare and submit for certification and payment, original and separate invoices each month to each Federal Government component responsible for Federal prisoners housed at the Facility.

Address(es) for the component(s) is/are:

**United States Marshals Service**
District: **Northern District of New York**
Address: **100 S. Clinton St, 10th Floor, Syracuse, NY 13261**
Contact Information: **(315) 473-7601**

**United States Marshals Service**
District: **Middle District of Pennsylvania**
Address: **235 N. Washington Ave. Room 215, Scranton, PA 18503**
Contact Information: **(570) 346-7277**

**Bureau of Prisons**
District: **RRM Pittsburgh**
Address: **1000 Liberty Ave. Pittsburgh, PA 15222**
Contact Information: **(412) 395-7930**

**U.S. Immigration & Customs - Enforcement & Removal**
District: **Buffalo Field Office**
Address: **250 Delaware Avenue, Floor 7, Buffalo, NY 14202**
Contact Information: **(716) 464-5800**

To constitute a proper monthly invoice, the name and address of the Facility, the name of each Federal prisoner, their specific dates of confinement, the total days to be paid, the appropriate per diem rate as approved in the agreement, and the total amount billed (total days multiplied by the per-diem rate per day) shall be listed, along with the name, title, complete address, and telephone number of the Local Government official responsible for invoice preparation. Additional services provided, such as transportation and guard services, shall be listed separately and itemized.

Nothing contained herein shall be construed to obligate the Federal Government to any expenditure or obligation of funds in excess of, or in advance of, appropriations in accordance with the 31 U.S.C Section 1341 - Limitations on expending and obligating amounts.

(End of Provision)

## 26. Payment Procedures (May 2021)

The Federal Government will make payments to the Local Government at the address listed in block #6 on page one (1) of this agreement. The payments will be made promptly after the district office has received and certified the invoice is correct.

(End of Provision)

## 27. Hold Harmless (May 2021)

It is understood and agreed that the Local Government shall fully defend, indemnify, and hold harmless the United States of America, its officers, employees, agents, and servants, individually and officially, for any and all liability caused by any act of any member of the Local Government or anyone else arising out of the use, operation, or handling of any property (to include any vehicle, equipment, and supplies) furnished to the Local Government in which legal ownership is retained by the United States of America, and to pay all claims, damages, judgments, legal costs, adjuster fees, and attorney fees related thereto. The Local Government will be solely responsible for all maintenance, storage, and other expenses related to the care and responsibility for all property furnished to the Local Government.

(End of Provision)

## 28. Disputes (May 2021)

Disputes, questions, or concerns pertaining to this Agreement will be resolved between appropriate officials of each party. Both the parties agree that they will use their best efforts to resolve the dispute in an informal fashion through consultation and communication, or other forms of non-binding alternative dispute resolution mutually acceptable to the parties.

(End of Provision)

## 29. Review of Services (November 2021)

Review standards for prisoners may differ among authorized agency users. The Local Government agrees to allow periodic unannounced reviews by Federal Government, to include approved Federal contractors, in accordance with the standards required by any or all of the Federal authorized agency users whose prisoners may be housed pursuant to this Agreement. A summary of inspection findings will be shared with the facility administrator in order to promote improvements to facility operations, conditions of confinement, and levels of services. If the Federal Government identifies significant finding(s) during the review, the Local Government will provide the Federal Government with a corrective action plan to address the issue(s).

(End of Provision)

## 30. IGA Amendments (May 2021)

For all amendments except for full or partial terminations, either party may initiate a request for amendment to this agreement in writing. All amendments negotiated will be effective only upon written approval of both parties.

(End of Provision)

### 31. Litigation (May 2021)

The Federal Government shall be notified, in writing, of all litigation pertaining to this agreement and provided copies of any pleadings filed or said litigation within five (5) business days of the filing.

The Local Government shall cooperate with the Federal Government legal staff and the United States Attorney regarding any requests pertaining to Federal Government or Local Government litigation.

(End of Provision)

### 32. The First Step Act (May 2021)

This agreement refers the Local Government facility operations and administrations to the following sections of the First Step Act:

a. Section 613 of Public Law 115-391 the FIRST STEP Act of 2018 and 18 USC 5043 with respect to any USMS juveniles in custody.

b. Section 301 of Public Law 115-391 the FIRST STEP Act of 2018 and that pursuant to USMS policy that these requirements have been adopted for all pregnant and postpartum USMS prisoners, regardless of case status. The postpartum period is twelve weeks after childbirth, miscarriage, or abortion.

(End of Provision)

### 33. Ensuring Access to Voter Registration for Eligible Individuals in Federal Custody (February 2022)

The facility, to the extent practicable and appropriate, will provide federal prisoners educational materials related to voter registration and voting and, upon request by the federal prisoner, facilitate voting by mail by prisoners who are eligible to vote under the laws of the applicable jurisdiction. The facility will work with state and local election officials and, in appropriate circumstances, may also work with other reliable sources of voter information to assist federal prisoners with voter registration, voting by mail, and notification of upcoming elections. This clause does not endorse or advocate in support of or in opposition to any candidate or political party.

(End of Provision)

(End of Agreement)

# Declaration of Sheriff Akshar

# Exhibit B

# MEMORANDUM OF AGREEMENT
Warrant Service Officer Program

## I. PARTIES

This Memorandum of Agreement (MOA) constitutes an agreement between U.S. Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and the Broome County Sheriff's Office, hereinafter the law enforcement agency (LEA), pursuant to which ICE delegates to nominated, trained, certified, and authorized LEA personnel the authority to perform certain immigration enforcement functions as specified herein. The LEA and ICE enter into this MOA in good faith and agree to abide by the terms and conditions contained herein.

## II. PURPOSE

The purpose of this collaboration is to promote public safety by facilitating the custodial transfer of specific aliens in LEA jail/correctional facilities to ICE for removal purposes at the time of the alien's scheduled release from criminal custody. This MOA sets forth the terms and conditions pursuant to which selected LEA personnel (participating LEA personnel) will be nominated, trained, and approved by ICE to perform certain limited functions of an immigration officer within the LEA's jail/correctional facilities. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating LEA personnel as members of the LEA. However, the exercise of the immigration enforcement authority delegated under this MOA to participating LEA personnel shall occur only as provided in this MOA.

## III. AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1357(g) (1996), as amended by the Homeland Security Act of 2002, Pub. L. No. 107-296, authorizes the Secretary of DHS to enter into written agreements with a State or any political subdivision of a State so that qualified personnel can perform certain functions of an immigration officer. Such authority has been delegated by the Secretary to ICE, and this MOA constitutes such a written agreement.

## IV. RESPONSIBILITIES

The LEA is expected to pursue to completion all criminal charges that caused the alien to be taken into custody and over which it has jurisdiction. ICE will assume custody of an alien only after said individual has been released from LEA custody.

### A. DESIGNATION OF AUTHORIZED FUNCTIONS

Approved participating LEA personnel will be authorized to perform only those immigration officer functions set forth in the Standard Operating Procedures (SOP) in Appendix A.

### B. NOMINATION OF PERSONNEL

The LEA will use due diligence to screen and nominate candidates for ICE training and approval under this MOA. All candidates must be United States citizens, have knowledge of and have enforced laws and regulations pertinent to their law enforcement activities and their jurisdictions, and have been trained on maintaining the security of LEA facilities, and have enforced rules and regulations governing inmate accountability and conduct.

ICE reserves the right to conduct an independent background check for each candidate. This background check requires all candidates to complete a background questionnaire. The questionnaire requires, but is not limited to, the submission of fingerprints, a personal history questionnaire, and the candidate's disciplinary history (including allegations of excessive force or discriminatory action). ICE reserves the right to query any and all national and international law enforcement databases to evaluate a candidate's suitability to participate in the enforcement of immigration authorities under this MOA. Upon request by ICE, the LEA will provide continuous access to disciplinary records of all candidates along with a written authorization by the candidate allowing ICE to have access to his or her disciplinary records.

Any expansion in the number of participating LEA personnel or scheduling of additional training classes is subject to all the requirements of this MOA and the accompanying SOP.

## C. TRAINING OF PERSONNEL

Before participating LEA personnel receive authorization to perform immigration officer functions under this MOA, they must successfully complete initial training provided by ICE on relevant administrative, legal, and operational issues tailored to the immigration enforcement functions to be performed.

Each LEA nominee must pass a final examination with a minimum score of 70 percent to receive certification. If an LEA nominee fails to attain a 70-percent rating on the examination, he or she will have one opportunity to review the testing material and re-take a similar examination. Failure to achieve a 70-percent rating upon retaking the final examination will result in the disqualification of the LEA nominee and discharge of the nominee from training.

ICE will review the training requirements annually, reserves the right to amend them, and may require additional training as needed.

## D. CERTIFICATION AND AUTHORIZATION

Upon successful completion of initial training, LEA personnel shall be deemed "certified" under this MOA.

ICE will certify in writing the names of those LEA personnel who successfully complete training and pass all required test(s). Upon receipt of the certification, the ICE Field Office Director (FOD) will provide the participating LEA personnel a signed authorization letter allowing the named LEA personnel to perform specified functions of an immigration officer. ICE will also provide a copy of the authorization letter to the LEA. ICE will also execute ICE Form 70-006, Designated Immigration Officer. Only those certified LEA personnel who receive authorization letters and ICE Form 70-006 issued by ICE and whose immigration enforcement efforts are overseen by ICE may conduct immigration officer functions described in this MOA.

Along with the authorization letter and ICE Form 70-006, ICE will issue the certified LEA personnel official immigration officer credentials. Participating LEA personnel shall carry their ICE-issued credentials while performing immigration officer functions under this MOA. Such credentials provided by ICE shall remain the property of ICE and shall be returned to ICE upon termination of this agreement, when a participating LEA employee ceases his/her participation, or when deemed necessary by the FOD.

Authorization of participating LEA personnel to act pursuant to this MOA may be withdrawn at any time and for any reason by ICE and must be memorialized in a written notice of withdrawal identifying an effective date of withdrawal and the personnel to whom the withdrawal pertains. Such withdrawal may be effectuated immediately upon notice to the LEA. The LEA and the FOD will be responsible for notification of the appropriate personnel in their respective agencies. The termination of this MOA shall constitute immediate revocation of all immigration enforcement authorizations delegated hereunder.

The LEA will make every attempt, where practicable, to provide ICE with a 90 day notice if participating LEA personnel cease their participation in the program, so that appropriate action can be taken in accordance with ICE policies, including inventorying and retrieval of credentials, and training replacement personnel as needed.

**E. COSTS AND EXPENDITURES**

The LEA is responsible for personnel expenses, including, but not limited to, salaries and benefits, local transportation, and official issue material. ICE will provide instructors and training materials. The LEA is responsible for the salaries and benefits, including any overtime, of all of its personnel being trained or performing duties under this MOA and of those personnel performing the regular functions of the participating LEA personnel while they are receiving training. The LEA will cover the costs of all LEA personnel's travel, housing, and per diem affiliated with the training required for participation in this MOA. ICE is responsible for the salaries and benefits of all of its personnel, including instructors and supervisors.

If ICE determines the training provides a direct service for the Government and it is in the best interest of the Government, the Government may issue travel orders to selected personnel and reimburse travel, housing, and per diem expenses only. The LEA remains responsible for paying salaries and benefits of the selected personnel.

The LEA is responsible for providing all administrative supplies (e.g. printer toner) necessary for normal office operations. The LEA is also responsible for providing the necessary security equipment, such as handcuffs, leg restraints, etc.

**F. ICE SUPERVISION**

Immigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized to perform immigration officer functions except when working under the supervision or direction of ICE. Additional supervisory and administrative responsibilities are specified in Appendix A.

The actions of participating LEA personnel will be reviewed by ICE officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for individual training or guidance.

For purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only to immigration enforcement functions as authorized in this MOA. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these delegated authorities under this MOA shall be DHS and ICE policies and procedures. ICE is responsible for providing the LEA with the

applicable DHS and ICE policies. However, when engaged in immigration enforcement activities, no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law.

If a conflict arises between an order or direction of an ICE officer or a DHS or ICE policy and the LEA's rules, standards, or policies, the conflict shall be promptly reported to the points of contact in Section VII. who shall attempt to resolve the conflict.

## G. INTERPRETATION SERVICES

Participating LEA personnel will provide an opportunity for aliens with limited English language proficiency to request an interpreter. Qualified foreign language interpreters will be provided by the LEA, as needed.

The LEA will maintain a list of qualified interpreters or companies it contracts with to provide such interpreters. A qualified interpreter, which may include LEA personnel, means an interpreter who can interpret effectively, accurately, and impartially, using any specialized vocabulary. If an interpreter is used when a designated officer is performing functions under this MOA, the interpreter must be identified, by name, in records by annotating on the Warrant for Arrest of Alien or the Warrant of Removal/Deportation.

## H. LIABILITY AND RESPONSIBILITY

Except as otherwise noted in this MOA or allowed by Federal law, and to the extent required by 8 U.S.C. § 1357(g)(7) and (8), the LEA will be responsible and bear the costs of participating LEA personnel with regard to their property or personal expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating LEA personnel will be treated as Federal employees only for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. *See* 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. In addition, it is the understanding of the parties to this MOA that participating LEA personnel will enjoy the same defenses and immunities from personal liability for their in-scope acts that are available to ICE officers based on actions conducted in compliance with this MOA. *See* 8 U.S.C. § 1357(g)(8).

Participating LEA personnel named as personal-capacity defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice. *See* 28 C.F.R. § 50.15. Absent exceptional circumstances, such requests must be made in writing. LEA personnel who wish to submit a request for representation shall notify the local ICE Office of the Chief Counsel at 250 Delaware Avenue, Suite 773, Buffalo, NY 14202 . The Office of the Chief Counsel in turn will notify the ICE Headquarters Office of the Principal Legal Advisor (OPLA), which will assist LEA personnel with the request for representation, including the appropriate forms and instructions. Unless OPLA concludes that representation clearly is unwarranted, it will forward the request for representation, any supporting documentation, and an advisory statement opining whether: 1) the requesting individual was acting within the scope of his/her authority under 8 U.S.C. § 1357(g); and, 2) such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Tort Litigation Section, Civil Division, Department of Justice (DOJ). Representation is granted at the discretion of DOJ; it is not an entitlement. *See* 28 C.F.R. § 50.15.

The LEA agrees to cooperate with any Federal investigation related to this MOA to the full extent of its available powers, including providing access to appropriate databases, personnel, individuals in custody and documents. Failure to do so may result in the termination of this MOA. Failure of any participating LEA employee to cooperate in any Federal investigation related to this MOA may result in revocation of such individual's authority provided under this MOA. The LEA agrees to cooperate with Federal personnel conducting reviews to ensure compliance with the terms of this MOA and to provide access to appropriate databases, personnel, and documents necessary to complete such compliance review. It is understood that information provided by any LEA personnel under threat of disciplinary action in an administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with *Garrity v. New Jersey*, 385 U.S. 493 (1967), and its progeny.

As the activities of participating LEA personnel under this MOA are undertaken under Federal authority, the participating LEA personnel will comply with Federal standards and guidelines relating to the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny, which govern the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

The LEA and ICE are each responsible for compliance with the Privacy Act of 1974, 5 U.S.C. §552a, DHS Privacy Act regulations, 6 C.F.R. §§ 5.20-5.36, as applicable, and related system of records notices with regard to data collection and use of information under this MOA.

## I. CIVIL RIGHTS STANDARDS

Participating LEA personnel are bound by all Federal civil rights laws, regulations, and guidance relating to non-discrimination, including the U.S. Department of Justice "Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity," dated December 2014, Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency," (Aug. 2000), Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000 et seq., which prohibits discrimination based upon race, color, or national origin (including limited English proficiency) in any program or activity receiving Federal financial assistance, Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination based on disability and requires the LEA to provide effective communication to individuals with disabilities, and Title II of the Americans with Disabilities Act of 1990, which also prohibits discrimination based on disability and requires the LEA to provide effective communication to individuals with disabilities.

## V. REPORTING AND DOCUMENTATION

### A. COMPLAINT PROCEDURES

The complaint reporting procedure for allegations of misconduct by participating LEA personnel, including activities undertaken under the authority of this MOA, is included in Appendix B.

### B. COMMUNICATION

The FOD (or the FOD's management representative) and the LEA shall make every effort to meet at least annually to ensure compliance with the terms of this MOA. When necessary, ICE and the LEA may limit the participation of these meetings in regard to non-law enforcement personnel. The attendees will meet at locations to be agreed upon by the parties, or via teleconference. An

initial review meeting between ICE and the LEA should be held within approximately 12 months of the MOAs operational date.

## C. RELEASE OF INFORMATION TO THIRD PARTIES

The LEA may, at its discretion, communicate the substance of this agreement to organizations and groups expressing an interest in the law enforcement activities to be engaged in under this MOA. It is the practice of ICE to provide a copy of this MOA, only after it has been signed, to requesting media outlets; the LEA is authorized to do the same.

The LEA hereby agrees to coordinate with ICE prior to releasing any information relating to, or exchanged under, this MOA. For releases of information to the media, the LEA must coordinate in advance of release with the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval prior to any release. The points of contact for ICE and the LEA for this purpose are identified in Appendix C. For releases of information to all other parties, the LEA must coordinate in advance of release with the FOD or the FOD's representative.

Information obtained or developed as a result of this MOA, including any documents created by the LEA that contain information developed or obtained as a result of this MOA, is under the control of ICE and shall not be disclosed unless: 1) permitted by applicable laws, regulations, or executive orders; and 2) the LEA has coordinated in advance of release with (a) the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval, prior to any release to the media, or (b) an ICE officer prior to releases to all other parties. LEA questions regarding the applicability of this section to requests for the release of information shall be directed to an ICE officer.

Nothing herein limits LEA's compliance with state public records laws regarding those records that are solely state records and not ICE records.

## VI. MODIFICATIONS TO THIS MOA

Modifications to this MOA must be proposed in writing and approved and signed by both parties. Modification to Appendix A shall be done in accordance with the procedures outlined in the SOP.

## VII. POINTS OF CONTACT

ICE and the LEA points of contact (POCs) for purposes of this MOA are:
For the LEA: Broome County Sheriff's Office, Sheriff
For DHS: Buffalo Field Office, Field Office Director

## VIII. EFFECTIVE DATE AND TERMINATION OF THIS MOA

This MOA becomes effective upon signature of both parties and will remain in effect until either party, upon 90-day written notice to the other party, provides notice of termination or suspension of the MOA. A termination or suspension notice by ICE shall be delivered personally or by certified or registered mail to the LEA and termination or suspension shall take effect 90-days after receipt of such notice, unless exigent circumstances involving public safety dictate otherwise. Notice of termination or suspension by the LEA shall be given to the FOD and termination or suspension shall take effect 90-days after receipt of such notice, unless exigent circumstances involving public safety dictate otherwise.

This MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents it is fully authorized to enter into this MOA, accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law.

**For the LEA:**

Date: 3.7.2025

Signature: [signature]

Name: Frederick J. Akshar II

Title: Sheriff

Agency: Broome County Sheriff's Office

**For ICE:**

Date: March 10, 2025

Signature: [signature]

Name: Todd M. Lyons

Title: Acting Director

Agency: U.S. Immigration and Customs Enforcement

## APPENDIX A
## STANDARD OPERATING PROCEDURES (SOP)

The purpose of this appendix is to establish standard, uniform procedures for the implementation and oversight of the program within the FOD area of responsibility. This appendix can be modified only in writing and by mutual acceptance of ICE and the LEA.

Pursuant to this MOA, the LEA has been delegated authorities as outlined below. This MOA is designed to facilitate the custodial transfer of designated aliens in LEA's jail/correctional facilities to ICE within 48 hours of alien's release from criminal custody.

**Authorized Functions:**

Participating LEA personnel are only delegated the two authorities listed below:

- The power and authority to serve and execute warrants of arrest for immigration violations, 8 U.S.C. § 1357(a) and 8 C.F.R. § 287.5(e)(3), on designated aliens in LEA jail/correctional facilities at the time of the alien's scheduled release from criminal custody in order to transfer custody of the alien to ICE; and

- The power and authority to serve warrants of removal, 8 U.S.C. § 1357(a) and 8 C.F.R. §§ 241.2(b)(2), 287.5(e)(3), on designated aliens in LEA jail/correctional facilities at the time of the alien's scheduled release from criminal custody that executes the custodial transfer of the alien to ICE for removal purposes.

Upon transfer of the alien's custody to ICE, the alien will continue to be held in the LEA's jail/correctional facilities for no more than 48 hours unless there exists an agreement pursuant to which the LEA will continue to detain, for a reimbursable fee, aliens for immigration purposes. In the absence of an agreement, if the alien is not transferred to an ICE field office or an immigration detention facility within 48 hours, the alien shall be released from the LEA jail/correctional facility.

**Additional Supervisory and Administrative Responsibilities:**

The above immigration enforcement functions conducted by the participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized to perform immigration officer functions except when working under the supervision or direction of ICE. Additional supervisory and administrative responsibilities for each entity include, but are not limited to:

- The LEA shall provide notification to the ICE officer immediately after participating LEA personnel serve any warrant of arrest or warrant of removal that executes the custodial transfer of the alien to ICE for removal purposes, in a manner mutually agreed upon by the LEA and the FOD.

- Participating LEA personnel must report all encounters with asserted or suspected claims of U.S. citizenship to ICE immediately, but generally within one hour of the claim.

## APPENDIX B
## COMPLAINT PROCEDURE

The training, supervision, and performance of participating LEA personnel pursuant to the MOA, as well as the protections for U.S. citizens' and aliens' civil and constitutional rights, are to be monitored. Part of that monitoring will be accomplished through the complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

If any participating LEA personnel are the subject of a complaint or allegation involving the violation of the terms of this MOA or a complaint or allegation of any sort that may result in that individual receiving professional discipline or becoming the subject of a criminal investigation or civil lawsuit, the LEA shall, to the extent allowed by State law, make timely notification to an ICE officer within 48 hours, excluding weekends, of the existence and nature of the complaint or allegation. The results of any internal investigation or inquiry connected to the complaint or allegation and the resolution of the complaint shall also be reported to an ICE officer, as established by ICE. It is the responsibility of the ICE officer to ensure notification is made to the ICE Office of Professional Responsibility (OPR) at **ICEOPRIntake@ice.dhs.gov**.

The LEA will also handle complaints filed against LEA personnel who are not designated and certified pursuant to this MOA but are acting in immigration functions in violation of this MOA. Any such complaints regarding non-designated LEA personnel acting in immigration functions must be forwarded to the ICE officer within 48 hours of the LEA receiving notice of the complaint. It is the responsibility of the ICE officer to ensure notification is made to OPR.

287(g) Complaint Process posters will be displayed in the processing areas of the LEA to ensure aliens encountered under the 287(g) Program are aware of the complaint process. Posters will be displayed in English and Spanish. If the alien understands a language other than English or Spanish or is unable to read, LEA personal will read and/or translate the complaint process in a language the alien understands.

## APPENDIX C
## PUBLIC INFORMATION POINTS OF CONTACT

Pursuant to Section V(D) of this MOA, the signatories agree to coordinate appropriate release of information to the media, provided the release has been previously approved by both the ICE Privacy Officer and Public Affairs Officer, regarding actions taken under this MOA before any information is released. The points of contact for coordinating such activities are:

For the LEA:

Broome County Sheriff's Office
Communications Director
155 Lt. Van Winkle Drive
Binghamton, NY 13905
607-778-2437

For ICE:

Public Affairs Office
Office of Public Affairs and Internal Communication
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Washington, DC 20536
202-732-4242

# Declaration of Sheriff Akshar

# Exhibit C

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

# EXECUTIVE LAW § 63-E(3) INVESTIGATIVE DEMAND FOR DOCUMENTS
# THE PEOPLE OF THE STATE OF NEW YORK

**TO**: Sheriff Akshar II
Broome County Sheriff's Office
Public Safety Facility, 155 Lt. VanWinkle Drive
Binghamton, NY 13905

***Via Email***

**PLEASE TAKE NOTICE** that the Attorney General is conducting an investigation pursuant to New York Executive Law § 63-E(3) and has reasonable cause to believe that the Broome County Sheriff's Office has information relevant to that investigation.

**THEREFORE**, pursuant to Executive Law § 63-E(3)(iv), we command you or a designated agent, all business and excuses being laid aside, to produce, at the offices of Letitia James, Attorney General of the State of New York, 28 Liberty, 20th Floor, New York, New York, 10005, on or before August 25, 2026, the following documents that are within your possession, custody, or control or possession, custody or control of your agents or attorneys, subject to the instructions, definitions and relevant time period set forth below.

**PLEASE TAKE FURTHER NOTICE** that the Broome County Sheriff's Office shall preserve all documents relating to the subject matter of this Demand, including all documents concerning the specific documents demanded herein.

## Definitions

1. "Communication" means any conversation, discussion, letter, email, text message, postings or messages on any social media platform, memorandum, meeting, note or other transmittal of information or message, whether transmitted in writing, orally, electronically or by any other means, and shall include any Document that abstracts, digests, transcribes, records or reflects any of the foregoing.

2. "Document" means any written, recorded, printed, imprinted, digitized, or graphic matter, whether an original, a draft, or a copy, whether produced, reproduced, or stored on papers, cards, tapes, belts, computer devices, and each and every tangible thing from which information can be processed or transcribed, such as tape or other electronic data communications. The term includes, but is not limited to, letters, memoranda, notes,

instructions, reports, analyses, faxes, telexes, diaries, calendars, studies, logs, journals, books, notebooks, plans, records, forms, charts, graphs, recordings, photographs (positive prints and negatives), slides, work-sheets, customer checks, credit card charge slips, computation sheets, computer printouts and programs, voice mail, web site and e-mail tapes, discs, microfilm, microfiche, any marginal comments appearing on any document, and copies of documents which are not identical duplications of the originals (e.g., because handwritten or "blind" copy notes appear thereon or are attached thereto).

3. "2025 ICE MOA" means the Memorandum of Agreement entered into by Broome County Sheriff's Office and U.S. Immigration and Customs Enforcement (ICE) in March 2025.

4. "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

5. "All" means "any and all" and "any" means "any and all."

6. "Including" means without limitation.

7. "Concerning" means relating to, referring to, describing, evidencing, regarding or constituting.

8. The use of a verb in any tense shall be construed as the use of that verb in all other tenses, wherever necessary to bring within the scope of the document request all responses which might otherwise be construed to be outside its scope.

9. The singular of any word includes the plural; the plural of any word includes the singular.

## Time Period

The relevant time period for this Demand is from May 1, 2026, until the present unless otherwise indicated.

## Instructions

1. Continuing Obligation to Produce. This Demand imposes a continuing obligation to produce the Documents and information requested. Documents located, and information learned or acquired, at any time after your response is due shall be promptly produced at the place specified in this Demand.

2. Preservation of Relevant Documents and Information: Spoliation. Please preserve Documents and information relevant or potentially relevant to this request from destruction or loss. Your duty to preserve such documents for litigation or investigation supersedes any data retention policy to the contrary. The destruction of any and all information raises a presumption that disclosure of materials would be damaging.

3. Demand Modifications. No agreement, written or otherwise, purporting to modify, limit, or otherwise vary the terms of this Demand, shall be construed in any way to narrow, qualify, eliminate, or otherwise diminish your aforementioned preservation obligations. Nor shall you act, in reliance upon any such agreement or otherwise, in any manner inconsistent with your preservation obligations under law. No agreement purporting to modify, limit, or otherwise vary your preservation obligations under law shall be construed as in any way narrowing, qualifying, eliminating, or otherwise diminishing such aforementioned preservation obligations, nor shall you act in reliance upon any such agreement, unless an Assistant Attorney General, Deputy Bureau Chief, or Chief in the Office of the New York State Attorney General (OAG) confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

4. No Oral Modification. No agreement purporting to modify, limit, or otherwise vary this Demand shall be valid or binding, and you shall not act in reliance upon any such agreement, unless an Assistant Attorney General, Deputy Bureau Chief, or Chief in the OAG confirms or acknowledges such agreement in writing or makes such agreement a matter of record in open court.

5. Possession, Custody, and Control. This Demand calls for all responsive Documents or information in your possession, custody, or control. This includes, without limitation, Documents or information possessed or held by any present or former officers, directors, employees, agents, representatives, divisions, affiliates, subsidiaries, or Persons from whom you could request Documents or information. If Documents or information responsive to a request in this Demand are in your control, but not in your possession or custody, you shall promptly identify the Person with possession or custody.

6. No Documents Responsive to Demand. If there are no Documents responsive to any particular document request set forth below, you shall so state in writing, identifying the paragraph number(s) of the Demand concerned.

7. Existing Organization of Documents to be Preserved. Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization, or other order or layout in which it was maintained before production in the ordinary course of business, including but not limited to, production of any Document or other material indicating filing or other organization. Such production shall include without limitation any file folder, file jacket, cover, or similar organizational material, as well as any folder bearing any title or legend that contains no Document. Likewise, all Documents that are physically attached to each other in your files shall remain so attached in any production; or if such production is electronic, shall be accompanied by notation or information sufficient to indicate clearly such physical attachment.

8. Privilege. If you withhold any Document responsive to this Demand on the ground of privilege or other legal doctrine, you shall submit with the Documents produced a statement in writing under oath that:

    a. specifies the privilege or other asserted basis for withholding the document;

b. describes the nature and general topic or subject matter of the document;

c. identifies the persons who prepared the document and any persons to whom the document was sent or disclosed;

d. identifies any persons who have seen or had possession of the document; and,

e. specifies the dates on which the document was prepared, transmitted and received.

9. Documents No Longer in Your Possession. If any Document requested herein was formerly in your possession, custody, or control but is no longer available, or no longer exists, you shall submit a statement in writing under oath that:

a. describes in detail the nature of such Document and its contents;

b. identifies the Person who prepared the Document and any persons to whom the document was sent or disclosed;

c. identifies all Persons who have seen or had possession of such Document;

d. specifies the date on which such Document was prepared, transmitted, and received;

e. specifies the date on which the document was unavailable, lost, or destroyed and specifies the reason why such Document is unavailable, including without limitation whether it was misplaced, lost, destroyed, or transferred, and if such Document has been destroyed or transferred, the conditions of and reasons for such destruction or transfer and the identity of the Persons requesting and performing such destruction or transfer; and identifies all Persons with knowledge of any portion of the contents of the Document.

10. Cover Letter. Accompanying any production made pursuant to this Demand, you shall include a cover letter that shall at a minimum provide an index containing:

a. a description of the type and content of each Document produced therewith;

b. the paragraph number of any Demand requests to which each such Document is responsive; and

c. the identity of any Custodian of each such Document.

**Document Requests**

**YOU ARE HEREBY REQUIRED TO PRODUCE**, at the time and place aforesaid, originals or true copies of the following materials:

1. Documents sufficient to show what action(s) Broome County Sheriff’s Office (BCSO), or any agent thereof, has taken to terminate the 2025 ICE MOA.

**WITNESS**, **the Honorable Letitia James**, Attorney General of the State of New York, August 19, 2026.

LETITIA JAMES
Attorney General of the State of New York

By: ______________________________

Zoe Levine
Interim Bureau Chief
Office of Immigrant Trust
New York State Office of the Attorney General
28 Liberty Street, New York, NY 10005

# Declaration of Sheriff Akshar

# Exhibit D

**BROOME COUNTY SHERIFF'S OFFICE**

**Sheriff Frederick J. Akshar II** **Undersheriff Sammy L. Davis**

**155 Lt. Van Winkle Drive, Binghamton, NY 13905**

August 20, 2026

Buffalo Field Office Acting Director Philip Rhoney
U.S. Immigration and Customs Enforcement (ICE)
250 Delaware Avenue, 7th Floor
Buffalo, New York 14202

Re: Notice of Termination – WSO Program Memorandum of Agreement

Dear Acting Director Rhoney:

This letter serves as formal notification that, by operation of law following the passage of New York's "Local Cops, Local Crimes Act of 2026," our 2025 MOA regarding the Warrant Service Officer program is terminated effective August 25, 2026.

Despite the prevailing political winds and statutory restrictions against our participation in federal immigration enforcement programs, the Broome County Sheriff's Office remains resolute in its unwavering commitment to public safety and protecting and serving the people of Broome County.

I, along with several fellow sheriffs across the state, strongly object to this unconstitutional statute and look forward to taking legal action in the coming days to challenge and ultimately overturn this egregious act of government overreach.

I'd respectfully ask that you confirm receipt of this letter at your earliest convenience.

Best wishes,

FREDERICK J. AKSHAR II
Broome County Sheriff

cc: Deputy Field Operations Director Stephen J. Kurzdorfer