UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

KYLE BOURGAULT, in his official capacity as Sheriff of Rensselaer County, New York *et al.*,

Plaintiffs,

v.

KATHY HOCHUL, in her official capacity as Governor of the State of New York *et al.*,

Defendants.

No. 26-cv-1637 (MAD/ML)

**STATE DEFENDANTS' MEMORANDUM OF LAW IN RESPONSE TO THE ORDER TO SHOW CAUSE**

LETITIA JAMES
Attorney General
State of New York
The Capitol
Albany, New York 12224
*Attorney for State Defendants*

Arastu K. Chaudhury
Special Counsel
*Of Counsel*

# Table of Contents


PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................... 2

STANDARD OF REVIEW ............................................................................................... 3

ARGUMENT ..................................................................................................................... 5

I. PLAINTIFFS CANNOT SUCCEED ON THE MERITS ................................................ 5

A. Plaintiffs Lack Capacity to Bring These Claims Against the State ............................... 5

i. Plaintiffs have no proprietary interest in a specific fund of moneys .......................... 7

ii. The Termination Act is a general law that complies with the State Constitution's Home Rule provisions........................................................................................ 9

iii. Plaintiffs are not confronted with a dilemma creating capacity ..............................11

iv. Plaintiffs' status as state constitutional officers confers no capacity to sue here..... 12

B. Plaintiffs Cannot Succeed on their Contract Clause Claim ........................................ 14

i. Plaintiffs fail to provide any reason to deviate from the Court's prior legitimate public purpose analysis ......................................................................... 15

ii. Plaintiffs identify no other reason this Court should not defer to the State's means of effecting its public purpose ......................................................................... 17

iii. Plaintiffs are unlikely to show a severe impairment of a contractual right ............. 19

C. Plaintiffs' Preemption and Supremacy Clause Claims Also Fail. ............................... 21

II. PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM ............................................. 22

III. THE PUBLIC INTEREST FAVORS THE STATE....................................................... 23

CONCLUSION................................................................................................................. 25

## Table of Authorities

**Cases** **Pages**

*A.H. by & through Hester v. French*,
985 F.3d 165 (2d Cir. 2021)....................4, 23

*All. Of Am. Ins. v. Cuomo*,
854 F.2d 591 (2d Cir. 1988)....................14

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978)....................20

*Antonyuk v Hochul*,
635 F. Supp. 3d 111 (N.D.N.Y. 2022)....................3

*Aristy-Farer v. State*,
143 A.D.3d 101 (1st Dept. 2016).................... 7-9

*Beal v. Stern*,
184 F.3d 117 (2d Cir. 2999)....................20

*Board of Educ. of Roosevelt Union Free School Dist. v. Board of Trustees of State University of New York*,
282 A.D.2d 166 (3d Dep't 2001)....................8

*Buffalo Teachers Fed'n v. Tobe*,
464 F.3d 362 (2d Cir. 2006) (discussing *Local Div. 589,* 666 F.2d at 642)....................18

*Cayuga Cty. v. McHugh*,
4 N.Y.2d 609 (1958)....................12

*City of New York v. State*,
86 N.Y.2d 286 (1995).................... *passim*

*Clarke v. Town of Newburgh*,
45 N.Y.3d 428 (2025)....................6, 11

*Colon de Mejias v. Lamont*,
963 F.3d 196 (2d Cir. 2020).................... 19-20

*Community Bd. 7 v. Schaffer*,
84 N.Y.2d 148 (1999)....................7

*Comstock v. New York State*,
No. 3:23-CV-907 (BKS/ML), 2024 WL 3091884 (N.D.N.Y. June 21, 2024)....................14

*CRP/Extell Parcel I, L.P. v. Cuomo*,
394 F. App'x 779 (2d Cir. 2010) ....................24

*Cty. of Albany v. Hooker*,
204 N.Y. 1 (1912) ....................6, 7

*Cty. of Onondaga v. State*,
238 A.D.3d 1535 .................... 9-10

*Cty. of Resnsselaer v. Regan*,
173 A.D.2d 37 (3d Dep't 1991) ....................8

*Cty. of Seneca v. Eristoff*,
43 A.D.3d 950 (3d Dep't 2008) .................... 8-9

*Doe v. New York University*,
666 F.2d 761 (2d Cir. 1981)....................20

*Donohue v. Cuomo*,
980 F.3d 53 (2d Cir. 2020)....................20

*Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*,
459 U.S. 400 (1983)....................14, 16, 19, 21

*Enstrom v. City of New York*,
258 A.D. 672 (2d Dep't 1940) ....................13

*Faiveley Transportation Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009)....................23

*Floyd v. N.Y. State Urban Dev. Corp.*,
33 N.Y.2d 1 (1973) ....................10

*Genesee Cty. v. State*,
240 A.D.3d 1338 (3d Dep't 2025) .................... 7-9

*Grand River Enterprise Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007).................... 23-24

*Hartford Courant Co., LLC v. Carroll*,
986 F.3d 211 (2d Cir. 2021)....................4

*Jolly v. Coughlin*,
76 F.3d 468 (2d Cir. 1996)....................4

*Liquifin Aktiengesellschaft v. Brennan*,
446 F. Supp. 914 (S.D.N.Y. 1978) ....................13

*Local Div. 589, Amalgamated Transit Union v. Massachusetts*,
666 F.2d 618 (1st Cir. 1981) .......... 18

*Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.*,
30 N.Y.3d 377 (2017) .......... 6

*McGowan v. Burstein*,
71 N.Y.2d 729 (1988) .......... 10

*McHenry Cty. v. Raoul*,
44 F.4th 581 (7th Cir. 2022) .......... 17

*McNulty v. Chinlund*,
62 A.D.2d 682 (3d Dep't 1987) .......... *passim*

*Moore v. Consolidated Edison of N.Y.*,
409 F.3d 506 (2d Cir. 2005) .......... 24

*Murphy v. NCAA*,
548 U.S. 453 (2018) .......... 22

*New York v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) .......... 4

*New York v. Lawrence*,
250 N.Y. 429 (1929) .......... 6

*New York v. United States*,
505 U.S. 144 (1992) .......... 22

*Nixon v. Missouri Municipal League*,
541 U.S. 125 (2004) .......... 17

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 4

*Pennhurst State School & Hosp. v. Halderman*,
465 U.S. 89 (1984) .......... 5, 14

*People ex rel. McEwen v. Keeler*,
64 How. Pr. 478 (Sup Ct. Gen Term 1883) .......... 13

*People ex rel. Wogan v. Rafferty*,
208 N.Y.451 (1913) .......... 12-13

*People v. Viviani*,
36 N.Y.3d 564 (2021) .......... 12-13

*Printz v. United States*,
521 U.S. 898 (1997)....................17, 22

*Robertson v. Zimmermann*,
268 N.Y. 52 (1935) ....................6

*Silver v. Pataki*,
96 N.Y.2d 532 (2001) ....................6

*Sveen v. Melin*,
584 U.S. 811 (2018)....................20

*Sullivan v. Nassau Cnty. Interim Fin. Auth.*,
959 F.3d 54 (2d Cir. 2020)....................18

*Toia v. Regan*,
54 A.D.2d 46 (4th Dep't 1976)....................10

*Tough Traveler, Ltd, v. Outbound Products*,
60 F.3d 964 (2d Cir. 1995)....................23

*Town of Moreau v. Cty. of Saratoga*,
142 A.D.2d 864 (3d Dep't 1988) .................... 7-9

*United States v. New York*.
1:26-cv-1360, 2026 WL 2225423 (N.D.N.Y. Aug. 3, 2026).................... *passim*

*United States v. Virginia*,
3:26-cv-00545-REP, Dkt. 103 (E.D. Va. Sept. 3, 2026).................... 16-17

*U.S. Tr. Co. v. New Jersey*,
431 U.S. 1 (1977)....................17

*Weiner v. McGraw-Hill, Inc.*,
57 N.Y.2d 458 (1982) .................... 19-20

*Williams v. Baltimore*,
289 U.S. 36 (1933).................... 5-6, 22

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008).................... 3-4

*Ysursa v. Pocatello Education Ass'n*,
555 U.S. 353 (2009)....................22

## U.S. Constitution

Tenth Amendment ....................,17, 22

Eleventh Amendment ............ 14

**New York Constitution**

Article IX. ............ 10

Article XIII ............ 13

**State Statutes**

Civil Rights Law
§ 28 (known as the "Protect Our Courts Act," enacted in 2020) ............ 15

Executive Law
§ 170-k(2)(a) ............ 2, 10, 13, 20
§ 170-k(7) ............ 3, 23

Judiciary Law
§§ 400-411-b ............ 14

Corrections Law
§ 500-c ............ 9, 14, 21

County Law
§ 217 ............ 9, 14
§§ 650-662 ............ 14

Ch. 55, part LL, 2026 N.Y. Laws ............ 2

**Federal Statutes**

8 U.S.C.
§ 1103(a) ............ 3
§ 1231(g) ............ 3, 21
§ 1357(g) ............ *passim*

**State Regulations**

9 N.Y.C.R.R.
§ 8.170 (2017) ............ 15

**Rules**

Fed. R. Civ. P. 17(b)(3) ............ 6

Defendants the State of New York, Governor Kathy Hochul, and Attorney General Letitia James, the latter two sued in their official capacities (collectively, the "State Defendants"), respectfully submit this memorandum of law, with the accompanying Declaration of Arastu K. Chaudhury, dated September 9, 2026 ("Chaudhury Declaration"), and its attached exhibits, in response to the Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction.

## PRELIMINARY STATEMENT

The clearest reason to deny preliminary relief here is simple: this Court already denied a substantively identical motion in its comprehensive decision in *United States v. New York*. 1:26-cv-1360, 2026 WL 2225423, at *19-23 (N.D.N.Y. Aug. 3, 2026). This Court addressed nearly identical Contracts Clause, Supremacy Clause, and preemption claims in that related action, and Plaintiffs' Complaint and Declarations here add nothing to warrant deviating from that decision. However, the Court need not reach even the merits of Plaintiffs' motion because under well-established law grounded in both the Federal and State Constitutions, Plaintiffs have no *capacity* to contest, let alone contravene, the "Local Cops, Local Crimes" Act, a duly enacted general law that expresses the State Legislature's policy judgment regarding the appropriate use of local resources and authority. No level of disagreement with that policy gives Plaintiffs the power to sue the State.

Plaintiffs' arguments to the contrary fundamentally misunderstand New York's constitutional structure and their role in it. Nothing in the New York Constitution prohibits the State from regulating county sheriffs and the use of county resources; indeed, New York's constitution confirms the Legislature's primacy and authority to regulate state and local officers, including sheriffs. Plaintiffs' effort to invert this structure through an unprecedented and

unsupported theory of reverse-commandeering is unpersuasive. Plaintiffs make these arguments without also showing irreparable harm flowing from the challenged statute or explaining why their policy preference warrants this Court overriding the State Legislature's routine exercise of control over its officers and political subdivisions. This Court should deny the requested preliminary relief.

## BACKGROUND

In May 2026, the New York Legislature enacted a series of laws aimed at protecting New York residents and state resources. *See* Ch. 55, part LL, 2026 N.Y. Laws; *see also* Chaudhury Decl. Ex. A (Governor's Program Bill 2026 Memo.). The case concerns portions of the Budget Bill that added Sections 170-k and 63-e to the New York Executive Law. The latter provision creates the Office of Immigrant Trust in the New York State Attorney General's Office, which, *inter alia*, has authority to enforce Section 170-k.

At issue in this motion is the former, specifically Section 170-k(2) (the "Termination Act"), which provides that the State and its subdivisions, including local governments, law enforcement agencies, and detention facilities may not "enter into, modify, renew, remain in, or extend" any "agreement pursuant to section 287(g) of the Immigration and Nationality Act [INA]" to provide assistance to federal authorities with immigration enforcement.[1] Exec. Law § 170-k(2)(a)(i). That includes "any formal or informal agreement under which an officer or employee [of a state or local government entity] may engage in or assist immigration enforcement, or otherwise may perform a function of an immigration officer." *Id*. The provision also provides the same proscription for "any contract, intergovernmental service agreement, or any other formal or informal agreement to

[1] Section 287(g) of the INA, codified at 8 U.S.C. § 1357(g), permits, but does not require, state and local officers to enter into agreements with the federal government to assist with federal immigration enforcement "to the extent consistent with state and local law." 8 U.S.C. § 1357(g)(9); *see also, generally* Albany Law School, ICE and Local Law Enforcement: 287(g): An Explainer, https://tinyurl.com/4pyxsukb.

house or detain individuals for federal civil immigration violations, including, but not limited to, agreements entered into pursuant to 8 U.S.C. § 1103(a) or § 1231(g)."[2] *Id.* § 170-k(2)(a)(ii). The Termination Act deems any such agreement not "consistent with state law[.]" Id. § 170-k(7)(a).

The challenged provisions of the Executive Law voids the covered agreements in their entireties as of August 25, 2026, and directs local entities with any such agreements to terminate them. *Id.* § 170-k(7). State and local entities with intergovernmental service ("IGS") agreements to house civil immigration detainees have an additional three months to complete the termination process before those agreements are deemed void and unenforceable. *Id.* The statute does not affect IGS agreements to house federal *criminal* detainees.

Plaintiffs filed the instant Complaint and Emergency Motion for an Order to Show Cause on August 25, 2026, after the Termination Act went into effect. *Compare* Dkt. 1 ("Compl.") (filed Aug. 25, 2026) *with* Exec. Law § 170-k(7) (eff. date Aug. 25, 2026). Plaintiffs challenge the Termination Act, seek to enjoin its operation, and prohibit the Office of Immigrant Trust from subpoenaing information or otherwise enforcing the Termination Act. *See* Dkt. 5-2 ("Pls.' Br.") 23-24. Plaintiffs only challenge Section 63-e and the Office of Immigrant Trust derivatively: its challenged enforcement powers rise and fall with the validity of the Act. *See* Compl. ¶¶ 196-198.

## STANDARD OF REVIEW

Injunctive relief, such as the preliminary injunction sought by Plaintiffs here,[3] is "an extraordinary remedy *never* awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (emphasis added). Specifically, the movant bears the burden of establishing, by

[2] 8 U.S.C. §§ 1103(a) and 1231(g) authorize the U.S. Attorney General or Secretary of Homeland Security to enter into agreements regarding federal immigration detention.

[3] While Plaintiffs' papers are unclear as to whether they seek a Temporary Restraining Order or a Preliminary Injunction, or both, the applicable standard for either type of relief is the same. *See, e.g.*, *Antonyuk v Hochul*, 635 F. Supp. 3d 111, 124 (N.D.N.Y. 2022).

clear and convincing evidence, that (a) it is likely to succeed on the merits; (b) it is likely to suffer irreparable harm in the absence of preliminary relief; (c) the balance of equities tips in its favor; and (d) an injunction is in the public interest. *See Winter*, 555 U.S. at 20; *see also Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (likelihood of success on the merits is required where the movant seeks to enjoin a "government action taken in the public interest pursuant to a statutory or regulatory scheme"). Where the preliminary injunction would run against the State, the balance of the equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party"); *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021) (merging balance of equities and public interest factors where Connecticut state officials opposed a motion for a preliminary injunction).

In addition, the Second Circuit has "held the movant to a heightened standard" where (i) an injunction would alter the status quo, rather than maintaining it, or (ii) the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015); *see A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021).[4] In such cases, the movant must show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest. *See id.* (quoting *Beal v. Stern*, 184 F.3d 117, 123 (2d Cir. 1999) and *Doe v. New York University*, 666 F.2d 761, 773 (2d Cir. 1981)).

[4] The requested temporary restraining order and preliminary injunction are mandatory in nature because the challenged statutes went into effect before the Plaintiffs sought emergency relief. *See* Dkt. 1, 2, and 5.

## ARGUMENT

## I. PLAINTIFFS CANNOT SUCCEED ON THE MERITS

Plaintiffs are unlikely to succeed on the merits because under clearly established State law, the office of sheriff, as a local government entity created by State law, lacks the capacity to sue the State to challenge the validity of a duly-enacted statute, and Plaintiffs do not identify anything in the New York Constitution or its general laws that allows the sheriffs to bring this action.[5] Even if the Plaintiffs could somehow show capacity to sue, their claims fail on the merits. Plaintiffs' Contracts Clause claim is substantively identical to claim asserted by the United States in the related action, and Plaintiffs do not offer any reason for this Court to depart from its prior decision denying a preliminary injunction on that claim. *See United States v. State of New York*, 1:26-cv-1360 (MAD/ML), 2026 WL 2225423, at 19-23 (N.D.N.Y. Aug. 3, 2026). Plaintiffs also offer no basis for this Court to second-guess its prior decision on federal preemption and the Supremacy Clause, and their novel reverse-commandeering theory gets the Tenth Amendment jurisprudence and its historical underpinnings completely wrong. Thus, Plaintiffs' claims are unlikely to succeed, and the requested preliminary relief should be denied.

### A. Plaintiffs Lack Capacity to Bring These Claims.

As a threshold matter, Plaintiffs are unlikely to succeed on the merits because sheriffs, as State officers empowered solely by State law, lack the capacity to bring any suit against the State.

[5] Plaintiffs' purported injury-in-fact is to the office of the sheriff and not to the individual Plaintiffs personally. *See* Pls.' Br. 11 ("injuries are particularized to each Plaintiff in his official capacity"). As such, Plaintiffs can only have standing insofar as the Termination Act injures the office of the sheriff and State law permits them to assert a claim against the State. *See, e.g.*, *Williams v. Baltimore*, 289 U.S. 36, 40 (1933). Also, insofar as Plaintiffs are seeking to enjoin the Termination Act based on a violation of the State constitution, such injunctive relief is foreclosed by the Eleventh Amendment. *See, e.g.*, *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

Capacity is a "threshold matter," *see Silver v. Pataki*, 96 N.Y.2d 532, 537 (2001), determined by state law, *see* Fed. R. Civ. P. 17(b)(3).

It is well established that the State is the original source of sovereign authority, and that State's agencies, officers, and political subdivisions are "creatures of the State." *Clarke v. Town of Newburgh*, 45 N.Y.3d 428, 436-437 (2025). Consequently, a State's political subdivision has "no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." *Williams v. Baltimore*, 289 U.S. 36, 40 (1933); *City of New York v. State*, 86 N.Y.2d 286, 290 (1995). After all, "[j]ust as the legislature has the power to create entities to perform its functions, it has the power to change, and even destroy, those entities." *Clarke*, 45 N.Y.3d at 436-437 (quoting *City of New York*, 86 N.Y.3d at 289-90); *McNulty v. Chinlund*, 62 A.D.2d 682, 687 (3d Dep't 1987) (since State legislature conferred responsibilities to counties and sheriffs via statute it "has the power to limit, curtail or abolish them with or without the consent of the counties or the Sheriffs."). A political subdivision's "right to sue, if it exists at all, must be derived from the relevant enabling legislation or some other concrete statutory predicate." *Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.,* 30 N.Y.3d 377, 384 (2017)).

Limitations on a political subdivision's rights to sue the State are a "necessary outgrowth" of separation of powers concerns and derive from the "extreme reluctance of courts to intrude in the political relationships between the Legislature, the State and its governmental subdivisions." *City of New York*, 86 N.Y.2d at 295-96. Thus, New York State "has long followed the Federal rationale for finding that [political subdivisions and their officers] lack the capacity to bring suit to invalidate State legislation." *Id.* at 290; *see also Robertson v. Zimmermann*, 268 N.Y. 52 (1935); *New York v. Lawrence,* 250 N.Y. 429 (1929); *Cty. of Albany v. Hooker*, 204 N.Y. 1 (1912).

This rule allows for four narrow exceptions: (1) when there is express statutory authorization to bring a suit; (2) when State legislation adversely affects a political subdivision's "proprietary interest in a specific fund of moneys;" (3) when "the State statute impinges upon 'Home Rule' powers of a municipality constitutionally guaranteed under article IX of the State Constitution" or otherwise restricts the core of the agency's constitutional powers; and (4) when a political subdivision's very compliance with the State statute will force that subdivision "to violate a constitutional proscription," often called the "dilemma" exception. *City of New York*, 86 N.Y.2d at 291; *see also Community Bd. 7 v. Schaffer*, 84 N.Y.2d 148, 156 (1999).

Plaintiffs do not and cannot identify any State statute that specifically authorizes this suit, and cannot show that they have capacity under the "specific fund" exception, the "Home Rule" exception, the "dilemma" exception, or based on their status as constitutional officers.

**i. Plaintiffs have no proprietary interest in a specific fund of moneys.**

To assert capacity based on a "proprietary interest in a specific fund of moneys", a local subdivision must have a "cognizable right in a specific fund" that the challenged statute improperly displaces or alters. *City of New York,* 86 N.Y.2d at 295. The "specific fund" exception does not apply where the municipality has a 'mere hope or expectancy' of receiving funds." *Genesee Cty. v. State*, 240 A.D.3d 1338, 1339 (3d Dep't 2025) (quoting *Aristy-Farer v. State*, 143 A.D.3d 101, 110 (1st Dept. 2016)). Nor is it not enough to "assert[] a claim to a particular sum of money." *Town of Moreau v. Cty. of Saratoga*, 142 A.D.2d 864, 865 (3d Dep't 1988). Rather, the proprietary interest must relate to funds that the subdivision has "in its possession or to which it ha[s] a right to immediate possession." *Cty. of Albany,* 204 N.Y. at 16.

The fundamental purpose of the specific fund exception is to limit "dispute[s] over the appropriate amount of State aid to a governmental subdivision or the appropriate State/local mix of shared governmental expenses." *City of New York,* 86 N.Y.2d at 295. Thus, the plaintiffs must

be "vested with an entitlement to a specific fund by statute." *Town of Moreau*, 142 A.D.2d at 865 (finding a lack of capacity to sue where no statutory authorization gave town "immediate right to possess that fund" consisting of county tax revenues); *Cty. of Rensselaer v. Regan*, 173 A.D.2d 37, 40-41 (3d Dep't 1991) (finding capacity to sue because statute created special fund wholly for benefit of counties from collection of certain fines); *Cty. of Seneca v. Eristoff*, 43 A.D.3d 950, 951 (3d Dep't 2008) (finding a lack of capacity to sue where statute created a right to monies collected by the State, but no specific fund existed because the State had not actually collected any monies). And, the amounts in the specific funds must be fixed and knowable. *Arist y-Farer*, 143 A.D.3d at 110 (finding lack of capacity to sue when the allocation of funds from off-track betting was "the product of a complex formula that turns on the application of numerous variables" and whose total amount varied from year to year); *Genesee Cty.*, 240 A.D.3d at 1339 (same); *Board of Educ. of Roosevelt Union Free School Dist. v. Board of Trustees of State University of New York*, 282 A.D.2d 166, 173 (3d Dep't 2001) (same); *see also Cty. of Seneca*, 43 A.D.3d at 951.

Plaintiffs' claims do not fit within the specific fund exception and the fact that some revenue is derived through the IGS agreements does not render this exception applicable.[6] First, a sheriff has no direct proprietary interest in the revenues produced by the jails. Though sheriffs administer local jails, they do not own those jails or otherwise keep funds generated by the jail's operations: the jails belong to the relevant county, none of whom are plaintiffs in this litigation. *See* County Law § 217 (imbuing the Board of Supervisors of a County with the responsibility for the county jail); *McNulty*, 62 A.D.2d at 686-87 (counties are responsible for maintaining the jail);

[6] The specific fund exception does not apply to Plaintiffs' claims challenging the termination of their 287(g) Agreements for the additional reason that those agreements do not (and indeed cannot) provide for the payment of money to either the sheriffs or the counties they represent. *See* 8 U.S.C. § 1357(g)(1) (agreements must be "at the expense of the State or political subdivision").

N.Y. Corrections Law § 500-c (identifying the sheriff as the office with "custody of the county jail.").

Even if the Court were to ignore the distinction between sheriffs and counties, Plaintiffs still cannot establish any "cognizable right in a specific fund." *City of New York,* 86 N.Y.2d at 295. There is no state-created fund that Plaintiffs' access to which is disrupted by the Termination Act. No statute vests them with any rights to a specific stream of revenue from the operation of their jails. At most, Plaintiffs may have a claim for moneys not yet collected, consisting of lost, future revenues based on their agreements, whose amounts will vary based on the number of civil immigration detainees over any given time period. *See, e.g.*, Dkt. 5-6 (Decl. of Sheriff Akshar) at 9, Blocks 10, 11.[7] Such a claim falls wholly outside the specific fund exception to the capacity rule. *See City of New York,* 86 N.Y.2d at 295; *Town of Moreau*, 142 A.D.2d at 865; *Genesee Cty.*, 240 A.D.3d at 1339; *Aristy-Farer*, 143 A.D.3d at 110; *Cty. of Seneca*, 43 A.D.3d at 951.

**ii. The Termination Act is a general law that complies with the State Constitution's Home Rule provisions.**

While Plaintiffs raise "Home Rule" provisions of the State Constitution, they cannot identify how the Termination Act fails to comply with the State Constitution. *See* Pls.' Br. 20. Thus, the Plaintiffs lack capacity to sue under this exception and, for substantially the same reason, are unlikely to succeed on the merits of their Home Rule claim.

The State Constitution grants the State legislature "'the power to act in relation to the property, affairs or government of any local government' either by 'general law' or, under certain

[7] Each sheriff's declaration contains the same form IGS agreement, conformed to the different counties and signed at different times, attached as Exhibit A. See, e.g., Dk.t 5-6 (Ashkar Decl. Ex. A) at 9. The compensation terms are located at page 1 of the respective agreements.

circumstances, by 'special law.'"[8] *Cty. of Onondaga v. State*, 238 A.D.3d 1535, 1539 (4th Dep't), *aff'd* 44 N.Y.3d 639 (2025) (quoting N.Y. Const. Art. IX, § 2(b)(2)). A general law is a "law which in terms and in effect applies alike to all counties, all counties other than those wholly included within a city, all cities, all towns or all villages." N.Y. Const. Art. IX, § 3(d)(1). The State Legislature, "upon enactment of a valid general law, . . . may abridge the right of local governments to home rule." *Toia v. Regan*, 54 A.D.2d 46, 53 (4th Dep't 1976); *see also Floyd v. N.Y. State Urban Dev. Corp.*, 33 N.Y.2d 1, 6 (1973). The State Constitution also allows the Legislature to pass special law that governs one or more, but not all, counties or localities within the State, provided that the Legislature satisfies certain additional safeguards. *See* N.Y. Const. Art. IX, §§ 2(b)(2), 3(d)(4); *see also Cty. of Onondaga*, 238 A.D.3d 1539-40; *Floyd*, 33 N.Y.2d at 6.

The Termination Act is entirely consistent with the principles governing Constitutional Home Rule in New York. The relevant provisions affect every governmental unit throughout the state, including all state and local agencies. Executive Law § 170-k(2)(a)(i)-(ii). The Termination Act also applies not only to the existing agreements of state and local governments, but to any attempt to enter future agreements. *Id.* In short, the scope of the law is State-wide and temporally unlimited, and Plaintiffs cannot identify any county somehow exempt from the Termination Act. *See Cty. of Onondaga*, 238 A.D.3d at 1541 (ruling challenged statute was a general law when plaintiffs could not identify "a single county … to which [the law] does not apply"). Since the Termination Act on its face and in application is a general law, the State legislature is fully empowered "to act in relation to the affairs or government of any local government." N.Y. Const.

---

[8] In any event, the Constitution's Home Rule provision protects the rights of counties and localities, not of specific officers. As explained below, sheriffs are not representatives of the counties they serve, and Plaintiffs offer no basis to conclude that they are empowered to bring a Home Rule claim on behalf of the counties.

Art. IX, § 2(b)(2); *see also Floyd*, 33 N.Y.2d at 6; *Toia*, 54 A.D.2d at 53; *Cty. of Onondaga*, 238 A.D.3d at 1539-40. Consequently, Plaintiffs cannot rely on the Home Rule provision of the New York Constitution to show capacity; nor are they likely to succeed on the merits of their constitutional Home Rule claim.

**iii. Plaintiffs are not confronted with a dilemma creating capacity.**

Plaintiffs' claims do not fall within the capacity rule's dilemma exception. The dilemma exception is not a general carve out from the capacity rule that permits any constitutional challenge to a State statute. Rather, the exception only permits a claim if compliance with a State statute would "force [the subdivision] into taking an unconstitutional action." *Clark*, 45 N.Y.3d at 438-49; *see also City of New York*, 86 N.Y.2d at 295. Additionally, when a political subdivision has asserted a facial constitutional challenge to a State statute, the subdivision "would have to show that 'every conceivable application' of the [challenged statute]—*i.e.*, every possibly remedy a trial court could order—would force it to take an unconstitutional act." *Clark*, 45 N.Y.3d at 438 (quoting *McGowan v. Burstein*, 71 N.Y.2d 729, 733 (1988)).

Plaintiffs do not and cannot articulate how compliance with the Termination Act would result in their violating a constitutional proscription. Their Contracts Clause claim may be constitutional in character, but courts look not to the claim but to the actions the political subdivision must take if the claim is barred. *Clark*, 45 N.Y.3d at 438-39. Here, nothing about the act of exercising a contractual right to terminate a contract violates any constitutional prohibition. Indeed, both 287(g) Agreements and IGS agreements are voluntary, form agreements, containing mutual terminations clauses that the parties can exercise at any time with the requisite notice. *See, e.g.*, Dkt. 5-6 (Decl. of Sheriff Askar) at 13-14,[9] 33. Even if the termination of the contracts would

[9] Section 6 is termination provision found at pages 5-6 of the IGS agreements attached as Exhibit A to each sheriff's declaration.

somehow violate a contractual provision, such a violation does not rise to the level of violating "a *constitutional* proscription." *City of New York*, 86 N.Y.2d at 291 (emphasis added). The sheriffs also offer no basis to conclude that the Termination Act would force them to violate any other provision of the State or Federal Constitution.

**iv. Plaintiffs' status as state constitutional officers confers no capacity to sue here.**

Plaintiffs also cannot rely on their status as elected officials identified in the New York State Constitution to show capacity to sue, and, for the same reasons, are unlikely to succeed on their claim that the Termination Act contravenes the New York Constitution.

As a general rule, the State Legislature has broad authority to modify, diminish, or abolish any powers delegated to a state or local officer or to direct how that officer performs their functions, subject only to constitutional limitations. *Cayuga Cty. v. McHugh*, 4 N.Y.2d 609, 614-15 (1958); *see also McNulty*, 62 A.D.2d at 687 (the State legislature may "limit, curtail or abolish [powers conferred by statute] with or without the consent of the counties or the Sheriffs."). When the New York Constitution "establishes a specified office, or recognizes its existence, and prescribes the manner in which it shall be filled" the Legislature retains the power "to regulate the duties of constitutional officers" but not to "transfer any essential function of the office to a different officer" or "depriv[e] them of a substantial attribute of the office." *People ex rel. Wogan v. Rafferty*, 208 N.Y.451, 456 (1913); *see also People v. Viviani*, 36 N.Y.3d 564, 576 (2021).

In *People v Viviani*, the New York Court of Appeals, applying the rule from *Wogan*, struck down the special prosecutor statute because it took "an essential function from a constitutional officer," there the District Attorney and the Attorney General, and gave those powers "to a different officer chosen in a different manner." *Id.* at 577-78. The New York Constitution, the Court held, permits the legislature to "prescribe the powers and duties of [constitutional officers]

but it may not deprive [them] of the right to exercise and discharge those powers and duties by any form of legislation." *Id.* at 577 (quoting *Wogan*, 208 N.Y. at 461).

While the New York Constitution recognizes the office of the sheriff and requires sheriffs to be elected rather than appointed, it does not specify a sheriff's duties and powers. *See* N.Y. Const. Art. XIII § 13. Rather, courts look to the powers of the sheriff at common law to understand the core of their constitutional duties, *see Wogan*, 208 N.Y. at 456, and courts in New York have long held that sheriffs are primarily responsible for arresting and confining all persons charged with a crime in the county jail, executing the process of the higher court, and keeping the peace. *See People ex rel McEwan v. Keeler*, 64 How. Pr. 478, 482-83 (Sup Ct. Gen Term 1883); *Enstrom v. City of New York*, 258 A.D. 672, 675 (2d Dep't 1940); *Liquifin Aktiengesellschaft v. Brennan*, 446 F. Supp. 914, 918 (S.D.N.Y. 1978). Nothing in Termination Act affects the sheriffs' core common law responsibilities. The act does not take away the ability of sheriffs to administer jails or maintain custody of individuals charged with a crime. *See* Exec. Law 170-k(2)(a)(i)-(ii). Nor does the Termination Act deprive sheriffs of their ability to conduct criminal law enforcement or restrict their ability to serve and execute judicial warrants. *See id*. Rather, the Termination Act restricts the sheriffs' ability to conduct civil immigration enforcement, house civil immigration detainees, and serve administrative warrants, none of which have ever been at the core of the sheriff's common law responsibilities. *See McEwan*, 64 How. Pr. At 482-83.

Additionally, it is well established that the Legislature may modify or regulate a sheriff's duties, and indeed, it has defined the scope of a sheriff's role in various statutes. *See generally* Judiciary Law 400-411-b; County Law §§ 650-662; Corrections Law § 500-c. For example, the Legislature conferred the responsibility of the jails on the counties, County Law § 217, and the custody and control of the jails on sheriffs, Corrections Law § 500-c. *See McNulty*, 62 A.D.2d at

687. Nothing in these statutes authorizes a sheriff to take or maintain custody over individuals subject to civil immigration detention or to conduct civil immigration enforcement. Even if these statutes could be read to confer that kind of authorization, the Legislature has broad authority to change those statutory duties, and the Legislature is well within its right to prohibit sheriffs from using state and local resources for civil immigration enforcement. *See McNulty*, 62 A.D.2d at 6887.

In any event, Plaintiffs' claim under the New York Constitution cannot support injunctive relief from this Court. *See, e.g.*, *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (holding a federal court may not consider—regardless of the relief sought—a claim that state officials violated state law). The Eleventh Amendment bars suits against the State except in cases involving prospective injunctive relief on constitutional claims. *See id.* at 104-05 (discussing *Ex Parte Young* exception to Eleventh Amendment). This Eleventh Amendment immunity exception, however, only applies "as to conduct that is violative of the United States Constitution." *All. Of Am. Ins. v. Cuomo*, 854 F.2d 591, 604 (2d Cir. 1988). Thus, "a federal district court cannot decide 'a claim challenging a state official's conduct under state law,' because to do so 'would fly squarely in the face of the Eleventh Amendment and the limited nature of the exception for constitutional claims.'" *Comstock v. New York State*, No. 3:23-CV-907 (BKS/ML), 2024 WL 3091884, at *5 (N.D.N.Y. June 21, 2024) (quoting *All. Of Am. Ins.*, 854 F.2d at 604).

**B. Plaintiffs Cannot Succeed on their Contract Clause Claim.**

This Court has already declined to enjoin the Termination Act based on a Contracts Clause claim brought by the United States, *see United States v. New York*, 1:26-CV-1360, 2026 WL 2225423, at *19-23, and the Court should likewise find that Plaintiffs are unlikely to succeed on their substantially similar claims.[10]

[10] In a Contracts Clause action, "[t]he threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Energy Rsrvs. Grp., Inc. v.*

**i. Plaintiffs fail to provide any reason to deviate from the Court's prior legitimate public purpose analysis.**

This Court has already determined that the State had a significant and legitimate public purpose in passing the Termination Act. *Id.* at *21. Specifically, the Court found that the New York's stated public purpose, as evidenced by the Governor's Program Bill 2026 Memorandum, was not an improper post-hoc justification,[11] there was "no indication that special interests are at play," and the Termination Act constituted "an exercise of New York's police powers, aimed at protecting public safety and local law enforcement resources." *Id.*

Notwithstanding the ruling, Plaintiffs contend that this Court left open the question of whether the State's asserted purpose is "legitimate." Pls.' Br. 14. Plaintiffs make the same mistake as the United States in the related action: conflating the legitimate purpose analysis for a policy debate. *New York*, 2026 WL 2225423, at *21. Plaintiffs again "ask[] that the Court weigh the

*Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983) (citations and internal quotation marks omitted). Next, "[i]f the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, ... such as the remedying of a broad and general social or economic problem." *Id.* at 411-12 (citations omitted). Finally, after the State articulates a legitimate public purpose, the court addresses "whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Id.* at 412 (internal quotation marks omitted).

[11] The Governor's Program Bill 2026 Memorandum provides: "Current federal immigration efforts have made communities less safe, leading to the loss of innocent lives, including those of U.S. citizens. The use of local law enforcement officers and assets for the enforcement of federal civil immigration violations in furtherance of the federal administration's immigration agenda draws critical public safety resources away from essential law enforcement functions that keep New York's residents and communities safe." Chaudhury Decl. Ex. A at 2; *see also* 9 N.Y.C.R.R. § 8.170 (2017) (executive order directing state officials to refrain from participating in federal civil immigration enforcement); Civil Rights Law § 28 (known as the "Protect Our Courts Act," enacted in 2020); Chaudhury Decl. Ex. B (Off. of N.Y. State Att'y Gen., *Guidance Concerning Local Authorities' Participation in Immigration Enforcement and Model Provisions* (2025)), Ex. C (Off. of N.Y. State Att'y Gen., *Guidance Concerning Local Authority Participation in Immigration Enforcement and Model Sanctuary Provisions* (2017 & Supps. 2017-2018)).

propriety of New York's exercise of its police powers" based on their disagreement with the Legislature's assessment that the Termination Act was necessary to protect public safety and state and local resources. *Id*; *see* Pls.' Br. 15. Indeed, Plaintiffs' allegations in their Complaint confirm that their Contract Clause claim, and their claims more generally, hinge on the sheriffs' disagreement with the Legislature's policy choices. *See* Compl. ¶ 9, ¶¶ 49- 62. However, policy disagreements are irrelevant to this prong of the Contracts Clause analysis. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *New York*, 2026 WL 2225423, at *21 (internal quotation marks omitted) (quoting *Energy Rsrvs.*, 459 U.S. at 412). This Court already held that there were "no special interests at play" in the passage of the Termination Act. *Id.* Plaintiffs' policy disagreement with the Termination Act does not change any aspect of that analysis and Plaintiffs identify no other basis for this Court to depart from its prior conclusion that the Termination Act serves a legitimate public purpose.

Plaintiffs misplace also their reliance on *United States v. Virginia*, 3:26-cv-00545-REP, Dkt. 103 (E.D. Va. Sept. 3, 2026) ("*Virginia*"), *see* Dkt. 11, which addresses a different state statute and is wrongly decided in any event. As explained, this Court has already determined that New York's Termination Act "seeks only to control whether New York and its localities voluntarily engage in certain cooperation with federal authorities" and does not "directly control how the Federal Government carries out its enforcement of federal law." *New York*, 2026 WL 2225423, at *17. That an out-of-circuit district court reached a different conclusion with respect to Virginia's statute does not provide a basis to revisit this Court's careful analysis of New York's statute. *See Virginia* Op. at 19, 31, 39.

In any event, the *Virginia* decision should be given minimal weight because the court in that case overlooked the INA's requirement that any 287(g) agreement be "consistent with state law" and the federal law's prohibition on "constru[ing this section] to require any State or political subdivision of a State to enter into an [287(g)] agreement." 8 U.S.C. § 1357(g)(1), (12). In overlooking these provisions, *Virginia*'s interpretation of the INA runs squarely into Tenth Amendment problems by taking a state's exclusive control of its subdivisions and giving it to the federal government. This is prohibited by the Tenth Amendment, *see Printz v. United States*, 521 U.S. 898, 935 (1997), especially since a State's political subdivision "serve as 'convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion,'" *McHenry Cty. v. Raoul*, 44 F.4th 581, 590 (7th Cir. 2022) (quoting *Nixon v. Missouri Municipal League*, 541 U.S. 125, 140 (2004)).

**ii. Plaintiffs identify no other reason this Court should not defer to the State's means of effecting its public purpose.**

In the related action, this Court also determined that the Termination Act's "adjustment of 'the rights and responsibilities of contracting parties [was based] upon reasonable conditions and [was] of a character appropriate to the public purpose justifying [the legislation's] adoption." *United States v. New York*, 2026 WL 2225423, at *22 (quoting *U.S. Tr. Co. v. New Jersey*, 431 U.S. 1, 22 (1977)). The Court found no "showing [of] self-interested reneging or compelling evidence that the Termination Act is unreasonable or unnecessary," and thus the State was entitled to substantial deference in its "determination that the Termination Act is an appropriate means of furthering New York's legitimate interests in protecting public welfare and choosing how state and local resources are expended." *Id.* at *23. Again, Plaintiffs present no reason to disturb the Court's interpretation of New York's law.

Instead, Plaintiffs contend that the challenged statute is neither reasonable nor necessary because Plaintiffs and the counties they represent want to continue the affected contracts. *See, e.g.*, Pls.' Br. 16-17. Plaintiffs further complain that the Legislature has undone the counties' "nuanced policy choices" regarding their involvement with civil immigration enforcement by "the most extreme means available." *Id*. However, Plaintiffs' disagreement about the State Legislature's policy judgment is not a basis to second-guess the State's determinations of how best to protect the public welfare, how state and local resources should be expended, and whether state and local participation in federal civil immigration enforcement was likely to further those interests.

"Answering these sorts of questions and thereby determining the 'reasonableness and necessity' of a particular statute is a task far better suited to legislators than to judges. Thus, in the case before [the Court], where economic or social legislation is at issue, some deference to the legislature's judgment is surely called for." *Local Div. 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 643 (1st Cir. 1981); *see also Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 370-71 (2d Cir. 2006) (discussing *Local Div. 589,* 666 F.2d at 642) ("[W]e agree with the First Circuit that U.S. Trust Co. does not require courts to reexamine all of the factors underlying the legislation at issue and to make a *de novo* determination whether another alternative would have constituted a better statutory solution to a given problem.").

Where, as here, legislation is not self-serving, "*substantial deference* is accorded to the legislature's 'judgment[s] as to the necessity and reasonableness of a particular measure." *Buffalo Teachers*, 464 F.3d at 369 (emphasis added) (internal citations omitted). In other words, less deferential review is not appropriate because the State was "genuinely acting for the public good," rather than in "self-interest" to reduce its own liability or avoid its own contractual obligations. *See id*, 464 F.3d at 370. Indeed, Plaintiffs have not demonstrated that the State was "acting like a

private party who reneges to get out of a bad deal[.]" *See New York*, 2026 WL 2225423, at *22 (quoting *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 65 (2d Cir. 2020)). Rather, Plaintiffs simply disagree with how a particular legislative judgment made by the State, and such disagreements in no way undermine the Court's earlier decision. *See id.* at *23.

**iii. Plaintiffs are unlikely to show a severe impairment of a contractual right.**

Plaintiffs are also unlikely to succeed on their Contract Clause claim because they cannot show that the Termination Act severely impaired a contractual right.[12] *See Energy Rsrvs. Grp.*, 459 U.S. at 411; *Colon de Mejias v. Lamont*, 963 F.3d 196, 202-03 (2d Cir. 2020).

A Contracts Clause claim requires a substantial impairment of a contractual right. *See Colon de Mejias*, 963 F.3d at 202-03. The question of whether there is an enforceable contract is a question of State law. *Id.* Under New York law, a contract is only binding if it meets all the requirements for contract formation, *e.g.*, consideration. *See Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (1982). Plaintiffs' Complaint is devoid of any allegations that the 287(g) agreements satisfy those requirements. Indeed, by statute, any local government entering into a 287(g) agreement is required to pay for all costs associated with enforcement and training, and does not receive any money or reimbursement of any kind from the federal government, and the Plaintiffs' agreements reflect this statutory requirement. *See* 8 U.S.C. § 1357(g)(1); *see also, e.g.*, Dkt. 5-6 at 30 (Akshar Decl. Ex. B. Mem. of Agreement Warrant Service Office Program Section IV.E). Plaintiffs do not identify any other consideration they received from the federal government

[12] In *United States v. New York*, this Court assumed without deciding that the 287(g) and IGS agreements were substantially impaired because, at the preliminary injunction stage, defendants did not contest the issue. *See* 2026 WL 2225423. at *20 n.10. Defendants in the related action, however, do deny that the Termination Act substantially impairs existing 287(g) agreements between local governments and the Federal Government. *See United States v. New York*, 1:26-CV-1367, Dkt 58 (Defs.' Answer to Complaint) ¶ 147.

when entering into their 287(g) agreements. *Id.* Thus, they are not enforceable agreements under New York law, *Weiner*, 57 N.Y.2d at 464, and not covered by the Contracts Clause, *Colon de Mejias*, 963 F.3d at 202-03.

Separately, Plaintiffs also failed to show that the state law substantially impaired the bargained benefit of IGS agreements. "'Minimal alteration of contractual obligations may end the inquiry' at the stage of evaluating an impairment's substantiality, whereas '[s]evere impairment . . . will push the inquiry to a careful examination of the nature and purpose of the state legislation.'" *Donohue v. Cuomo*, 980 F.3d 53, 82 (2d Cir. 2020) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978)). Executive Law § 170-k only affects a narrow portion of individuals who would be housed or detained in local facilities. The sheriffs assert that they have entered into these agreements with various federal agencies, including the U.S. Marshals Service and the Bureau of Prisons, and their agreements with those agencies to house federal criminal detainees are unaffected by the Termination Act. *See, e.g.*, Dkt 5-3 (Bourgault Decl.) ¶¶ 19-24, Ex. A at 1. Rather, the Act only requires sheriffs to terminate the riders appended to those agreement that would extend the terms of the agreement to ICE or CBP detainees. *See id.* ¶ 22. *See* Exec. Law § 170-k(2)(a)(ii). Indeed, by Plaintiffs' own acknowledgement, civil immigration detention represents, at best, a small fraction of the revenue they receive under the IGS agreements, *see id.* ¶ 26, Ex. B, and Plaintiffs do not explain why termination of that portion of the agreement substantially deprives them of the benefit of the bargain they struck with the U.S. Marshals Service and the Bureau of Prisons.[13]

[13] In any event, in assessing substantial impairment, courts also consider "the extent to which [a] law . . . prevents the party from safeguarding or reinstating his rights," *Sveen v. Melin*, 584 U.S. 811, 819 (2018), and "the extent to which the challenged provision provides for gradual applicability or grace periods," *Donohue*, 980 F.3d at 82 (quoting *Sanitation & Recycling Indus., Inc v. City of New York*, 107 F.3d 985, 993(2d Cir. 1997)). Here, even if Plaintiffs had shown

Plaintiffs also cannot show a substantial impairment of a contractual right because they operate in a heavily regulated industry and are always subject to "extensive and intrusive" state regulation. *See Energy Rsrvs. Group., Inc.*, 459 U.S. at 411. A party who operates in a heavily regulated area knows any contract they enter into may be subject to changes in state law, and they cannot evade state regulation through contract. *Id.* at 410-11. As explained, it is undisputed that the State consistently substantially regulates how its prisons are run and how its officers conduct law enforcement. *See e.g.*, Corr. § Law 500-c. Indeed, federal law expressly contemplates ongoing state regulation in this area and requires compliance with those regulations as a precondition to the 287(g) and IGS Agreements. *See* 8 U.S.C. §§ 1357(g), 1231(g). Plaintiffs fail to explain how the State's continued regulation in that area through the Termination Act undermined their reasonable contractual expectations.

C. **Plaintiffs' Preemption and Supremacy Clause Claims Also Fail.**

Plaintiffs also cannot succeed on their preemption and Supremacy Clause claims, and do not expressly raise them as a basis for the preliminary injunction. *See generally* Pls.' Br. This Court already held the Supremacy Clause and the INA do not act to preempt the Termination Act's prohibition on 287(g) agreements because the INA does not require state and local officers to enter such agreements and contemplates that States can determine if their officers and political subdivisions will cooperate with federal immigration enforcement. *See New York*, 2026 WL 2225423, at *16-19. This conclusion applies with equal force to the IGS agreement. Federal law does not require states and municipalities to enter into such agreements and a State's restriction on

that the revenue received from ICE was significant, the Termination Act gives Plaintiffs three months to wind down operations related to civil immigration detention and to renegotiate the terms of their agreement with the U.S. Marshal service to account for any loss in revenue.

those agreements does not contradict any federal law or interfere with the federal government's exercise of its authority or use of its resources.

Plaintiffs offer no basis for this Court to second-guess its prior decision and instead, repeat arguments this Court has already rejected, *see New York*, 2026 WL 2225423, at *16-19, while adding an entirely novel and unsupported theory of reverse commandeering. Plaintiffs contend that the U.S. Constitution's reservation of plenary sovereign authority to the *States* somehow extends further to the State's political subdivisions. *See* Pls.' Br. 18-19 (citing *Printz v. United States*, 521 U.S. 898, 935 (1997); *Murphy v. NCAA*, 584 U.S. 453, 470–74 (2018); *New York v. United States*, 505 U.S. 144, 188 (1992)).

That argument is incorrect and utterly antithetical to the logic and history of our constitutional structure. The Tenth Amendment reflects the historical understanding that the States were sovereign before the creation of the United States, and maintained their status as distinct sovereigns under the Constitution. *See* The Federalist No. 32 (Hamilton). But the U.S. Constitution's dual-sovereignty system does not create or even imply that a political subdivision of a State is afforded the same sovereignty as the State itself, and Plaintiffs do not identify any case from any court that has reached a contrary conclusion. Nor can they: the Supreme Court has consistently held a State's political subdivision has "no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." *Williams*, 289 U.S. at 40; *see also Ysursa v. Pocatello Education Ass'n*, 555 U.S. 353, 362 (2009) (State's political subdivisions "never were and never have been considered as sovereign entities.").

To the extent the Plaintiffs could articulate a reverse-commandeering principle, that principle would have to be grounded in the terms of the State Constitution, which reaffirms the principle that sovereignty lies exclusively with the State.

## II. PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transportation Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted). Plaintiffs must show that absent a preliminary injunction, they will suffer an injury that cannot be remedied if a court waits until the end of trial to resolve the harm. *See, e.g.*, *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). Delay in filing an action or seeking a preliminary injunction weighs against a finding of irreparable harm. *See, e.g.*, *Tough Traveler, Ltd, v. Outbound Products*, 60 F.3d 964, 968 (2d Cir. 1995). Plaintiffs fail to assert an irreparable harm that is not speculative and that cannot be remedied following a trial on the merits. *See* Pls.' Br. 21-22..

As a threshold matter, Plaintiffs unreasonably delayed in seeking preliminary relief. The Termination Act was passed in May 2026 and provided Plaintiffs with a three-month window terminate their 287(g) agreements and an additional three months to terminate the IGS agreements before voiding those agreements as a matter of law. The portions of the Termination Act challenged in this litigation as essentially unchanged from their January 2026 introduction. Chaudhury Decl. Ex. D. Despite this, Plaintiffs waited until the day their 287(g) agreements were deem void to seek emergency relief, and they offer no explanation for their delay. *See* Exec. Law § 170-k(7) (effective date of Aug. 25, 2026) *with* Compl. (filing date Aug. 25, 2026). Additionally, because Plaintiffs waited until the statute voided their 287(g) agreements to sue, their requested preliminary injunction would require this Court to change, rather than maintain, the status quo, and they fail to show any likelihood of success, much less the "clear" or "substantial" likelihood required for such relief. *A.H. by & through Hester*, 985 F.3d at 176. And their requested relief would give them the ultimate relief they seek—reinstatement of terminated agreements—without

any explanation as to why that relief would be ineffective if they were forced to wait until a trial on the merits.[14]

While Plaintiffs explain that they will suffer from a loss of revenue because of the IGS agreement termination, *see* Pls.' Br. 21, and because certain state grant provisions that require compliance with the Termination Act, *see* Dkt. 12 ¶¶ 11-17, Plaintiffs fail to articulate how these injuries constitute irreparable harm as opposed to monetary injuries that do not warrant equitable relief. *See, e.g.*, *Moore v. Consolidated Edison of N.Y.,* 409 F.3d 506, 510 (2d Cir. 2005). Their claims that litigation will somehow chill continuing federal involvement with the county prisons, Pls.' Br. 21, is pure conjecture. Plaintiffs do not know or control what the federal government will do, and thus, such claims of injury are too speculative to constitute irreparable harm. *Grand River*, 481 F.3d at 66; *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 782 (2d Cir. 2010) (affirming denial of preliminary injunction in part because irreparable harm was based on "purely speculative allegations"). While a constitutional injury can give rise to irreparable harm, Plaintiffs' arguments collapses the irreparable harm and likelihood of success inquiries, and, for the reasons stated above, *supra* Section I, Plaintiffs cannot succeed on the merits.

## III. THE PUBLIC INTEREST FAVORS THE STATE

The Termination Act is a duly enacted general law that expresses a clear policy choice of the State as a whole. Plaintiffs disagree with this policy, and while they are free to voice that disagreement, their voices should not be elevated above or privileged over those as the State as a whole. No federal or state law gives them a cognizable right to be part of the civil immigration

---

[14] At best, Plaintiff Sheriff Bourgault points the Court to a state enforcement action to compel termination of Rensselaer County's 287(g) agreement consistent with the statute. *See* Dkt. 12. The only relief sought in that action is compliance with the Termination Act, which is already in effect, so the existence of that enforcement action does not give rise to any injury that is distinct from the challenged statute.

enforcement process. Indeed, the State has spoken unequivocally to preclude State and local agencies from voluntarily agreeing to conduct civil immigration enforcement on behalf of the federal government and using state and local resources to do so. The State defines the crimes a sheriff may enforce, sets the terms of how their jails must be administers, regulates the parameters of what constitutes a legitimate exercise of their authority, and here, the State has decided that a certain class of agreements and participation in enforcement actions are simply not in the State's interest. The Termination Act is a clear statement of the State's interest, and outweighs Plaintiffs' claim to powers that are not found anywhere in the State or Federal Constitutions. And granting Plaintiffs' requested relief would fundamentally undermine the State's sovereign authority to regulate its own officers and political subdivisions.

## CONCLUSION

Based on the foregoing, the Plaintiffs' request for a Temporary Restraining Order and Preliminary Injunction should be denied.

Dated: Albany, New York
September 9, 2026

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*

By: *s/ Arastu K. Chaudhury*
Arastu K. Chaudhury
Special Counsel
Telephone: (212) 416-8555
arastu.chaudhury@ag.ny.gov
Bar Roll No. 707902

TO: Counsel of record (*via ECF*)