**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**KYLE BOURGAULT, *et al.*,**

**Plaintiffs,**

**vs.** **1:26-CV-1637 (MAD/ML)**

**KATHY HOCHUL, *et al.*,**

**Defendants.**

---

**APPEARANCES:** **OF COUNSEL:**

**FEDERATION FOR AMERICAN IMMIGRATION REFORM** **MATEO FORERO-NORENA, ESQ.**
25 Massachusetts Ave., NW - Ste. 330
Washington, D.C. 20001
Attorney for Plaintiffs

**OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL** **ARASTU K. CHAUDHURY, AAG**
28 Liberty, 18th Floor
New York, New York 10005
Attorney for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiffs are fifteen county sheriffs from around New York State challenging a New York State law enacted on May 27, 2026. *See* Dkt. Nos. 1, 5. Plaintiffs challenge Executive Law §§ 170-K and 63-E. Section 170-K concerns agreements between federal law enforcement agencies and county sheriff's offices, both existing and future, referred to as § 287(g) agreements. Section 63-E created the Office of Immigrant Trust ("OIT") which possesses investigative, subpoena, and civil enforcement powers related to § 170-K. Plaintiffs allege that the laws violate the Contracts

Clause, the Tenth Amendment, and the Supremacy Clause of the United States Constitution; and Art. IX, Art. XIII § 13, and the separation of powers guaranteed by the New York State Constitution. *See* Dkt. No. 1. Plaintiffs name Kathy Hochul in her official capacity as Governor of the State of New York, Letitia A. James in her official capacity as Attorney General of the State of New York, and the State of New York as Defendants. *See id.* Plaintiffs seek a preliminary injunction to restrain and enjoin Defendants from enforcing Executive Law §§ 170-K and 63-E. *See* Dkt. No. 5. Defendants oppose the motion. *See* Dkt. No. 13. Plaintiffs filed a reply in further support of their motion. *See* Dkt. No. 16.

For the reasons stated herein, Plaintiffs' motion is denied.

## II. BACKGROUND

On June 22, 2026, the United States filed a lawsuit against the Defendants named in this action challenging three New York laws: two concerned law enforcement wearing face coverings and not displaying visible identification while enforcing immigration operations and one concerned cooperative agreements between federal law enforcement and local law enforcement. *See United States v. New York*, No. 1:26-CV-1360, Dkt. No. 1. The first two are not at issue in this case. The third law, referred to as the Termination Act, forms the basis of this lawsuit.

Plaintiffs assert that "this case raises distinct issues from those pressed in the parallel action brought by the federal government . . . ." Dkt. No. 5-2 at 7.[1] Defendants argue otherwise, stating that "[t]he clearest reason to deny preliminary relief here is simple: this Court already denied a substantively identical motion in" the earlier action. Dkt. No. 13 at 8. The Court finds that this case falls between the parties' perspectives. While portions of the Court's prior decision might answer some of the questions raised in this case, there are also distinct issues presented

[1] Citations are to the pagination generated by CM/ECF in the pages' headers.

herein. The Court will reiterate only those portions of its previous decision that are relevant to the issues in this case.

The Court previously explained the contours of the Termination Act:

> The Termination Act prohibits any "local government, law enforcement agency, correctional facility, local correctional facility, juvenile detention facility, or facility for youth placed with or committed to the office of children and family services, or agent thereof" from entering, modifying, renewing, remaining in, or extending (1) "any agreement pursuant to section 287(g) of the Immigration and Nationality Act" with the Federal Government ("287(g) Agreements"); or (2) "any contract, intergovernmental service agreement, or any other formal or informal agreement to house or detain individuals for federal civil immigration violations, including, but not limited to, agreements entered into pursuant to 8 U.S.C. § 1103(a) or § 1231(g)." N.Y. EXEC. LAW § 170-k(2)(a).
>
> When the Termination Act becomes effective on August 25, 2026, any contract or agreement identified in the Act, including 287(g) Agreements, "shall be deemed not consistent with state law and any such agreement . . . shall be void and unenforceable," and "any law enforcement agency, correctional facility, local correctional facility, juvenile detention facility, or facility for youth placed with or committed to the office of children and family services, or agent thereof shall exercise any applicable termination provision contained in such agreement." *Id.* § 170-k(7)(a).
>
> Pursuant to the Immigration and Nationality Act ("INA"), the Attorney General of the United States "can exercise discretion to issue a warrant for an alien's arrest and detention 'pending a decision on whether the alien is to be removed from the United States.'" *Arizona v. United States*, 567 U.S. 387, 407 (2012) (quoting 8 U.S.C. § 1226(a)). Although the INA gives federal officers significant discretion to apprehend individuals believed to be removable aliens, "federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." *Id.* at 408. Section 287(g) of the INA, codified at 8 U.S.C. 1357(g), enables the Secretary of Homeland Security[] to authorize certain state or local officers to "perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States . . . at the expense of the State or political subdivision and to the extent consistent with State and local law" when the Secretary has entered into a written

> agreement with the relevant state or local entity. 8 U.S.C. § 1357(g)(1).
>
> The statute further "require[s] that an officer or employee . . . performing a function under the agreement shall have knowledge of, and adhere to, Federal law relating to the function," and that these "officers or employees . . . receive[] adequate training regarding the enforcement of relevant Federal immigration laws." *Id.* § 1357(g)(2). State or local officers covered by 287(g) Agreements "are subject to the [Secretary's] direction and supervision." *Arizona*, 567 U.S. at 409. "In short, Section 287(g) 'permits ICE to deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement,' and 'ICE trains the local law enforcement officers who participate.'" *United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023) (quoting *United States v. Sosa-Carabantes*, 561 F.3d 256, 257 (4th Cir. 2009)). Section 287(g) also permits local law enforcement "to cooperate with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States" without a formal agreement. 8 U.S.C. § 1357(g)(10)(B).

*United States v. New York*, No. 1:26-CV-1360, 2026 WL 2225423, *3-4 (N.D.N.Y. Aug. 3, 2026) (headers and footnote omitted).

The key difference between the information set forth above and the situation presently before the Court is that, as of the date of this decision, the Termination Act has become effective. The Termination Act became effective on August 25, 2026, which is the same day Plaintiffs filed their complaint.

In support of their motion for a preliminary injunction, Plaintiffs have filed declarations and supporting exhibits from six of the fifteen Sheriff Plaintiffs who have entered into § 287(g) agreements with the federal government. *See* Dkt. Nos. 5-3–5-8; Dkt. No. 12.[2] There are "three primary models" of § 287(g) agreements: (1) "the Jail Enforcement Model ("JEM"), [whereby]

[2] The six declarations and corresponding exhibits thoroughly set forth each county's agreements with the federal government, their respective sheriff office's responsibilities related thereto, as well as the impact the Termination Act has had or will have on their office.

trained local officers identify and process removable aliens who are already in the agency's custody on state or local charges"; (2) "the Warrant Service Officer ("WSO") model, [which permits] trained local officers [to be] authorized to serve and execute administrative immigration warrants on aliens in their custody"; and (3) "the Task Force Model ("TFM"), [which allows] trained local officers [to] exercise limited immigration authority in the course of their routine duties and [to] participate in ICE-led enforcement operations." Dkt. No. 1 at ¶ 45.

Separate and apart from the § 287(g) agreements, "ICE also enters into Intergovernmental Service Agreements ("IGSA") with local jails and correctional facilities." *Id.* at ¶ 46. "These IGSAs authorize the housing of ICE detainees in local facilities and provide for reimbursement of the costs of detention. [The United States Marshals Service] likewise enters into Intergovernmental Agreements with local jails for the housing of federal prisoners." *Id.*[3]

Sheriff Kyle Bourgault is the Rensselaer County Sheriff and assumed that position after being elected in January of 2024. *See* Dkt. No. 5-3 at 1, ¶ 1. "The Rensselaer County Correctional Facility is a 432-bed jail. It is a full-service local correctional facility." *Id.* at 3, ¶ 12. On November 1, 2024, Sheriff Bourgault signed an Intergovernmental Agreement with the United States Marshals Service which "authorizes the housing, safekeeping, and care of federal prisoners at our facility at a per-diem rate of $136.00." *Id.* at 4, ¶ 21.

On June 27, 2024, Sheriff Bourgault signed a Memorandum of Understanding with United States Customs and Border Protection ("CBP") which permitted "federal detainees—including persons charged with federal offenses that are detained pending trial" to be housed at the Rensselaer County Correctional Facility for $130 per night. *Id.* at 5, ¶ 28. Sheriff Bourgault states that as part of this agreement, "the Rensselaer County Sheriff's Office is not placing people

---

[3] The IGSAs were not addressed in *United States v. New York*, No. 1:26-CV-1360, Dkt. No. 4-1.

in the jail under these agreements; it is making the beds available to house people detained by the [United States Marshals Service] or the CBP." *Id.* at 5, ¶ 31.

As to the § 287(g) agreements, Sheriff Bourgault explains, "Rensselaer County was the first county in New York State to enter into a 287(g) agreement." *Id.* at 6, ¶ 34. The first § 287(g) agreement was signed in 2018, and the current agreement was signed in March of 2020. *See id.* at 6, ¶¶ 35-36. Sheriff Bourgault states Rensselaer County has agreed to "the Jail Enforcement Model" whereby his "officers do not go into the community to make civil immigration arrests. They do not conduct traffic stops for immigration status. They do not question people on the street about their papers." *Id.* at 6, ¶ 39.

On July 24, 2026, Sheriff Bourgault received a letter from Meghan Faux, Chief Deputy Attorney General for Social Justice. *See id.* at 15, ¶ 94. The letter states that the Local Cops, Local Crimes Act "prohibits your agency from conducting civil immigration enforcement pursuant to your Section 287(g) agreement, effective immediately upon the Governor's signing the legislation on May 27, 2026." Dkt. No. 5-3 at 77 (citing N.Y. Exec. L. § 170-k(2)(a)). "The statute also requires your agency to terminate its agreement with ICE and provides that the Section 287(g) agreement will be deemed null and void in its entirety as of August 25, 2026." *Id.* (citing N.Y. Exec. L. § 170-k(7); Local Cops, Local Crimes Act § 4). The letter "request[ed] that you submit information to our office regarding the status of your Section 287(g) agreement, including any ongoing activities pursuant to that agreement and steps you have taken to comply with the termination requirement." *Id.* A response was requested by August 14, 2026. *See id.*

Sheriff Bourgault "did not submit the written response the Attorney General demanded by August 14, 2026, in part because the statute does not require a confession of termination." Dkt. No. 5-3 at 16, ¶ 101. On August 19, 2026, Zoe Levine, Interim Bureau Chief of the Office of

Immigrant Trust sent Sheriff Bourgault an investigative demand for documents from May 1, 2026, to the present "sufficient to show what action(s) Rensselaer County Sheriff's Office [], or any agent thereof, has taken to terminate the 2020 ICE MOA." *Id.* at 83.

As of the date of his August 24, 2026, declaration, Sheriff Bourgault "did not terminate the 287(g) agreement because [his] ability to meaningfully engage in law enforcement activities will be curtailed[,]" he has "not instructed [his] officers to stop screening inmates already in their custody," and he has "not refused a lawful ICE detainer." *Id.* at 17, ¶¶ 109-11.

Sheriff Bourgault attests that his office will suffer the following irreparable harms if § 170-K is enforced: (1) the "loss of the trained, ICE-supervised capacity to identify and process removable aliens who are already in our criminal custody"; (2) the office "would be forced to release individuals [it] know[s]—or would have known—are wanted by federal authorities"; (3) he and the office will face "continued investigation, compelled testimony, further document demands, and a civil action by the Attorney General" and "public-safety consequences"; (4) it will "put [the] existing" agreements other than § 287(g) agreements "under a cloud"; and (5) he will lose additional monetary reimbursements from the federal government. *Id.* at 19-20, ¶ 121.

Following the filing of Plaintiffs' motion for a preliminary injunction and the Court's scheduling of briefing deadlines, Plaintiffs filed a second declaration from Sheriff Bourgault dated September 4, 2026. *See* Dkt. No. 12-1. Sheriff Bourgault explains that on August 27, 2026, OIT filed a petition and complaint in Rensselaer County seeking "an order of mandamus compelling [Rensselaer County Sheriff's Office] to terminate" the § 287(g) agreement. *Id.* at 1-2, ¶¶ 3-5. Sheriff Bourgault attests that the day the complaint was filed against him, "Attorney General James and Governor Hochul issued a joint press release announcing the lawsuit." *Id.* at 2, ¶ 8.

Sheriff Bourgault notes that his office "submitted an application to the New York State Division of Criminal Justice Services ("DCJS") for $248,925 under the 2026-2027 Law Enforcement Technology Program" for "body-worn cameras, trauma kits, portable scene lighting, speed trailers, rifle-rated ballistic plates, and replacement mobile radios." *Id.* at 3, ¶ 11. Sheriff Bourgault states that "[n]one of that equipment is used for civil immigration enforcement." *Id.* at 3, ¶ 12. He explains that DCJS requires applicants to submit a Grantee Attestation Form which requires "the applicant to 'comply with applicable provisions of section 170-k of the executive law.'" *Id.* at 3, ¶ 13; *see* Dkt. No. 12-1 at 107. The Attestation Form also states: "No application will be considered should the applicant be determined to be operating a 287(g) agreement, or similar agreements, with the federal government which would support state and local resources being used for civil immigration enforcement purposes." Dkt. No. 12-1 at 107. "Further, no data or information generated by technology or equipment procured with these funds shall be used for civil immigration enforcement purposes." *Id.*

Sheriff Bourgault signed an Attestation Form on September 2, 2026, certifying "that no funds, technology, equipment, data, personnel costs, or other resources provided through this award will be used for civil immigration enforcement purposes." *Id.* at 109. However, he noted that the validity of § 170-K is the subject of active litigation and that the Attestation Form "shall [not] constitute or be construed as" an admission of any kind or a waiver of any claims or defenses. *Id.*[4]

[4] The five other Sheriff Plaintiffs who supplied declarations in support of the preliminary injunction motion similarly attest to entering into § 287(g) agreements and receiving demand letters from OIT before and after the Termination Act went into effect. They also assert similar irreparable harm to their respective offices as espoused by Sheriff Bourgault.

## III. DISCUSSION

### A. Standard of Review

"'A preliminary injunction is an extraordinary and drastic remedy' and 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (summary order) (quoting *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024)). "To obtain a preliminary injunction, a party must show '(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.'" *Id.* (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)). "Where, as here, the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020).

If a case involves "mandatory injunctions [which] disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *N. Am. Soccer League, LLC*, 883 F.3d at 37 (quoting *N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). "Because the proposed injunction's effect on the status quo drives the standard, [a court] must ascertain the status quo—that is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)).

### B. Capacity to Sue

Plaintiffs argue the Termination Act and OIT's enforcement efforts violate (1) the Contracts Clause of the United States Constitution by impairing the local sheriffs' agreements

with the federal government; (2) the Tenth Amendment of the United State Constitution, because New York is conscripting local independently elected constitutional officers to obstruct federal endeavors; and (3) Article XIII, § 13 of the New York State Constitution, by nullifying the discretionary judgments of independently elected sheriffs. *See* Dkt. No. 5-2 at 18-25.[5]

Plaintiffs assert they have standing to seek preliminary injunctive relief because they will suffer injuries absent injunctive relief through the enforcement actions taken by OIT; the injuries are traceable to the passing of the Termination Act and creation of OIT; and a preliminary injunction will redress the alleged harms by halting enforcement of the Termination Act against Plaintiffs. *See id.* at 15-17.

Defendants argue Plaintiffs are unlikely to succeed on their claims because they "lack the capacity to sue the State to challenge the validity of a duly-enacted statute, and Plaintiffs do not identify anything in the New York Constitution or its general laws that allows the sheriffs to bring this action." Dkt. No. 13 at 12.

In their preliminary injunction motion, Plaintiffs addressed only standing, and not their capacity to sue Defendants. *See* Dkt. No. 5-2. In their reply, however, Plaintiffs argue their status as "independently elected constitutional officers asking the Court to stop enforcement of a statute that impairs their existing agreements with the United States" gives them the right to sue Defendants. Dkt. No. 16 at 5.

***1. Analysis***

"The federal judicial power extends only to the resolution of 'Cases' and 'Controversies.'" *A.H. by E.H. v. N.Y. State Dep't of Health*, 147 F.4th 270, 276 (2d Cir. 2025) (quoting U.S.

---

[5] Plaintiffs do not address their U.S. Constitution Supremacy Clause or New York State Constitution Art. IX claims in their preliminary injunction motion. *See generally* Dkt. No. 5-2.

CONST. ART. III, § 2). "'For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing.'" *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). "To establish standing, a plaintiff must show '(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief.'" *Id.* (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024)).

"At the preliminary injunction stage, 'a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment.'" *New York*, 969 F.3d at 59 (quoting *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)). "'Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot rest on . . . mere allegations . . . but must set forth by affidavit or other evidence specific facts' that establish the 'three familiar elements of standing: injury in fact, causation, and redressability.'" *Id.* (quoting *Cacchillo*, 638 F.3d at 404).

"'Capacity to sue is a threshold matter allied with, but conceptually distinct from, the question of standing.'" *Town of Babylon, NY v. James*, 707 F. Supp. 3d 213, 221 (E.D.N.Y. 2023) (quoting *LBBW Luxemburg S.A. v. Wells Fargo Sec., LLC*, 744 Fed. Appx. 710, 714 n.3 (2d Cir. 2018) (summary order)), *appealed*, No. 24-177 (2d Cir. Jan. 18, 2024); *see also Aristy-Farer v. State*, 143 A.D.3d 101, 109 (1st Dep't 2016), *aff'd as modified*, 29 N.Y.3d 501 (2017) ("The capacity to sue or be sued concerns a litigant's power to bring a grievance to the court, while standing involves whether the litigant has suffered an injury in fact and thus has an actual legal stake in the matter") (citation omitted).

"Although '[c]apacity, unlike standing, is ordinarily not a jurisdictional issue . . . a party must maintain its capacity to sue throughout litigation, and lack of capacity is grounds for

dismissal.'" *Id.* (quoting *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 403 F. Supp. 3d 257, 267 (S.D.N.Y. 2019)). "The issue of capacity often arises in suits brought by governmental entities." *Graziano v. Cnty. of Albany*, 3 N.Y.3d 475, 479 (2004). "Without both capacity and standing, a party lacks authority to sue." *Id.*

"'Legal capacity is governed by Federal Rule of Civil Procedure 17(b).'" *Town of Babylon*, 707 F. Supp. 3d at 221 (citation omitted). Rule 17(b) instructs that "[c]apacity to sue or be sued is determined . . . for an individual who is not acting in a representative capacity, by the law of the individual's domicile . . . and [] for all other parties, by the law of the state where the court is located[.]" FED. R. CIV. P. 17(b). "As such, '[p]ursuant to [Rule] 17(b), the capacity of a governmental entity to sue or be sued is a question of state law.'" *Town of Babylon*, 707 F. Supp. 3d at 221 (quoting *Orraca v. City of New York*, 897 F. Supp. 148, 152 (S.D.N.Y. 1995)).

"New York follows the traditional capacity-to-sue rule, which states that 'municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation.'" *Id.* at 221-22 (quoting *City of New York v. State of New York*, 86 N.Y.2d 286, 290 (1995)); *see also Wantagh Union Free Sch. Dist. v. New York State Bd. of Regents*, No. 25-1136, 2026 WL 2949485, *1 (2d Cir. Oct. 1, 2026) (summary order). "Such entities are 'purely creatures or agents of the State,' and so 'cannot have the right to contest the actions of their principal or creator affecting them in their governmental capacity or as representatives of their inhabitants.'" *Id.* at 222 (citation omitted).[6] "In other words, political power conferred by the Legislature confers no vested right as against the government itself." *Id.* (citation and quotation marks omitted); *see Black River Regulating Dist.*

---

[6] This general rule appears across federal circuits in interpreting states' laws within their jurisdiction. *See* 13B *Wright & Miller's Federal Practice and Procedure* § 3531.11.1, n.46-47 (3d ed. 2026).

*v. Adirondack League Club*, 307 N.Y. 475, 488 (1954). "The New York capacity-to-sue rule is also a 'necessary outgrowth of separation of powers doctrine: it expresses the extreme reluctance of courts to intrude in the political relationships between the Legislature, the State and its governmental subdivisions.'" *Town of Babylon*, 707 F. Supp. 3d at 222 (quoting *City of New York*, 631 N.Y.2d at 296).

"'[M]unicipal officials and members of municipal administrative or legislative boards suffer the same lack of capacity to sue the State with the municipal corporate bodies they represent.'" *New York State Ass'n of Small City Sch. Dists., Inc. v. State*, 42 A.D.3d 648, 649 (3d Dep't 2007) (citation omitted). "Thus, municipalities and other local government entities lack capacity to attack actions by the State and the Legislature on constitutional grounds unless they properly invoke one of the [] recognized exceptions to the rule." *Cnty. of Nassau v. State*, 100 A.D.3d 1052, 1055 (3d Dep't 2012).

The New York Court of Appeals in *City of New York* recognized four exceptions to the general rule prohibiting a local government from suing New York as its parent state:

> (1) where a public corporation has express statutory authorization to bring suit; (2) where the legislation adversely affects a public corporation's proprietary interest in a specific fund of moneys; (3) where the statute impinges upon 'Home Rule' powers of a public corporation constitutionally guaranteed under article IX of the New York State Constitution; and (4) where the public corporation asserts that, if it is obliged to comply with the statute, that very compliance will force the corporation to violate a constitutional proscription.

*Town of Babylon*, 707 F. Supp. 3d at 222 (quoting *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d 58, 63-64 (2d Cir. 2017)). "The New York Court of Appeals has emphasized 'that the exceptions [it has] recognized to date are narrow.'" *Id.* (quoting *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d 377, 380 (2017)).

In their reply, Plaintiffs state that "if *City of New York* control[s], the 'dilemma exception' would apply." Dkt. No. 16 at 7. "The Second Circuit has recognized . . . the so-called 'dilemma' theory [] where, unlike a municipal corporation, a municipal official acting in their official capacity may have standing to challenge a state statute under the Fourteenth Amendment in certain circumstances." *Blakeman v. James*, No. 2:24-CV-1655, 2024 WL 3201671, *16 (E.D.N.Y. Apr. 4, 2024) (citing *Bd. of Educ. of Mt. Sinai Union Free Sch. Dist. v. N.Y. State Tchrs. Ret. Sys.*, 60 F.3d 106, 112 (2d Cir. 1995)). "The county official must demonstrate that 'compliance with state law will require them to violate their oaths to act constitutionally' and 'that their positions as officials or funding for [their governmental entity] is in jeopardy if they refuse' to comply." *Id.* (quoting *N.Y. State Tchrs. Ret. Sys.*, 60 F.3d at 110-12).

For example, "[i]n *Board of Education of Central School District No. 1 v. Allen*, the State of New York passed a law requiring local school boards to provide free textbooks to public and private school students." *Harrison v. Jefferson Par. Sch. Bd.*, No. 20-CV-2916, 2021 WL 3286456, *7 (E.D. La. Aug. 2, 2021) (citing *Bd. of Ed. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 241 n.5 (1968)). Neither standing nor capacity to sue were disputed before the Supreme Court because the Rensselaer and Columbia County School Boards alleged that they believed the First Amendment prevented them from lending books to parochial schools, but that if they failed to provide the books, they would violate the state law. *See Allen*, 392 U.S. at 241 n.5; *see also City of New York v. Richardson*, 473 F.2d 923, 933 (2d Cir. 1973) (noting that the plaintiffs could sue under *Allen* "because of the conflict each of these officials must face between his sworn duty to uphold the Constitution of the United States and his responsibility for administering New York's allegedly unconstitutional Social Services Law" where the case concerned whether "the

Social Security Act [] that [] 'mandates' State" and local governments to provide certain funds contravenes the Fifth, Ninth, Tenth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983).

Here, in arguing that the dilemma exception applies to their claims, Plaintiffs assert that "*Clarke v. Town of Newburgh*, 45 N.Y.3d 428, 438 (2025), leaves open 'a municipality's ability to bring an as-applied challenge, showing that it will be forced to take a course of action that is unconstitutional'" which "is precisely what is at play here." Dkt. No. 16 at 8.

In *Clarke*, "the Town and Town Board of Newburgh—subordinate governmental entities created by, divisible by and even extinguishable by the State Legislature—[brought a] facial constitutional challenge to the vote dilution provision of the John R. Lewis Voting Rights Act of New York ("NYVRA")." *Clarke*, 45 N.Y.3d at 434. The New York Court of Appeals stated that "'[f]rom very early times,' New York courts have 'consistently applied the Federal rule in holding that political power conferred by the Legislature confers no vested right as against the government itself.'" *Id.* at 436 (quoting *Black Riv.*, 307 N.Y. at 488). Additionally, "[a] political subdivision's 'right to sue, if it exists at all, must be derived from the relevant enabling legislation or some other concrete statutory predicate.'" *Id.* (quoting *World Trade Ctr.*, 30 N.Y.3d at 384).

The Court of Appeals noted that "[j]ust as the legislature has the power to create entities to perform its functions, it has the power to change, and even destroy, those entities. Separation of powers principles accordingly demand that courts do not interfere in legislative disputes raised by legislative subordinates." *Id.* at 437. "Those principles are the bedrock of our Federal and State Constitutions alike." *Id.* The Court of Appeals then reiterated its "four limited exceptions" to the capacity-to-sue rule. *Id.*

The Town of Newburgh "relie[d] solely on the rare fourth exception—colloquially termed the 'dilemma' exception—to contend that any compliance with the NYVRA would force it to

violate the Equal Protection Clauses of the U[nited States] and New York Constitutions." *Id.* The Court of Appeals stated that the Town of "Newburgh's failure to identify any case where a New York court has held that a political subdivision fit into the fourth exception evidences the narrowness of the exception." *Id.* Indeed, the New York Court of Appeals had "found no case in which a court has held it applicable." *Id.*

Because the Town of Newburgh was "pursuing a facial invalidity claim[,]" "principles of 'judicial restraint' . . . counsel[ed] strongly against permitting subordinate units of state government from using the judiciary to second-guess the wisdom of enacted legislation." *Id.* at 438 (internal citation omitted). The Court of Appeals stated that "[a] municipality's authority to raise a challenge to a state law is at its lowest ebb when that challenge is a facial constitutional challenge, seeking to invalidate a statute in all possible applications, not merely because it allegedly placed the particular municipality in an allegedly untenable position." *Id.* "As [the Court of Appeals] made clear in *World Trade Ctr.*, '[the] capacity rule reflects a self-evident proposition about legislative intent: the "manifest improbability" that the legislature would breathe constitutional rights into a public entity and then equip it with authority to police state legislation on the basis of those rights.'" *Id.* (quoting *World Trade Ctr.*, 30 N.Y.3d at 384).

The Court of Appeals held that the Town of Newburgh could not bring its constitutional claims. *See id.* at 439. Specifically, the Town of Newburgh argued "that because, in its view, the NYVRA violate[d] the U.S. Constitution, the Supremacy Clause overc[a]me[] New York's bar prohibiting its subordinate local governments from suing it." *Id.* However, the Town of "Newburgh offer[ed] no authority for that novel proposition, which would authorize every local governmental entity to sue to challenge as unconstitutional any state legislation arguably affecting that subordinate entity." *Id.*

The Second Circuit has noted that "[h]undreds of federal laws apply nationwide to states and their political subdivisions. They impose various responsibilities and prohibitions on states and political subdivisions that are intended by Congress to apply nationwide." *Tweed-New Haven Airport Auth. v. Tong* ("*Tweed*"), 930 F.3d 65, 73 (2d Cir. 2019). The Second Circuit stated that "[i]f the Supremacy Clause means anything, it means that a state is not free to enforce within its boundaries laws preempted by federal law. Lawsuits invoking the Supremacy Clause are one of the main ways of ensuring that this does not occur." *Id.* Therefore, the Second Circuit held "that a subdivision may sue its state under the Supremacy Clause." *Id.*

In *Tweed*, the airport "sued the then[-]Connecticut Attorney General George Jepsen in his official capacity (the "State"), seeking a declaratory judgment that a Connecticut statute . . . that limits the Airport's runway to its current length of 5,600 feet was invalid." *Id.* at 68. "Tweed claimed that the Statute was preempted by federal laws governing the regulation of air transportation, including the Federal Aviation Act . . . ." *Id.* The Second Circuit noted that "the Supreme Court has repeatedly entertained suits against a state by a subdivision of the state, including cases under the Supremacy Clause." *Id.* at 73 (collecting cases). "In light of this authority, [the Second Circuit] h[e]ld that a subdivision may sue its state under the Supremacy Clause. In reaching this conclusion [the Second Circuit] join[ed] the Fifth and Tenth Circuits." *Id.* (citing *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979); *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619 (10th Cir. 1998)).

In moving for a preliminary injunction and in replying to Defendants' response, Plaintiffs do not invoke *Tweed* or any other circuit precedent concerning the Supremacy Clause or its relationship to a local government's ability to sue its parent state. In their complaint, Plaintiffs allege: "Count III Conflict-Obstacle Preemption (Supremacy Clause)." Dkt. No. 1 at 48.

Plaintiffs allege that "Executive Law § 170-K stands as a direct obstacle to" Congress' authorization for "the federal government to enter into written agreements with political subdivisions of a State . . . ." *Id.* at ¶¶ 165-66. Plaintiffs refer to Defendants' legislation as an "affirmative obstruction of the specific cooperative mechanisms Congress authorized." *Id.* at ¶ 169. In their complaint, Plaintiffs recognize that this Court "in *United States v. New York*, No. 1:26-cv-1360 (N.D.N.Y.) . . . concluded that the United States had not, at the preliminary-injunction stage, shown a likelihood of success on its obstacle-preemption theory as framed in that litigation." *Id.* at ¶ 168. Plaintiffs allege, however, that the Court's reliance "on authorities holding that participation in federal immigration enforcement is voluntary and that States may decline to cooperate" is inapplicable to the present action because "[t]he present action is brought by the actual local parties whose own agreements are being nullified. The claim is therefore as-applied to the concrete impairment of existing cooperative relationships and to the coercive enforcement apparatus directed at those relationships." *Id.* at ¶ 169.[7]

Despite these allegations, in their preliminary injunction motion and reply, Plaintiffs are silent about their Supremacy Clause claim. *See* Dkt. Nos. 5-2, 16. They do not address the claim in their arguments on having capacity to sue Defendants nor do they argue the merits of that claim. "[I]t is not this Court's obligation to 'make a party's arguments for it or "fill in the blanks" on that party's behalf[.]'" *Johannes Baumgartner Wirtschafts-Und Vermogensberatung GmbH v.*

[7] In the Prayer for Relief section of their complaint, Plaintiffs ask that the Court "A. Declare that Executive Law § 170-K is unconstitutional under the Contracts Clause of the United States Constitution, the Tenth Amendment to the United States Constitution, and the Supremacy Clause of the United States Constitution; B. Declare that Executive Law § 170-K is unconstitutional under" New York's Home Rule; and "C. Declare that Executive Law § 63-E, as applied to Plaintiffs, is unconstitutional under the United States Constitution and the New York Constitution[.]" Dkt. No. 1 at 59. Therefore, Plaintiffs' contention that their suit is purely an as-applied challenge is incorrect.

*Salzman*, 969 F. Supp. 2d 278, 288 (E.D.N.Y. 2013) (quoting *Bey v. New York*, No. 11-CV-3296, 2013 WL 3282277, *6 (E.D.N.Y. June 25, 2013)).

Plaintiffs are correct that this Court previously held that the United States failed to demonstrate a likelihood of success on a Supremacy Clause preemption claim regarding the Termination Act. *See New York*, 2026 WL 2225423, at *16-17. Insofar as Plaintiffs argue that this case requires a different outcome, Plaintiffs do not present a single case in their complaint, motion, or reply, to support that assertion. "[M]ere disagreement by a political subdivision with the policies of its parent state will not be sufficient to overcome the traditional barrier to political subdivision standing." *Branson*, 161 F.3d at 630. "Instead, . . . a political subdivision [is allowed] to sue its parent state when the suit alleges a violation by the state of some controlling federal law. The Supremacy Clause guarantees no less." *Branson*, 161 F.3d at 630. However, Plaintiffs have not presented a controlling federal law that the Termination Act overrides.[8]

Plaintiffs agree that "[c]apacity exists where compliance with a statute would force the plaintiff 'to violate a constitutional *proscription*.'" Dkt. No. 16 at 7 (quoting *City of New York*, 86 N.Y.2d at 292) (emphasis added). Plaintiffs contend that forcing them to terminate their § 287(g) agreements "is itself unconstitutional." *Id.* at 8.

"'[P]roscription' is a prohibition or 'an imposed restraint or restriction.'" *Merola v. Cuomo*, 427 F. Supp. 3d 286, 292 (N.D.N.Y. 2019) (quoting Merriam Webster's Collegiate Dictionary (10th ed. 1997)). "Anecdotally, New York courts have interpreted constitutional or statutory

---

[8] Plaintiffs refer to the relationship between the federal government and local law enforcement as a "cooperative framework." Dkt. No. 1 at ¶ 40. Plaintiffs allege that federal statutes "authorize[]" and "permit[]" agreements between the federal government and a "political subdivision of a State." *Id.* Plaintiffs have not presented any legal authority in their preliminary injunction motion concerning a local government's capacity to sue a State which interferes with a permissive or voluntary federal statutory scheme.

proscriptions to be something expressly forbidden and along the lines of 'no [person or entity] shall [engage in certain action].'" *Id.* (quoting *Bellanca v. N.Y. State Liquor Auth.*, 54 N.Y.2d 228, 230-31 (1981)). "[T]he Supremacy Clause contains no proscription whatsoever." *Id.* "No proscription is evident, unlike, for example, the First Amendment's 'Congress shall make no law' . . . or the Fourth Amendment's proclamation that the right against unreasonable searches 'shall not be violated[.]'" *Id.* (citations omitted). "The list of federal constitutional proscriptions is long, but it does not include the Supremacy Clause . . . ." *Id.*

The "dilemma" exception asks a plaintiff to choose between effectuating the state law at issue and violating the federal constitution or declining to abide by the state law. In other words, the "dilemma" is whether to comply with the parent state's demands or offend the constitution. Here, if Plaintiffs were to effectuate the Terminate Act and comply with OIT's enforcement demands, the question is what constitutional requirement they would be forced to disregard. Plaintiffs have not identified such a choice. Therefore, Plaintiffs have not demonstrated that they are likely to have capacity to sue Defendants under the dilemma exception to New York's capacity rule. *See Wantagh Union*, 2026 WL 2949485, at *2 (affirming dismissal of claims for lack of capacity to sue under New York law because the plaintiffs "cannot show that 'every conceivable application' of [the law at issue] compels a constitutional violation") (citation omitted).

In their reply, Plaintiffs attempt to rebut New York's capacity-to-sue rule and exceptions. The Court has reviewed each case cited by Plaintiffs on this issue. *See* Dkt. No. 16 at 5-8. None are availing. Plaintiffs first cite *Howlett v. Rose*, 496 U.S. 356, 367-75 (1990). *See* Dkt. No. 16 at 6. In that case, the Supreme Court addressed whether a state could use a sovereign immunity defense to a 42 U.S.C. § 1983 action brought in state court when that defense would have been

unavailable if the case had been brought in federal court. That issue plainly has no applicability to Plaintiffs' capacity to sue in this action.

Next, Plaintiffs argue that *City of New York* and *Williams* "do not apply []." Dkt. No. 16 at 6. Plaintiffs note that "[t]he plaintiffs there were the City of New York, its Board of Education, the Mayor, and the Chancellor. They were asking a court to decide how the Legislature funds a state-created school system." *Id.* Plaintiffs then contend "[i]n *Williams*, the U.S. Supreme Court held that a municipality 'has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator.' That case involved an Equal Protection challenge by two cities to a state tax exemption." *Id.* (quoting *Williams*, 289 U.S. at 40).

Plaintiffs attempt to distinguish those cases from their present claims by arguing that they "are not municipalities seeking a reallocation of state resources. They are independently elected officers[,]" and "New York courts have long treated the Sheriff as distinct from the county that elects it." *Id.* (citing *Hanley v. New York*, 250 A.D. 552, 553 (1st Dep't 1937); *Enstrom v. City of New York*, 258 A.D. 672, 676 (2d Dep't 1940)).

First, like the plaintiffs in *City of New York*, Plaintiffs are elected. Second, in *Hanley*, the sheriff was suing to recover funds for his personal salary and the First Department held that sheriffs are included under Article X, section 9 of the New York State Constitution which provides that "[n]o officer whose salary is fixed by the Constitution shall receive any additional compensation." *Hanley*, 250 A.D. at 553. This case has nothing to do with Plaintiffs' salaries. And third, *Enstrom* concerned a sheriff getting into a car accident and the Second Department concluding that the decedents' families could not sue the City of New York for the sheriff's allegedly negligent conduct. *Enstrom*, 258 A.D. at 676. This case does not concern torts or

negligence. Therefore, neither case provides any assistance to the Court in deciding the capacity-to-sue issue.

Plaintiffs next discuss *People v. Viviani*, 36 N.Y.3d 564, 578 (2021) and *People ex rel. Wogan v. Rafferty*, 208 N.Y. 451, 456 (1913) to establish that "an officer whose office the Constitution creates and protects is not a disposable subdivision that exists only at legislative pleasure." Dkt. No. 11 at 7. In *Viviani*, a state law "created a new 'special prosecutor and inspector general' . . . , appointed by the Governor, with the express authority to: (1) 'investigate and prosecute' offenses involving abuse or neglect against a vulnerable person by the person's professional caregiver; and (2) 'cooperate with and assist district attorneys and other local law enforcement officials in their efforts against such abuse or neglect of vulnerable persons.'" *Viviani*, 36 N.Y.3d at 573. The Court of Appeals explained that the law "deprive[d] the elected district attorneys of an essential function of their constitutional office—namely, the discretionary power to determine whom, whether and how to prosecute [in] a criminal matter . . . by vesting concurrent discretionary power in a different officer, appointed by the Governor . . . ." *Id.* at 578 (citations and quotation marks omitted). The Court of Appeals explained that "the essence of a District Attorney's constitutional, statutory and common-law prosecutorial authority is the discretionary power to determine whom, whether and how to prosecute [in] a criminal matter." *Id.* at 577-78 (citation and quotation marks omitted).

Therefore, the Court of Appeals held that the legislation was unconstitutional because "there is simply no analogy—in precedent or in statute—to [the new law's] creation of a statewide prosecutor, appointed by the Governor, with concurrent prosecutorial authority over a set of enumerated crimes." *Id.* at 579. The Court of Appeals left intact portions of the legislation which "provide[d] the special prosecutor with non-prosecutorial functions," and which permitted

cooperation between the special prosecutor and district attorneys. *See id.* at 583. The Court of Appeals explained that "[c]ooperation with the local district attorney furthers the overarching goal of the legislature—providing resources to address crimes of abuse and neglect committed against vulnerable persons—without infringing on that constitutional officer's essential authority." *Id.* at 583.

*Viviani* does not control the Court's conclusion in this matter. Plaintiffs argue that *Viviani* demonstrates that "an officer whose office the Constitution creates and protects is not a disposable subdivision that exists only at legislative pleasure." Dkt. No. 16 at 7. However, Plaintiffs have not alleged that anything in the Termination Act or in OIT's enforcement disposes of the Plaintiff Sheriffs' positions or offices. Plaintiffs likewise present no state or local legislation which specifically grants a sheriff the right to contract with the federal government that is directly contravened by the Termination Act. The Court of Appeals in *Viviani* held a statute to be unconstitutional which directly challenged an existing statutory grant of authority. Plaintiffs have not identified an existing statutory scheme which grants express powers to local governments that the Termination Act violates.[9] Rather, they allege only that they are independently elected, *see* Dkt. No. 1 at ¶ 31, and are sworn to uphold the United States and New York Constitutions, *see id.* at ¶ 32. Plaintiffs have not sufficiently alleged that the Termination Act or OIT's enforcement actions negate express authority they have been given by statute or force them to violate either the United States or New York State Constitutions.

In their reply, Plaintiffs also cite *Wogan*. *See* Dkt. No. 16 at 7. There, the Court of Appeals held that "[w]here the Constitution establishes a specified office, or recognizes its

---

[9] As noted, Plaintiffs discuss a permissive statutory scheme in their complaint but present no case law in support of their request for injunctive relief requiring the Court to hold that interference with a permissive scheme violates the Constitution.

existence, and prescribes the manner in which it shall be filled, the legislature may not transfer any essential function of the office to a different officer chosen in a different manner." *Wogan*, 208 N.Y. at 456. The Court of Appeals stated that "[t]he authority of the legislature to regulate the duties of constitutional officers to some extent has frequently been recognized by the courts, but not to the extent of depriving them of a substantial attribute of the office." *Id.* The Court of Appeals held "[t]hose portions of the Judiciary Law which operate to prevent an incoming county clerk from appointing a new chief clerk of the County Court of Kings [C]ounty [to be] unconstitutional[,]" and "no legislation can be constitutional which prevents the county clerk from being the clerk of the Supreme Court." *Id.* at 461-62. The Court of Appeals stated that because the New York State Constitution "expressly provides" for specific powers of the county clerk, "the legislature may prescribe the powers and duties of the clerks of the Supreme Court, but it may not deprive the clerks of the several counties of the right to exercise and discharge those powers and duties by any form of legislation." *Id.* at 461.

Plaintiffs fail to articulate how their appointment or retention in their elected position is being altered or disposed of through enforcement of the Termination Act. *Wogan* concerned appointment of a person to a specific position, which was a constitutionally proscribed office. Here, Plaintiffs have not alleged that the constitutional process that has been set forth for their selection has been changed in any way by the Termination Act or OIT's actions.

Plaintiffs also contend that "[p]ublic officials have long been recognized to have capacity to sue commensurate with their official duties, without express statutory authorization." Dkt. No. 16 at 7 (citing *Frank v. United States*, 78 F.3d 815, 825 (2d Cir. 1996); *Printz v. United States*, 854 F. Supp. 1503, 1507-08 (D. Mont. 1994); *Mack v. United States*, 856 F. Supp. 1372, 1378 (D. Ariz. 1994)). Plaintiffs acknowledge that the three cases they cite were "against the United States

rather than the State," but they argue that the cases support that "an independently elected sheriff may indeed sue in his official capacity to protect the duties of his office." *Id.*

In *Frank*, the Second Circuit held a local sheriff had standing to sue the federal government for creation and implementation of a background check law because "[t]he burden imposed on Sheriff Frank by the Brady Act [wa]s sufficiently concrete, actual, and particularized to constitute injury for constitutional purposes. The injury [wa]s directly caused by the challenged statutory provision, and would be eliminated were the litigation resolved in Sheriff Frank's favor." *Frank*, 78 F.3d at 825.

In *Printz*, the Supreme Court explained that it previously "held . . . that Congress cannot compel the States to enact or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). The *Printz* Court "h[e]ld that Congress cannot circumvent that prohibition by conscripting the State's officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id.* In their reply, Plaintiffs cite the district court case which led to that Supreme Court decision and in which the district court found that the plaintiff sheriff had standing to sue the United States. *See* Dkt. No. 16 at 7 (citing *Printz*, 854 F. Supp. at 1506-09). The district court in *Mack*, 856 F. Supp. at 1378, held the same. *See* Dkt. No. 16 at 7.[10]

---

[10] Plaintiffs submitted a notice of supplemental authority which includes a case from a district court in the Eastern District of Virginia. There, the court "granted in part the United States' motion for a preliminary injunction as to Va. Code § 15.2-1726.1. That statute required existing 287(g) agreements to be rewritten by a date certain to include twelve state-prescribed terms, or be 'deemed void and unenforceable.'" Dkt. No. 11 at 1. "The court found the United States likely to succeed on its Contracts Clause claim . . . ." *Id.* However, that case was brought by the United States against the Commonwealth of Virginia and did not concern local officers suing their parent state. Therefore, it does not aid the Court on the capacity-to-sue issue.

Plaintiffs argue that although those cases were challenges by local officials against the federal government, they support Plaintiffs' claims which are intended "to protect the duties of [their] office[s]." Dkt. No. 16 at 7. Plaintiffs' arguments are unconvincing. The Court has reviewed the cases cited by the parties, and, of course, conducted its own research. In doing so, the Court has not found a case which supports Plaintiffs' capacity to sue New York, its Governor, or its Attorney General for the alleged constitutional violations.

Various secondary sources have commented on a local municipality's inability to bring a suit against its parent state. *See* 24 Carmody-Wait 2d § 144:7 ("Governmental subdivisions lack the capacity to commence an action in pursuit of individual interests of their citizenry. Municipal officials and members of municipal administrative or legislative boards suffer the same lack of capacity to sue the state as the municipal corporate bodies they represent"). Indeed, "[t]he American constitutional system is one of dual sovereigns: the federal government and the states. Local governments are not themselves sovereign." Katharine Cooney & Katherine Mims Crocker, *Local Government Standing as State Standing*, 2025 WIS. L. REV. 1255, 1276 (2025). "From this precept flows the general proposition that local governments are mere arms of the state—and the specific proposition that they possess neither sovereign nor quasi-sovereign interests for purposes of standing to sue in federal court." *Id.*; *see also* Kathleen S. Morris, *The Case for Local Constitutional Enforcement*, 47 HARV. C.R.-C.L. L. REV. 1, 3 (2012) (citing *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907)) ("As the United States Supreme Court put it in *Hunter v. City of Pittsburgh*, in 1907: 'Municipal Corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted [sic] to them'").

Although some scholars have called for a reform of the legal landscape to allow local governments to sue their parent state, the current state of the law does not appear to allow for such a suit. *See Local Government Standing as State Standing*, 2025 WIS. L. REV. 1255 at 1280 n.172. Indeed, Plaintiffs have not presented a single case which states that "an independently elected sheriff may indeed sue in his official capacity to protect the duties of his office," Dkt. No. 16 at 7, in contravention of New York's general capacity rules and the four narrow exceptions. The New York Court of Appeals has previously dismissed an action because the municipality "ha[d] not shown that compliance with the [state law at issue] would force it into taking an unconstitutional action." *Clarke*, 45 N.Y.3d at 438. The same conclusion is warranted here. Plaintiffs have not identified what constitutional provision they will be "command[ed]" to violate through the State's "compelled performance" under the Termination Act. Dkt. No. 16 at 8. The Court of Appeals in November of 2025 had "found no case in which a court has held [the dilemma exception] applicable." *Clarke*, 45 N.Y.3d at 437. At this stage, Plaintiffs have not demonstrated that this case is likely to be the first.

Finally, as explained, there is an additional exception to New York's "rule barring local governmental challenges to State legislation which have been identified in the case law" "where the State statute impinges upon 'Home Rule' powers of a municipality constitutionally guaranteed under article IX of the State Constitution . . . ." *City of New York*, 86 N.Y.2d at 291-92. "The New York Court of Appeals first recognized the home rule exception in *Town of Black Brook v. State*, 41 N.Y.2d 486 (1977), finding 'a limited exception' to the rule that a municipality cannot attack 'state legislative action affecting its powers' where the 'local government's claim is based on one of the [home rule] protections of article IX [of the New York Constitution].'" *Blakeman*,

2024 WL 3201671, at *13. "This 'limited exception' applies only to a municipality's claim that a state statute violates Article IX of the New York Constitution." *Id.*

Plaintiffs do bring a claim for a violation of New York's Home Rule in Count V of their complaint. *See* Dkt. No. 1 at 53. However, in neither their preliminary injunction motion nor reply did Plaintiffs argue the applicability of the home rule exception to New York's capacity-to-sue rule. *See* Dkt. Nos. 5-2, 16.[11]

At this stage, because Plaintiffs have not established a likelihood that they have capacity to sue Defendants for the alleged constitutional violations, their request for preliminary injunctive relief is denied. In turn, the Court declines to reach the merits of their claims. *See Clarke*, 45 N.Y.3d at 439-40.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for a preliminary injunction (Dkt. No. 5) is **DENIED** as set forth herein; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: November 4, 2026
Albany, New York

Mae A. D'Agostino
U.S. District Judge

[11] In their response to the preliminary injunction motion, Defendants address all of the exceptions to New York's capacity-to-sue rule. *See* Dkt. No. 13 at 14-19. Because Plaintiffs do not argue that any of them other than the dilemma exception apply, the Court declines to address Defendants' additional arguments.